# In the United States Court of Appeals for the Eleventh Circuit

HAVANA DOCKS CORPORATION, PLAINTIFF-APPELLEE

*v.*

ROYAL CARIBBEAN CRUISES, LTD., DEFENDANT-APPELLANT

HAVANA DOCKS CORPORATION,
PLAINTIFF-APPELLEE-CROSS-APPELLANT

*v.*

ROYAL CARIBBEAN CRUISES, LTD.;
NORWEGIAN CRUISE LINE HOLDINGS, LTD.;
CARNIVAL CORPORATION, A FOREIGN CORPORATION
DOING BUSINESS AS CARNIVAL CRUISE LINES;
MSC CRUISES S.A. CO.; MSC CRUISES (USA), INC., ET AL.,
DEFENDANTS-APPELLANTS-CROSS-APPELLEES

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA (CIV. NOS. 19-23590, 19-23591)
(THE HONORABLE BETH BLOOM, J.)*

## BRIEF OF DEFENDANT-APPELLANT-CROSS-APPELLEE CARNIVAL CORPORATION

STUART H. SINGER
MEREDITH L. SCHULTZ
PASCUAL A. OLIU
COREY P. GRAY
ALISHA MORICEAU
BOIES SCHILLER FLEXNER LLP
  401 East Las Olas Boulevard, Suite 1200
  Fort Lauderdale, FL 33301

PEDRO A. FREYRE
AKERMAN LLP
  98 S.E. Seventh Street, Suite 1100
  Miami, FL 33131

GEORGE J. FOWLER, III
LUIS LLAMAS
JONES WALKER LLP
  201 South Biscayne Boulevard, Suite 3000
  Miami, FL 33131

KANNON K. SHANMUGAM
BRIAN M. LIPSHUTZ
ABIGAIL FRISCH VICE
ELIZABETH NORFORD
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  2001 K Street, N.W.
  Washington, DC 20006
  (202) 223-7300
  kshanmugam@paulweiss.com

HILLARY S. BLACK
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  1285 Avenue of the Americas
  New York, NY 10019

**Nos. 23-10151 & 23-10171,** *Havana Docks Corporation* **v.** *Royal Caribbean Cruises, Ltd.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, Defendant-Appellant Carnival Corporation provides the following list of interested persons:

- Akerman, LLP, *Counsel for Defendant-Appellant Carnival Corporation*

- Baldridge, James D., *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Balmori, Daniel, *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Bash III, John F., *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Black, Hillary S., *Counsel for Defendant-Appellant Carnival Corporation*

- Bloom, Honorable Beth, *United States District Judge*

- Bohrer, Sanford L., *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Boies Schiller & Flexner, LLP, *Counsel for Defendant-Appellant Carnival Corporation*

- Burck, William Anthony, *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Carnival Corporation (CCL), a foreign corporation doing business as Carnival Cruise Line, *Defendant-Appellant*

- Casey, Stephanie A., *Counsel for Plaintiff-Appellee*

- Clement & Murphy, PLLC, *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Clement, Paul D., *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Colson Hicks Eidson, *Counsel for Plaintiff-Appellee*

- Cooke, Honorable Marcia G., *United States District Judge*

- Cooper, Jonathan G., *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Cruise Lines International Association, *Amicus Curiae in the District Court*

- Elayan-Martinez, Aziza F., *Counsel for Plaintiff-Appellee*

- Ellis George Cipollone O'Brien Annaguey, LLP, *Counsel for Plaintiff-Appellee*

- Foreman Friedman, PA, *Counsel for Amicus Curiae in the District Court*

- Fowler, George J., III, *Counsel for Defendant-Appellant Carnival Corporation*

- Freyre, Pedro A., *Counsel for Defendant-Appellant Carnival Corporation*

- Friedman, Darren Wayne, *Counsel for Amicus Curiae in the District Court*

- Gayles, Honorable Darrin P., *United States District Judge*

- Goodman, Honorable Jonathan, *United States Magistrate Judge*

- Gray, Corey P., *Counsel for Defendant-Appellant Carnival Corporation*

- Harper, Chadwick J., *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Harvard Law School, *Counsel for Amicus Curiae in the District Court*

- Havana Docks Corporation, *Plaintiff-Appellee*

- Hernacki, Andrew T., *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Hogan Lovells US, LLP, *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Holland & Knight LLP, *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Jones Walker, LLP, *Counsel for Defendant-Appellant Carnival Corporation*

- Klingler, Richard D., *Counsel for Plaintiff-Appellee*

- Kroeger, Thomas A., *Counsel for Plaintiff-Appellee*

- Landau, Christopher, *Counsel for Plaintiff-Appellee*

- Li, Vincent, *Counsel for Plaintiff-Appellee*

- Lindsay III, Alvin Francis, *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Lipshultz, Zachary A., *Counsel for Plaintiff-Appellee*

- Lipshutz, Brian M., *Counsel for Defendant-Appellant Carnival Corporation*

- Llamas, Luis Emilio, *Counsel for Defendant-Appellant Carnival Corporation*

- Loeb, Robert, *Counsel for Defendants-Appellants MSC Cruises S.A. Co.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Lorenzo, Richard C., *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Louis, Honorable Lauren F., *United States Magistrate Judge*

- Lutz, Zachary P., *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Maderal, Francisco, *Former Counsel for Plaintiff-Appellee*

- Manhas, Robbie, *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Margol & Margol, P.A., *Counsel for Plaintiff-Appellee*

- Margol, Rodney S., *Counsel for Plaintiff-Appellee*

- Martinez, Honorable Jose E., *United States District Judge*

- Martinez, Roberto, *Counsel for Plaintiff-Appellee*

- Massey & Gail LLP, *Counsel for Amicus Curiae in the District Court*

- Massey, Jonathan S., *Counsel for Amicus Curiae in the District Court*

- McAliley, Honorable Chris M., *United States Magistrate Judge*

- Michel, Christopher G., *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Moriceau, Alisha, *Counsel for Defendant-Appellant Carnival Corporation*

- MSC Cruises S.A., *Defendant-Appellant*

- MSC Cruises S.A. Co., *Defendant-Appellant*

- MSC Cruises (USA), Inc. (real party in interest: MSC Cruises (USA) LLC), *Defendant-Appellant*

- Munyan, Katherine, *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Nemeroff, Justin B., *Counsel for Defendants-Appellants MSC Cruises S.A. Co.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Norford, Elizabeth, *Counsel for Defendant-Appellant Carnival Corporation*

- Norwegian Cruise Line Holdings, Ltd. (NCLH), *Defendant-Appellant*

- Oliu, Pascual A., *Counsel for Defendant-Appellant Carnival Corporation*

- Orrick Herrington & Sutcliffe, LLP, *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Otazo-Reyes, Honorable Alicia M., *United States Magistrate Judge*

- Paul, Weiss, Rifkind, Wharton & Garrison LLP, *Counsel for Defendant-Appellant Carnival Corporation*

- Pegg, Allen P., *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Ponce, Scott D., *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Quinn Emanuel Urquhart & Sullivan, LLP, *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Rosenkranz, E. Joshua, *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Rowen, Matthew D., *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Royal Caribbean Cruises, Ltd. (RCL), *Defendant-Appellant*

- Saieh, Sabrina S., *Counsel for Plaintiff-Appellee*

- Saladrigas, Caitlin F., *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Schultz, Meredith L., *Counsel for Defendant-Appellant Carnival Corporation*

- Shaffer, Derek L., *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Shanmugam, Kannon K., *Counsel for Defendant-Appellant Carnival Corporation*

- Singer, Stuart H., *Counsel for Defendant-Appellant Carnival Corporation*

- Sullivan, Kathleen M., *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Taormina, Benjamin A., *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Tribe, Laurence H., *Counsel for Amicus Curiae in the District Court*

- Venable, LLP, *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Vice, Abigail Frisch, *Counsel for Defendant-Appellant Carnival Corporation*

- Wang, Jonas Q., *Counsel for Defendants-Appellants MSC Cruises S.A. Co.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

Defendant-Appellant Carnival Corporation is a publicly traded company whose common stock is listed on the New York Stock Exchange (CCL).  It has no parent corporation, and no publicly held company owns 10% or more of its stock.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Carnival Corporation respectfully submits that oral argument would be useful to the disposition of this case because it presents important issues regarding the interpretation, application, and constitutionality of a federal statute.

# TABLE OF CONTENTS

Page

Statement regarding adoption of briefs of other parties ...................................1

Statement of subject-matter and appellate jurisdiction ...................................1

Statement of the issues ...................................2

Statutes and regulations involved...................................2

Introduction...................................3

Statement of the case ...................................6

    A.    Background...................................6

    B.    Proceedings below...................................16

    C.    Standard of review ...................................20

Summary of argument ...................................21

Argument...................................25

    I.    Carnival did not use 'property' that was 'confiscated'
from Havana Docks ...................................25

        A.    Havana Docks' limited concession did not confer
a right to conduct passenger operations...................................25

        B.    Havana Docks' concession would have expired
in 2004...................................32

    II.    Carnival did not engage in trafficking because its conduct
was 'incident' and 'necessary' to 'lawful travel' ...................................36

Table of contents—continued:

   A. Carnival's travel was 'lawful' ...............................37

   B. Carnival's use of the terminal was 'necessary to' the conduct of its lawful travel....................................42

  III. Havana Docks is not a proper plaintiff because it is not a United States national ...................................................46

  IV. At a minimum, the damages award should be set aside..............50

   A. The 'one-satisfaction rule' prohibits duplicative awards for the value of the terminal...................50

   B. The damages award violates the Due Process Clause ......54

Conclusion.........................................................................56

Addendum

**TABLE OF CITATIONS**

**CASES**

*Action Marine, Inc.* v. *Continental Carbon Inc.*,

 481 F.3d 1302 (11th Cir. 2007).........................................20

* *Alamo Land & Cattle Co.* v. *Arizona*, 424 U.S. 295 (1976)............................26

* *Ayestas* v. *Davis*, 138 S. Ct. 1080 (2018) ....................................42, 43

*BMW of North America, Inc.* v. *Gore*, 517 U.S. 559 (1996)..............................55

Cases—continued:

\* *BUC International Corp.* v. *International Yacht Council Ltd.*,

517 F.3d 1271 (11th Cir. 2008) ..............................................50, 51, 53

*Cellular Telecommunications & Internet Association* v. *FCC*,

330 F.3d 502 (D.C. Cir. 2003)...................................................43

*City of Pompano Beach* v. *FAA*, 774 F.2d 1529 (11th Cir. 1985)...................31

*Commissioner* v. *Tellier*, 383 U.S. 687 (1966) ...................................43

*Cox* v. *Louisiana*, 379 U.S. 559 (1965)...........................................45

*Dames & Moore* v. *Regan*, 453 U.S. 654 (1981).....................................7

*De Gaster* v. *Dillon*, 247 F. Supp. 511 (D.D.C. 1963),

*aff'd*, 354 F.2d 515 (D.C. Cir. 1965).......................................31

*Fish* v. *Kobach*, 840 F.3d 710 (10th Cir. 2016)...................................43

*Florida International University Board of Trustees* v. *Florida*

*National University, Inc.*, 830 F.3d 1242 (11th Cir. 2016)...................20

*Gatlin Oil Co.* v. *United States*, 169 F.3d 207 (4th Cir. 1999) ...................46

*Gilmour* v. *Gates, McDonald & Co.*,

382 F.3d 1312 (11th Cir. 2004).............................................47

*Glen* v. *American Airlines, Inc.*, 7 F.4th 331 (5th Cir. 2021),

*cert. denied*, 142 S. Ct. 863 (2022) .......................................51

*Glen* v. *Club Méditerranée, S.A.*, 450 F.3d 1251 (11th Cir. 2006) ...................35

Cases—continued:

*Golan* v. *FreeEats.com, Inc.*, 930 F.3d 950 (8th Cir. 2019) ............................... 55

*Grupo Dataflux* v. *Atlas Global Group, L.P.*, 541 U.S. 567 (2004) ................. 48

*Hansberry* v. *Lee*, 311 U.S. 32 (1940) ................................................................ 31

*Havana Docks Corp.* v. *MSC Cruises SA Co.*:

    431 F. Supp. 3d 1367 (S.D. Fla. 2020) ............................................................ 34

    455 F. Supp. 3d 1355 (S.D. Fla. 2020) ............................................................ 53

\* *Hertz Corp.* v. *Friend*, 559 U.S. 77 (2010) ........................................................ 48

\* *Inbesa America, Inc.* v. *M/V Anglia*,

    134 F.3d 1035 (11th Cir. 1998) ........................................................................ 43

*McCulloch* v. *Maryland*, 4 U.S. 316 (1819) ........................................................ 42

*Missouri Pacific Railway Co.* v. *Tucker*, 230 U.S. 340 (1913) ......................... 54

*PlayNation Play Systems, Inc.* v. *Velex Corp.*,

    924 F.3d 1159 (11th Cir. 2019) ........................................................................ 32

*Raley* v. *Ohio*, 360 U.S. 423 (1959) ...................................................................... 45

*Sessions* v. *Johnson*, 95 U.S. 347 (1877) ............................................................ 50

*Southwestern Telegraph & Telephone Co.* v. *Danaher*,

    238 U.S. 482 (1915) ........................................................................................... 54

\* *St. Louis, Iron Mountain & Southern Railway Co.* v.

