No. 23-10171

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

HAVANA DOCKS CORPORATION,

*Plaintiff-Appellee-*
*Cross-Appellant,*

*v.*

ROYAL CARIBBEAN CRUISES, LTD., NORWEGIAN CRUISE LINE
HOLDINGS, LTD., CARNIVAL CORPORATION, a foreign
corporation doing business as Carnival Cruise Lines,
MSC CRUISES S.A. CO., MSC CRUISES (USA), INC., et al.,

*Defendants-Appellants-*
*Cross-Appellees.*

On Appeal from the United States District Court for the
Southern District of Florida (Hon. Beth Bloom)
(Nos. 19-cv-21724, 19-cv-23588, 19-cv-23590, 19-cv-23591)

### BRIEF FOR *AMICUS CURIAE*
### PETER KUCIK, FORMER OFAC OFFICIAL,
### IN SUPPORT OF APPELLANTS AND REVERSAL

Samuel V. Lioi
JONES DAY
901 Lakeside Avenue, E
Cleveland, OH 44114

Robert N. Stander
Ryan M. Proctor
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
rstander@jonesday.com

*Counsel for Amicus Curiae*

*No. 23-10171*
*Havana Docks Corporation v. Royal Caribbean Cruises, Ltd., et al.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with Eleventh Circuit Rule 26.1-1, counsel for amicus certifies that amicus represented herein is an individual person, and counsel believes the CIP included in the Appellants' briefs is complete.

/*s*/ Robert N. Stander
ROBERT N. STANDER

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF *AMICUS CURIAE* ...................................................... 1

STATEMENT OF THE ISSUES ................................................................ 2

SUMMARY OF ARGUMENT .................................................................. 2

BACKGROUND ....................................................................................... 3

    A.  History of Cuba Embargo Regulations ............................................ 3

    B.  The People-to-People Travel Provision ........................................... 7

    C.  OFAC's Enforcement Scheme ...................................................... 11

    D.  The District Court's Decision ........................................................ 13

ARGUMENT ........................................................................................... 15

I.    THE SCOPE OF "PEOPLE-TO-PEOPLE TRAVEL" MUST BE
    READ IN LIGHT OF OFAC'S CORE FOREIGN-AFFAIRS ROLE. .......... 15

    A.  The President serves a central foreign-affairs role in the Cuba
        Embargo and receives wide judicial latitude as a result. ............... 15

    B.  OFAC administers this core foreign-affairs function, and the "people-
        to-people travel" provision should be read in light of OFAC's
        longstanding role ........................................................................... 18

II.    BY IGNORING OFAC'S VIEWS, THE DISTRICT COURT GAVE
    THE PEOPLE-TO-PEOPLE TRAVEL EXCEPTION AN UNDULY
    NARROW READING. .......................................................................... 20

    A.  OFAC authorized a wide range of people-to-people travel. .......... 20

    B.  The district court's crabbed reading misconstrued the people-to-
        people travel exception and undermined OFAC's authority over
        foreign policy. ................................................................................ 22

CONCLUSION ........................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Biden v. Nebraska,*
No. 22-506, 2023 WL 4277210 (U.S. June 30, 2023) .................................... 17

*Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp. Civ. Aeronautics Bd.,*
333 U.S. 103 (1948) ..................................................................... 17

*Dames & Moore v. Regan,*
453 U.S. 654 (1981) ..................................................................... 17

*Dean Witter Reynolds, Inc. v. Fernandez,*
741 F.2d 355 (11th Cir. 1984) ......................................................... 23

*Epsilon Elecs., Inc. v. United States Dep't of the Treasury,*
168 F. Supp. 3d 131 (D.D.C. 2016) ................................................... 18

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ..................................................................... 19

*George v. McDonough,*
142 S. Ct. 1953 (2022) .................................................................. 24

*Gonzalez v. Reno,*
212 F.3d 1338 (11th Cir. 2000) ....................................................... 18

*Haig v. Agee,*
453 U.S. 280 (1981) ..................................................................... 17

*Hamdi v. Rumsfeld,*
542 U.S. 507 (2004) ..................................................................... 16

*Hartford Fire Ins. Co. v. California,*
509 U.S. 764 (1993) ..................................................................... 19

*Islamic Am. Relief Agency v. Gonzales,*
477 F.3d 728 (D.C. Cir. 2007) ......................................................... 18

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State,*
104 F.3d 1349 (D.C. Cir. 1997) ................................................................ 17

*Murray v. Charming Betsy,*
6 U.S. (2 Cranch) 64 (1804) ..................................................................... 19

*Nixon v. Administrator of General Services,*
433 U.S. 425 (1977) .................................................................................. 20

*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.,*
715 F.3d 1268 (11th Cir. 2013) ........................................................*passim*

*Parker Drilling Mgmt. Servs., Ltd. v. Newton,*
139 S. Ct. 1881 (2019) ................................................................................ 6

*Regan v. Wald,*
468 U.S. 222 (1984) .......................................................................... 4, 5, 17

*Sale v. Haitian Ctrs. Council,*
509 U.S. 155 (1993) .................................................................................. 19

*Sosa v. Alvarez-Machain,*
542 U.S. 692 (2004) .................................................................................. 18

*Trump v. Hawaii,*
138 S. Ct. 2392 (2018) .............................................................................. 20

*United States v. Belmont,*
301 U.S. 324 (1937) .................................................................................. 16

*United States v. Curtiss-Wright Exp. Corp.,*
299 U.S. 304 (1936) .................................................................................. 16

*United States v. Fausto,*
484 U.S. 439 (1988) .................................................................................. 19

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Weinberger v. Rossi,*
    456 U.S. 25 (1982) ........................................................................................... 19

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ......................................................................................... 17

*Zivotofsky v. Kerry,*
    576 U.S. 1 (2015) ............................................................................................. 16

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

U.S. CONST. Article II, § 1 ........................................................................................ 15

U.S. CONST. Article II, § 2 ........................................................................................ 15

U.S. CONST. Article II, § 3 ........................................................................................ 15