    *Williams*, 251 U.S. 63 (1919) ......................................................................... 54

Cases—continued:

*Stamm* v. *Paul*, 121 F.3d 635 (1997)..................................................20

*Stansell* v. *Revolutionary Armed Forces of Colombia*,

    771 F.3d 713 (11th Cir. 2014)..........................................32

*United States* v. *Cruickshank*, 837 F.3d 1182 (11th Cir. 2016),

    *cert. denied*, 137 S. Ct. 1435 (2017) ..............................31

\* *United States* v. *General Motors Corp.*, 323 U.S. 373 (1945) .......................26

*United States* v. *Hernandez*, 864 F.3d 1292 (11th Cir. 2017),

    *cert. denied*, 138 S. Ct. 1025 (2018) ..............................30

*United States* v. *Utah Construction Co.*, 384 U.S. 394 (1966) .........................31

*Vorchheimer* v. *Philadelphian Owners Association*,

    903 F.3d 100 (3d Cir. 2018) ................................................44

*Wylie* v. *Red Bull North America, Inc.*,

    627 Fed. Appx. 755 (11th Cir. 2015)..................................49

*Zadvydas* v. *Davis*, 533 U.S. 678 (2001) .......................................31, 45

## CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const. Amend. V..............................................................*passim*

\* Helms-Burton Act, 22 U.S.C. §§ 6021-6091:

    22 U.S.C. § 6022(6)..............................................................44

    22 U.S.C. § 6023(4)(A) ........................................................25

Statutes and regulations—continued:

22 U.S.C. § 6023(12) ........................................................ 25

22 U.S.C. § 6023(13) .................................................... 44, 45

22 U.S.C. § 6023(13)(A) ................................................... 34

22 U.S.C. § 6023(13)(A)(ii) ............................................ 4, 9

22 U.S.C. § 6023(13)(B) ..................................................... 5

22 U.S.C. § 6023(13)(B)(iii) ............................... 36, 43, 46

22 U.S.C. § 6023(15) .......................................... 5, 23, 47

22 U.S.C. § 6023(15)(A) .............................................. 18, 47

22 U.S.C. § 6023(15)(B) ................................................... 47

22 U.S.C. § 6044(b) ........................................................ 44

22 U.S.C. § 6081(8) ........................................................ 51

22 U.S.C. § 6082(a)(1) ..................................................... 33

22 U.S.C. § 6082(a)(1)(A) ....................................... *passim*

22 U.S.C. § 6082(a)(1)(A)(i) .................................... 52, 53

22 U.S.C. § 6082(a)(1)(B) ................................................ 19

22 U.S.C. § 6082(f)(1)(A) ................................................ 51

22 U.S.C. § 6082(f)(1)(B) ................................................ 52

22 U.S.C. § 6082(f)(2)(A)(i) ........................................... 52

22 U.S.C. § 6083(a)(1) ..................................................... 30

Statutes and regulations—continued:

    22 U.S.C. § 6084 ....................................................................17

    22 U.S.C. § 6085(b)(1).........................................................9

    22 U.S.C. § 6091 ..................................................................14

Trade Sanctions Reform and Export Enhancement Act:

    22 U.S.C. § 7209(b)(2).........................................................42

22 U.S.C. § 1643b(a)................................................................8, 30

28 U.S.C. § 1291 ........................................................................1

28 U.S.C. § 1331 ........................................................................1

46 U.S.C. § 70504(a)................................................................31

Pub. L. No. 89-262, 79 Stat. 988 (1965)................................7

* Cuban Assets Control Regulations, 31 C.F.R. pt. 515:

    31 C.F.R. § 515.317 ..............................................................37

    31 C.F.R. § 515.318 ..............................................................37

    31 C.F.R. § 515.560(a) .........................................................42

    31 C.F.R. § 515.560(a)(5) (2016) ...................................38, 42

    31 C.F.R. § 515.565(b) (2016)........................................38, 41

    31 C.F.R. § 515.565(b)(1) (2016)...................................38, 40

    31 C.F.R. § 515.565(b)(2) (2016)...................................38, 40

    31 C.F.R. § 515.565(b)(4) (note) ...................................38, 39

Regulations—continued:

    31 C.F.R. § 515.572 (note 1) ...................................................38

    31 C.F.R. § 515.572(a)(2) (2016) ...........................................37

    31 C.F.R. § 515.572(a)(4) (2016) ...........................................38

    31 C.F.R. § 515.572(b)(1) (2016) ...........................................39

31 C.F.R. pt. 501, subpart D ...................................................13

80 Fed. Reg. 2291 (Jan. 16, 2015) ...........................................10

80 Fed. Reg. 56,915 (Sept. 21, 2015) ......................................10

81 Fed. Reg. 13,989 (Mar. 16, 2016) .......................................10

82 Fed. Reg. 51,998 (Nov. 9, 2017) .........................................10

## OTHER AUTHORITIES

*Black's Law Dictionary* (11th ed. online 2019) .....................26, 36, 44

Department of the Treasury, *Frequently Asked Questions*

    *Related to Cuba* 5 (Mar. 15, 2016)

    <tinyurl.com/FAQ-3-15-16> ..........................................41

William S. Dodge, *The Helms-Burton Act and Transnational*

    *Legal Process*, 20 Hastings Int'l & Comp. L. Rev. 713 (1997) ......................9

H.R. Conf. Rep. No. 468, 104th Cong., 2d Sess. (1996) ....................43

Secretary of State Michael R. Pompeo, *Remarks to the Press*

    (Apr. 17, 2019) <tinyurl.com/mxvs2fcc> ..........................14

Other authorities—continued:

The White House, *Presidential Policy Directive—United States-Cuba Normalization* (Oct. 14, 2016) <tinyurl.com/5xy8ywfa> .................13

The White House, *Remarks by President Obama and President Raul Castro of Cuba in a Joint Press Conference* (Mar. 21, 2016) <tinyurl.com/bdh65prn> .....................................................11

The White House, *Statement by the President on Cuba Policy Changes* (Dec. 17, 2014) <tinyurl.com/59857ksz> .........................................9

U.S. Embassy in Cuba, Office of the Spokesperson, *Secretary's Determination of 45-Day Suspension Under Title III of LIBERTAD Act* (Jan. 16, 2019) <tinyurl.com/3cr6dt4y> ..........................14

## STATEMENT REGARDING ADOPTION
## OF BRIEFS OF OTHER PARTIES

Pursuant to Federal Rule of Appellate Procedure 28(i) and 11th Circuit Rule 28-1(f), Carnival Corporation adopts and joins in full the arguments made in the brief of MSC Cruises S.A.; MSC Cruises S.A. Co.; MSC Cruises (USA), Inc.; Norwegian Cruise Line Holdings, Ltd.; and Royal Caribbean Cruises, Ltd., including their arguments that (1) the cruise lines did not traffic in "property" that was "confiscated"; (2) the cruise lines' activities were "incident" and "necessary" to "lawful travel"; (3) Havana Docks is not a "United States national"; (4) the cruise lines did not "knowingly" and "intentionally" traffic in confiscated property; (5) the damages award violates the one-satisfaction rule and the Due Process Clause of the Fifth Amendment to the United States Constitution; and (6) the district court erred by trebling the interest it awarded.

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. The district court entered final judgment on December 30, 2022. Doc. 544.[1] Carnival Corporation filed a timely notice of appeal on January 25, 2023. Doc. 545. The jurisdiction of this Court rests on 28 U.S.C. § 1291.

---

[1] District court docket entries are cited by document number and ECF page number. Entries in Civ. No. 19-21724 are cited as "Doc." Entries in Civ. No. 19-23588 are cited as "MSC Doc." Entries in Civ. No. 19-23591 are cited as "NCL Doc." Entries in No. Civ. 19-23590 are cited as "RCCL Doc."

## STATEMENT OF THE ISSUES

1.    Whether defendant Carnival Corporation used "property" that was "confiscated" from plaintiff Havana Docks Corporation within the meaning of the Helms-Burton Act, 22 U.S.C. § 6082(a)(1)(A).

2.    Whether Carnival's conduct falls within the exception for "transactions and uses of property" that are "incident" and "necessary" to "lawful travel."

3.    Whether Havana Docks is a "United States national" with a cause of action under the Helms-Burton Act.

4.    a.    Whether the one-satisfaction rule prohibits Havana Docks from recovering more than once for the alleged confiscation.

    b.    Whether the award of statutory damages violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

## STATUTES AND REGULATIONS INVOLVED

The relevant statutory and regulatory provisions are set forth in an addendum to this brief.

**INTRODUCTION**

The district court imposed nearly $440 million in damages against four cruise lines under a controversial private cause of action that had been suspended for decades since its enactment. It imposed that liability based on conduct that was supervised by the government and encouraged by the President himself. And in so doing, it bestowed a windfall on plaintiff Havana Docks Corporation for activities that never infringed on its rights.

Havana Docks and its predecessors had constructed piers and other structures in the early twentieth century at what is now the Havana Cruise Terminal. In exchange, they received a concession from the Cuban government to conduct cargo operations there until 2004. But in 1960, the Cuban government terminated the concession. Havana Docks' president now runs the company—which exists primarily to pursue this lawsuit—from London.

Beginning in 2014, the United States government relaxed the longstanding embargo on Cuba. An important part of the policy change was the return of cruises from the United States, which President Obama heralded when he visited Havana in 2016. Shortly after that visit, defendant Carnival Corporation began sailing from the United States to Havana. As required by the Cuban government, Carnival docked at the Havana Cruise Terminal.

Carnival sailed to Cuba under licenses from the Office of Foreign Assets Control (OFAC) in the Department of the Treasury. Those licenses permitted

"people-to-people" travel to Cuba and "carrier services" for transporting travelers.  Carnival and the other cruise lines sponsored shore excursions designed to comply with OFAC requirements.  Not once did OFAC object that the cruise lines were violating the licenses as they facilitated one of the President's signature foreign-policy initiatives.

On May 2, 2019, President Trump allowed the private cause of action in Title III of the Helms-Burton Act to go into effect.  That cause of action makes "any person" who "traffics in property which was confiscated by the Cuban Government .  .  . liable to any United States national who owns the claim to such property for money damages." 22 U.S.C. § 6082(a)(1)(A).  "Traffic[king]" includes "engag[ing] in a commercial activity using or otherwise benefiting from confiscated property."  22 U.S.C. § 6023(13)(A)(ii).  The same day the cause of action went into effect, Havana Docks filed an action against Carnival in the United States District Court for the Southern District of Florida.

The district court held Carnival liable for "trafficking" in the terminal and entered a judgment of approximately $109 million.  That judgment cannot stand for four principal reasons.

*First*, Carnival did not traffic in any "property" that was "confiscated."  Havana Docks never had a right to conduct passenger operations at the terminal; it simply held a non-exclusive right to use the terminal for cargo operations.  For that reason, the judgment below should be reversed.  But even if

4

Havana Docks had the right to conduct passenger operations, the concession would have expired of its own accord in 2004, well before the voyages between 2016 and 2019. At a minimum, the judgment below should be vacated and the case remanded.

*Second*, Carnival did not "traffic" in any property. A defendant is not liable under the Helms-Burton Act for "transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel." 22 U.S.C. § 6023 (13)(B). Carnival's use of the terminal was lawful because it complied with OFAC licenses, and its use was necessary because the Cuban government required Carnival to dock there when traveling to Havana. For that independent reason, the judgment below should be vacated.

*Third*, Havana Docks lacks a cause of action because it was not a "United States national" at the time of filing. The Helms-Burton Act defines that phrase as "any United States citizen" or "any other legal entity . . . which has its principal place of business in the United States." 22 U.S.C. § 6023(15). Havana Docks forfeited any argument that it is a United States citizen, and its principal place of business is in the United Kingdom. For that reason as well, the judgment below should be reversed.

*Fourth*, the district court erred in calculating the damages award. It declined to apply the one-satisfaction rule, a background legal principle that

precludes a plaintiff from recovering more than once for a single injury. To the extent the one-satisfaction rule does not apply, the award of damages was also unconstitutionally excessive, in violation of the Due Process Clause. At a minimum, the damages award should be vacated and the case remanded.

## STATEMENT OF THE CASE

### A.  Background

1.  In 1904, Sylvester Scovel proposed to build a "jetty/dock with mechanical installation, a building for Customs Offices, a special Department for Customs Inspectors, apparatus for loading and unloading, and other accessory works at the port of [Havana]." Doc. 331-4, at 11. In exchange, he proposed to charge fees to shippers, consigners, and merchants for cargo operations. Doc. 331-1, at 17. On February 27, 1905, the president of Cuba certified that the project would be "of public utility" and directed the Ministry of Public Works to establish a term and conditions. Doc. 331-4, at 7. Following that process, on November 29, 1905, the president of Cuba issued Decree 467, which granted the concession for a term of 50 years at "the rates accepted." *Id.* at 11, 13. The Cuban government assigned the docks and public area in limited usufruct only for cargo operations and only for the term of the concession. *Id.* at 11-12. Neither Scovel's proposal nor the presidential decrees mentioned a right to conduct passenger operations at the terminal.

Havana Docks purchased the concession in 1911. Doc. 337, at 3. By that time, the Cuban government had extended the term from 50 years to 99 years, such that the concession would expire in 2004. *Id.* The plans had also expanded from one pier to three piers: the San Francisco, the Machina, and the Santa Clara. *Id.* at 3-4. Construction was finished in 1930, and Havana Docks proceeded to use the terminal for cargo operations until 1960. Doc. 331-1, at 9-11; Doc. 337, at 5; Doc. 367, at 4.

2.     On October 24, 1960, after the Cuban Revolution, the Cuban government announced that it would nationalize "properties and enterprises" that purportedly belonged to United States nationals, including Havana Docks. Doc. 73-6, at 7; Doc. 337, at 6; Doc. 367, at 5. In response to that policy and others of Fidel Castro's Communist regime, the United States has maintained an economic embargo that was eventually codified in the Helms-Burton Act and the Cuban Assets Control Regulations. *See* 31 C.F.R. pt. 515.