U.S. CONST. Article III ............................................................................................. 16

5 U.S.C. § 702 ........................................................................................................... 13

5 U.S.C. § 703 ........................................................................................................... 13

5 U.S.C. § 704 ........................................................................................................... 13

50 U.S.C. § 4315 ....................................................................................................... 13

Helms-Burton Act, Pub. L. No. 104-114, 110 Stat. 785
    (codified at 22 U.S.C. § 6021 *et seq.*) ............................................................ 5
    22 U.S.C. § 6032 ........................................................................................ 5, 19
    22 U.S.C. § 6064 ............................................................................................. 5
    22 U.S.C. § 6082 ............................................................................................. 5
    22 U.S.C. § 6091 ............................................................................................. 6
    50 U.S.C. § 4315 ........................................................................................... 13

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Trade Sanctions Reform and Export Enhancement Act of 2000,
  Pub. L. No. 106-387, Title IX, 114 Stat. 1549
  (codified at 22 U.S.C. § 7201 *et seq.*) ............................................................. 5
  22 U.S.C. § 7209 .................................................................................... 5, 6, 7, 19

Trading with the Enemy Act of 1917, *as amended by*, Act of Mar. 9, 1933,
  ch. 1, § 2, 48 Stat. 1 ...................................................................................... 3

## REGULATORY AUTHORITIES

31 C.F.R. § 501.703 ........................................................................................ 11, 13

31 C.F.R. § 501.706 ............................................................................................. 13

31 C.F.R. § 501.707 ............................................................................................. 13

31 C.F.R.§ 501.708 .............................................................................................. 13

31 C.F.R. § 501.709 ............................................................................................. 13

31 C.F.R. § 501.713 ............................................................................................. 13

31 C.F.R. § 501.740 ............................................................................................. 13

31 C.F.R. § 501.741 ............................................................................................. 13

Cuban Assets Control Regulations, 31 C.F.R. pt. 515 ........................................ 4
  31 C.F.R. § 515.201 ......................................................................................... 4
  31 C.F.R. § 515.317 ......................................................................................... 4
  31 C.F.R. § 515.318 ......................................................................................... 5
  31 C.F.R. § 515.501 *et seq.* ............................................................................ 4
  31 C.F.R. § 515.560 .................................................................................... 6, 7, 23
  31 C.F.R. § 515.565 .................................................................................. 7, 10, 11
  31 C.F.R. § 515.701 ....................................................................................... 11

27 Fed. Reg. 1085 (Feb. 7, 1962) ..................................................................... 4

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

60 Fed. Reg. 54,194 (Oct. 20, 1995) ..................................................... 8

64 Fed. Reg. 25,808 (May 13, 1999) ................................................... 8, 9

68 Fed. Reg. 14,141 (Mar. 24, 2003) ................................................... 9

69 Fed. Reg. 33,768 (June 16, 2004) ................................................... 9

74 Fed. Reg. 57,593 (Nov. 9, 2009) ................................................... 12

76 Fed. Reg. 5072 (Jan. 28, 2011) ...................................................... 9

80 Fed. Reg. 2291(Jan. 16, 2015) ................................................... 10, 11

81 Fed. Reg. 13,989 (Mar. 16, 2016) ........................................10, 20, 21

82 Fed. Reg. 51,998 (Nov. 9, 2017) ................................................... 11

84 Fed. Reg. 25,992 (June 5, 2019) ................................................... 11

87 Fed. Reg. 35,088 (June 9, 2022) ................................................... 11

**OTHER AUTHORITIES**

*Bush Strengthens Cuba Embargo*, ABC News (July 13, 2001) ................................ 9

*Enforcement Information for October 27, 2015*, U.S. Dept. of Treasury ............................... 12

*Enforcement Information for January 12, 2017*, U.S. Dept. of Treasury ............................... 12

*Obama's Itinerary in Cuba*, N.Y. Times (Mar. 20, 2016) ..................................... 10

Barack Obama, *Remarks by the President at the Summit of the Americas Opening Ceremony*, The Obama White House (Apr. 17, 2009).................................... 9

Barack Obama, *Statement by the President on Cuba Policy Changes*, The Obama White House (Dec. 17, 2014).................................... 9, 21

# TABLE OF AUTHORITIES

### (continued)

**Page(s)**

Office of Foreign Assets Control,
*Civil Penalties and Enforcement Information, U.S. Dept. of Treasury,* ................................. 12

*People-to-People Program*, Eisenhower Presidential Library ................................................ 7

Pamphlet Regarding the High School Ambassador Program, Eisenhower
Presidential Library (1970) ...................................................................................... 8, 25

Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power over
Foreign Affairs*, 111 Yale L.J. 231 (2001) ...................................................... 16

U.S. Dep't of the Treasury, Office of Inspector General, "Terrorist
Financing/Money Laundering: Review of Travel to Cuba by Shawn
Carter and Beyoncé Knowles-Carter," Memorandum Report
OIG-CA-14-014, August 20, 2014 ................................................................. 12

Louise Shannon-Martin, *Student Ambassadors Go on European Adventure*,
Savannah Morning News (Aug. 7, 2011) ........................................................ 8

George Washington, *The Proclamation of Neutrality* (Apr. 22, 1793) .................................. 3

## STATEMENT OF IDENTITY AND INTEREST
## OF *AMICUS CURIAE*[1]

Amicus is a former official of the United States Department of the Treasury and its Office of Foreign Assets Control (OFAC).  Peter Kucik served as the OFAC senior sanctions policy advisor responsible for the Cuba Sanctions Program from 2009 until leaving the government in 2014, during which time he worked to implement President Obama's policy changes to ease restrictions on Cuba, including for travel, and drafted revisions to the Code of Federal Regulations to effectuate those changes.   He respectfully submits this brief as *Amicus Curiae* in support of Appellants and reversal.  Amicus seeks to convey his view of OFAC's role within the statutory and regulatory scheme discussed in the district court's opinion, including the Cuban Assets Control Regulations, the regulatory approval for travel to Cuba, and the interaction of these regulations with the "lawful travel" provision in the Helms-Burton Act.  His expertise and unique perspective on many of the regulations at issue in this case will assist the Court in reaching a decision consistent with the law.