In 1965, Congress added Cuba to the compensation framework of the International Claims Settlement Act, which it originally enacted in 1949 as part of the "established international practice" of "settling claims by nationals of one state against the government of another." *Dames & Moore* v. *Regan*, 453 U.S. 654, 679 (1981) (citation omitted); *see* Pub. L. No. 89-262, 79 Stat. 988 (1965). The Foreign Claims Settlement Commission is a component of the Department of Justice with authority to determine the "amount and validity of

claims by nationals of the United States against the Government of Cuba . . .
arising since January 1, 1959 . . . for losses resulting from the nationaliza-
tion, expropriation, intervention, or other taking of, or special measures di-
rected against, property." 22 U.S.C. § 1643b(a).

In 1967, Havana Docks submitted a claim to the Commission for losses
of $9.9 million. Doc. 331-14. It claimed $2 million in losses for "[l]and and
concession"; $6,892,557 for "[b]uildings"; and $1,023,322 for other property
and debts owed. *Id.* at 2.

On April 21, 1971, following ex parte proceedings, the Commission is-
sued a proposed decision certifying a claim for $7,669,420.88 (plus interest).
Doc. 331-15. The proposed decision explained that the piers and buildings
were "used for warehousing purposes, cargo deposits, and for merchandise
provisionally stored pending Customs clearance," with no mention of passen-
ger operations. *Id.* at 3. It further explained that the "terms of the concession
granted by the Cuban Government were to expire in the year 2004, at which
time the corporation had to deliver the piers to the government in good state
of preservation." *Id.* at 6. The proposed decision also described Havana
Docks, apparently based on its erroneous submissions, as the "own[er]" and
"operat[or]" of the piers. *Id.* at 6-7. Following additional ex parte proceedings,
the Commission issued a final decision, certifying a claim for $9,179,700.88
(plus interest). Doc. 73-8, at 4.

3.      In March 1996, President Clinton signed into law the Helms-Burton Act.  The private cause of action in Title III of the Act makes "any person" who "traffics in property which was confiscated by the Cuban Government on or after January 1, 1959  .  .  .  liable to any United States national who owns the claim to such property for money damages."  22 U.S.C. § 6082(a)(1)(A). Trafficking is defined to include "engag[ing] in a commercial activity using or otherwise benefiting from confiscated property."  22 U.S.C. § 6023(13)(A)(ii).

The Act authorizes the President to suspend the cause of action for up to six months, with no limitation on the number of suspensions.  *See* 22 U.S.C. § 6085(b)(1).  Presidents Clinton, Bush, Obama, and Trump continuously suspended the cause of action until May 2, 2019.  The response of foreign governments to the Helms-Burton Act was nonetheless "swift and vehement," with the European Union, Canada, Mexico, and others protesting that the Act violated international law.  William S. Dodge, *The Helms-Burton Act and Transnational Legal Process*, 20 Hastings Int'l & Comp. L. Rev. 713, 718 (1997).

4.      On December 17, 2014, President Obama announced that the government was "changing its relationship with the people of Cuba" and planning to make it "easier for Americans to travel to Cuba."  The White House, *Statement by the President on Cuba Policy Changes* (Dec. 17, 2014) <tinyurl.com/59857ksz>.  The following year, OFAC published amended regulations that

created general licenses for people-to-people travel and carrier services for individuals authorized to travel to Cuba.

On January 16, 2015, OFAC published a general license for people-to-people travel sponsored by an organization. 80 Fed. Reg. 2291 (Jan. 16, 2015). OFAC required travelers to have a "full-time schedule of activities intended to enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities." *Id.* at 2297; *see also id.* (requiring a "full-time schedule of educational exchange activities that will result in meaningful interaction between the traveler and individuals in Cuba"). Sponsoring organizations were required to monitor activities to "ensure that each traveler has a full-time schedule of educational exchange activities." *Id.* OFAC also imposed recordkeeping requirements and provided an illustrative example of people-to-people travel. *Id.* at 2295, 2297. From March 16, 2016, to November 9, 2017, OFAC also permitted self-directed people-to-people travel. *See* 81 Fed. Reg. 13,989, 13,992 (Mar. 16, 2016); 82 Fed. Reg. 51,998, 51,998-51,999 (Nov. 9, 2017).

OFAC further addressed the need for transportation to, and lodging in, Cuba for authorized travelers. On September 21, 2015, it published a general license for American entities to "provide carrier services by vessel" to authorized travelers. 80 Fed. Reg. 56,915, 56,916 (Sept. 21, 2015). Authorized travelers were those traveling to, from, and within Cuba under a general or specific

license. *Id.* at 56,924. The general license for carrier services included lodging "when docked at a port in Cuba." *Id.*

On March 21, 2016, President Obama and nearly 40 members of Congress visited Cuba to celebrate the recent changes. President Obama touted a recent "port security announcement" that "removed the last major hurdle to resuming cruises and ferry service," which would permit more Americans to "appreciat[e] the incredible history and culture of the Cuban people." The White House, *Remarks by President Obama and President Raul Castro of Cuba in a Joint Press Conference* (Mar. 21, 2016) <tinyurl.com/bdh65prn>.

5.      In May 2016, a Carnival brand made its first voyage to Cuba. Doc. 477, at 44. In all, Carnival ships docked at the terminal 83 times between March 2016 and May 2019. *Id.*

Carnival docked in Havana under agreements signed with Cuban authorities during President Obama's visit. Doc. 326-38, at 163. Consistent with Cuban law, those agreements required Carnival to dock at the Havana Cruise Terminal. Doc. 326, at 8-9; *see also* Doc. 331-1, at 34-35.

Carnival went to great lengths to conduct its operations pursuant to government licenses. On May 7, 2015, it applied for a specific license from OFAC to conduct carrier services to Cuba. Doc. 326, at 6. Carnival's application included an "overview of proposed activities" that were similar to the shore excursions offered by Carnival and the other cruise lines in this case. *Id.* On

July 2, 2015, OFAC granted Carnival a specific license for "carrier services" to Cuba, "including when docked at a port in Cuba." *Id.* Carnival also obtained an export license from the Bureau of Industry and Security on July 1, 2015. *Id.*

Carnival communicated the relevant OFAC requirements to its passengers in advance of each trip. It advised passengers of the documentation "needed for travel to Cuba," including a "completed U.S. Travel Affidavit" identifying an OFAC-approved category of travel and a "copy of [the] itinerary" for the trip's shore excursions. Doc. 326-47, at 2-3, 13. Carnival also gave passengers a document explaining that travel "for tourist activities is not allowed"; reiterating that "a full-time schedule of activities that will create educational interactions between guests and the Cuban people" was required; and explaining that Carnival's shore excursions would "fully comply" with people-to-people requirements. *Id.* at 13. Carnival clearly informed passengers that free time was allowed only "[a]fter completion of a full-time schedule of people-to-people activities," defined as seven to eight hours of excursions. *Id.* at 14.

Some itineraries described the people-to-people activities in great detail, while others simply referred to a community project; an "active square[]"; or opportunities to "engage with local artisans," "local souvenir vendors," or "local Cubans." Doc. 311-38, at 12-14, 17-19. One itinerary described a walking tour of Old Havana, with a stop where "a local Cafe owner [would] explain the

role of tourism in Old Havana"; a cathedral visit involving discussion with patrons on "the role of religion on the island"; and an encounter with "local artists at Taller Grafico Experimental, where [passengers would] learn about one of the world's oldest 'grabado' or printmaking techniques." Doc. 326-47, at 7-8. Another itinerary included stops at the Plaza de la Revolución, where guests would "talk to passionate Cubans about their national hero, José Martí, below the monument memorializing his commitment to the people of the island"; the Museo Nacional de Bellas Artes, where guests were invited to "discuss[] th[e] comprehensive collection with local art enthusiasts"; and a community project at the "home of famed Cuban artist Jose Fuster, who has turned his entire neighborhood into a mosaic maze inspired by the [] styles of Picasso and Gaudi." *Id.* at 8. Other itineraries included similar full-day and half-day excursions. *See*, *e.g.*, Doc. 311-38.

Between 2016 and 2019, the United States government never objected to the activities offered by Carnival and the other cruise lines. Although OFAC has the power to impose civil penalties against violators of its licenses, *see* 31 C.F.R. pt. 501, subpart D, the agency never even initiated proceedings against the cruise lines. In fact, the President praised the arrival of the first "U.S. cruise liner" to Cuba. The White House, *Presidential Policy Directive—United States-Cuba Normalization* (Oct. 14, 2016) <tinyurl.com/

5xy8ywfa>. And in response to requests from Havana Docks to expel or exclude aliens who traffic in property that had been confiscated by the Cuban government, *see* 22 U.S.C. § 6091, the State Department concluded that no action was warranted with respect to the cruise lines. Doc. 331-104. The State Department explained that, "given the clear exclusion in Title IV's definition of 'traffics' of transactions and uses of property incident to lawful travel to Cuba, [it was] not currently pursuing Title IV actions in relation to commercial cruise lines." *Id.* at 2.

6. On January 16, 2019, the Trump Administration reported to Congress that the President would undertake a "careful review" of the continued suspension of Title III. U.S. Embassy in Cuba, Office of the Spokesperson, *Secretary's Determination of 45-Day Suspension Under Title III of LIBERTAD Act* (Jan. 16, 2019) <tinyurl.com/3cr6dt4y>. On April 17, 2019, the Trump Administration announced that the President would permit the private cause of action in Title III to become effective on May 2, 2019. Secretary of State Michael R. Pompeo, *Remarks to the Press* (Apr. 17, 2019) <tinyurl.com/mxvs2fcc>. Carnival stopped traveling to Cuba in May 2019. Doc. 477, at 44.

As of May 2, 2019, Havana Docks had no employees and conducted almost no business activities. It "maintain[ed] its corporate existence pending any potential recovery of the property or compensation," "manag[ed] a num-

ber of income-producing marketable investments," and paid a stipend to corporate president Mickael Sosthenes Behn. Doc. 331, at 12; Doc. 388, at 24. Behn has resided in London since 1999. Doc. 331, at 11. He is the great-grandson of Sosthenes Behn, who founded International Telephone & Telegraph, conducted business between Paris and Madrid, and was president and director of Havana Docks from 1921 to 1956. *Id.* at 9; Doc. 349-3, at 6; Doc. 365-7, at 7; Doc. 388, at 11.

As president, Behn has conducted business from the United Kingdom and elsewhere in Europe. Doc. 331, at 12. In lieu of director meetings, Behn signed written consents in London. *Id.* He also served as "chief executive officer," in "general charge of the business and affairs of the corporation." *Id.* at 11.

Havana Docks has another officer, Jerry Johnson, who was appointed the year before this litigation commenced and who carries out ministerial tasks on a generally unpaid basis. Doc. 331, at 9, 11-12, 15. Johnson works full-time at a bank in Kentucky where the Behn family keeps accounts. *Id.* at 12; Doc. 349-5, at 4. Havana Docks uses the bank's address, but it is not registered to do business in Kentucky. Doc. 331, at 12, 15. Johnson is not an employee of Havana Docks; indeed, it has no employees. Doc. 331-112, at 15.

### B. Proceedings Below

1. In February 2019, following the announcement that President Trump was reviewing the suspension of the cause of action, Havana Docks sent a letter to Carnival claiming a property interest in the terminal. Doc. 322-12. On May 2, 2019—the day the private right of action went into effect—Havana Docks filed an action against Carnival under the Helms-Burton Act in the United States District Court for the Southern District of Florida. Doc. 1. In its initial complaint, Havana Docks alleged that Carnival was liable for damages for docking at the terminal beginning in May 2016. *Id.* at 1-6.

Carnival moved to dismiss the complaint on several grounds, including that the complaint failed to allege a cognizable property interest because the concession would have expired in 2004 even if it had not allegedly been confiscated. Doc. 17, at 18-22. The district court denied the motion. Doc. 47, at 8. After the court reached the opposite conclusion and dismissed the complaints against other cruise lines, Carnival sought reconsideration. Doc. 65. The district court changed its view again, denying reconsideration to Carnival and granting reconsideration of the motions to dismiss the complaints against the other cruise lines. Doc. 79, at 6, 19.

In its second amended complaint, Havana Docks alleged that Carnival was liable under the Helms-Burton Act for using the terminal beginning in May 2016. Doc. 149, at 11. Havana Docks also alleged that Carnival was liable

for the activities of Airtours plc (a British company) and Costa Crociere S.p.A. (an Italian company) between 1996 and 2001. *Id.* at 8-10.[2]

2.     Following discovery, the cruise lines filed an omnibus motion for summary judgment, as well as individual motions for summary judgment. Havana Docks filed an omnibus motion for partial summary judgment, as well as individual motions for summary judgment against each cruise line.

As is relevant to this appeal, Carnival argued that it did not traffic in "property" that had been "confiscated," because Havana Docks held at most a limited right to use the terminal for cargo operations. Doc. 330, at 3-12. Carnival also argued that its use of the terminal between 2016 and 2019 was not trafficking because it was "incident" and "necessary" to "lawful travel" to

---

[2] Carnival held a minority interest in Airtours between 1996 and 2001, during which time an Airtours subsidiary or brand operated cruises to Cuba for European passengers without Carnival's involvement. Doc. 326, at 1-2. Carnival also acquired an interest in Costa in June 1997. *Id.* at 2, 5. As part of the acquisition, OFAC issued a specific license that obligated Costa to unwind its obligations in Cuba, which Costa did by November 1997. *Id.* at 3-5. Carnival argued that it lacked control over either Airtours or Costa; that both entities had complied with governing foreign law; and that Havana Docks' claim based on conduct between 1997 and 2001 was untimely under 22 U.S.C. § 6084. If this Court were to remand for further proceedings, it should permit the district court to address those issues in the first instance. And in addressing the timeliness of claims against other cruise lines, this Court should leave for remand the question whether Section 6084 is a statute of repose or a statute of limitations, because the timeliness of those claims does not turn on that distinction.