---

[1] Counsel for all parties have consented to the filing of this brief.  No counsel for any party authored any part of this brief.  No party or counsel for any party contributed money that was intended to fund its preparation or submission.  No person other than *amicus* and its counsel contributed money intended to fund its preparation or submission.

## STATEMENT OF THE ISSUES

Whether the district court erred in holding that Appellant cruise lines were not engaged in lawful "people-to-people travel."

## SUMMARY OF ARGUMENT

The Executive Branch serves the leading role in foreign affairs, including for issues concerning the Cuba Embargo. And the Obama Administration took a uniquely permissive stance toward travel to Cuba, including—as relevant here—for so-called "people-to-people" travel. This broadly permissive stance was reflected in OFAC's persistently loosening regulatory regime and its not finding any violation to support enforcement actions against cruise lines despite specific requests by the plaintiff to investigate.

Yet the district court brushed all of these realities aside—and the typical latitude afforded to the Executive in the foreign-affairs realm—when it interpreted and implemented the "lawful travel" provision of the Helms-Burton Act. The court instead inserted itself into the typical role of OFAC and strictly scrutinized every jot and tittle of cruise ship passengers' itineraries to deem the travel too touristy—and thus unlawful.

The district court overstepped and underanalyzed. It overstepped by trying to fill OFAC's shoes without giving any regard for the agency's role in implementing the President's foreign-policy agenda. Indeed, the court effectively interpreted the Helms-Burton Act to turn OFAC's attempts to normalize relations with Cuba on their head—i.e., having the effect of discouraging rather than encouraging travel there. And it

2

underanalyzed by giving short shrift to what "people-to-people" exchanges meant historically and the level of scrutiny required by a court analyzing this core foreign-affairs question. Because the district court improperly concluded that Appellant cruise lines' conduct fell outside the Helms-Burton Act's exception for "lawful travel," this Court should reverse.

## BACKGROUND

### A. History of Cuba Embargo Regulations

1.     Under our Constitution, the President plays a central role in times of international conflict in determining what contact Americans can have with foreign nations. This role dates back to President George Washington's 1793 Proclamation of Neutrality, in which he unilaterally decided that the United States would be neutral in the war between Great Britain and France and that Americans aiding either side would be liable for prosecution. *See* George Washington, *The Proclamation of Neutrality* (Apr. 22, 1793), https://perma.cc/ZGL6-7L6A.

Congress has recognized and reinforced this role by statute. Through the Trading with the Enemy Act of 1917, as amended in 1933, it authorized the President, upon declaring a "period of national emergency," to "investigate, regulate, or prohibit . . . by means of licenses or otherwise, any transactions in foreign exchange." Act of Mar. 9, 1933, ch. 1, § 2, 48 Stat. 1, 1. In other words, Congress "gave the President broad authority to impose comprehensive embargoes on foreign countries as

one means of dealing with both peacetime emergencies and times of war." *Regan v. Wald*, 468 U.S. 222, 225–26 (1984).

**2.**    Under that authority, President Kennedy proclaimed an embargo on trade with Cuba in 1962. *See* Proclamation 3447 § 1, 27 Fed. Reg. 1085 (Feb. 7, 1962).[2]  His proclamation directed the Secretary of the Treasury to carry out the embargo and "to make such exceptions thereto, by license or otherwise," as would be consistent with the effective operation of the embargo. *Id.* § 2.  The Secretary in turn delegated his authority to OFAC, where it resides today. *See Regan*, 468 U.S. at 226 n.2.  The following year, OFAC promulgated the Cuban Assets Control Regulations (CACR), 31 C.F.R. pt. 515, implementing the embargo, which it continues to administer.  *See Regan*, 468 U.S. at 225; *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1276 (11th Cir. 2013).

OFAC's embargo regulations are "pervasive." *Odebrecht Constr.*, 715 F.3d at 1277. The CACR operate by first prohibiting all transactions in which Cuba or a Cuban national has an interest, and then granting licenses to authorize permissible transactions. *See* 31 C.F.R. §§ 515.201(a), 515.501 *et seq*.  The licenses take two forms: "general" and "specific."  To authorize broad categories of transactions for the public, OFAC promulgates regulations that constitute "general license[s]." *Id.* § 515.317.  And to

---

[2] The President's power to impose travel and trade restrictions in peacetime emergencies now resides in the International Emergency Economic Powers Act, but that Act explicitly allows the President to maintain the Cuba embargo under the Trading with the Enemy Act. *See Regan*, 468 U.S. at 232–40.

authorize transactions for individual applicants, OFAC issues "specific license[s]." *Id.* § 515.318.

The CACR apply to travel too. From 1963 until 1977, travel to Cuba was effectively banned under the CACR. *See Regan*, 468 U.S. at 227–28. In 1977, however, the Carter Administration made changes to the regulations that essentially lifted the travel ban. *See id.* And since the Reagan Administration's changes in 1982, the regulations have authorized travel for various non-tourism reasons. *See id.* at 229. The specifics of lawful travel to Cuba—and thus the corresponding exemptions from the embargo—have shifted over time from presidential administration to administration.

**3.** During the Clinton Administration, Congress codified certain aspects of the embargo by passing the Cuban Liberty and Democratic Solidarity Act—or "Helms-Burton Act"—of 1996, Pub. L. No. 104-114, 110 Stat. 785 (codified at 22 U.S.C. § 6021 *et seq.*). The Act requires the embargo to remain in place until the President finds that Cuba has transitioned to a democratic government. 22 U.S.C. §§ 6032(h), 6064. The Act also establishes a civil remedy against anyone who "traffics" in property confiscated by the Castro regime. *Id.* § 6082(a)(1)(A). Similarly, Congress passed the Trade Sanctions Reform and Export Enhancement Act of 2000 , Pub. L. No. 106-387, tit. IX, 114 Stat. 1549 (codified at 22 U.S.C. § 7201 *et seq.*). That statute prohibits any federal official from authorizing travel to Cuba "for tourist activities." 22 U.S.C. § 7209(b)(1). The "term 'tourist activities' means any" travel to Cuba "that is not expressly

authorized . . . in any of paragraphs (1) through (12) of [31 C.F.R. § 515.560(a)]." *Id.* § 7209(b)(2).