Cuba. *Id.* at 12-23. Carnival further argued that Havana Docks was not a "United States national" and thus not a proper plaintiff. *Id.* at 23-27.

The district court granted summary judgment to Havana Docks based on the use of the terminal between 2016 and 2019. Doc. 477, at 166-168. With respect to the issue of confiscated property, the court reasoned that the Foreign Claims Settlement Commission had conclusively determined that Havana Docks had an interest in the terminal. *Id.* at 106-113.

With respect to the issue of lawful travel, the district court concluded that the cruise lines had not "strictly complied with" the general license for people-to-people travel to Cuba. Doc. 477, at 118-119. As is relevant to Carnival, the court determined that Carnival's excursions did not comply with the general license because some of the seven to eight hours was not solely dedicated to people-to-people interactions. *Id.* at 123-126. The court further faulted Carnival for permitting guests to leave the ship without having purchased a shore excursion. *Id.* at 126.

Finally, the district court concluded that Havana Docks was a proper plaintiff. Doc. 477, at 100-106. It agreed with the cruise lines that Havana Docks was not a "United States citizen" under Section 6023(15)(A), but it concluded that Havana Docks' principal place of business was Kentucky based on Johnson's presence and its use of Johnson's employer's address. *Id.* at 101-105.

3.    The cruise lines then moved to confirm that the one-satisfaction rule would apply to prevent Havana Docks from obtaining the full value of the terminal from each cruise line.  Doc. 524.  The district court denied the motion. Doc. 542.  It treated each cruise line's use of the terminal as a separate injury and rejected the argument that Havana Docks' injury was the "singular loss of the value of its property interests" in the terminal.  *Id.* at 3, 5.

The cruise lines also filed a motion to confirm the interest calculation. Doc. 513.  The Helms-Burton Act provides for interest "at the rate set forth in section 1961 of title 28, computed by the court from the date of confiscation of the property involved to the date on which the action is brought."  22 U.S.C. § 6082(a)(1)(B).  Although the district court disagreed with the cruise lines on several points related to interest and trebling, the court did agree that the statute required the use of simple interest, not compound interest.  Doc. 541, at 9-11.

Following the consolidation of the cases for calculation of damages, Havana Docks moved for entry of final judgment against the cruise lines.  NCL Doc. 444.  It sought three times the value of the certified claim ($9,179,700.88) plus post-judgment interest from each cruise line.  *Id.* at 8.  That calculation resulted in requests for $109,671,180.90 against Carnival, and $109,848,747.87 each against the other cruise lines.  *Id.*  The cruise lines opposed, in part on the ground that the requested awards would violate the Due Process Clause

of the Fifth Amendment to the United States Constitution. NCL Doc. 448, at 23-44.

The district court granted Havana Docks' motion. NCL Doc. 452. It concluded that the damages award comported with due process because it was proportional to the cruise lines' revenue and consistent with the purposes of the Helms-Burton Act. *Id.* at 12-13. On December 30, 2022, the court entered final judgments in favor of Havana Docks totaling $439,217,424.51, including $109,671,180.90 against Carnival. Doc. 544; MSC Doc. 395; NCL Doc. 453; RCCL Doc. 318.

The cruise lines appealed, and Havana Docks cross-appealed on the issue of interest.

## C. Standard Of Review

This Court reviews a district court's decision to grant summary judgment de novo. *See, e.g., Florida International University Board of Trustees* v. *Florida National University, Inc.*, 830 F.3d 1242, 1252 (2016). This Court reviews legal conclusions embodied in a final judgment de novo; it reviews factual findings for clear error. *See, e.g., Action Marine, Inc.* v. *Continental Carbon Inc.*, 481 F.3d 1302, 1309 (2007); *Stamm* v. *Paul*, 121 F.3d 635, 638 (1997).

## SUMMARY OF ARGUMENT

The district court committed four principal errors in holding Carnival liable under the Helms-Burton Act and awarding nearly $440 million in damages against the cruise lines. *First*, Carnival did not traffic in "property" that was "confiscated" by the Cuban government, both because Havana Docks never had the right to conduct passenger operations at the terminal and because Havana Docks' concession would have expired of its own accord in 2004. *Second*, Carnival did not violate the Helms-Burton Act because its use of the terminal was "necessary" and "incident" to "lawful travel" to Havana under the OFAC licenses. *Third*, Havana Docks is not a "United States national" and thus not entitled to sue under the Helms-Burton Act. *Fourth*, the award of nearly $440 million in damages against the four cruise lines is contrary to the one-satisfaction rule and the Due Process Clause.

I.     Carnival's use of the terminal was not trafficking in "property" that was "confiscated" from Havana Docks.

A.     The judgment below should be reversed because Carnival did not use, or benefit from, any property interest that was ever held by Havana Docks. The non-exclusive concession from the Cuban government gave Havana Docks the right to use the terminal for cargo operations, not for passenger ones. Under Cuban law, the government owned the terminal at all times.

The district court erred by deferring to language in the Commission's written decision. The Helms-Burton Act requires a court to defer to the existence and valuation of a claim determined by the Foreign Claims Settlement Commission. But by statute, the Commission's job does not extend any further. And to the extent the Helms-Burton Act were to require a court to defer to a finding by the Commission as to the scope of a claim, it would violate the Due Process Clause, because the proceedings before the Commission were ex parte.

B.    At a minimum, the judgment of the district court should be vacated because Havana Docks' rights under the concession would have expired in 2004 even if they had not been terminated. The Helms-Burton Act compensates plaintiffs for the value of their confiscated property interest. Here, the concession was limited to a term of 99 years, dating from 1905. That fact was undisputed in the proceedings before the Foreign Claims Settlement Commission. Because the district court held Carnival liable only for conduct occurring after 2004, the judgment cannot stand.

II.    The district court committed an independent error that requires vacatur when it concluded that Carnival engaged in trafficking. Carnival's conduct—which was encouraged by the President and never questioned by OFAC—was "incident" and "necessary" to "lawful travel."

A.     Carnival operated "carrier services" pursuant to a general license from OFAC.  That license did not require Carnival to offer compliant shore excursions to passengers who made other arrangements for authorized travel, and the district court erred by holding otherwise.

The shore excursions that Carnival did offer complied with OFAC's general license for people-to-people travel.  The district court erred by concluding that the license prohibited even a momentary incidental activity that was not itself a people-to-people activity.

B.     The use of the terminal was "necessary" to the conduct of lawful travel to Cuba.  The use of the terminal was unquestionably important, helpful, and appropriate to travel to Havana by cruise ship.  Any ambiguity should be construed in Carnival's favor to avoid the serious due-process concerns from what amounts to a bait-and-switch by the Executive Branch.  And even if "necessary" meant "absolutely necessary," the use of the terminal would be necessary because the Cuban government required Carnival to dock there when calling in Havana.

III.     Even if Carnival had trafficked in confiscated property, Havana Docks lacks a cause of action.  Only a "United States citizen" or a "legal entity" that "has its principal place of business in the United States" may sue under the Helms-Burton Act.  22 U.S.C. § 6023(15).  Havana Docks forfeited any argument that it is a "citizen," and Havana Docks' principal place of business and

nerve center is London, where its president resides and conducts company business, not Kentucky.

IV.    Finally, even if Carnival could be held liable, the award should be vacated, and the case remanded for a recalculation of damages, for two independent reasons.

A.    The Act should be interpreted in light of the one-satisfaction rule applied at common law.  The cause of action in the Helms-Burton Act is tort-like, and statutory context confirms that Congress intended to prevent multiple recoveries for the same injury.  Here, the injury was the alleged confiscation of the terminal by Cuban authorities.  The district court erred by entering judgment against each cruise line for the full value of the terminal.

B.    In addition, the damages award of nearly $440 million violates the Due Process Clause.  That award is grossly disproportionate because it is approximately four times the value of the certified claim with trebling and interest, and 20 times the amount paid by the cruise lines to the Cuban port operator.

# ARGUMENT

## I. CARNIVAL DID NOT USE 'PROPERTY' THAT WAS 'CONFIS-CATED' FROM HAVANA DOCKS

The Helms-Burton Act imposes liability only for "traffic[king] in property" that was "confiscated by the Cuban Government on or after January 1, 1959." 22 U.S.C. § 6082(a)(1)(A). "Property" includes "any property . . . and any present, future, or contingent right, security, or other interest therein." 22 U.S.C. § 6023(12). "Confiscation" includes the "nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959" without compensation. 22 U.S.C. § 6023(4)(A).

The district court's conclusion that Carnival trafficked in confiscated property rests on two errors. *First*, operating cruises using the terminal did not constitute "trafficking" in Havana Docks' limited concession to conduct cargo operations. *Second*, Havana Docks' concession would have expired of its own accord in 2004, well before the conduct that formed the basis for liability here.[3]

### A. Havana Docks' Limited Concession Did Not Confer A Right To Conduct Passenger Operations

The district court erred by concluding that Carnival's cruise operations amounted to trafficking in confiscated property. Havana Docks neither owned

---

[3] Although both issues can be resolved as a matter of law, to the extent this Court concludes that there are factual disputes, it should remand for a trial.

the terminal nor had any right to conduct passenger operations there. The terminal has always been owned by the Cuban government, and Havana Docks held only a limited right to conduct cargo operations. That right is no more infringed by Carnival's passenger operations at the terminal than it would be infringed by a vendor selling snacks on the pier. For that reason, the district court's judgment should be reversed.

1. To give rise to liability under the Helms-Burton Act, a defendant's "trafficking" must impinge on the interest or right formerly held by the claim-holder, not merely some use of the object of that interest. An interest in property extends only as far as the rights one has acquired. For instance, "the holder of an unexpired leasehold interest in land is entitled, under the Fifth Amendment, to just compensation for the value of that interest when it is taken upon condemnation by the United States." *Alamo Land & Cattle Co.* v. *Arizona*, 424 U.S. 295, 303 (1976). But that compensation is typically limited to "the remaining term of the lease, plus the value of any renewal right." *Id.* at 304. In other words, a plaintiff is entitled to "what is taken, not more." *United States* v. *General Motors Corp.*, 323 U.S. 373, 382 (1945).

2. All that Havana Docks held was a concession—a "contract in which a country transfers some rights to a foreign enterprise which then engages in an activity contingent on state approval and subject to the terms of the contract." "Concession," *Black's Law Dictionary* (11th ed. online 2019).

Here, Havana Docks received the right to use the terminal for cargo operations. It never held a right to conduct passenger operations.

In 1904, Sylvester Scovel proposed the construction of a "jetty/dock with mechanical installations, a building for Customs Offices, a special Department for Customs Inspectors, apparatus for loading and unloading, and other accessory works." Doc. 331-4, at 11; *see also* Doc. 331-1, at 8. In exchange, Scovel proposed to charge fees for loading and unloading cargo, as well as fees for consigners and merchants sending and receiving cargo. *See* Doc. 331-1, at 18. Scovel did not propose to charge fees for anything to do with passenger services. *See id.* In 1905, the Cuban government issued Decree 467, which granted Scovel's company a 50-year concession to charge the rates accepted by the government in the decree. *See* Doc. 331-4, at 13. The Cuban government assigned the docks and public area in limited usufruct only for cargo operations and only for the term of the concession. *See id.* at 12.

The Cuban government always retained ownership of the shoreline and any piers at the terminal. *See* Doc. 331, at 2; Doc. 331-1, at 22. Under the Cuban Law of Ports, the piers are part of a port of "general interest of first class," and thus are "national property and for public use." Doc. 331-3, at 11-14; *see also* Doc. 331-1, at 7. The Law of Ports specifically provides that "ports," which include "man-made constructions" within a port, are "national property and for public use." Doc. 331-3, at 11, 13-14; *see also* Doc. 331-1, at

14. Every decree issued by the Cuban government with respect to the concession confirmed that it was for the benefit of the public. *See* Doc. 331-1, at 10-11. Indeed, in 2018, a Havana Docks shareholder wrote to the company's president to caution that he did "not believe Havana Docks owns any property in Cuba or ever did." Doc. 331-12, at 4.

Havana Docks also lacked the right to exclude anyone, including cruise lines, from docking at the piers. Under Article 12 of the Law of Ports, the public has "free use of the coast waters, coves, roadsteads, bays, and havens," including ports. Doc. 331-3, at 13. Under Article 44, a concession "shall not constitute a monopoly, and therefore others may be granted for the same class of works in the same harbor, beach or stretch of coast." *Id.* at 18. And under Article 48, a concession "must be granted under such conditions as may be necessary to reserve in full force the existing rights of entering the port, anchoring, loading, and unloading, afloat or on the coast, so that none of the services that are freely exercised or enjoyed by the public may be made compulsory." *Id.* at 18-19. As the cruise lines' unrebutted expert explained, "the public, including cruise lines, could use the Piers to embark and disembark passengers." Doc. 331-1, at 14, 22.

3. Nothing in the concession or Cuban law suggests that Havana Docks or its predecessor held more than a right to conduct cargo operations. *See* Doc. 477, at 110-111. Havana Docks had certain obligations to maintain

the terminal and "deliver the piers" to the Cuban government at the end of the concession. *Id.* (quoting Doc. 73-8, at 7). But those obligations are entirely consistent with a limited right to *use* the piers for cargo operations.