OFAC's authority otherwise remained intact. Although in some ways codifying the embargo, the Helms-Burton Act continues to recognize the authority of the President, acting through OFAC, to define permissible categories of travel to Cuba. The Act's civil-remedy provision has an exception for "transactions and uses of property incident to lawful travel to Cuba, to the extent that [they] are necessary to the conduct of such travel." *Id.* § 6091(b)(2)(B)(iii). The Act does not define "lawful travel," which must be interpreted in light of OFAC's preexisting and leading authority to define the scope of lawful travel to Cuba. *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) ("It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'").

And the statutory provision that limits "tourist" travel references a portion of the CACR enumerating several authorized grounds for obtaining a license to visit Cuba. *See* 22 U.S.C. § 7209(b)(2). In other words, by statutory design, OFAC's travel regulations necessarily define the scope of lawful travel. The Executive thus retains core authority for these embargo-related policy determinations.

**B. The People-to-People Travel Provision.**

This case concerns travel for educational activities, 31 C.F.R. § 515.560(a)(5), and within that category "people-to-people travel" in particular, *id.* § 515.565(b).[3] From the early days of the Cold War, the United States has sought to promote long-term peace through people-to-people travel that familiarizes other nations with the American people and American values. The government did not, however, permit such travel to Cuba until the 1990s. Since then, as with the Cuba embargo provisions generally, the rules governing this type of travel have varied greatly across presidential administrations, corresponding with Chief Executives' tough or conciliatory foreign-policy stances toward the country.

**1.** The concept of "people-to-people" travel originated with President Eisenhower. In 1956, he "established the "People-to-People Program," a student-exchange program designed to foster lasting peace during the Cold War through "the exchange of ideas and experiences directly among peoples of different countries and diverse cultures." *People-to-People Program*, Eisenhower Presidential Library, https://perma.cc/RW5L-Z8M6 (last visited July 1, 2023). Originally linked to the U.S. government, *id.*, by 1962 the program had become a separately incorporated non-profit that organized trips for high school students around the world. *See* Pamphlet Regarding

---

[3] This Court should be careful not to reach issues beyond this case's scope. The Cuba Embargo permits other forms of non-tourist transactions besides the ones at issue here. *Cf.* 22 U.S.C. § 7209. As one example, this case does not concern how the Helms-Burton Act applies to cargo travel and the like. *Cf., e.g.*, 31 C.F.R. § 515.560(c)(1).

the High School Ambassador Program (1970), Eisenhower Presidential Library, https://perma.cc/E92L-Y2FS. Students selected for the Program traveled to foreign countries over the summer, where they would "visit those schools still in session and talk to the students," "be a guest in selected homes" to "become acquainted with the customs of other countries," and "participate with [local] young people in social activities and sports." *Id.* Traditional sightseeing was also part of the Program: students would participate in "visits to museums, historical spots and other points of interest." *Id.* The Program continued to organize trips into the 2010s. *See, e.g.*, Louise Shannon-Martin, *Student Ambassadors Go on European Adventure*, Savannah Morning News (Aug. 7, 2011), https://perma.cc/4H34-SYFF.

2.      The CACR, however, did not allow people-to-people travel programs until the Clinton Administration. Yet it was allowed only on a more-limited basis—and sometimes not at all—until the Obama Administration broadened it.

In 1995, under President Clinton, OFAC amended the CACR to permit travel licenses for "educational activities" for the first time. 60 Fed. Reg. 54,194, 54,195 (Oct. 20, 1995). But it allowed licenses only for "formal" college or graduate study and teaching, and even then only specific licenses granted "on a case-by-case basis." *Id.* at 54,197.

The Clinton Administration went further in 1999. It expanded the exception to include formal programs for "secondary school" students. 64 Fed. Reg. 25,808, 25,817 (May 13, 1999). And it also allowed educational travel outside a formal course of study

"to promote people-to-people contact." *Id.* Still, such travel would only be approved "on a case-by-case basis," and only "under the auspices of an organization that sponsors and organizes such programs." *Id.*

Even these limited expansions proved controversial, however, and when George W. Bush took office, they were reversed in part. President Bush believed tightening the embargo would be the best policy.[4] Accordingly, OFAC eliminated licenses for people-to-people educational exchanges, 68 Fed. Reg. 14,141, 14,142 (Mar. 24, 2003), and then for formal study by secondary school students, 69 Fed. Reg. 33,768, 33,769 (June 16, 2004).

**3.**    Upon taking office in 2009, President Obama took a diametrically opposite approach. The President desired a "new beginning with Cuba."[5] And he sought nothing less than "to normalize relations between our two countries."[6]

President Obama's changes to educational travel rules reflected his ambition. In his first term, OFAC essentially "restore[d]" President Clinton's allowance for people-to-people travel. 76 Fed. Reg. 5072, 5073 (Jan. 28, 2011). In his second term, OFAC went further. It established a *general* license for person-to-person travel, and it dropped

---

[4] *See Bush Strengthens Cuba Embargo*, ABC News (July 13, 2001), https://perma.cc/5TW3-97VH.

[5] Barack Obama, *Remarks by the President at the Summit of the Americas Opening Ceremony*, The Obama White House (Apr. 17, 2009), https://perma.cc/6DJW-M9BU.