What is more, the proposal to expand an existing passenger ticket office and deliver it to the Cuban government illustrates that Havana Docks had no right to conduct passenger operations at the terminal. *See* Doc. 331-4, at 12, 13. The existence of a ticket office predating the concession confirms that there had been passenger service at the terminal. Under Article 49 of the Law of Ports, the concession could not alter those "prior rights to the use of the port and its works" by giving Havana Docks an exclusive right to conduct passenger operations. Doc. 331-3, at 19. The requirement to turn the office expansion over to the Cuban government simply underscores that Havana Docks did not have the right to conduct passenger operations at the terminal.

4.      The district court deferred to language in the Commission's written decision suggesting that Havana Docks had a broader right that might encompass passenger operations. *See* Doc. 477, at 110. But the Helms-Burton Act does not require a court to defer to the Commission's references to the nature or extent of an interest; the function of the Commission is limited to certifying the *value* of an interest. To the extent this Court were to conclude otherwise, it would violate the Due Process Clause, because the proceeding before the Commission was ex parte.

a.    The Helms-Burton Act requires a court to defer only to the existence of "an interest," not the nature or scope of that interest.  It requires a court to "accept as conclusive *proof of ownership of an interest* in property a certification of a claim to ownership of that interest that has been made by the Foreign Claims Settlement Commission."  22 U.S.C. § 6083(a)(1) (emphasis added).  The Act does not state that a court must accept a certified claim as conclusive proof of every detail in the Commission's written decision.

That limited deference is unsurprising, because the Commission never actually determined that Havana Docks owned the terminal.  Nor was it meant to do so.  The Commission's role is to certify the "amount and validity of claims."  22 U.S.C. § 1643b(a).  Here, the Commission did not discuss Cuban property law or explain the basis for its passing references to Havana Docks' purported ownership of the terminal.  *See* Doc. 73-8.  Rather, the Commission primarily used financial statements and appraisals, consistent with its limited mandate to determine a value for the claim.  *See id.* at 9.

The district court's reliance on a case applying the certification regime under the Maritime Drug Law Enforcement Act is misplaced.  *See* Doc. 477, at 107-108.  In *United States* v. *Hernandez*, 864 F.3d 1292 (2017), *cert. denied*, 138 S. Ct. 1025 (2018), this Court treated as conclusive a certification from the Coast Guard that Guatemala did not "affirmatively and unequivocally assert" jurisdiction over a captured vessel.  *See id.* at 1299.  But that certification is

simply a matter of diplomatic courtesy that permits a prosecution to proceed. *See* 46 U.S.C. § 70504(a); *United States* v. *Cruickshank*, 837 F.3d 1182, 1191-1192 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 1435 (2017). It does not, as here, have preclusive effect as to an element of the claim.

b.   To the extent there is any ambiguity, it should be construed to avoid the "serious constitutional concerns" that would be raised by an interpretation in which an absent party is bound by the certified claim. *Zadvydas* v. *Davis*, 533 U.S. 678, 682 (2001). "It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry* v. *Lee*, 311 U.S. 32, 40 (1940). If a judgment is rendered without an opportunity to be heard, "judicial action enforcing it against the person or property of the absent party is not that due process which the Fifth and Fourteenth Amendments requires." *Id.* at 41. That principle applies equally where the earlier proceeding was administrative rather than judicial. *See, e.g., United States* v. *Utah Construction Co.*, 384 U.S. 394, 422 (1966); *City of Pompano Beach* v. *FAA*, 774 F.2d 1529, 1539 n.10 (11th Cir. 1985). Without that rule, the claim-certification process would be subject to abuse by fraudulent submissions. *See, e.g., De Gaster* v. *Dillon*, 247 F. Supp. 511, 516 (D.D.C. 1963) (applying unclean-hands doctrine), *aff'd*, 354 F.2d 515 (D.C. Cir. 1965).

It is not enough to give a defendant in the second proceeding an opportunity to rebut some of the elements of the claim against it. As this Court has explained, "[d]ue process contemplates offering a party an opportunity to rebut charges leveled against it, not allowing that party's opponent to present evidence supporting that charge." *Stansell* v. *Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 727 (11th Cir. 2014); *see also PlayNation Play Systems, Inc.* v. *Velex Corp.*, 924 F.3d 1159, 1169 (11th Cir. 2019).

Because the district court erred by concluding that Havana Docks had an interest in "property" to conduct passenger operations at the terminal that was "confiscated" by the Cuban government, the judgment below should be reversed and the case remanded with instructions to enter summary judgment for Carnival.

## B.   Havana Docks' Concession Would Have Expired In 2004

Even if Havana Docks had a right to conduct passenger operations at the terminal, that interest would have expired of its own accord in 2004. Because the district court held Carnival liable for conduct that occurred between 2016 and 2019, at a minimum the judgment should be vacated and the case remanded.

1.     As discussed above, a Helms-Burton plaintiff's interest in property is limited to the rights that were acquired. *See* p. 26, *supra*. By the terms of the concession and Cuban law, Havana Docks' interest in the terminal would

have expired in 2004. When Havana Docks acquired the concession in 1911, the Cuban government had fixed the term of the concession at 99 years, dating from 1905 and expiring in 2004. *See* Doc. 337, at 3. Havana Docks has not argued that any later decree or other act of the Cuban government extended that term.

To the extent the Court considers the language of the Commission's written decision, it confirms that Havana Docks' interest would have expired in 2004. The Commission's proposed decision, which was modified on other grounds by the final decision, explains that "the terms of the concession granted by the Cuban Government were to expire in the year 2004." Doc. 73-8, at 9. At that time, Havana Docks was required to "deliver the piers to the government in good state of preservation." *Id.* Nothing in the Commission's decision suggests that the Castro regime's actions extended the expiration date. Although language in the Commission's decision is not entitled to defer-ence, *see* p. 30, *supra*, it certainly reflects the undisputed facts before the pro-spect of a treble-damages claim presented itself in 2019.

2. The district court's grounds for concluding that Havana Docks' property interest did not expire are unavailing. The Helms-Burton Act's ref-erence to the "United States national who owns the claim," 22 U.S.C. § 6082 (a)(1), presupposes a claim *to something*. *See* Doc. 47, at 8; *see also* NCL Doc.

53, at 18, 24-25. That thing is an interest in property, and as discussed above, Havana Docks' interest in the terminal would have expired in 2004.

Indeed, the district court recognized this point in its later-abandoned opinion dismissing the complaint against another cruise line. *See Havana Docks Corp.* v. *MSC Cruises SA Co.*, 431 F. Supp. 3d 1367, 1372 (S.D. Fla. 2020). As the court wrote, "a person's interest in property can only extend as far as the particular right from the bundle that the person has acquired," and "there is nothing to suggest that Congress intended to grant victims of property confiscations more rights to the property than they would otherwise have simply by virtue of the confiscation." *Id.* at 1372, 1374.

Two other arguments advanced by the district court are unpersuasive for the same reason. The court observed that the statutory definition of "traffics" refers to "confiscated property" and "an interest in confiscated property," not simply the plaintiff's interest in the property. *See* NCL Doc. 53, at 22-23; 22 U.S.C. § 6023(13)(A). But the court failed to recognize that a defendant is liable for "traffic[king] *in property*" only to the person "who owns the claim to *such property*." 22 U.S.C. § 6082(a)(1)(A) (emphases added). The references to "property" match. Where, as here, the interest in "such property" was less than ownership in fee simple, the "property" that is "traffic[ked]" must be the more limited interest held by the plaintiff. Despite the remedial purposes of the Helms-Burton Act, *see* NCL Doc. 53, at 19-22, Congress chose

to hold a defendant liable only for trafficking in a property interest that the plaintiff would have held but for the confiscation.

Nothing in this Court's decision in *Glen* v. *Club Méditerranée, S.A.*, 450 F.3d 1251 (2006), is to the contrary. The district court read that opinion to "stand[] for the notion that the Cuban Government's confiscation of property extinguished any ownership rights of those who owned the property prior to the expropriation." NCL Doc. 53, at 17. But this Court did not indicate that a plaintiff with a limited interest in property somehow acquired a limitless interest in that same property when its limited interest was terminated. Indeed, it would have been strange for this Court to do so in a case decided over a decade before the cause of action in Title III went into effect. This Court simply held that the act-of-state doctrine precluded adjudication of common-law claims against the owners of confiscated property, and it rejected the argument that the Helms-Burton Act somehow "proclaim[ed] the ineffectiveness of the Cuban expropriations." 450 F.3d at 1255.

Accordingly, Carnival could not have trafficked in "confiscated" "property" after 2004, because Havana Docks' interest in the terminal would have expired then. Even if this Court does not reverse based on the limited scope of the right to use the terminal, it should at a minimum vacate the judgment based on the limited term of the concession and remand the case for further proceedings.

## II. CARNIVAL DID NOT ENGAGE IN TRAFFICKING BECAUSE ITS CONDUCT WAS 'INCIDENT' AND 'NECESSARY' TO 'LAWFUL TRAVEL'

The district court also erred for the independent reason that Carnival's conduct was "incident" and "necessary" to "lawful travel." The Helms-Burton Act defines "traffics" to exclude "transactions and uses of property *incident to lawful travel* to Cuba, to the extent that such transactions and uses of property are *necessary to the conduct of such travel*." 22 U.S.C. § 6023(13)(B)(iii) (emphases added). Carnival's travel was both lawful and necessary, and the district court's contrary conclusion requires vacatur and remand.[4]

The district court's conclusion that Carnival's travel was not "lawful"—despite OFAC's tacit approval and a contrary determination by the State Department, *see* Doc. 331-104—rests on two fundamental legal errors. *First*, the district court misinterpreted the carrier license to preclude Carnival from transporting passengers who signed an affidavit that they were engaged in authorized travel rather than purchasing shore excursions from Carnival. *Second*, the district court misinterpreted the people-to-people license to require seven to eight hours of non-stop people-to-people interactions.

As for the requirement of necessity, the use of the terminal was necessary to travel to Cuba, and the district court's interpretation of "necessary" to

---

[4] Carnival's use of the terminal was "incident to" lawful travel because it was "[d]ependent on, subordinate to, arising out of, or otherwise connected with" that travel. "Incident," *Black's Law Dictionary* (11th ed. online 2019). The district court did not conclude otherwise.

mean "essential" was legally erroneous.  To the extent there is any ambiguity, it should be construed to avoid the serious due-process concerns that imposing liability would raise.[5]

### A.     Carnival's Travel Was 'Lawful'

1.      In the absence of a statutory definition of the phrase "lawful travel to Cuba," OFAC has established its scope through licenses and enforcement activities.  OFAC issued two kinds of licenses for lawful travel to Cuba:  specific licenses and general licenses.  A specific license is adjudicated on a case-by-case basis in response to an application from a prospective licensee.  *See* 31 C.F.R. § 515.318.  A general license is published in the Code of Federal Regulations and is available without an application.  *See* 31 C.F.R. § 515.317.  In 2015 and 2016, OFAC issued general and specific licenses that broadly defined the scope of lawful travel to Cuba.

a.      OFAC issued a general license in 2015 authorizing "carrier services to, from, or within Cuba in connection with travel or transportation, directly or indirectly, between the United States and Cuba" of persons who were authorized to travel to Cuba.  31 C.F.R. § 515.572(a)(2) (2016).  OFAC also authorized carriers to "provide lodging services onboard such vessels" while they are "traveling to, from, or within Cuba, including when docked at a port in

---

[5] Although both issues can be resolved as a matter of law, to the extent this Court concludes that there are factual disputes, it should remand for a trial.

Cuba." 31 C.F.R. § 515.572(a)(4) (2016). OFAC specified that authorized carriers could transport people "who are traveling to or from Cuba pursuant to a general license under one of the 12 categories of travel listed in § 515.560." 31 C.F.R. § 515.572 (note 1) (2016). One of those categories was "[e]ducational activities." 31 C.F.R. § 515.560(a)(5) (2016).

b. In January 2015, OFAC issued a separate general license for travelers for a particular kind of educational travel called "people-to-people travel." OFAC defined people-to-people travel as travel "for the purpose of engaging, while in Cuba, in a full-time schedule of activities *intended to* enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities." 31 C.F.R. § 515.565(b)(1) (2016) (emphasis added); *see also* 31 C.F.R. § 515.565(b)(2) (2016) (requiring a "full-time schedule of educational exchange activities that *will result in meaningful interaction* between the traveler and individuals in Cuba (emphasis added)). The license also authorized "such additional transactions as are directly incident to educational exchanges not involving academic study pursuant to a degree program." 31 C.F.R. § 515.565(b) (2016).[6]

---

[6] For part of the time at issue, OFAC required that travel be "conducted under the auspices of an organization that . . . sponsors such exchanges to promote people-to-people contact." 31 C.F.R. § 515.565(b)(1) (2016). A note stated that the sponsor of a trip "in which travelers engage in individually selected and/or self-directed activities would not qualify for the general license." 31 C.F.R. § 515.565(b)(4) (note) (2016).

2. Carnival complied with the terms of the general license for carrier services. It is uncontroverted that Carnival required travelers to provide affidavits certifying that they were complying with one of the authorized categories of travel or complying with a specific license. *See* Doc. 326-45, at 5, 8, 16-20, 45, 113-114, 127; Doc. 326-47, at 2, 12. It is also uncontroverted that Carnival retained those affidavits, as required by the general license. *See* Doc. 326-45, at 5, 8, 119. If passengers did not ultimately do what they swore they would in the affidavits, that is a matter for OFAC to take up with the passengers, not with Carnival.

The district court erred by concluding that Carnival violated the terms of the carrier license by not mandating that passengers buy Carnival's own people-to-people activities. *See* Doc. 477, at 126. It was entirely permissible for Carnival to rely on a "certification from each customer indicating the section of this part that authorizes the person to travel . . . to Cuba." 31 C.F.R. § 515.572(b)(1) (2016). The regulatory note that the district court cited prohibiting self-guided people-to-people activities was in the people-to-people license, not the carrier license. *See* Doc. 477, at 126 (citing 31 C.F.R. § 515.565 (b)(4) (note) (2016)).