[6] Barack Obama, *Statement by the President on Cuba Policy Changes*, The Obama White House (Dec. 17, 2014), https://perma.cc/66VT-C26Q.

the requirement that such travel occur under the auspices of a sponsoring organization. 81 Fed. Reg. 13,989, 13,992 (Mar. 16, 2016) (the "2016 amendments").  Now any American could travel to Cuba provided she maintain a "full-time schedule of educational exchange activities that will result in meaningful interaction between the traveler and individuals in Cuba."  *Id.*

President Obama himself modeled the sort of contact he sought to promote. Just days after OFAC issued revised regulations on people-to-people travel, he became the first American President to visit Cuba since Fidel Castro took power in 1959. *Obama's Itinerary in Cuba*, N.Y. Times (Mar. 20, 2016), https://perma.cc/2YM2-NR8Y. In his three days on the island, he sought to promote closer relations not just through meetings with government officials, but through cultural events.  He walked through the streets of Havana, toured the Havana Cathedral, and attended a state dinner.  And the culmination of the visit was attending a baseball game.  *Id.*

Yet the people-to-people exception's reach remained largely undefined.  An organization would satisfy the general license if, for example, it sponsored an exchange "for individuals to learn side-by-side with Cuban individuals in areas such as environmental protection or the arts" where "[t]he travelers will have a full-time schedule of educational exchange activities that will result in meaningful interaction between the travelers and individuals in Cuba."  80 Fed. Reg. 2291; *see* § 515.565 (2015) (example).  And OFAC added more travel-permissive examples over time.  *E.g.*, 81 Fed. Reg. 13,989; *see* § 515.565 (effective October 2016) (additional examples of qualifying

people-to-people contacts).  But on the other end, "[t]ransactions related to activities that" were "*primarily* tourist-oriented"—say, "self-directed educational activities that are intended only for personal enrichment"—were "not authorized pursuant to this section." 80 Fed. Reg. 2291; *see* § 515.565(c) (2015) (emphasis added).  Crucially, the regulations otherwise left considerable interpretive room beyond these contours.

    **4.**    After President Obama left office, the Trump Administration reversed course.  Following the President's signing of a June 2017 Cuba policy initiative, OFAC amended the CACR to remove self-guided people-to-people travel. 82 Fed. Reg. 51,998 (Nov. 9, 2017); *see* § 515.565(b)(1)–(4) (2017).  Then in 2019, OFAC entirely "remove[d] the authorization for group people-to-people educational travel in § 515.565(b)." 84 Fed. Reg. 25,992, 25,992 (June 5, 2019); *see* § 515.565(b) (2019).

    This too, however, was not destined to last.  Last year, under the Biden Administration, OFAC restored the general license for people-to-people travel, which remains in force today.  87 Fed. Reg. 35,088, 35,090–91 (June 9, 2022); *see* § 515.565(b) (current version).  The upshot of this history is that the President, via OFAC, has core authority to broaden and constrain the embargo's reach.  And this pattern has repeated over and over from administration to administration.

### C. OFAC's Enforcement Scheme

    OFAC's enforcement structure safeguards compliance.  OFAC enforces its licenses and the CACR through the agency's extensive administrative process for investigating and adjudicating violations.  31 C.F.R. § 515.701; *see id.* § 501.703(a).  If

OFAC finds a violation, the agency may impose penalties ranging from civil monetary sanctions and license denial or suspension—all the way to referral for criminal prosecution. *See* 74 Fed. Reg. 57,593, 57,602 (Nov. 9, 2009).

Several examples of OFAC's enforcement decisions appear on the agency's website.[7] OFAC has utilized its enforcement procedures against entities and individuals that violated the CACR travel restrictions, including violations that occurred during the Obama Administration's more permissive regulatory outlook.[8]

But the agency also declines to take enforcement actions based on various criteria, including when "there is insufficient evidence to conclude that a violation has occurred," even after referrals from outside sources. *See* 74 Fed. Reg. at 57,602; *cf.* U.S. Dep't of the Treasury, Office of Inspector General, "Terrorist Financing/Money Laundering: Review of Travel to Cuba by Shawn Carter and Beyoncé Knowles-Carter," Memorandum Report OIG-CA-14-014, August 20, 2014 (OFAC's decision not to initiate enforcement proceedings for Beyoncé and Jay-Z's 5-year anniversary trip to Cuba deemed reasonable after congressional inquiry).

---

[7] *See* Office of Foreign Assets Control, *Civil Penalties and Enforcement Information*, U.S. Dept. of Treasury, https://ofac.treasury.gov/civil-penalties-and-enforcement-information (last visited at July 5, 2023).

[8] *See, e.g.*, *Enforcement Information for January 12, 2017*, U.S. Dept. of Treasury, https://ofac.treasury.gov/civil-penalties-and-enforcement-information/2017-enforcement-information (enforcement action against Alliance for Responsible Cuba Policy Foundation for Obama-era conduct); *Enforcement Information for October 27, 2015*, U.S. Dept. of Treasury, https://ofac.treasury.gov/civil-penalties-and-enforcement-information/2015-enforcement-information (same for Gil Tours Travel, Inc.).

When OFAC does pursue its enforcement authority, alleged violators receive several procedural protections. OFAC must notify a suspected violator of an alleged violation, allow the suspected violator to defend against the alleged violation, and find whether the violation occurred and warrants a civil penalty. 31 C.F.R. §§ 501.703(a)(1)–(3), 501.706–09. If OFAC finds that a violation occurred and warrants a civil penalty, the suspected violator can seek a hearing with an Administrative Law Judge (ALJ)—and a designee of the Secretary of the Treasury may administratively review the ALJ's decision. *Id.* §§ 501.703(a)(3)–(6), 501.713, 501.740, 501.741(a), 501.742. From there, suspected violators can seek judicial review of final decisions under the Administrative Procedure Act (APA). *Id.* §§ 501.703(a)(7), 501.741(g); *see* 5 U.S.C. §§ 702–04. And Congress codified this review regime in the Helms-Burton Act by amending the TWEA to provide that the Treasury Secretary may impose civil penalties against "any person who violates any license, order, rule, or regulation issued in compliance with the provisions of this [chapter]," such as the CACR. Helms-Burton Act, § 102(d)(1), 110 Stat. at 793 (codified at 50 U.S.C. § 4315(b)(1)); *cf.* Appellants' Joint Opening Br. 14–15.