3. Carnival also complied with the terms of the people-to-people license. Carnival's shore excursions were "for the purpose of engaging . . . in a full-time schedule of activities *intended to* enhance contact with the Cuban

people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities" and "result[ed] in *meaningful interaction*" with Cubans. 31 C.F.R. § 515.565(b)(2) (2016) (emphases added). Many of the activities that Carnival designed lasted a full day. *See* Doc. 311-38, at 11-19. Others lasted between three and four and a half hours. *See id.* at 3, 5, 7, 9-10, 20-23. Carnival made clear that "[a]ll guests must participate in a people-to-people program on each day in Cuba" and that "[t]hese programs must include a full-time schedule of activities that will create educational interactions between guests and the Cuban people." Doc. 326-45, at 45. It also explained to participants in half-day tours that "a second tour or self-certification activity will need to be completed to meet the 7-8 hour People-to-People requirement." Doc. 311-38, at 3.

The district court erroneously required seven to eight hours of non-stop people-to-people activities and determined that even a minute not spent interacting with individuals in Cuba did not count toward the required full-time schedule. *See* Doc. 477, at 121-125. All that was necessary was a schedule "*intended to* enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities" and one that "*result[s] in meaningful interaction* between the traveler and individuals in Cuba." 31 C.F.R. § 515.565(b)(1), (2) (emphases added). The regulations specifically permitted "such additional transactions as are directly

incident to educational exchanges not involving academic study pursuant to a degree program." 31 C.F.R. § 515.565(b) (2016). Contemporaneous OFAC guidance for other travelers similarly referred to "free time or recreation," as long as it was not "in excess of that consistent with a full-time schedule" in Cuba. Department of the Treasury, *Frequently Asked Questions Related to Cuba* 5 (Mar. 15, 2016) <tinyurl.com/FAQ-3-15-16>. There was plainly no requirement that the activities provide nonstop interaction with individuals in Cuba. And it would be entirely contrary to the government's purpose of encouraging travel to Cuba if travelers could not purchase a meal or a bottle of water without violating the terms of OFAC's license. *See* pp. 9-11, *supra*.

For that reason, the district court's criticism of the "Explore Havana By American Classic Car" excursion was misplaced. *See* Doc. 477, at 122-123. That trip consisted of a guided tour through Havana and featured a visit to the Almacenes San José artisans' market. *See* Doc. 311-38, at 5. The district court likened the tour to a hypothetical non-compliant excursion in OFAC's regulations, in which an individual "plans to travel to Cuba to rent a bicycle to explore the streets of Havana." Doc. 477, at 122 (quoting 31 C.F.R. § 515.565(b) (example 4) (2016)). But that hypothetical exploration is aimless and thus distinguishable from a guided tour that was "designed to be in compliance with People to People guidelines." Doc. 311-38, at 5.

4.     Finally, as the district court correctly recognized, the OFAC licenses did not violate the Trade Sanctions Reform and Export Enhancement Act. *See* Doc. 477, at 118-120; 22 U.S.C. §§ 7201-7211.  That statute defines impermissible "tourist activities" as "any activity with respect to travel to, from, or within Cuba that is not expressly authorized" in 31 C.F.R. § 515.560 (a). 22 U.S.C. § 7209(b)(2).  One of those categories is educational activities, 31 C.F.R. § 515.560(a)(5), which OFAC has interpreted to include people-to-people travel.  Accordingly, travel related to people-to-people activities is lawful.

## B.     Carnival's Use Of The Terminal Was 'Necessary To' The Conduct Of Its Lawful Travel

Carnival's alleged use of the terminal was also "necessary to" the conduct of its lawful travel to Cuba. *First*, the ordinary meaning of the word "necessary" does not require there to be no alternative to a particular course of action, and any ambiguity should be construed to avoid the serious due-process concerns posed by contradicting years of OFAC acquiescence in Carnival's activities. *Second*, even if the word "necessary" meant "absolutely necessary," Carnival had no alternative to using the terminal.

1.     The Supreme Court has observed that, "in ordinary speech," the word "necessary" is "often used more loosely to refer to something that is merely important or strongly desired." *Ayestas* v. *Davis*, 138 S. Ct. 1080, 1093 (2018).  For example, "necessary" in the Necessary and Proper Clause of the Constitution "does not mean '*absolutely* necessary.'"  *Id.* (quoting *McCulloch*

v. *Maryland*, 4 U.S. 316, 414-415 (1819)).  Similarly, a "necessary" business expense under the Internal Revenue Code "may be an expense that is merely helpful and appropriate."  *Id.* (citing *Commissioner* v. *Tellier*, 383 U.S. 687, 689 (1966)).  In the context of "deciding whether the subject matter of a contract is necessary to the operation, navigation, or management of a ship," this Court has applied a "test of reasonableness, not of absolute necessity." *Inbesa America, Inc.* v. *M/V Anglia*, 134 F.3d 1035, 1036 (11th Cir. 1998) (citation omitted).  Other examples abound.  *See, e.g.*, *Fish* v. *Kobach*, 840 F.3d 710, 734 (10th Cir. 2016); *Cellular Telecommunications & Internet Association* v. *FCC*, 330 F.3d 502, 509-510 (D.C. Cir. 2003).

Interpreting the phrase "necessary to the conduct of such travel" in 22 U.S.C. § 6023(13)(B)(iii) to mean important, helpful, or appropriate to the conduct of the lawful travel is consistent not only with the ordinary understanding of the term, but also with congressional intent.  In enacting the Helms-Burton Act, Congress sought to "remove any liability for  .  .  .  any activities related to lawful travel to Cuba."  H.R. Conf. Rep. No. 468, 104th Cong., 2d Sess. 44 (1996).  Interpreting the term "necessary" to mean absolutely essential would effectively nullify provisions designed to accomplish that goal.  For instance, the Act provides that "the President shall take all necessary steps to ensure the safety and security of the United States against espionage by Cuban jour-

nalists it believes to be working for the intelligence agencies of the Cuban Government." 22 U.S.C. § 6044(b). A strict definition of "necessary" would prohibit the President from taking appropriate measures if some other measure would be equally effective.

2. The sole case cited by the district court for interpreting "necessary" to mean strictly necessary is inapposite. *See* Doc. 477, at 149. That case interpreted the meaning of "necessaries" in contract law. *See Vorchheimer* v. *Philadelphian Owners Association*, 903 F.3d 100, 106 (3d Cir. 2018). And while the noun "necessaries" is distinct from the adjective "necessary," it too "does not mean absolutely indispensable." "Necessaries," *Black's Law Dictionary* (11th ed. online 2019). "Necessaries" can include "whatever is reasonably needed for subsistence, health, comfort, and education." *Id.*

The district court's invocation of congressional intent is also unavailing. *See* Doc. 477, at 148. The court quoted a congressional finding that the Helms-Burton Act was intended to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." 22 U.S.C. § 6022(6); *see* Doc. 477, at 148. But the fact that the Act was intended to protect against "wrongful trafficking" says nothing about the scope of activities that are *excluded from* the definition of "trafficking" because they were "necessary to the conduct of" lawful travel. 22 U.S.C. § 6023(13).

3.     To the extent the word "necessary" is ambiguous, it should be construed in favor of Carnival to avoid serious constitutional concerns. *See, e.g.*, *Zadvydas*, 533 U.S. at 682. Imposing liability for conduct that "public officials" have "affirmatively told" a party is permissible would raise serious due-process concerns. *Cox* v. *Louisiana*, 379 U.S. 559, 571 (1965); *see also Raley* v. *Ohio*, 360 U.S. 423, 438 (1959). Here, OFAC issued general and specific licenses that authorized Carnival's travel; indeed, the President specifically and expressly *encouraged* cruising to Cuba. *See* pp. 9-11, *supra*.

4.     Under the correct interpretation of the term, Carnival's alleged use of the terminal was "necessary" to the conduct of lawful travel to Cuba. 22 U.S.C. § 6023(13). Docking in Havana was manifestly important, helpful, and appropriate to "the conduct of" Carnival's "lawful travel to Cuba"—*i.e.*, sailing to Havana. As a result, Carnival's alleged use of the terminal was not trafficking.

Even if "necessary" meant "strictly essential," Carnival's use of the terminal would still have been necessary to the conduct of its lawful travel to Cuba. The district court reasoned that use of the terminal was not essential to travel to other parts of Cuba. *See* Doc. 477, at 149-152. But nothing in the statute or regulations prevented Carnival from choosing Havana over other cities. The Helms-Burton Act excludes from the definition of "traffics" all uses of property that are incident to lawful travel to Cuba if they are "necessary to

the conduct of *such* travel." 22 U.S.C. § 6023(13)(B)(iii) (emphasis added). "Such" travel simply refers to the lawful travel in which Carnival engaged— which was travel to Havana. *See, e.g., Gatlin Oil Co.* v. *United States*, 169 F.3d 207, 211 (4th Cir. 1999). And consistent with Cuban law, the Cuban government required Carnival to dock at the Havana Cruise Terminal when traveling to Havana. *See* Doc. 326, at 8-9; *see also* Doc. 331-1, at 34-35. It was thus impossible for Carnival to travel to Havana without docking at the terminal.

The district court's interpretation of "necessary" would also deprive the lawful-travel exception of nearly any meaning. A plaintiff could always argue that a defendant could have traveled somewhere else within Cuba. It therefore must be the case that a defendant is entitled to choose where in Cuba it wishes to travel (and that "necessary" does not mean "absolutely essential"). Because Carnival's alleged use of the terminal was not "trafficking" within the meaning of the Helms-Burton Act, the judgment below should be vacated and the case remanded for further proceedings.

## III. HAVANA DOCKS IS NOT A PROPER PLAINTIFF BECAUSE IT IS NOT A UNITED STATES NATIONAL

If the judgment is not reversed or vacated for the reasons set forth above, it should be reversed for the independent reason that Havana Docks is not a United States national. The Helms-Burton Act makes a defendant who traffics in confiscated property liable to "any United States national" who owns the claim to that property. 22 U.S.C. § 6082(a)(1)(A). The Act defines a

"United States national," in turn, as "any United States citizen," 22 U.S.C.
§ 6023(15)(A), or "any other legal entity which is organized under the laws of
the United States . . . and which has its principal place of business in the
United States," 22 U.S.C. § 6023(15)(B). As the brief of the other appellants
explains, Havana Docks failed to allege that it was a United States citizen; in
fact, its principal place of business is in the United Kingdom. Havana Docks
is simply not in the class of persons Congress intended to afford a private right
of action.

1.    In the district court, Havana Docks offered the conclusory argu-
ment that it is a United States national because a corporation can be a "United
States citizen" under Section 6023(15)(A). *See* Doc. 336, at 8-9; Doc. 389, at 25.
But Havana Docks failed to allege that fact in its operative complaint. *See*
*Gilmour* v. *Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). And
in any event, the most natural way to reconcile the two paragraphs in Section
6023(15) is that the first (referring to "citizen[s]") applies to natural persons,
and the second (referring to "principal place[s] of business") to corporate per-
sons. Havana Docks cannot avoid the definition for legal entities in paragraph
(B) by availing itself of conclusory assertions concerning the definition for nat-
ural persons in paragraph (A).

2.    Havana Docks' "principal place of business" is not "in the United
States." 22 U.S.C. § 6023(15)(B). A corporation's "principal place of business"

is "the place where a corporation's officers direct, control, and coordinate the corporation's activities"—in other words, the corporation's "nerve center." *Hertz Corp.* v. *Friend*, 559 U.S. 77, 92-93 (2010). The nerve center is the "*actual* center of direction, control, and coordination," not "simply an office where the corporation holds its board meetings." *Id.* at 93 (emphasis added). The principal place of business is determined at the time the lawsuit is filed. *See Grupo Dataflux* v. *Atlas Global Group, L.P.*, 541 U.S. 567, 571 (2004).

Havana Docks' actual center of direction was in the United Kingdom. Havana Docks president (and family heir) Mickael Sosthenes Behn resided in London when the lawsuit was filed. *See* Doc. 331, at 9-11. He conducted business primarily from the United Kingdom and elsewhere in Europe. *See id.* at 12. As corporate president, Behn was "chief executive officer" and had "general charge of the business and affairs of the corporation." *Id.* at 11. He approved drafts of letters, e-mails, social-media posts, and corporate governance records; approved the retention of Havana Docks' accountant and lawyers and the payment of consulting fees; and served as the decisionmaker concerning Havana Docks' lobbying and legal strategies. *Id.* at 14-15. He also signed written consents—which substituted for director meetings—in London. *See id.* at 12-13.

Havana Docks points to the activities of Jerry Johnson, a generally unpaid volunteer who reported to Behn, and Johnson's employer's address in

Kentucky. *See* Doc. 331, at 9, 12, 16. In light of the other facts indicating that Havana Docks' principal place of business is in the United Kingdom, the address of convenience does not establish that Havana Docks' principal place of business is Kentucky. *See Wylie* v. *Red Bull North America, Inc.*, 627 Fed. Appx. 755, 758 (11th Cir. 2015) (per curiam). Havana Docks is not registered to do business in Kentucky, and as of December 2020, Behn had never visited the bank where Havana Docks claims to be located. *See* Doc. 331, at 12.

Johnson's role at Havana Docks was ministerial and subordinate to Behn's. Under Havana Docks' bylaws, Johnson could keep records, give notice of meetings, have charge of the corporation's financial affairs, and "perform such other duties as may be imposed upon him by the directors or the executive committee or the president." Doc. 331, at 11. When Johnson retained an accountant and lawyers for Havana Docks, it was with Behn's approval. *Id.* at 14. When Johnson received consulting fees, Behn reviewed and approved them. *Id.* at 15, 16.