### D. The District Court's Decision

The travel at issue here occurred when the 2016 amendments were still in force. During that time, the Appellant cruise ship companies traveled to Cuba and docked at the Havana Cruise Port Terminal. According to Plaintiff Havana Docks Corporation (HDC), the Appellants' travel to Cuba was unlawful, and the use of the Cruise Terminal constituted trafficking in confiscated property, in violation of the Helms-Burton Act.

13

HDC initially asked OFAC to bring an enforcement action against the cruise ship companies, but OFAC, in its legal and policy judgment, determined that no enforcement action was warranted. *See* MSC.Dkt.357-17 at 126–28. HDC then filed a Helms-Burton claim against Appellants in the Southern District of Florida, and the district court saw things differently than OFAC.

In largely granting summary judgment in HDC's favor, the court held that the "lawful travel" exception to the Helms-Burton Act did not apply to the Appellants' conduct here despite the specific and general licenses afforded to them under the regulations. NCL.Dkt.367 at 113–45. To reach this result, however, the court conducted an extensive minute-by-minute scrutiny of cruise guests' activities— criticizing snippets of programming (such as attending guided tours, watching shows, drinking, and dancing) as essentially too fun to constitute people-to-people exchanges from the court's vantage. *See id.* at 120–45. The court thus found these activities too touristy and the overall programs insufficiently educational. *Id.* Yet nowhere did the court pinpoint how (or why) the law requires the court—rather than, say, the agency tasked with enforcing the regime—to conduct this strict, itinerary-level scrutiny.

The problems continued. Beyond trying to fill OFAC's shoes, the court otherwise gave short shrift to what "people-to-people" exchanges meant historically and the level of scrutiny required by a court analyzing this core foreign-affairs question. And the court likewise brushed away the reality that the Executive Branch refused to

14

deem the cruise lines' conduct unlawful—and decidedly brought no enforcement actions—even in light of specific inquiries for it to do so. *Id.* at 113–14.

In the end, then, the court opted to strictly analyze the guests' behavior while lethargically assessing the regulatory regime at play. The court's methodology faltered on both edges—and thus produced an erroneous conclusion on the lawful-travel issue.

## ARGUMENT

## I. THE SCOPE OF "PEOPLE-TO-PEOPLE TRAVEL" MUST BE READ IN LIGHT OF OFAC'S CORE FOREIGN-AFFAIRS ROLE.

The President, through OFAC, has primary authority for determining lawful travel under the Cuba Embargo regulations. These determinations involve sensitive policy decisions. And different administrations take different stances on these policy questions. Yet the district court's analysis improperly intrudes on these sensitive foreign-affairs questions.

### A. The President serves a central foreign-affairs role in the Cuba Embargo and receives wide judicial latitude as a result.

The President (not the judiciary) has inherent and delegated power over foreign policy regarding the Cuba Embargo. And the vast power afforded to the Executive in this sphere corresponds with a light judicial touch on such matters.

**1.** Start with the President's inherent power over foreign policy generally. The Constitution vests in the President "[t]he executive Power," U.S. CONST. art. II, § 1, provides that he "shall be Commander in Chief of the" Armed Forces, § 2, and places

in him the power to recognize foreign governments, § 3; *but cf.* U.S. CONST. art. III (containing no similar oversight of foreign affairs).

These Constitutional provisions thus grant the Executive significant power in the foreign-policy realm. *Cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J., dissenting) ("[T]he President ha[s] primary responsibility—along with the necessary power—to . . . conduct the Nation's foreign relations."); Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power over Foreign Affairs*, 111 Yale L.J. 231, 253 (2001) (Founding-era evidence suggests that the "executive Power" included broad foreign affairs powers). Especially for matters of "diplomatic relations," then, the President "ha[s] authority to speak as the sole organ of th[e] government" and thus needs room to speak with "one voice" in such sensitive policy areas. *Zivotofsky v. Kerry*, 576 U.S. 1, 5, 14–15, 18 (2015) (quoting *United States v. Belmont*, 301 U.S. 324, 330 (1937)); *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (similar).

**2.** The same holds true for Cuba policy in particular. The President, as shown above, has historically served a central role in Cuba policy and in the embargo over the island country. *See supra* at 4–6, 8–11. This was true before Congress enacted the Helms-Burton Act that officially codified certain aspects of the Cuba Embargo. *Odebrecht Constr.*, 715 F.3d at 1276 & n.1. And it remained true after the enactment— Congress reaffirmed presidential authority to enforce the embargo. *Id.*

So Cuba sanctions regulations concern apex presidential power. Not only does the embargo involve quintessential presidential powers, but Congress has also

specifically reaffirmed the President's core role in enforcing it. When "the President acts pursuant to an express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress"—and thus "the executive action 'would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'" *Dames & Moore v. Regan*, 453 U.S. 654, 668 (1981) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

**3.** For all these reasons, too, the Executive traditionally receives significant regard from Article III courts. The Executive's responsibility in this field often poses "delicate" and "complex" questions involving "large elements of prophecy . . . for which the Judiciary has neither aptitude, facilities nor responsibility." *Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp. Civ. Aeronautics Bd.*, 333 U.S. 103, 111 (1948) (Jackson, J.). Given this structural concentration of foreign-affairs power in the political branches, courts tread lightly when adjudicating matters involving international relations. *See id.*; *Regan*, 468 U.S. at 242–243 (applying "classical deference to the political branches in matters of foreign policy" to Cuba travel restrictions); *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy . . . are rarely proper subjects for judicial intervention."); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) ("By long-standing tradition, courts have been wary of second-guessing executive branch decision[s] involving complicated foreign policy matters."); *see also Biden v. Nebraska*, No. 22-506, 2023 WL 4277210, at *17, *19 (U.S.

17

June 30, 2023) (Barrett, J., concurring) ("Background legal conventions," such as our "system of separated powers," "are part of [a] statute's context.").