Havana Docks is not among the class of plaintiffs that Congress intended to protect. The use of a Kentucky address and a ministerial, generally unpaid officer does not satisfy the statutory language. Because Havana Docks' principal place of business is in the United Kingdom, the judgment should be reversed. At a minimum, the judgment should be vacated and the case re-

manded for a trial regarding Havana Docks' principal place of business because the district court improperly weighed the evidence, choosing to discredit evidence showing that Behn had ultimate authority over the corporation's affairs.

## IV. AT A MINIMUM, THE DAMAGES AWARD SHOULD BE SET ASIDE

Finally, as explained in the brief of the other appellants, even if Carnival could be held liable, the award of over $100 million was erroneous for two reasons. *First*, under a background common-law and equitable principle known as the one-satisfaction rule, Havana Docks is entitled to recover the value of its alleged property (with trebling and interest) only once, not four times. *Second*, the total award of over $400 million is unconstitutionally excessive under the Due Process Clause.

### A. The 'One-Satisfaction Rule' Prohibits Duplicative Awards For The Value Of The Terminal

The one-satisfaction rule "generally provides that a plaintiff is entitled to only one satisfaction for a single injury." *BUC International Corp.* v. *International Yacht Council Ltd.*, 517 F.3d 1271, 1276 (11th Cir. 2008); *see also Sessions* v. *Johnson*, 95 U.S. 347, 348 (1877). That rule, which "has its roots in elementary principles of tort law," prevents plaintiffs from extracting duplicative recoveries from multiple defendants. *BUC International*, 517 F.3d at 1276. Here, the single injury is the value of the property with trebling and

interest. The district court erred by refusing to apply that rule and instead awarding Havana Docks four times the value of the terminal, with trebling and interest.

1. The Helms-Burton Act should be interpreted against the backdrop of common-law and equitable principles. For statutes "in the nature of a tort," part of that backdrop is the one-satisfaction rule. *BUC International*, 517 F.3d at 1278 (citation omitted). A trafficking claim under the Helms-Burton Act is similar to a tort claim, permitting plaintiffs to recover the value of an interest in property from a defendant who infringes on that interest. Indeed, "[t]he [c]ongressional findings of the Helms-Burton Act recognize as much, stating that the international judicial system 'lacks fully effective remedies for the wrongful confiscation of property and for unjust enrichment from the use of wrongfully confiscated property.'" *Glen* v. *American Airlines, Inc.*, 7 F.4th 331, 334 (5th Cir. 2021) (quoting 22 U.S.C. § 6081(8)), *cert. denied*, 142 S. Ct. 863 (2022).

Other provisions of the Helms-Burton Act support the conclusion that Congress intended to prevent multiple recoveries for a single injury. For example, a plaintiff who "brings an action under [Section 6082] may not bring any other civil action or proceeding" concerning "the same subject matter." 22 U.S.C. § 6082(f)(1)(A). Moreover, a plaintiff who "brings, under the common

law or any [other] provision of law . . . a civil action or proceeding for monetary or nonmonetary compensation arising out of a claim for which an action would otherwise be cognizable under this section may not bring an action under this section on that claim." 22 U.S.C. § 6082(f)(1)(B). And a plaintiff who recovers the value of a certified claim is not entitled to recover from any subsequent settlement of claims between the United States and Cuba. *See* 22 U.S.C. § 6082(f)(2)(A)(i).

The one-satisfaction rule also prevents absurd results. The result in this case is absurd enough: by suing four cruise lines, Havana Docks has obtained judgments worth four times the value of its property. But a plaintiff with a claim to property that was used by 100 or 1,000 defendants could recover 100 or 1,000 times the value of its claim. Nothing in the text of the statute supports such an irrational result.

2.    The district court's concern that Carnival's interpretation "would prevent [Havana Docks] from recovering for future acts of trafficking by others" is misplaced. NCL Doc. 429, at 8. The fundamental purpose of the Helms-Burton Act is to compensate claimants for the value of their confiscated property interest. Plaintiffs are entitled to recover the value of the certified claim, the valuation determined by a special master, or the fair-market value of the property. *See* 22 U.S.C. § 6082(a)(1)(A)(i). As the district court recognized earlier in the case, "[Havana Docks'] certified claim is *not* an interest in the

confiscated property itself; rather, it represents the dollar amount that the victim has suffered by being deprived of its property interests." *Havana Docks Corp.* v. *MSC Cruises SA Co.*, 455 F. Supp. 3d 1355, 1368 (2020). After a claimant has been compensated, there is no need for further recourse under the Helms-Burton Act.

3.    The record in this case reflects that the claims against each cruise line "are for precisely the same injury": namely, the alleged confiscation of the terminal. *BUC International*, 517 F.3d at 1279. Each cruise line's use of the terminal did not cause a separate injury cognizable under the Helms-Burton Act. All Havana Docks is entitled to recover is what the Cuban government would owe it in a settlement of claims: the value of the allegedly confiscated property, with trebling and interest.

The purported additional injury identified by the district court—"subsequent trafficking in that confiscated property"—is illusory. *See* Doc. 542, at 5. Trafficking is merely what makes a defendant liable under the Act. The injury being compensated is still the loss of the property—whether it is valued using a certified claim, the fair-market value of the property, or a valuation determined by other means. *See* 22 U.S.C. § 6082(a)(1)(A)(i). If Congress had conceived of the injury as the trafficking itself, it presumably would have included a remedy tied to that trafficking, such as disgorgement. Because Congress sought to compensate plaintiffs for the injury of having their property

confiscated by the Cuban government, the one-satisfaction rule should limit Havana Docks to recovering the value of that property, with trebling and interest.

### B. The Damages Award Violates The Due Process Clause

If the Court were to conclude that the one-satisfaction rule does not apply, the damages award would be unconstitutionally excessive. A statutory damages award violates the Due Process Clause if it is "wholly disproportioned to the offense and obviously unreasonable." *St. Louis, Iron Mountain & Southern Railway Co.* v. *Williams*, 251 U.S. 63, 67 (1919); *see Southwestern Telegraph & Telephone Co.* v. *Danaher*, 238 U.S. 482, 491 (1915); *Missouri Pacific Railway Co.* v. *Tucker*, 230 U.S. 340, 351 (1913). The nearly $440 million in damages awarded in this case is disproportionate to any harm suffered by Havana Docks.

No matter how proportionality is defined, the award is obviously unreasonable. Carnival used the terminal intermittently for just a few years, but the award is three times the entire purported value of the terminal with interest. *See* Doc. 73-8, at 3. It is also roughly 20 times the amount that the cruise lines paid the Cuban port operator. *See* NCL Doc. 346-7, at 5-6.

The bait-and-switch by the Executive Branch in this case also weighs in favor of reducing the award. The Eighth Circuit has held an award of statutory damages to be unconstitutional in part because the defendant "plausibly

believed it was not violating" the statute. *Golan* v. *FreeEats.com, Inc.*, 930 F.3d 950, 962 (8th Cir. 2019). That factor unquestionably applies here, because the President of the United States encouraged the cruise lines to sail to Cuba, OFAC never objected to Carnival's conduct, and the State Department declined to exercise its Title IV authority because it considered the cruise lines to be lawfully traveling to Cuba.

The district court erred by comparing the amount of the award to the cruise lines' revenues in Cuba. *See* NCL Doc. 452, at 13. Title III creates a remedy that places traffickers in the stead of the Cuban government and provides a means for plaintiffs to recover the value of their property. Title III does not create a disgorgement remedy. Indeed, the cruise lines are liable under the Act for the same amount regardless of whether they lost money, made money, or merely broke even.

The Supreme Court has observed that "the principle that punishment should fit the crime is deeply rooted and frequently repeated in common-law jurisprudence." *BMW of North America, Inc.* v. *Gore*, 517 U.S. 559, 575 n.24 (1996) (internal quotation marks and citation omitted). Travel licensed and encouraged by the Executive is not a crime. Punishing each cruise line with over $100 million in damages for travel licensed and encouraged by the Executive cannot be squared with the Due Process Clause.

**CONCLUSION**

The judgment of the district court should be reversed, and the case remanded with instructions to enter judgment in favor of Carnival. In the alternative, the judgment of the district court should be vacated, and the case remanded for further proceedings.

Respectfully submitted,

/s/ Kannon K. Shanmugam

<table>
<tr><td>

STUART H. SINGER
PASCUAL A. OLIU
MEREDITH L. SCHULTZ
COREY P. GRAY
ALISHA MORICEAU
BOIES SCHILLER FLEXNER LLP
  *401 East Las Olas Boulevard,*
    *Suite 1200*
  *Fort Lauderdale, FL 33301*

PEDRO A. FREYRE
AKERMAN LLP
  *98 S.E. Seventh Street, Suite 1100*
  *Miami, FL 33131*

GEORGE J. FOWLER, III
LUIS LLAMAS
JONES WALKER LLP
  *201 South Biscayne Boulevard,*
    *Suite 3000*
  *Miami, FL 33131*

JUNE 30, 2023

</td><td>

KANNON K. SHANMUGAM
BRIAN M. LIPSHUTZ
ABIGAIL FRISCH VICE
ELIZABETH NORFORD
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

HILLARY S. BLACK
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

</td></tr>
</table>

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, a member of the Bar of this Court and counsel for defendant-appellant-cross-appellee Carnival Corporation, hereby certify, pursuant to Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and 32(a)(7), that the attached Brief of Defendant-Appellant-Cross-Appellee Carnival Corporation is proportionately spaced, has a typeface of 14 points or more, and contains 12,750 words.

JUNE 30, 2023                                    /s/ Kannon K. Shanmugam
                                                 KANNON K. SHANMUGAM

# STATUTORY
# AND REGULATORY
# ADDENDUM

## STATUTORY AND REGULATORY ADDENDUM
## TABLE OF CONTENTS

Page

22 U.S.C. § 6023, Definitions ........................................................1

22 U.S.C. § 6044, News Bureaus in Cuba ........................................4

22 U.S.C. § 6082(a)(1), Liability for Trafficking..................................5

22 U.S.C. § 6082(f), Election of Remedies .........................................6

22 U.S.C. § 6083, Proof of Ownership of Claims
to Confiscated Property.............................................................8

22 U.S.C. § 6085, Effective Date ....................................................9

22 U.S.C. § 6091, Exclusion from United States of Aliens
Who Have Confiscated Property of United States Nationals
or Who Traffic in Such Property ..............................................10

22 U.S.C. § 1643b, Receipt of Claims; Determination of Amount
and Validity ...........................................................................14

22 U.S.C. § 7209, Requirements Relating to Certain
Travel-Related Transactions with Cuba......................................15

31 C.F.R. § 515.560(a) (2016), Travel-Related Transactions
to, from, and within Cuba by Persons Subject
to U.S. Jurisdiction.................................................................16

31 C.F.R. § 515.565 (2016), Educational Activities .............................17

31 C.F.R. § 501.701, Penalties .....................................................19

31 C.F.R. § 515.572(a) (2016), Authorization to Provide Travel Services,
Carrier Services, and Remittance Forwarding Services......................20

(i)

# 22 U.S.C. § 6023, Definitions

* * *

(4)    As used in subchapters I and III, the term "confiscated" refers to—

    (A)    the nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959—

        (i)    without the property having been returned or adequate and effective compensation provided; or

        (ii)    without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure.

* * *

(12)

    (A)    The term "property" means any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest.

    (B)    For purposes of subchapter III of this chapter, the term "property" does not include real property used for residential purposes unless, as of March 12, 1996—

        (i)    the claim to the property is held by a United States national and the claim has been certified under title V of the International Claims Settlement Act of 1949 [22 U.S.C. 1643 et seq.]; or

        (ii)    the property is occupied by an official of the Cuban Government or the ruling political party in Cuba.

* * *

(13)

    (A)    As used in subchapter III, and except as provided in subparagraph (B), a person "traffics" in confiscated property if that person knowingly and intentionally—

        (i)    sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

        (ii)    engages in a commercial activity using or otherwise benefiting from confiscated property, or

        (iii)    causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,

    without the authorization of any United States national who holds a claim to the property.

    (B)    The term "traffics" does not include—

        (i)    the delivery of international telecommunication signals to Cuba;

        (ii)    the trading or holding of securities publicly traded or held, unless the trading is with or by a person determined by the Secretary of the Treasury to be a specially designated national;

            (a)    transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel; or

            (b)    transactions and uses of property by a person who is both a citizen of Cuba and a resident of Cuba, and who

is not an official of the Cuban Government or the ruling political party in Cuba.

\* \* \*

(15) The term "United States national" means—

(A) any United States citizen; or

(B) any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States.

## 22 U.S.C. § 6044, News Bureaus in Cuba

\* \* \*

(b)    In implementing this section, the President shall take all necessary steps to ensure the safety and security of the United States against espionage by Cuban journalists it believes to be working for the intelligence agencies of the Cuban Government.

\* \* \*

## 22 U.S.C. § 6082(a)(1), Liability for Trafficking

\* \* \*

(A)    Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this subchapter, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages in an amount equal to the sum of—

    (i)    the amount which is the greater of—

        (I)    the amount, if any, certified to the claimant by the Foreign Claims Settlement Commission under the International Claims Settlement Act of 1949 [22 U.S.C. 1621 et seq.], plus interest;

        (II)    the amount determined under section 6083(a)(2) of this title, plus interest; or

        (III)    the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater; and

    (ii)    court costs and reasonable attorneys' fees.

(B)    Interest under subparagraph (A)(i) shall be at the rate set forth in section 1961 of title 28, computed by the court from the date of confiscation of the property involved to the date on which the action is brought under this subsection.