As a result, the Supreme Court has emphasized the importance of judicial restraint in cases with "potential implications for the foreign relations of the United States," noting that courts should be "particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004). Indeed, as this Circuit put it: "[I]n no context is the executive branch entitled to more deference than in the context of foreign affairs." *Gonzalez v. Reno*, 212 F.3d 1338, 1353 (11th Cir. 2000).

## B. OFAC administers this core foreign-affairs function, and the "people-to-people travel" provision should be read in light of OFAC's longstanding role.

That is where OFAC reenters. As discussed, the agency has long enforced the regulations implementing Cuba sanctions (the CACR), including the scope of lawful travel. *See Odebrecht Constr.*, 715 F.3d at 1276. In so doing, OFAC operates "in an area at the intersection of national security, foreign policy, and administrative law" that merits courts' considerable regard. *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007); *see also Epsilon Elecs., Inc. v. United States Dep't of the Treasury*, 168 F. Supp. 3d 131, 139–40 (D.D.C. 2016).

Against this backdrop, Congress enacted subsequent statutes, including the Helms-Burton Act and its "lawful travel" exception. Yet Congress merely codified the

Executive's regulatory and enforcement scheme in the process. *See Odebrecht Constr.*, 715 F.3d at 1275 n.1, 1276. In fact, Congress enacted the Helms-Burton Act with knowledge of OFAC's Cuba regulations, and incorporated the bounds of lawful travel atop this framework. *See* 22 U.S.C. §§ 6032(h), 7209(b)(2). Congress otherwise largely left intact OFAC's longstanding role.

These legal structures—the Helms-Burton Act's lawful travel exception on one hand and OFAC's primary enforcement role on the other—must be reconciled. It is a "classic judicial task" to read laws in a way that makes "sense in combination." *United States v. Fausto*, 484 U.S. 439, 453 (1988); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (similar). So too, courts construe statutes in light of the Executive's foreign policy responsibilities. *See, e.g.*, *Murray v. Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("[A]n act of congress ought never to be construed to violate the law of nations if any other possible construction remains."). The Supreme Court has regularly invoked this type of interpretive rule to avoid construing legislation in violation of the United States' international commitments. *See, e.g.*, *Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 178 n.35 (1993); *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982); *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 814–15 (1993) (Scalia, J., dissenting).

At bottom, the Helms-Burton Act must be harmonized with OFAC's longstanding role in this context. Given Congress's codification of the OFAC-enforced regulations, any interpretation of the Helms-Burton Act must accord with OFAC's regulatory framework—and must not impinge on the Executive Branch's power in this

area. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 443 (1977) (action unlawful when it "prevents the Executive Branch from accomplishing its constitutionally assigned functions"); *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) (courts hesitate to "intrud[e] on the President's constitutional responsibilities in the area of foreign affairs" given the lack of expertise).

## II. BY IGNORING OFAC'S VIEWS, THE DISTRICT COURT GAVE THE PEOPLE-TO-PEOPLE TRAVEL EXCEPTION AN UNDULY NARROW READING.

OFAC manifestly meant for the people-to-people travel exception to apply broadly. By disregarding its views, the district court adopted an unnaturally crabbed reading of the provision and undermined the Executive's leading role to conduct foreign policy toward Cuba.

### A. OFAC authorized a wide range of people-to-people travel.

Through the 2016 amendments to the CACR, OFAC plainly meant to establish a generous interpretation of "people-to-people travel" to implement President Obama's vision of normalizing relations between the United States and Cuba. This is evident for at least three reasons.

*First*, the amendments established a general license for people-to-people travel. 81 Fed. Reg. at 13,992. Previously, under Presidents Clinton and Bush and the earlier years of the Obama Administration, individuals could only engage in people-to-people travel to Cuba—to the extent it was allowed at all—by a specific license. *Supra* at 8–9.

20

As a matter of established policy, OFAC will not grant a specific license falling within the terms of a general license.  *See* Appellants' Joint Opening Br. 17.  The 2016 amendments thus do not simply permit individuals to travel without obtaining OFAC's pre-approval; they effectively require it.  That can only be a workable approach if an individual can readily ascertain the permissibility of a travel program from the general thrust of its activities.  If close, minute-by-minute scrutiny is needed to determine a trip's lawfulness, there would be no way for travelers to know for sure whether their travel was lawful.

*Second*, the amendments eliminated the requirement that people-to-people travel occur "under the auspices of an organization . . . that sponsors [educational] exchanges to promote people-to-people contact."  *See* 81 Fed. Reg. at 13,992.  If such a requirement were still in place, a high bar for compliance with the license would be more understandable.  If there is a sponsoring organization in charge in each case, the organization at least can be trusted to be a sophisticated entity that is knowledgeable about the contours of the governing rule.  Instead, OFAC determined ordinary people with no familiarity in the specifics of the embargo could be trusted to figure out for themselves whether their activities promote genuine people-to-people contact.

*Third*, the amendments are explicit that they "implement certain policy measures announced by the President on December 17, 2014 to further engage and empower the Cuban people."  *Id.* at 13,989.  That is the speech at which President Obama announced his intention to "normalize relations" with Cuba.  *Statement by the President on Cuba Policy*

*Changes*, *supra*. This indicates that the people-to-people travel license is meant to allow for a broad range of activities fostering contact between Americans and Cubans and should not be given an unduly narrow reading that thwarts that purpose.

**B. The district court's crabbed reading misconstrued the people-to-people travel exception and undermined OFAC's authority over foreign policy.**

The district court's hard-look approach to the person-to-person exemption thwarted OFAC's manifest intention in establishing it. If allowed to stand, it would seriously interfere with the Executive's ability to establish United States policy toward Cuba.