\* \* \*

# 22 U.S.C. § 6082(f), Election of Remedies

\* \* \*

(1)    Election.

Subject to paragraph (2)—

    (A)    any United States national that brings an action under this section may not bring any other civil action or proceeding under the common law, Federal law, or the law of any of the several States, the District of Columbia, or any commonwealth, territory, or possession of the United States, that seeks monetary or nonmonetary compensation by reason of the same subject matter; and

    (B)    any person who brings, under the common law or any provision of law other than this section, a civil action or proceeding for monetary or nonmonetary compensation arising out of a claim for which an action would otherwise be cognizable under this section may not bring an action under this section on that claim.

(2)    Treatment of Certified Claimants.

    (A)    In the case of any United States national that brings an action under this section based on a claim certified under title V of the International Claims Settlement Act of 1949 [22 U.S.C. 1643 et seq.]—

        (i)    if the recovery in the action is equal to or greater than the amount of the certified claim, the United States national may not receive payment on the claim under any agreement entered into between the United States and Cuba settling claims covered by such title, and such national shall be deemed to have discharged the United States from any further responsibility to represent the United States national with respect to that claim;

        (ii)    if the recovery in the action is less than the amount of the certified claim, the United States national may receive payment under a claims agreement described in clause (i)

but only to the extent of the difference between the amount of the recovery and the amount of the certified claim; and

(iii)    if there is no recovery in the action, the United States national may receive payment on the certified claim under a claims agreement described in clause (i) to the same extent as any certified claimant who does not bring an action under this section.

(B)    In the event some or all actions brought under this section are consolidated by judicial or other action in such manner as to create a pool of assets available to satisfy the claims in such actions, including a pool of assets in a proceeding in bankruptcy, every claimant whose claim in an action so consolidated was certified by the Foreign Claims Settlement Commission under title V of the International Claims Settlement Act of 1949 [22 U.S.C. 1643 et seq.] shall be entitled to payment in full of its claim from the assets in such pool before any payment is made from the assets in such pool with respect to any claim not so certified.

\* \* \*

**22 U.S.C. § 6083, Proof of Ownership of Claims to Confiscated Property**

(a)    Evidence of ownership.

    (1)    Conclusiveness of certified claims.

        In any action brought under this subchapter, the court shall accept as conclusive proof of ownership of an interest in property a certification of a claim to ownership of that interest that has been made by the Foreign Claims Settlement Commission under title V of the International Claims Settlement Act of 1949 (22 U.S.C. 1643 and following).

    (2)    Claims not certified.

        If in an action under this subchapter a claim has not been so certified by the Foreign Claims Settlement Commission, the court may appoint a special master, including the Foreign Claims Settlement Commission, to make determinations regarding the amount and ownership of the claim. Such determinations are only for evidentiary purposes in civil actions brought under this subchapter and do not constitute certifications under title V of the International Claims Settlement Act of 1949.

    (3)    Effect of determinations of foreign or international entities.

        In determining the amount or ownership of a claim in an action under this subchapter, the court shall not accept as conclusive evidence any findings, orders, judgments, or decrees from administrative agencies or courts of foreign countries or international organizations that declare the value of or invalidate the claim, unless the declaration of value or invalidation was found pursuant to binding international arbitration to which the United States or the claimant submitted the claim.

* * *

# 22 U.S.C. § 6085, Effective Date

\* \* \*

(b)    Suspension Authority

    (1)    Suspension Authority

        The President may suspend the effective date under subsection (a) for a period of not more than 6 months if the President determines and reports in writing to the appropriate congressional committees at least 15 days before such effective date that the suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba.

\* \* \*

# 22 U.S.C. § 6091, Exclusion from United States of Aliens Who Have Confiscated Property of United States Nationals or Who Traffic in Such Property

(a)   Grounds for exclusion

The Secretary of State shall deny a visa to, and the Attorney General shall exclude from the United States, any alien who the Secretary of State determines is a person who, after March 12, 1996—

(1)   has confiscated, or has directed or overseen the confiscation of, property a claim to which is owned by a United States national, or converts or has converted for personal gain confiscated property, a claim to which is owned by a United States national;

(2)   traffics in confiscated property, a claim to which is owned by a United States national;

(3)   is a corporate officer, principal, or shareholder with a controlling interest of an entity which has been involved in the confiscation of property or trafficking in confiscated property, a claim to which is owned by a United States national; or

(4)   is a spouse, minor child, or agent of a person excludable under paragraph (1), (2), or (3).

(b)   Definitions

As used in this section, the following terms have the following meanings:

(1)   Confiscated; confiscation

The terms "confiscated" and "confiscation" refer to—

(A)   the nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property—

(i)   without the property having been returned or adequate and effective compensation provided; or

(ii) without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure; and

(B) the repudiation by the Cuban Government of, the default by the Cuban Government on, or the failure of the Cuban Government to pay—

(i) a debt of any enterprise which has been nationalized, expropriated, or otherwise taken by the Cuban Government;

(ii) a debt which is a charge on property nationalized, expropriated, or otherwise taken by the Cuban Government; or

(iii) a debt which was incurred by the Cuban Government in satisfaction or settlement of a confiscated property claim.

(2) Traffics

(A) Except as provided in subparagraph (B), a person "traffics" in confiscated property if that person knowingly and intentionally—

(i)

(I) transfers, distributes, dispenses, brokers, or otherwise disposes of confiscated property,

(II) purchases, receives, obtains control of, or otherwise acquires confiscated property, or

(III) improves (other than for routine maintenance), invests in (by contribution of funds or anything of value, other than for routine maintenance), or begins after March 12, 1996, to manage, lease,

possess, use, or hold an interest in confiscated property,

(ii)    enters into a commercial arrangement using or otherwise benefiting from confiscated property, or

(iii)    causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,

without the authorization of any United States national who holds a claim to the property.

(B)    The term "traffics" does not include—

(i)    the delivery of international telecommunication signals to Cuba;

(ii)    the trading or holding of securities publicly traded or held, unless the trading is with or by a person determined by the Secretary of the Treasury to be a specially designated national;

(iii)    transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel; or

(iv)    transactions and uses of property by a person who is both a citizen of Cuba and a resident of Cuba, and who is not an official of the Cuban Government or the ruling political party in Cuba.

(c)    Exemption

This section shall not apply where the Secretary of State finds, on a case by case basis, that the entry into the United States of the person who would otherwise be excluded under this section is necessary for medical reasons or for purposes of litigation of an action under subchapter III.

(d)    Effective date

    (1)    In general

        This section applies to aliens seeking to enter the United States on or after March 12, 1996.

    (2)    Trafficking

        This section applies only with respect to acts within the meaning of "traffics" that occur on or after March 12, 1996.

## 22 U.S.C. § 1643b, Receipt of Claims;
## Determination of Amount and Validity

(a)     Claims for property loss.

The Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba, or the Chinese Communist regime, arising since January 1, 1959, in the case of claims against the Government of Cuba, or since October 1, 1949, in the case of claims against the Chinese Communist regime, for losses resulting from the nationalization, expropriation, intervention, or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States, if such claims are submitted to the Commission within such period specified by the Commission by notice published in the Federal Register (which period shall not be more than eighteen months after such publication) within sixty days after October 16, 1964, or sixty days after November 6, 1966, with respect to claims against the Chinese Communist regime, or of legislation making appropriations to the Commission for payment of administrative expenses incurred in carrying out its functions with respect to each respective claims program authorized, under this subchapter, whichever date is later. In making the determination with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to, (i) fair market value, (ii) book value, (iii) going concern value, or (iv) cost of replacement.

* * *

## 22 U.S.C. § 7209, Requirements Relating to Certain Travel-Related Transactions with Cuba

\* \* \*

(b)   Prohibition on travel relating to tourist activities

    (1)   In general

        Notwithstanding any other provision of law or regulation, the Secretary of the Treasury, or any other Federal official, may not authorize the travel-related transactions listed in subsection (c) of section 515.560 of title 31, Code of Federal Regulations, either by a general license or on a case-by-case basis by a specific license for travel to, from, or within Cuba for tourist activities.

    (2)   Definition

        In this subsection, the term "tourist activities" means any activity with respect to travel to, from, or within Cuba that is not expressly authorized in subsection (a) of this section, in any of paragraphs (1) through (12) of section 515.560 of title 31, Code of Federal Regulations, or in any section referred to in any of such paragraphs (1) through (12) (as such sections were in effect on June 1, 2000).

**31 C.F.R. § 515.560(a) (2016), Travel-Related Transactions to, from, and within Cuba by Persons Subject to U.S. Jurisdiction**

(a)     The travel-related transactions listed in paragraph (c) of this section may be authorized either by a general license or on a case-by-case basis by a specific license for travel related to the following activities (see the referenced sections for the applicable general and specific licensing criteria):

    (1)     Family visits (see § 515.561);

    (2)     Official business of the U.S. government, foreign governments, and certain intergovernmental organizations (see § 515.562);

    (3)     Journalistic activity (see § 515.563);

    (4)     Professional research and professional meetings (see § 515.564);

    (5)     Educational activities (see § 515.565);

    (6)     Religious activities (see § 515.566);

    (7)     Public performances, clinics, workshops, athletic and other competitions, and exhibitions (see § 515.567);

    (8)     Support for the Cuban people (see § 515.574);

    (9)     Humanitarian projects (see § 515.575);

    (10)     Activities of private foundations or research or educational institutes (see § 515.576);

    (11)     Exportation, importation, or transmission of information or informational materials (see § 515.545); and

    (12)     Certain export transactions that may be considered for authorization under existing Department of Commerce regulations and guidelines with respect to Cuba or engaged in by U.S.-owned or -controlled foreign firms (see §§ 515.533 and 515.559).

# 31 C.F.R. § 515.565 (2016), Educational Activities

\* \* \*

(b)    General license for people-to-people travel. The travel-related transactions set forth in § 515.560(c) and such additional transactions as are directly incident to educational exchanges not involving academic study pursuant to a degree program are authorized, provided that:

    (1)    Travel-related transactions pursuant to this authorization must be for the purpose of engaging, while in Cuba, in a full-time schedule of activities intended to enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities;

    (2)    Each traveler has a full-time schedule of educational exchange activities that will result in meaningful interaction between the traveler and individuals in Cuba;

    (3)    The predominant portion of the activities engaged in by individual travelers is not with a prohibited official of the Government of Cuba, as defined in § 515.337 of this part, or a prohibited member of the Cuban Communist Party, as defined in § 515.338 of this part;

    (4)    For travel conducted under the auspices of an organization that is a person subject to U.S. jurisdiction that sponsors such exchanges to promote people-to-people contact, an employee, paid consultant, or agent of the sponsoring organization must accompany each group traveling to Cuba to ensure that each traveler has a full-time schedule of educational exchange activities; and

    (5)    In addition to all other information required by § 501.601 of this chapter, persons relying on the authorization in paragraph (b) of this section must retain records sufficient to demonstrate that each individual traveler has engaged in a full-time schedule of activities that satisfy the requirements of paragraphs (b)(1) through (3) of this section. In the case of an individual traveling

under the auspices of an organization that is a person subject to U.S. jurisdiction and that sponsors such exchanges to promote people-to-people contact, the individual may rely on the entity sponsoring the travel to satisfy his or her recordkeeping requirements with respect to the requirements of paragraphs (b)(1) through (3) of this section. These records must be furnished to the Office of Foreign Assets Control on demand pursuant to § 501.602 of this chapter.

* * *

# 31 C.F.R. § 501.701, Penalties

(a)  Attention is directed to section 16 of the TWEA, as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (Pub. L. 101–410, as amended, 28 U.S.C. 2461 note), which provides that:

(1)  Persons who willfully violate any provision of TWEA or any license, rule, or regulation issued thereunder, and persons who willfully violate, neglect, or refuse to comply with any order of the President issued in compliance with the provisions of TWEA shall, upon conviction, be fined not more than $1,000,000 or, if an individual, be imprisoned for not more than 20 years, or both.

(2)  Any property, funds, securities, papers, or other articles or documents, or any vessel, together with its tackle, apparel, furniture, and equipment, concerned in a violation of TWEA may upon conviction be forfeited to the United States Government.

(3)  The Secretary of the Treasury may impose a civil penalty of not more than $105,083 per violation on any person who violates any license, order, or regulation issued under TWEA.

## 31 C.F.R. § 515.572(a) (2016), Authorization to Provide Travel Services, Carrier Services, and Remittance Forwarding Services

(a)     General licenses—

(1)     Authorization to provide travel services. Persons subject to U.S. jurisdiction are authorized to provide travel services in connection with travel-related transactions involving Cuba authorized pursuant to this part.

(2)     Authorization to provide carrier services.

(i)     Persons subject to U.S. jurisdiction are authorized to provide carrier services to, from, or within Cuba in connection with travel or transportation, directly or indirectly, between the United States and Cuba of persons, baggage, or cargo authorized pursuant to this part.

(ii)    The entry into blocked space, code-sharing, or leasing arrangements to facilitate the provision of carrier services by air authorized pursuant to section 515.572(a)(2) is authorized, including the entry into such arrangements with a national of Cuba.

(3)     Authorization to provide remittance forwarding services. Banking institutions, as defined in § 515.314, including U.S.-registered brokers or dealers in securities and U.S.-registered money transmitters, are authorized to provide services in connection with the collection, forwarding, or receipt of remittances authorized pursuant to this part.

(4)     Authorization to provide lodging services. Persons subject to U.S. jurisdiction who are providing carrier services by vessel authorized pursuant to paragraph (a)(2) of this section are authorized to provide lodging services onboard such vessels to persons authorized to travel to or from Cuba pursuant to this part during the period of time the vessel is traveling to, from, or within Cuba, including when docked at a port in Cuba.