1.    The district court's approach eviscerates OFAC's authority to grant general licenses. To repeat, before the 2016 amendments, OFAC had in place a system of case-by-case approval for person-to-person travel. The switch to a general license was meant to abandon that approach to make person-to-person travel generally available. Under the district court's reasoning, however, the effect is simply to transfer case-by-case approval from OFAC to the federal courts. *Someone* will still scrutinize the minute details of travelers' itineraries. But instead of obtaining prospective permission from the agency responsible for implementing the President's foreign policy objectives, travelers and travel companies will instead be assessed for civil damages on the back end by federal courts. In effect, the district court impermissibly stepped into the shoes of the head of OFAC for a day, usurping the essential role of OFAC in determining foreign policy regarding travel to Cuba.

The perverse result of this approach is to make a general-license regime less friendly to travel than a specific-license regime. A specific license may be harder to obtain, but a party that obtains one has assurance that its travel is lawful. After all, a specific license conclusively "authorize[s]" a person's concrete travel plans under the CACR. *See Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355, 357 (11th Cir. 1984). In contrast, if courts conduct strict scrutiny of the genuineness of a traveler's educational activities, OFAC cannot give assurance by a general license that a traveler's plans are lawful. Certainty only comes at the back end, when the trip is already complete and the only question is whether the traveler should be subject to ruinous civil liability. Travel pursuant to a general license becomes a high-stakes gamble, and the risk averse approach is simply not to go. Thus, as the district court would have it, OFAC's attempts to normalize relations with Cuba actually had the effect of discouraging travel there.

2.      The district court's go-it-alone approach also led it to read the person-to-person travel provision in isolation. But "[f]ederal policy towards Cuba . . . is nuanced, it is highly calibrated, and it is constantly being fine-tuned." *Odebrecht Constr.*, 715 F.3d at 1278. And the history behind the exemption for person-to-person travel sheds light on its meaning. Had the district court given more consideration to the Executive's views, it could have interpreted the provision in its proper context, rather than adopt the strict, ham-fisted reading that it did.

Although the district court spent a great deal of its analysis on the Appellant cruise lines' activities, it spent very little on the meaning of section 515.560. It did not

discuss the evolution of that provision across presidential administrations, nor did it discuss the origins of the phrase "people-to-people travel." Instead, it appeared to take for granted its own gut intuition of what "*proper* people-to-people travel" is and then analyzed Appellants' activities in detail to see whether they met that intuition. NCL.Dkt.367 at 119. And under that intuition, it appears that almost any time not spent actually talking to Cuban locals could not constitute people-to-people travel. Thus, for instance, in an excursion that involved touring the art displays in a neighborhood of Havana and then discussing public art with locals in that neighborhood, only the latter activity constituted people-to-people exchange, despite its obvious connection to the former. *Id.* at 123. This was error.

The phrase "people-to-people travel" is not a common expression in everyday parlance, making it an especially hazardous phrase for a court to define by shooting from the hip in a case involving retrospective damages. But as discussed above, OFAC did not invent the term. It originated with the program President Eisenhower developed to promote cross-cultural understanding with the Soviet Union through the exchange of students and other ordinary Americans. *Supra* at 7–8. When a legal text "employs a term of art 'obviously transplanted from another legal source,' it 'brings the old soil with it,'" and carries the "same meaning" as it did in the original source. *George v. McDonough*, 142 S. Ct. 1953, 1959 (2022). That is the case here, since OFAC plainly used this otherwise unusual expression in an analogous context—to denote a form of

encouraged travel to a traditionally hostile communist country in the context of promoting warmer relations.

The People to People Program was never strictly limited to structured dialogue. It included, for instance, "sports," "social activities" and "visits to museums" and "other points of interest." *See* Pamphlet Regarding the High School Ambassador Program, *supra*. Accordingly, the district court's sense of "*proper* people-to-people travel" was too narrow.

Similarly, the district court did not account for the evolution of the people-to-people travel provision. As discussed, the 2016 amendments eliminated historic limitations on the provision, allowing individual Americans to engage in people-to-people travel to Cuba without obtaining a specific license in advance or going under the auspices of a sponsoring organization. *Supra* at 9–11. This implies a judgment that there are a wide variety of meaningful people-to-people interactions—as varied and diverse as the American people themselves—and that OFAC did not mean to unduly limit or predetermine what those activities might look like. To the extent the district court disagreed and found such activities (including contracting with Cuban companies for excursions) to cross the threshold from people-to-people activities to tourism, it extended beyond the judicial ken without due regard for OFAC's leading role.

Note, too, that if this Court takes a similarly far-reaching approach—or interprets the Helms-Burton Act in a way that extends beyond just this people-to-people context—it could enmesh the judiciary in all matter of complicated foreign-

affairs and traditionally regulatory matters in future Helms-Burton lawsuits. *Cf. supra* n.3 (noting that this court should carefully avoid issues beyond this case's scope). Such a result was inappropriate here and would likewise be improper in other contexts.

In sum, the people-to-people travel provision cannot be properly understood apart from its long and intricate history. The district court read the provision without the benefit of OFAC's knowledge of this history, failed to extend appropriate deference to the Executive's leading views, impermissibly conducted what amounts to strict scrutiny of travel itineraries, and adopted an unduly crabbed reading of the regulation.

## CONCLUSION

This Court should reverse.

Respectfully submitted,

/*s*/ Robert N. Stander

Samuel V. Lioi
JONES DAY
901 Lakeside Avenue, E
Cleveland, OH 44114

Robert N. Stander
Ryan Proctor
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
rstander@jonesday.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations contained in Federal Rule of Appellate Procedure 29(a)(5) because, excluding the portions exempted by Rule 32(f), the brief contains 5,950 words, as determined by the Microsoft Word 2016 program used to prepare it.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Garamond.

Dated:  July 7, 2023                    */s/* Robert N. Stander
                                        ROBERT N. STANDER

                                        *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on July 7, 2023, I caused the foregoing brief to be electronically filed with the United States Court of Appeals for the Eleventh Circuit using the ECF system, which automatically serves e-mail notification of such filings to the attorneys of record who are registered participants in the Court's electronic notice and filing system and each of whom may access this filing via the Court's Appellate PACER system.

Dated: July 7, 2023

/s/ Robert N. Stander
_____
ROBERT N. STANDER

*Counsel for Amicus Curiae*