Nos. 23-10151 & 23-10171

# In the United States Court of Appeals for the Eleventh Circuit

HAVANA DOCKS CORPORATION,
*Plaintiff-Appellee*
v.
ROYAL CARIBBEAN CRUISES, LTD.,
*Defendant-Appellant*

HAVANA DOCKS CORPORATION,
*Plaintiff-Appellee-Cross Appellant*
v.
ROYAL CARIBBEAN CRUISES, LTD.,
NORWEGIAN CRUISE LINE HOLDINGS, LTD.,
CARNIVAL CORPORATION,
a foreign corporation doing business as Carnival Cruise Lines,
MSC CRUISES S.A. CO.,
MSC CRUISES (USA), INC., *et al.*,
*Defendants-Appellants-Cross Appellees*

*On Appeal from the U.S. District Court for the Southern District of Florida*
*Civil Nos. 19-21724, 19-23588, 19-23590, 19-23591*
*The Honorable Beth Bloom, J.*

## BRIEF OF PLAINTIFF-APPELLEE
## HAVANA DOCKS CORPORATION

Roberto Martínez
Stephanie A. Casey
Zachary A. Lipshultz
Thomas A. Kroeger
Aziza F. Elayan
Sabrina S. Saieh
COLSON HICKS EIDSON, P.A.
255 Alhambra Circle, Penthouse
Coral Gables, FL   33134

Christopher Landau
Richard Klingler
ELLIS GEORGE CIPOLLONE O'BRIEN LLP
1155 F Street N.W., Suite 750
Washington, DC   20004
(202) 249-6900
*clandau@egcfirm.com*

Vincent H. Li
ELLIS GEORGE CIPOLLONE O'BRIEN LLP
152 West 57th Street, 28th floor
New York, NY   10019

September 29, 2023

*Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*
**AMENDED CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1, Plaintiff-Appellee Havana Docks Corporation hereby certifies that the following is a complete list of persons and entities having an interest in the outcome of these cases. Entries marked with an asterisk have been added or changed since Havana Docks' last filing.

1. 1972 Productions, Inc. Florida – Carnival Corporation Subsidiary

2. A.C.N. 098 290 834 Pty. Ltd. Australia – Carnival Corporation Subsidiary

3. A.J. Juneau Dock, LLC Alaska – Carnival Corporation Subsidiary

4. Admiral Management Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

5. Adventure Island Ltd. Bahamas – Carnival Corporation Subsidiary

6. Adventure of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

7. AIDA Kundencenter GmbH Germany – Carnival Corporation Subsidiary

8. AIDAradio GmbH Germany – Carnival Corporation Subsidiary

9.  Air-Sea Holiday GmbH Switzerland – Carnival Corporation Subsidiary

10. Akerman LLP – counsel for Carnival Corporation

11. Alaska Hotel Properties LLC Delaware – Carnival Corporation Subsidiary

12. Allure of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

13. American Society of Travel Advisors, Inc. – Amicus Curiae Supporting Defendants-Appellants

14. Anthem of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

15. Arrasas Limited Isle of Man – Norwegian Cruise Line Holdings, Ltd. Subsidiary

16. Baldridge, James D. – former counsel for MSC Cruises S.A.

17. Balmori, Daniel – counsel for Norwegian Cruise Line Holdings, Ltd.

18. Barcelona Cruise Terminal SLU Spain – Carnival Corporation Subsidiary

19. Bash III, John F. – counsel for Norwegian Cruise Line Holdings, Ltd

20. Bay Island Cruise Port, S.A. Honduras – Carnival Corporation Subsidiary

21. Behn, Aphra – shareholder of Havana Docks Corporation

22. Behn, Mickael – director of Havana Docks Corporation

23. Behn-Lucain, Melanie – shareholder of Havana Docks Corporation

24. Belize Cruise Terminal Limited Belize – Carnival Corporation Subsidiary

25. Belize Investments Limited St. Lucia – Norwegian Cruise Line Holdings, Ltd. Subsidiary

26. Belize Island Holdings Ltd. Belize – Norwegian Cruise Line Holdings, Ltd. Subsidiary

27. Bermuda Tenders, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

28. Black, Hillary S. – counsel for Carnival Corporation

29. Bloom, Honorable Beth – United States District Court Judge

30. Bluvacanze Spa Italy – MSC Cruises S.A. Subsidiary

31. Bohrer, Sanford L. – counsel for Royal Caribbean Cruises, Ltd.

32. Boies Schiller Flexner LLP – counsel for Carnival Corporation

33. Bondi, Bradley J. – counsel for Amici Curiae U.S. Travel Association, United States Tour Operators Association, Inc., and the American Society of Travel Advisors, Inc. Supporting Defendants-Appellants

34. Breakaway Four, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

35. Breakaway One, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

36. Breakaway Three, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

37. Breakaway Two, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

38. Brilliance of the Seas Shipping Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

39. Buffett, Warren E. – shareholder of Havana Docks Corporation

40. Burck, William Anthony – counsel for Norwegian Cruise Line Holdings, Ltd.

41. Caluda, Nicholas John – counsel for Norwegian Cruise Line Holdings, Ltd.

42. Canodros CL Ecuador – Royal Caribbean Cruises Ltd. Subsidiary

43. Carnival (UK) Limited UK – Carnival Corporation Subsidiary

44. Carnival Bahamas FC Limited Bahamas – Carnival Corporation Subsidiary

45. Carnival Bahamas Holdings Limited Bahamas – Carnival Corporation Subsidiary

46. Carnival Corporation (CCL) – Appellant

47. Carnival Corporation & plc Asia Pte. Ltd. Singapore – Carnival Corporation Subsidiary

48. Carnival Corporation Hong Kong Limited Hong Kong – Carnival Corporation Subsidiary

49. Carnival Corporation Korea Ltd. Korea – Carnival Corporation Subsidiary

50. Carnival Corporation Ports Group Japan KK Japan – Carnival Corporation Subsidiary

51. Carnival Finance, LLC Delaware – Carnival Corporation Subsidiary

52. Carnival Grand Bahama Investment Limited Bahamas – Carnival Corporation Subsidiary

53. Carnival Holdings (Bermuda) Limited Bermuda – Carnival Corporation Subsidiary

54. Carnival Investments Limited Bahamas – Carnival Corporation Subsidiary

55. Carnival Japan, Inc. Japan – Carnival Corporation Subsidiary

56. Carnival License Holdings Limited Bahamas – Carnival Corporation Subsidiary

57. Carnival Maritime GmbH Germany – Carnival Corporation Subsidiary

58. Carnival North America LLC Florida – Carnival Corporation Subsidiary

59. Carnival PLC UK – Carnival Corporation Subsidiary

60. Carnival Port Holdings Limited UK – Carnival Corporation Subsidiary

61. Carnival Ports Inc. Florida – Carnival Corporation Subsidiary

62. Carnival Support Services India Private Limited India – Carnival Corporation Subsidiary

63. Carnival Technical Services (UK) Limited UK – Carnival Corporation Subsidiary

64. Carnival Technical Services Finland Limited Finland – Carnival Corporation Subsidiary

65. Carnival Technical Services GmbH Germany – Carnival Corporation Subsidiary

66. Carnival Vanuatu Limited Vanuatu – Carnival Corporation Subsidiary

67. Casey, Stephanie A. – counsel for Havana Docks Corporation

68. CC U.S. Ventures, Inc. Delaware – Carnival Corporation Subsidiary

69. CCL Gifts, LLC Florida – Carnival Corporation Subsidiary

70. Celebrity Apex Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

71. Celebrity Cruise Lines Inc. Cayman Islands – Royal Caribbean Cruises Ltd. Subsidiary

72. Celebrity Cruises Holdings Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

73. Celebrity Cruises Inc., doing business as Celebrity Cruises Liberia – Royal Caribbean Cruises Ltd. Subsidiary

74. Celebrity Eclipse Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

75. Celebrity Edge Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

76. Celebrity Equinox Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

77. Celebrity Reflection Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

78. Celebrity Silhouette Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

79. Celebrity Solstice Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

80. Cisalpina Tours Spa Italy – MSC Cruises S.A. Subsidiary

81. Classic Cruises II, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

82. Classic Cruises, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

83. Clement & Murphy PLLC – counsel for Royal Caribbean Cruises, Ltd.

84. Clement, Paul D. – counsel for Royal Caribbean Cruises, Ltd.

85. CNS Compañia Naviera Seaside 1 SA Panama – MSC Cruises S.A. Subsidiary

86. Colson Hicks Eidson – counsel for Havana Docks Corporation

87. Compañia Naviera Evo 1 SA Panama – MSC Cruises S.A. Subsidiary

88. Compañia Naviera Evo 2 SA Panama – MSC Cruises S.A. Subsidiary

89. Compañia Naviera Fantasia SA Panama – MSC Cruises S.A. Subsidiary

90. Compañia Naviera Meraviglia SA Panama – MSC Cruises S.A. Subsidiary

91. Compañia Naviera Musica SA Panama – MSC Cruises S.A. Subsidiary

92. Compania Naviera Ocean Cay SA Panama – MSC Cruises S.A. Subsidiary

93. Compañia Naviera Orchestra SA Panama – MSC Cruises S.A. Subsidiary

94. Compañia Naviera Pacifica S.A. Panama – MSC Cruises S.A. Subsidiary

95. Compañia Naviera Preziosa SA Panama – MSC Cruises S.A. Subsidiary

96. Compañia Naviera Seaside 2 SA Panama – MSC Cruises S.A. Subsidiary

97. Compañia Naviera Serenata SA Panama – MSC Cruises S.A.

   Subsidiary

98. Compañia Naviera Vista 1 SA Panama – MSC Cruises S.A.

   Subsidiary

99. Compañia Naviera Vista 2 SA Panama – MSC Cruises S.A.

   Subsidiary

100. Compañia Naviera Vista 3 SA Panama – MSC Cruises S.A.

   Subsidiary

101. Compañia Naviera Vista 4 SA Panama – MSC Cruises S.A.

   Subsidiary

102. Compañia Naviera Vista 5 SA Panama – MSC Cruises S.A.

   Subsidiary

103. Compañia Naviera World Class 1 SA Panama – MSC Cruises S.A.

   Subsidiary

104. Compañia Naviera World Class 2 SA Panama – MSC Cruises S.A.

   Subsidiary

105. Compañia Naviera World Class 3 SA Panama – MSC Cruises S.A.

   Subsidiary

106. Compañia Naviera World Class 4 SA Panama – MSC Cruises S.A. Subsidiary

107. Compañia Naviera Yc1 SA Panama – MSC Cruises S.A. Subsidiary

108. Compañia Naviera Yc2 SA Panama – MSC Cruises S.A. Subsidiary

109. Compañia Naviera Yc3 SA Panama – MSC Cruises S.A. Subsidiary

110. Compañia Naviera Yc4 SA Panama – MSC Cruises S.A. Subsidiary

111. Compañia Naviera Yc5 SA Panama – MSC Cruises S.A. Subsidiary

112. Compañia Naviera Yc6 SA Panama – MSC Cruises S.A. Subsidiary

113. Constellation Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

114. Cooke, Honorable Marcia G. – United States District Judge

115. Cooper, Jonathan Gordon – counsel for Norwegian Cruise Line Holdings, Ltd

116. Costa Crociere PTE Ltd. Singapore – Carnival Corporation Subsidiary

117. Costa Crociere S.p.A. Italy – Carnival Corporation Subsidiary

118. Costa Cruceros S.A. Argentina – Carnival Corporation Subsidiary

119. Costa Cruise Lines Inc. Florida – Carnival Corporation Subsidiary

120. Costa Cruise Lines UK Limited UK – Carnival Corporation Subsidiary

121. Costa Cruises Customer Center S.L.U. Spain – Carnival Corporation Subsidiary

122. Costa Cruises Shipping Services (Shanghai) Company Limited China – Carnival Corporation Subsidiary

123. Costa Cruises Travel Agency (Shanghai) Co., Ltd. China – Carnival Corporation Subsidiary

124. Costa Cruises Turkey Turizm Gelisim A.S. Turkey – Carnival Corporation Subsidiary

125. Costa Cruzeiros Agencia Maritima e Turismo Ltda. Brazil – Carnival Corporation Subsidiary

126. Costa International B.V. Netherlands – Carnival Corporation Subsidiary

127. Costa Kreuzfahrten GmbH Switzerland – Carnival Corporation Subsidiary

128. Cozumel Cruise Terminal S.A. de C.V. Mexico – Carnival Corporation Subsidiary

129. Cruise Administration Services, Inc. Philippines – Carnival Corporation Subsidiary

130. Cruise Conglomerate Maritime Ltd Guernsey – MSC Cruises S.A. Subsidiary

131. Cruise Lines International Association – Amicus Curiae Supporting Defendants-Appellants

132. Cruise Quality Travel Spain SL Spain – Norwegian Cruise Line Holdings, Ltd. Subsidiary

133. Cruise Ships Catering & Services International N.V. Curacao – Carnival Corporation Subsidiary

134. Cruise Terminal Services, S.A. de C.V. Mexico – Carnival Corporation Subsidiary

135. Cruiseport Curacao C.V. Curacao – Carnival Corporation Subsidiary

136. CSMART Real Estate B.V. Netherlands – Carnival Corporation Subsidiary

137. CSMART Real Estate C.V. Netherlands – Carnival Corporation Subsidiary

138. D.R. Cruise Port, Ltd. Bahamas – Carnival Corporation Subsidiary

139. Dvoretzky, Shay – counsel for Amicus Curiae Cruise Lines International Association Supporting Defendants-Appellants

140. Elayan-Martinez, Aziza F. – counsel for Havana Docks Corporation

141. Ellis George Cipollone O'Brien Annaguey LLP – counsel for Havana Docks Corporation

142. Enchantment of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

143. Eurosoft Corporation Limited United Kingdom – Norwegian Cruise Line Holdings, Ltd. Subsidiary

144. Eurosoft Cruise Line (Shanghai) Co., Ltd. China – Norwegian Cruise Line Holdings, Ltd. Subsidiary

145. Explora SA Switzerland – MSC Cruises S.A. Subsidiary

146. Explorer II New Build, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

147. Explorer III New Build, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

148. Explorer New Build, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

149. Explorer of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

150. F.P.M. SAS French Polynesia – Carnival Corporation Subsidiary

151. F.P.P. SAS French Polynesia – Carnival Corporation Subsidiary

152. Fields, Lazaro – counsel for Havana Docks Corporation

153. Fleet Maritime Services (Bermuda) Limited Bermuda – Carnival Corporation Subsidiary

154. Fleet Maritime Services Holdings (Bermuda) Limited Bermuda – Carnival Corporation Subsidiary

155. Fleet Maritime Services International Limited Bermuda – Carnival Corporation Subsidiary

156. Foreman Friedman, PA – counsel for Amicus Curiae Cruise Lines International Association Supporting Defendants in the District Court

157. Fowler III, George J. – counsel for Carnival Corporation

158. Freedom of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

159. Freyre, Pedro A. – counsel for Carnival Corporation

160. Friedman, Darren Wayne – Counsel for Amicus Curiae Cruise Lines International Association Supporting Defendants in the District Court

161. Future Investments, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

162. Gayles, Honorable Darrin P. – United States District Court Judge

163. GG Operations Inc. Delaware – Royal Caribbean Cruises Ltd. Subsidiary

164. Gibs, Inc. Delaware – Carnival Corporation Subsidiary

165. Global Experience Innovators, Inc. Florida – Carnival Corporation Subsidiary

166. Global Fine Arts, Inc. Florida – Carnival Corporation Subsidiary

167. Global Fleet Management LLC Liberia – Royal Caribbean Cruises Ltd. Subsidiary

168. Global Fleet Management Two LLC Liberia – Royal Caribbean Cruises Ltd. Subsidiary

169. Global Shipping Service (Shanghai) Co., Ltd. China – Carnival Corporation Subsidiary

170. Going Srl Italy – MSC Cruises S.A. Subsidiary

171. Goodman, Honorable Jonathan – United States Magistrate Judge

172. Goulette Cruise Holding Limited UK – MSC Cruises S.A. Subsidiary

173. Grand Cruise Shipping Unipessoal LdA Portugal (Madeira) – Carnival Corporation Subsidiary

174. Grand Turk Cruise Center Ltd. Turks & Caicos – Carnival Corporation Subsidiary

175. Grandeur of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

176. Gray, Corey P. – counsel for Carnival Corporation

177. Great Stirrup Cay Limited Bahamas – Norwegian Cruise Line Holdings, Ltd. Subsidiary

178. Greensboro S.L. Spain – Royal Caribbean Cruises Ltd. Subsidiary

179. Gwart Srl Italy – MSC Cruises S.A. Subsidiary

180. GXI, LLC Delaware – Carnival Corporation Subsidiary

181. HAL Antillen N.V. Curacao – Carnival Corporation Subsidiary

182. HAL Beheer B.V. Netherlands – Carnival Corporation Subsidiary

183. HAL Maritime Ltd. British Virgin Islands – Carnival Corporation Subsidiary

184. HAL Nederland N.V. Curacao – Carnival Corporation Subsidiary

185. HAL Properties Limited Bahamas – Carnival Corporation Subsidiary

186. HAL Services B.V. Netherlands – Carnival Corporation Subsidiary

187. Harmony of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

188. Harper, Chadwick J. – counsel for Royal Caribbean Cruises, Ltd.

189. Harvard Law School – counsel for Amicus Curiae Cruise Lines International Association Supporting Defendants in the District Court

190. Havana Docks Corporation – Appellee

191. Hernacki, Andrew T. – counsel for MSC Cruises S.A.

192. Hoch, Dorothy – shareholder of Havana Docks Corporation

193. Hogan Lovells LLP – counsel for Norwegian Cruise Line Holdings, Ltd.

194. Holding Division Iberocruceros SLU Spain – Carnival Corporation Subsidiary

195. Holland & Knight LLP – counsel for Royal Caribbean Cruises, Ltd. and Carnival Corporation

196. Holland America Line Inc. Washington – Carnival Corporation Subsidiary

197. Holland America Line N.V. Curacao – Carnival Corporation Subsidiary

198. Holland America Line U.S.A., Inc. Delaware – Carnival Corporation Subsidiary

199. Hospedagm De Pomene (Mozambique) Lda Mozambique – MSC Cruises S.A. Subsidiary

200. HSE Hamburg School of Entertainment GmbH Germany – Carnival Corporation Subsidiary

201. Ibero Cruzeiros Ltda. Brazil – Carnival Corporation Subsidiary

202. Iberocruceros SLU Spain – Carnival Corporation Subsidiary

203. Independence of the Seas Inc. – Royal Caribbean Cruises Ltd. Subsidiary

204. Infinity Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

205. Information Assistance Corporation Bermuda – Carnival Corporation Subsidiary

206. Insignia Vessel Acquisition, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

207. International Cruise Services, S.A. de C.V. Mexico – Carnival Corporation Subsidiary

208. International Leisure Travel Inc. Panama – Carnival Corporation Subsidiary

209. International Maritime Recruitment Agency, S.A. de C.V. Mexico – Carnival Corporation Subsidiary

210. Island for Science, Inc. Indiana – Royal Caribbean Cruises Ltd. Subsidiary

211. Islas Galapagos Turismo y Vapores CA Ecuador – Royal Caribbean Cruises Ltd. Subsidiary

212. Jewel of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

213. Johnson, Jerry M. – director of Havana Docks Corporation

214. Jones Day – counsel for Amicus Curiae Peter Kucik Supporting Defendants-Appellants

215. Jones Walker, LLP – counsel for Carnival Corporation

216. Kats, Vitaliy – counsel for Amici Curiae U.S. Travel Association, United States Tour Operators Association, Inc., and the American Society of Travel Advisors, Inc. Supporting Defendants-Appellants

217. Klingler, Richard – counsel for Havana Docks Corporation

218. Kroeger, Thomas A. – counsel for Havana Docks Corporation

219. Krystalsea Limited British Virgin Islands – Norwegian Cruise Line Holdings, Ltd. Subsidiary

220. Kucik, Peter – Amicus Curiae Supporting Defendants-Appellants

221. Kwazulu Cruise Terminal (Pty) Ltd South Africa – MSC Cruises S.A. Subsidiary

222. Labadee Investments Ltd. Cayman Islands – Royal Caribbean Cruises Ltd. Subsidiary

223. Landau, Christopher – counsel for Havana Docks Corporation

224. Leonardo Five, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

225. Leonardo Four, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

226. Leonardo One, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

227. Leonardo Six, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

228. Leonardo Three, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

229. Leonardo Two, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

230. Li, Vincent – counsel for Havana Docks Corporation

231. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

232. Liberty of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

233. Lindsay III, Alvin F. – counsel for Norwegian Cruise Line Holdings, Ltd.

234. Lioli, Samuel V. – counsel for Amicus Curiae Peter Kucik Supporting Defendants-Appellants

235. Lipshultz, Zachary A. –counsel for Havana Docks Corporation

236. Lipshutz, Brian M. – counsel for Carnival Corporation

237. Llamas, Luis Emilio – counsel for Carnival Corporation

238. Loeb, Robert – counsel for MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.

239. Longoria-Green, Carmen N. – counsel for Amicus Curiae The Chamber of Commerce of the United States of America Supporting Defendants-Appellants

240. Lorenzo, Richard C. – counsel for Norwegian Cruise Line Holdings, Ltd.

241. Louis, Honorable Lauren F. – United States Magistrate Judge

242. Lutz, Zachary P. – counsel for Norwegian Cruise Line Holdings, Ltd

243. MacArthur Trust – shareholder of Havana Docks Corporation

244. Maderal, Francisco – former counsel for Havana Docks Corporation

245. Manhas, Robbie – counsel for MSC Cruises S.A. Co., MSC Cruises (USA), Inc.; MSC Cruises, S.A.

246. Marcus, Steven – counsel for Amicus Curiae Cruise Lines International Association Supporting Defendants-Appellants

247. Margol & Margol, P.A. – counsel for Havana Docks Corporation

248. Margol, Rodney S. – counsel for Havana Docks Corporation (now at Spohrer Dodd Trial Attorneys)

249. Marina New Build, LLC Republic of the Marshall Islands – Norwegian Cruise Line Holdings, Ltd. Subsidiary

250. Mariner of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

251. Mariner, LLC Republic of the Marshall Islands – Norwegian Cruise Line Holdings, Ltd. Subsidiary

252. Marseille Provence Cruise Terminal SAS France – MSC Cruises S.A. Subsidiary

253. Martinez, Honorable Jose E. – United States District Court Judge

254. Martinez, Roberto – counsel for Havana Docks Corporation

255. Massey & Gail LLP – counsel for Amicus Curiae Cruise Lines International Association Supporting Defendants in the District Court

256. Massey, Jonathan S. – counsel for Amicus Curiae Cruise Lines International Association Supporting Defendants in the District Court

257. Mayer Brown LLP – counsel for Amicus Curiae The Chamber of Commerce of the United States of America Supporting Defendants-Appellants

258. McAliley, Honorable Chris M. – United States Magistrate Judge

259. Mediterranean Cruises Travel Agency (Shanghai) Co Ltd China – MSC Cruises S.A. Subsidiary

260. Michel, Christopher – counsel for Norwegian Cruise Line Holdings, Ltd

261. Milestone N.V. Curacao – Carnival Corporation Subsidiary

262. Millennium Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

263. Moriceau, Alisha – counsel for Carnival Corporation

264. Msc Crewing Services Philippines Philippines – MSC Cruises S.A. Subsidiary

265. MSC Cruceros SA Argentina – MSC Cruises S.A. Subsidiary

266. MSC Cruceros SA Spain – MSC Cruises S.A. Subsidiary

267. MSC Cruise Management (UK) Ltd UK – MSC Cruises S.A. Subsidiary

268. MSC Cruises (Australia) Pty Ltd Australia – MSC Cruises S.A. Subsidiary

269. MSC Cruises (Canada) Ltd Canada – MSC Cruises S.A. Subsidiary

270. MSC Cruises (Ireland) Ltd Ireland – MSC Cruises S.A. Subsidiary

271. MSC Cruises (USA) Inc USA – MSC Cruises S.A. Subsidiary

272. MSC Cruises (USA) Inc. – Appellant

273. MSC Cruises Asia Company Ltd China – MSC Cruises S.A. Subsidiary

274. MSC Cruises Barcelona Terminal SL Spain – MSC Cruises S.A. Subsidiary

275. MSC Cruises Belgium NV Belgium – MSC Cruises S.A. Subsidiary

276. MSC Cruises Gmbh Germany – MSC Cruises S.A. Subsidiary

277. MSC Cruises Japan Ltd Japan – MSC Cruises S.A. Subsidiary

278. MSC Cruises Limited UK – MSC Cruises S.A. Subsidiary

279. MSC Cruises Ltd Cyprus – MSC Cruises S.A. Subsidiary

280. MSC Cruises S.A. Co. – Appellant

281. MSC Cruises Scandinavia AB Sweden – MSC Cruises S.A. Subsidiary

282. MSC Cruises Ship Management (Shanghai) Ltd China – MSC Cruises S.A. Subsidiary

283. MSC Cruises Shipping Service (Shanghai) Ltd China – MSC Cruises S.A. Subsidiary

284. MSC Cruises The Netherlands BV Netherlands – MSC Cruises S.A. Subsidiary

285. MSC Cruises, S.A. – Appellant

286. MSC Cruzeiros Do Brasil Ltda Brazil – MSC Cruises S.A. Subsidiary

287. MSC Cruzeiros SA Portugal – MSC Cruises S.A. Subsidiary

288. MSC Food & Beverage Division Spa Italy – MSC Cruises S.A. Subsidiary

289. MSC Italcatering Do Brasil Ltda Brazil – MSC Cruises S.A. Subsidiary

290. MSC Kreuzfahrten (Austria) Gmbh Austria – MSC Cruises S.A. Subsidiary

291. MSC Kreuzfahrten AG Switzerland – MSC Cruises S.A. Subsidiary

292. MSC Krstarenja Doo Croatia – MSC Cruises S.A. Subsidiary

293. MSC Kruvaziyer Turizm AS Turkey – MSC Cruises S.A. Subsidiary

294. MSC Logistics (Mozambique) Ltd Mozambique – MSC Cruises S.A. Subsidiary

295. Msc Malta Seafarers Company Ltd Malta – MSC Cruises S.A. Subsidiary

296. MSC Mediagrafica Srl Italy – MSC Cruises S.A. Subsidiary

297. MSC Miami Cruise Terminal LLC USA – MSC Cruises S.A. Subsidiary

298. MSC Ocean Cay Ltd Bahamas – MSC Cruises S.A. Subsidiary

299. MSC Starlight Cruises Pty Ltd South Africa – MSC Cruises S.A. Subsidiary

300. Munyan, Katherine – counsel for MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.

301. Musica Cruise Limited UK – MSC Cruises S.A. Subsidiary

302. Nautica Acquisition, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

303. Navigator of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

304. Navigator Vessel Company, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

305. Navitrans S.R.L. Italy – Carnival Corporation Subsidiary

306. NCL (Bahamas) Ltd. d/b/a Norwegian Cruise Line Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

307. NCL (Guernsey) Limited Guernsey – Norwegian Cruise Line Holdings, Ltd. Subsidiary

308. NCL America Holdings, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

309. NCL America LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

310. NCL Australia Pty Ltd. Australia – Norwegian Cruise Line Holdings, Ltd. Subsidiary

311. NCL Construction Corp., Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

312. NCL Corporation Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

313. NCL Cruises Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

314. NCL Emerald Corporation, Limited Ireland – Norwegian Cruise Line Holdings, Ltd. Subsidiary

315. NCL Finance, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

316. NCL HK Holding, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

317. NCL Holding AS Norway – Norwegian Cruise Line Holdings, Ltd. Subsidiary

318. NCL Hong Kong Limited Hong Kong – Norwegian Cruise Line Holdings, Ltd. Subsidiary

319. NCL International, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

320. NCL Japan KK Japan – Norwegian Cruise Line Holdings, Ltd. Subsidiary

321. NCL Singapore Pte. Ltd. Singapore – Norwegian Cruise Line Holdings, Ltd. Subsidiary

322. NCL UK IP CO LTD UK – Norwegian Cruise Line Holdings, Ltd. Subsidiary

323. NCL US IP CO 1, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

324. NCL US IP CO 2, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

325. NCLC Investments Canada Ltd. Canada – Norwegian Cruise Line Holdings, Ltd. Subsidiary

326. NCLM Limited Malta – Norwegian Cruise Line Holdings, Ltd. Subsidiary

327. Nelson, Timothy G. – counsel for Amicus Curiae Cruise Lines International Association Supporting Defendants-Appellants

328. Nemeroff, Justin B. – counsel for MSC Cruises S.A.

329. New Co Armonia SA Panama – MSC Cruises S.A. Subsidiary

330. New Co Lirica SA Panama – MSC Cruises S.A. Subsidiary

331. New Co Opera SA Panama – MSC Cruises S.A. Subsidiary

332. New Co S32 SA Panama – MSC Cruises S.A. Subsidiary

333. New Co Sinfonia SA Panama – MSC Cruises S.A. Subsidiary

334. Norford, Elizabeth – counsel for Carnival Corporation

335. Norwegian Carnival Ltd United Kingdom – Norwegian Cruise Line Holdings, Ltd. Subsidiary

336. Norwegian Compass Ltd. United Kingdom – Norwegian Cruise Line Holdings, Ltd. Subsidiary

337. Norwegian Cruise Co. Inc. Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

338. Norwegian Cruise Line Agéncia de Viagens Ltda. Brazil – Norwegian Cruise Line Holdings, Ltd. Subsidiary

339. Norwegian Cruise Line Group Italy S.r.l. Italy – Norwegian Cruise Line Holdings, Ltd. Subsidiary

340. Norwegian Cruise Line Group UK Limited (formerly Prestige Cruise Services (Europe) Limited) United Kingdom – Norwegian Cruise Line Holdings, Ltd. Subsidiary

341. Norwegian Cruise Line Holdings, Ltd. (NCLH) – Appellant

342. Norwegian Cruise Line India Private Limited India – Norwegian Cruise Line Holdings, Ltd. Subsidiary

343. Norwegian Dawn Limited Isle of Man – Norwegian Cruise Line Holdings, Ltd. Subsidiary

344. Norwegian Epic, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

345. Norwegian Gem, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

346. Norwegian Jewel Limited Isle of Man – Norwegian Cruise Line Holdings, Ltd. Subsidiary

347. Norwegian Pearl, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

348. Norwegian Sextant Ltd. United Kingdom – Norwegian Cruise Line Holdings, Ltd. Subsidiary

349. Norwegian Sky, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

350. Norwegian Spirit, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

351. Norwegian Star Limited Isle of Man – Norwegian Cruise Line Holdings, Ltd. Subsidiary

352. Norwegian Sun Limited Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

353. Norwegian USCRA, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

354. Nualy Investments Inc Panama – MSC Cruises S.A. Subsidiary

355. Class Plus One, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

356. Class Plus Two, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

357. Oasis of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

358. Ocean Bahamas Innovation Ltd. Bahamas – Carnival Corporation Subsidiary

359. Ocean Medallion Fulfillment, Ltd. Bahamas – Carnival Corporation Subsidiary

360. Oceanadventures S.A. Ecuador – Royal Caribbean Cruises Ltd. Subsidiary

361. Oceania Cruises S. de R.L. (formerly Oceania Cruises, Inc.) Panama – Norwegian Cruise Line Holdings, Ltd. Subsidiary

362. OCI Finance Corp. Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

363. Odds On Gaming Corporation Delaware – Carnival Corporation Subsidiary

364. Odyssey of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

365. Oliu, Pascual A. – counsel for Carnival Corporation

366. Operadora Catalina S.r.L. Dominican Republic – Carnival Corporation Subsidiary

367. Orrick, Herrington & Sutcliffe LLP – counsel for MSC Cruises S.A.

368. Otazo-Reyes, Honorable Alicia M. – United States Magistrate Judge

369. Ovation of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

370. P&O Princess American Holdings UK – Carnival Corporation Subsidiary

371. P&O Princess Cruises International Limited UK – Carnival Corporation Subsidiary

372. P&O Princess Cruises Pension Trustee Limited UK – Carnival Corporation Subsidiary

373. P&O Properties (California), Inc. California – Carnival Corporation Subsidiary

374. P&O Travel Limited UK – Carnival Corporation Subsidiary

375. Palumbo Malta Shipyard Limited Malta – MSC Cruises S.A. Subsidiary

376. Palumbo Shipyard Limited Malta – MSC Cruises S.A. Subsidiary

377. Paul Hastings, LLP – counsel for Amici Curiae U.S. Travel Association, United States Tour Operators Association, Inc., and the American Society of Travel Advisors, Inc. Supporting Defendants-Appellants

378. Paul, Weiss, Rifkind, Wharton & Garrison LLP – counsel for Carnival Corporation

379. Pegg, Allen P. – counsel for Norwegian Cruise Line Holdings, Ltd.

380. Pettlier, Romain Le – shareholder of Havana Docks Corporation

381. Piccapietra Finance S.r.l. Italy – Carnival Corporation Subsidiary

382. Ponce, Scott D. – counsel for Royal Caribbean Cruises, Ltd. And Carnival Corporation

383. Prestige Cruise Holdings S. de R.L. (formerly Prestige Cruise Holdings, Inc.) Panama – Norwegian Cruise Line Holdings, Ltd. Subsidiary

384. Prestige Cruise Services LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

385. Prestige Cruises Air Services, Inc. Florida – Norwegian Cruise Line Holdings, Ltd. Subsidiary

386. Prestige Cruises International S. de R.L. (formerly Prestige Cruises International, Inc.) Panama – Norwegian Cruise Line Holdings, Ltd. Subsidiary

387. Prestige Cruises Management S.A.M. Monaco – Carnival Corporation Subsidiary

388. Prestige Cruises N.V. Curacao – Carnival Corporation Subsidiary

389. Preziosa Cruise Limited UK – MSC Cruises S.A. Subsidiary

390. Pride of America Ship Holding, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

391. Pride of Hawaii, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

392. Princess Bermuda Holdings, Ltd. Bermuda – Carnival Corporation Subsidiary

393. Princess Cays Ltd. Bahamas – Carnival Corporation Subsidiary

394. Princess Cruise Corporation Inc. Panama – Carnival Corporation Subsidiary

395. Princess Cruise Lines, Ltd. Bermuda – Carnival Corporation Subsidiary

396. Princess Cruises and Tours, Inc. Delaware – Carnival Corporation Subsidiary

397. Princess U.S. Holdings, Inc. California – Carnival Corporation Subsidiary

398. Proctor, Ryan M – counsel for Amicus Curiae Peter Kucik Supporting Defendants-Appellants

399. Quantum of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

400. Quinn Emanuel Urquhart & Sullivan, LLP – counsel for Norwegian Cruise Line Holdings, Ltd

401. Radiance of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

402. RCI Holdings LLC Liberia – Royal Caribbean Cruises Ltd. Subsidiary

403. RCL (UK) Ltd. – Royal Caribbean Cruises Ltd. Subsidiary England and Wales

404. RCL Cruise Holdings LLC Liberia – Royal Caribbean Cruises Ltd. Subsidiary

405. RCL Cruises Ltd. – Royal Caribbean Cruises Ltd. Subsidiary England and Wales

406. RCL GEO LLC Florida – Royal Caribbean Cruises Ltd. Subsidiary

407. RCL Holdings Cooperatief U.A. Netherlands – Royal Caribbean Cruises Ltd. Subsidiary

408. RCL Horizon LLC Liberia – Royal Caribbean Cruises Ltd. Subsidiary

409. RCL Investments Ltd. – Royal Caribbean Cruises Ltd. Subsidiary England and Wales

410. RCL Monarch LLC Liberia – Royal Caribbean Cruises Ltd. Subsidiary

411. RCL New Vessel Holding Company LLC Liberia – Royal Caribbean Cruises Ltd. Subsidiary

412. RCL Sovereign LLC Liberia – Royal Caribbean Cruises Ltd. Subsidiary

413. RCL TUI Cruises German Holding GmbH & Co. KG Germany – Royal Caribbean Cruises Ltd. Subsidiary

414. RCL Worldwide (Hong Kong) Limited Hong Kong – Royal Caribbean Cruises Ltd. Subsidiary

415. RCL Worldwide Ltd. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

416. RCL Zenith LLC Liberia – Royal Caribbean Cruises Ltd. Subsidiary

417. RCT Maintenance & Related Services S.A. Honduras – Carnival Corporation Subsidiary

418. RCT Pilots & Related Services, S.A. Honduras – Carnival Corporation Subsidiary

419. RCT Security & Related Services S.A. Honduras – Carnival Corporation Subsidiary

420. Regatta Acquisition, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

421. Rhapsody of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

422. Rider-Longmaid, Parker – counsel for Amicus Curiae Cruise Lines International Association Supporting Defendants-Appellants

423. Riviera New Build, LLC Republic of the Marshall Islands – Norwegian Cruise Line Holdings, Ltd. Subsidiary

424. Roatan Cruise Terminal S.A. de C.V. Honduras – Carnival Corporation Subsidiary

425. Rosenkranz, E. Joshua – counsel for MSC Cruises S.A.

426. Rowen, Matthew D. – counsel for Royal Caribbean Cruises, Ltd.

427. Royal Caribbean Cruise Lines AS Norway – Royal Caribbean Cruises Ltd. Subsidiary

428. Royal Caribbean Cruises (Asia) Pte. Ltd. Singapore – Royal Caribbean Cruises Ltd. Subsidiary

429. Royal Caribbean Cruises Services (China) Company Limited China – Royal Caribbean Cruises Ltd. Subsidiary

430. Royal Caribbean Cruises, Ltd. (RCL) – Appellant

431. Royal Hyway Tours, Inc. Alaska – Carnival Corporation Subsidiary

432. Saieh, Sabrina S. – counsel for Havana Docks Corporation

433. Saladrigas, Caitlin F. – counsel for Royal Caribbean Cruises, Ltd.

434. Santa Cruz Terminal, S.L. Spain – Carnival Corporation Subsidiary

435. Schultz, Meredith L. – counsel for Carnival Corporation

436. Seabourn Cruise Line Limited Bermuda – Carnival Corporation Subsidiary

437. Seahawk One, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

438. Seahawk Two, Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

439. SeaVacations Limited UK – Carnival Corporation Subsidiary

440. SeaVacations UK Limited UK – Carnival Corporation Subsidiary

441. Serenade of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

442. Seven Seas Cruises S. de R.L. Panama – Norwegian Cruise Line Holdings, Ltd. Subsidiary

443. SG Cruises GmbH Switzerland – Royal Caribbean Cruises Ltd. Subsidiary

444. SG Expeditions Cyprus Limited Cyprus – Royal Caribbean Cruises Ltd. Subsidiary

445. SG Expeditions SAGL Switzerland – Royal Caribbean Cruises Ltd. Subsidiary

446. Shaffer, Derek L. – counsel for Norwegian Cruise Line Holdings, Ltd

447. Shanghai Coast Cruise Consulting Co. Lda China – Carnival Corporation Subsidiary

448. Shanmugam, Kannon K. – counsel for Carnival Corporation

449. Ship Care (Bahamas) Limited Bahamas – Carnival Corporation Subsidiary

450. Silver Cloud Shipping Co. Ltd. Bahamas – Royal Caribbean Cruises Ltd. Subsidiary

451. Silver Muse Shipping Co. Ltd. Bahamas – Royal Caribbean Cruises Ltd. Subsidiary

452. Silver Shadow Shipping Co. Ltd. Bahamas – Royal Caribbean Cruises Ltd. Subsidiary

453. Silver Spirit Shipping Co. Ltd. Bahamas – Royal Caribbean Cruises Ltd. Subsidiary

454. Silver Wind Shipping Ltd. Bahamas – Royal Caribbean Cruises Ltd. Subsidiary

455. Silversea Cruise Finance Ltd. Bahamas – Royal Caribbean Cruises Ltd. Subsidiary

456. Silversea Cruise Holding Ltd. Bahamas – Royal Caribbean Cruises Ltd. Subsidiary

457. Silversea Cruises (Europe) Ltd. England and Wales – Royal Caribbean Cruises Ltd. Subsidiary

458. Silversea Cruises (UK) Ltd. England and Wales – Royal Caribbean Cruises Ltd. Subsidiary

459. Silversea Cruises Australia Pty. Ltd. Australia – Royal Caribbean Cruises Ltd. Subsidiary

460. Silversea Cruises Canada Ltd. Canada – Royal Caribbean Cruises Ltd. Subsidiary

461. Silversea Cruises Ltd. Bahamas – Royal Caribbean Cruises Ltd. Subsidiary

462. Silversea Cruises South Africa Pty. Ltd. South Africa – Royal Caribbean Cruises Ltd. Subsidiary

463. Silversea New Build Seven Ltd. Bahamas – Royal Caribbean Cruises Ltd. Subsidiary

464. Silversea RCL Holdings LLC Liberia – Royal Caribbean Cruises Ltd. Subsidiary

465. Silversea SAM Monaco – Royal Caribbean Cruises Ltd. Subsidiary

466. Singer, Stuart H. – counsel for Carnival Corporation

467. Sirena Acquisition Cayman Islands – Norwegian Cruise Line Holdings, Ltd. Subsidiary

468. Sitmar Cruises Inc. Panama – Carnival Corporation Subsidiary

469. Sixthman Ltd. Bermuda – Norwegian Cruise Line Holdings, Ltd. Subsidiary

470. Skadden, Arps, Slate, Meagher & Flom, LLP - counsel for Amicus Curiae Cruise Lines International Association Supporting Defendants-Appellants

471. SNC Fantasia Bail France – MSC Cruises S.A. Subsidiary

472. SNC Splendida Bail France – MSC Cruises S.A. Subsidiary

473. Societe Labadee Nord, S.A. Haiti – Royal Caribbean Cruises Ltd. Subsidiary

474. Spanish Cruise Services N.V. Curacao – Carnival Corporation Subsidiary

475. Spectrum of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

476. Spezia & Carrara Cruise Terminal Srl Italy – MSC Cruises S.A. Subsidiary

477. Spohrer Dodd Trial Attorneys – counsel for Havana Docks Corporation

478. SSC Finance Corp. Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

479. Stander, Robert N. – counsel for Amicus Curiae Peter Kucik

Supporting Defendants-Appellants

480. Sullivan, Kathleen M. – counsel for Norwegian Cruise Line Holdings,

Ltd

481. Summit Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

482. Sun Princess II Limited Bermuda – Carnival Corporation Subsidiary

483. Sun Princess Limited Bermuda – Carnival Corporation Subsidiary

484. Sunshine Shipping Corporation Ltd. Bermuda – Carnival

Corporation Subsidiary

485. Super, John – counsel for Norwegian Cruise Line Holdings, Ltd.

486. Symphony of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd.

Subsidiary

487. T&T International, Inc. Texas – Carnival Corporation Subsidiary

488. Tager, Evan M. – counsel for Amicus Curiae The Chamber of

Commerce of the United States of America Supporting Defendants-

Appellants

489. Taormina, Benjamin A. – counsel for Royal Caribbean Cruises, Ltd.

490. Terminal De Cruceros Punta Del Este SA Uruguay – MSC Cruises

S.A. Subsidiary

491. The Chamber of Commerce of the United States of America –
Amicus Curiae Supporting Defendants-Appellants

492. Torcatt Enterprises Limitada Costa Rica – Royal Caribbean Cruises
Ltd. Subsidiary

493. Tour Alaska, LLC Delaware – Carnival Corporation Subsidiary

494. Transnational Services Corporation Panama – Carnival Corporation
Subsidiary

495. Tribe, Laurence H. – counsel for Amicus Curiae Cruise Lines
International Association Supporting Defendants in the District
Court

496. Trident Insurance Company Ltd. Bermuda – Carnival Corporation
Subsidiary

497. Trieste Adriatic Maritime Initiatives Srl Italy – MSC Cruises S.A.
Subsidiary

498. U.S. Travel Association – Amicus Curiae Supporting Defendants-
Appellants

499. United States Tour Operators Association, Inc. – Amicus Curiae
Supporting Defendants-Appellants

500. Venable LLP – counsel for Defendant-Appellant MSC Cruises S.A.

501. Venezia Investimenti Srl Italy – MSC Cruises S.A. Subsidiary

502. Vice, Abigail Frisch – counsel for Carnival Corporation

503. Vision of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

504. Von Bokern, Jordan L. – counsel for Amicus Curiae The Chamber of Commerce of the United States of America Supporting Defendants-Appellants

505. Voyager of the Seas Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

506. Voyager Vessel Company, LLC Delaware – Norwegian Cruise Line Holdings, Ltd. Subsidiary

507. Wang, Jonas – counsel for MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.

508. West Sicily Gates Srl Italy – MSC Cruises S.A. Subsidiary

509. Westmark Hotels of Canada, Ltd. Canada – Carnival Corporation Subsidiary

510. Westmark Hotels, Inc. Alaska – Carnival Corporation Subsidiary

511. Whisper SpA Italy – Royal Caribbean Cruises Ltd. Subsidiary

512. Whitaker, Walter H. – shareholder of Havana Docks Corporation

513. White Sand Inc. Liberia – Royal Caribbean Cruises Ltd. Subsidiary

514. World Leading Cruise Management (Shanghai) Co., Ltd. China – Carnival Corporation Subsidiary

515. XP Tours S.A. Ecuador – Royal Caribbean Cruises Ltd. Subsidiary

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-appellee Havana Docks Corporation respectfully submits that oral argument would materially aid the decisional process because these consolidated appeals present important issues of federal law.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF AUTHORITIES........................................................................ v

INTRODUCTION....................................................................................... 1

STATEMENT OF JURISDICTION............................................................ 4

STATEMENT OF THE ISSUES................................................................. 6

STATEMENT OF THE FACTS AND THE CASE ..................................6

    A.    The Creation, Use, And Confiscation Of Havana Docks'
        Property Rights In The Havana Docks................................. 6

    B.    Havana Docks' Certified Claim ......................................... 11

    C.    The United States' Economic Embargo Of Cuba.................. 15

    D.    The LIBERTAD Act ............................................................. 17

    E.    The Cruise Lines' Trafficking In The Property
        Confiscated From Havana Docks.........................................23

    F.    The LIBERTAD Act's Private Right Of Action Takes
        Effect...................................................................................... 28

    G.    Proceedings Below............................................................... 31

SUMMARY OF ARGUMENT .................................................................. 33

STANDARDS OF REVIEW .................................................................... 36

ARGUMENT ................................................................ 37

I.   The District Court Correctly Applied The LIBERTAD Act To
     Hold The Cruise Lines Liable For Trafficking In Property
     Confiscated From Havana Docks By The Cuban Government.
     ................................................................ 37

     A.   The Cruise Lines Used "Property" Confiscated By The
          Cuban Government To Which Havana Docks Owns A
          Certified Claim. ................................................... 39

          1.   The Certified Claim And The LIBERTAD Act's
               Conclusive Presumption Establish That The
               Cruise Lines Used Havana Docks' Confiscated
               Property. ...................................................... 39

          2.   The Cruise Lines' Efforts To Avoid The Certified
               Claim And The Conclusive Presumption Are
               Meritless. ..................................................... 46

               a.   The LIBERTAD Act Validly Forecloses The
                    Cruise Lines' Collateral Attack On Havana
                    Docks' Certified Claim. ...................................... 47

               b.   Havana Docks' Concession Did Not "Expire"
                    In 2004, As It Was Confiscated And Ceased
                    To Exist In 1960. ............................................. 51

     B.   The Cruise Lines' Use Of Havana Docks' Confiscated
          Property Was Neither Incident To "Lawful Travel" To
          Cuba Nor "Necessary" To The Conduct Of Such Travel. ..... 57

          1.   The Cruise Lines Did Not Engage In "Lawful
               Travel" To Cuba. ............................................. 58

# TABLE OF CONTENTS
## (continued)

a.    The Cruise Lines' Activities In Cuba Were Not Incident to "Lawful Travel" Under The LIBERTAD Act. .................................................. 61

b.    The Cruise Lines' Activities In Cuba Were Not Incident to "Lawful Travel" Under The CACR. ................................................................. 67

2.    The Cruise Lines' Use Of Havana Docks' Confiscated Property Was Not "Necessary" To Their Travel To Cuba. .................................................. 88

C.    Havana Docks Is A United States National Entitled To Pursue A Claim Under The Statute. .................................... 92

D.    The Cruise Lines Knowingly And Intentionally Used Havana Docks' Confiscated Property. ................................. 105

E.    MSC's Cuba-To-Cuba Cruises Were Within The Scope of Havana Docks' Operative Complaint. ................................. 112

II.    The District Court Correctly Calculated Trafficking Damages Under The LIBERTAD Act, And Those Statutory Damages Are Constitutional. ........................................................ 116

A.    The Cruise Lines' Statutory Challenges To The Damages Awards Are Meritless. ........................................ 117

B.    The Cruise Lines' Constitutional Challenge To The Damages Awards Is Meritless. ........................................... 127

CONCLUSION ................................................................. 134

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.W. Duckett & Co. v. U.S.*,
266 U.S. 149 (1924) ................................................... 56

*Alamo Land & Cattle Co. v. Ariz.*,
424 U.S. 295 (1976) ................................................... 56

*Am. & Eur. Agencies, Inc. v. Gillilland*,
247 F.2d 95 (D.C. Cir. 1957) .................................... 42

*AMFAC Distrib. Co. v. Harrelson*,
842 F.2d 304 (11th Cir. 1988) (*per curiam*) ........... 36

*Ayestas v. Davis*,
138 S. Ct. 1080 (2018) .............................................. 89

*B&G Constr. Co. v. Dir., OWCP*,
662 F.3d 233 (3d Cir. 2011) ..................................... 50

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.*,
512 U.S. 298 (1994) ................................................... 59

*Bd. of Trustees of Univ. of Ill. v. U.S.*,
289 U.S. 48 (1933) ..................................................... 59

*Bell v. Wolfish*,
441 U.S. 520 (1979) ................................................. 127

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
239 U.S. 441 (1915) ................................................... 50

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) .............................................. 62

*BMW of N. Am. v. Gore*,
517 U.S. 559 (1996) ................................................. 129

*Boggs v. Boggs*,
520 U.S. 833 (1997)............................................................45

*BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*,
900 F.3d 529 (7th Cir. 2018)...........................................96

*BUC Int'l Corp. v. Int'l Yacht Council, Ltd.*,
517 F.3d 1271 (11th Cir. 2008)....................... 120, 122, 128

*Campbell v. Universal City Dev. Partners, Ltd.*,
72 F.4th 1245 (11th Cir. 2023) .........................................89

*Carden v. Arkoma Assocs.*,
494 U.S. 185 (1990)....................................................93, 94

*Catlin v. Sobol*,
93 F.3d 1112 (2d Cir. 1996) .............................................50

*Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*,
685 F.3d 917 (10th Cir. 2012) ..........................................89

*City of Marietta v. CSX Transp., Inc.*,
196 F.3d 1300 (11th Cir. 1999) ........................................45

*Comm'r v. Tellier*,
383 U.S. 687 (1966)..........................................................89

*CostCommand, LLC v. WH Adm'rs, Inc.*,
820 F.3d 19 (D.C. Cir. 2016) ..........................................103

*Dames & Moore v. Regan*,
453 U.S. 654 (1981)............................................. 11, 12, 57

*Del Valle v. Trivago GMBH*,
56 F.4th 1265 (11th Cir. 2022) ...........................................4

*Dixon v. Univ. of Miami*,
75 F.4th 1204 (11th Cir. 2023) .........................................36

*Doe v. Drummond Co.*,
782 F.3d 576 (11th Cir. 2015)...........................................75

*Echeverría v. Expedia, Inc.*,
No. 19-22621, 2023 WL 5227002 (S.D. Fla. Aug. 15, 2023)............... 69

*Emergency Coalition to Defend Educ. Travel v.*
*U.S. Dep't of the Treasury*,
545 F.3d 4 (D.C. Cir. 2008) ................................................................. 73

*Empresa Cubana del Tabaco v. Culbro Corp.*,
399 F.3d 462 (2d Cir. 2005) ............................................................... 85

*\*Garcia-Bengochea v. Carnival Corp.*,
57 F.4th 916 (11th Cir. 2023) (*per curiam*) ................ 4, 5, 41, 121, 123

*Gilmour v. Gates, McDonald & Co.*,
382 F.3d 1312 (11th Cir. 2004) (*per curiam*)................................ 95, 96

*Glen v. Am. Airlines, Inc.*,
7 F.4th 331 (5th Cir. 2021) ............................................................... 123

*\*Glen v. Club Méditerranée, S.A.*,
450 F.3d 1251 (11th Cir. 2006)..................................... 52, 54, 57, 109

*Glen v. TripAdvisor LLC*,
529 F. Supp. 3d 316 (D. Del. 2021),
*aff'd*, 2022 WL 3538221 (3d Cir. Aug. 18, 2022) ...................... 108, 109

*Gonzalez v. Amazon.com, Inc.*,
No. 19-23988, 2020 WL 1169125 (S.D. Fla. Mar. 11, 2020),
*aff'd*, 835 F. App'x 1011 (11th Cir. 2021) ................................ 108, 109

*Havana Club Holding, S.A. v. Galleon S.A.*,
203 F.3d 116 (2d Cir. 2000) ............................................................... 85

*\*Havana Docks Corp. v. Carnival Corp.*,
592 F. Supp. 3d 1088 (S.D. Fla. 2022) (Dkt. 477) ...................... *passim*

*Havana Docks Corp. v. MSC Cruises SA Co.*,
455 F. Supp. 3d 1355 (S.D. Fla. 2020)............................................... 32

*Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*,
  454 F. Supp. 3d 1259 (S.D. Fla. 2020) ................................................. 32

*Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*,
  431 F. Supp. 3d 1375 (S.D. Fla. 2020) ................................................. 32

*\*Hertz Corp. v. Friend*,
  559 U.S. 77 (2010) ........................................ 97, 99, 100, 101, 103, 104

*Hoffman v. Laurans*,
  18 La. 70 (1841) ................................................................................ 45

*Holston Invs., Inc. B.V.I. v. LanLogistics Corp.*,
  677 F.3d 1068 (11th Cir. 2012) ....................................................... 104

*In re UAL Corp. (Pilots' Pension Plan Termination)*,
  468 F.3d 444 (7th Cir. 2006) ........................................................... 112

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
  559 U.S. 573 (2010) ......................................................................... 107

*Johnson v. City of Shelby, Miss.*,
  574 U.S. 10 (2014) (*per curiam*) ...................................................... 96

*Johnson v. SmithKline Beecham Corp.*,
  724 F.3d 337 (3d Cir. 2013) ..................................................... 99, 101

*Lamb v. ITT Corp.*,
  No. 08:09CV95, 2010 WL 376858 (D. Neb. Jan. 26, 2010) ............. 121

*Marbury v. Madison*,
  5 U.S. 137 (1803) .............................................................................. 84

*Marti v. Iberostar Hoteles y Apartamentos S.L.*,
  54 F.4th 641 (11th Cir. 2022) ..................................................... 20, 75

*McCulloch v. Md.*,
  17 U.S. 316 (1819) ............................................................................ 89

*Medellín v. Tex.*,
  552 U.S. 491 (2008) .......................................................................... 86

*Michael H. v. Gerald D.*,
    491 U.S. 110 (1989)...............................................................50

*Moore v. Johnson & Johnson*,
    907 F. Supp. 2d 646 (E.D. Pa. 2012)................................101

*Morissette v. U.S.*,
    342 U.S. 246 (1952).............................................................108

*N.H. v. Me.*,
    532 U.S. 742 (2001).............................................................110

*\*Odebrecht Constr. Inc. v. Secretary, Fla. Dep't of Transp.*,
    715 F.3d 1268 (11th Cir. 2013)............................ 16, 17, 58, 59, 62, 83

*P.O.P.S. v. Gardner*,
    998 F.2d 764 (9th Cir. 1993)..............................................50

*Real v. Simon*,
    510 F.2d 557 (5th Cir. 1975)..............................................85

*\*Regan v. Wald*,
    468 U.S. 222 (1984)................................... 16, 59, 61, 66, 83

*Rehaif v. U.S.*,
    139 S. Ct. 2191 (2019)........................................................108

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979).............................................................130

*Ruan v. U.S.*,
    142 S. Ct. 2370 (2022)........................................................108

*Skinner v. Switzer*,
    562 U.S. 521 (2011).............................................................96

*St. Louis, Iron Mountain & S. Ry. Co. v. Williams*,
    251 U.S. 63 (1919).....................................................128, 129

*St. Paul Fire & Marine Ins. Co. v. Scopia Windmill Fund, LP*,
    87 F. Supp. 3d 603 (S.D.N.Y. 2015)................................100

*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506 (2002)................................................................96, 114

*TXO Prod. Corp. v. Alliance Res. Corp.*,
509 U.S. 443 (1993)..........................................................................133

*U.S. v. Chase*,
18 F.3d 1166 (4th Cir. 1994)...............................................................50

*U.S. v. Church of Scientology of Boston, Inc.*,
933 F.2d 1074 (1st Cir. 1991) ............................................................90

*U.S. v. Ehrlichman*,
546 F.2d 910 (D.C. Cir. 1976) ............................................................81

*\*U.S. v. Fuentes-Coba*,
738 F.2d 1191 (11th Cir. 1984)...................................................73, 85

*U.S. v. General Motors Corp.*,
323 U.S. 373 (1945)............................................................................56

*U.S. v. Locke*,
471 U.S. 84 (1985)..............................................................................51

*U.S. v. Macko*,
994 F.2d 1526 (11th Cir. 1993)..........................................................85

*U.S. v. Marte*,
356 F.3d 1336 (11th Cir. 2004)..........................................................73

*U.S. v. Nixon*,
418 U.S. 683 (1974)............................................................................87

*U.S. v. North*,
910 F.2d 843 (D.C. Cir. 1990) (*per curiam*) ......................................81

*U.S. v. Petty Motor Co.*,
327 U.S. 372 (1946)............................................................................56

*U.S. v. Plummer*,
221 F.3d 1298 (11th Cir. 2000)..........................................................62

*U.S. ex rel. Schutte v. SuperValu Inc.*,
 598 U.S. 739 (2023) ............................................................ 110

*Vanderbilt Mortg. & Fin., Inc. v. Flores*,
 692 F.3d 358 (5th Cir. 2012) ............................................ 132

*Vorchheimer v. Philadelphian Owners Assoc.*,
 903 F.3d 100 (3d Cir. 2018) ............................................... 89

*West Coast Hotel Co. v. Parrish*,
 300 U.S. 379 (1937) ........................................................... 128

*Yates v. Pinellas Hematology & Oncology, P.A.*,
 21 F.4th 1288 (11th Cir. 2021) ....................... 129, 130, 132

*Zivotofsky v. Kerry*,
 576 U.S. 1 (2015) .................................................................. 86

## Federal Constitution

U.S. Const. art. I, § 8, cl. 3 ................................................ 59, 87

U.S. Const. art. III ................................................... 4, 113, 121

U.S. Const. amend. V ................................. 49-51, 117, 127-34

U.S. Const. amend. VIII ......................................... 130, 132

## Federal Statutes

19 U.S.C. § 4452(f)(7) ............................................................ 93

*International Claims Settlement Act of 1949,
 Pub. L. No. 81-455, 64 Stat. 12 (Mar. 10, 1950),
 codified at 22 U.S.C. § 1621 et seq.* ............................ *passim*

22 U.S.C. § 1622a ................................................................. 41

22 U.S.C. § 1622g ........................................... 41, 42, 43, 49

22 U.S.C. § 1623(h) ........................................... 42, 43, 49

22 U.S.C. § 1641 ................................................................ 93

22 U.S.C. § 1642 ................................................................ 93

22 U.S.C. § 1643 ................................................................ 12

22 U.S.C. § 1643a(1) ................................................... 41, 93

22 U.S.C. § 1643a(3) ........................................................ 13

22 U.S.C. § 1643b ............................................................. 41

22 U.S.C. § 1643b(a) .................................................. 41, 55

22 U.S.C. § 1643d ............................................................. 41

22 U.S.C. § 1644a ............................................................. 93

22 U.S.C. § 1645a ............................................................. 93

22 U.S.C. § 2370(a)(1) ...................................................... 15

*Cuban Liberty and Democratic Solidarity (LIBERTAD) Act,
Pub. L. No. 104-114, 110 Stat. 785 (Mar. 12, 1996),
*codified at* 22 U.S.C. § 6021 *et seq.* ........................... *passim*

22 U.S.C. § 6022(6) .......................................................... 18

22 U.S.C. § 6023(7)(A) ..................................................... 61

22 U.S.C. § 6023(8)(B) ..................................................... 94

22 U.S.C. § 6023(9) ........................................................ 105

22 U.S.C. § 6023(12) ................................... 39, 40, 46, 56

22 U.S.C. § 6023(13)(A) .................18, 19, 29, 121, 122, 134

22 U.S.C. § 6023(13)(A)(ii) ................. 34, 37, 58, 105, 106

22 U.S.C. § 6023(13)(B)(iii) ............................. 34, 38, 88

22 U.S.C. § 6023(15)(A) ........................... 35, 92, 93, 96, 105

22 U.S.C. § 6023(15)(B) ........................................................ 35, 92, 93

22 U.S.C. § 6032(h) .............................................. 17, 21, 61, 62, 65, 66

22 U.S.C. § 6081(1) ................................................................... 39

22 U.S.C. § 6081(2) ................................................................... 90

22 U.S.C. § 6081(5) .................................................................. 129

22 U.S.C. § 6081(6) .............................................. 18, 19, 90, 123, 129

22 U.S.C. § 6081(6)(B) .............................................................. 130

22 U.S.C. § 6081(10) .................................................................. 95

22 U.S.C. § 6081(11) ...........................................18, 75, 84, 90, 123, 130

22 U.S.C. § 6082(a)(1) ............................................... 52, 54, 56, 106

22 U.S.C. § 6082(a)(1)(A) ............................................ 34, 37, 46, 57

22 U.S.C. § 6082(a)(1)(A)(i) ........................................... 19, 125, 132

22 U.S.C. § 6082(a)(1)(A)(i)(I) ......................19, 35, 116, 118, 125, 129

22 U.S.C. § 6082(a)(1)(A)(i)(III) ............................................... 132

22 U.S.C. § 6082(a)(1)(A)(ii) ................................................... 84

22 U.S.C. § 6082(a)(2) ............................................... 19, 49, 125

22 U.S.C. § 6082(a)(3) .............................................................. 19

22 U.S.C. § 6082(a)(3)(C)(ii) ............................. 19, 35, 116, 125, 129

22 U.S.C. § 6082(a)(4)(B) ........................................................ 40

22 U.S.C. § 6082(a)(5)(D) ........................................................ 19

22 U.S.C. § 6082(f)(1)(A) ....................................................... 118

22 U.S.C. § 6082(f)(2)(A) ....................................................... 119

22 U.S.C. § 6083(a)(1) .......................................... 19, 35, 37, 40, 43, 48

22 U.S.C. § 6083(a)(2) .......................................................... 84

22 U.S.C. § 6085 ................................................................... 83

22 U.S.C. § 6085(b) ............................................................. 20

22 U.S.C. § 6085(c)(1)(B) ................................................... 20

22 U.S.C. § 6091 ........................................................... 17, 79

22 U.S.C. §§ 6031-46 (Title I) .......................................... 17

22 U.S.C. §§ 6061-67 (Title II) ......................................... 17

22 U.S.C. §§ 6081-85 (Title III) ....................................... 17

Trade Sanctions Reform & Export Enhancement Act (TSRA),
Pub. L. 106-387, 114 Stat. 1549 (Oct. 28, 2000),
*codified at* 22 U.S.C. § 7201 *et seq.* ................................. 67

22 U.S.C. § 7209(a) ............................................................. 67

22 U.S.C. § 7209(b)(1) ........................................................ 67

22 U.S.C. § 7209(b)(2) ........................................................ 67

28 U.S.C. § 1291 ................................................................... 5

28 U.S.C. § 1331 ................................................................... 4

28 U.S.C. § 1332(c) ............................................................. 96

50 U.S.C. § 4131(c) ............................................................. 93

50 U.S.C. § 4301 *et seq.* ..................................................... 16

Cuba Claims Act,
Pub. L. 88-666, 78 Stat. 1110 (Oct. 16, 1964) ............... 12, 41

**State Statutes**

Ky. Rev. Stat. Ann. § 14A.9-010 (2023) .................................................. 104

La. Civ. Code Ann. art. 535 (2023) ........................................................ 45

La.Civ. Code Ann. art. 539 (2023) ......................................................... 45

**Federal Regulations**

28 Fed. Reg. 6974 (July 9, 1963) ............................................................ 16

*31 C.F.R. part 515 (Cuban Assets Control Regulations) ............. *passim*

    31 C.F.R. § 515.201 ....................................................... 16, 60, 69, 83

    31 C.F.R. § 515.317 ................................................................. 16, 78

    31 C.F.R. § 515.318 .................................................................... 16

    31 C.F.R. § 515.419(a) (1996) ......................................... 21, 65, 66

    31 C.F.R. § 515.419(b) (1996) .................................................... 65

    31 C.F.R. § 515.560(a)(1) (1996) ............................................... 65

    31 C.F.R. § 515.560(b) (1996) ............................................... 65-66

    31 C.F.R. § 515.560(c) ............................................................... 67

    31 C.F.R. § 515.560(f) (2015, 2016, 2017, 2018) .................... 22, 69, 77

    31 C.F.R. § 515.565 ................................................................... 60

    31 C.F.R. § 515.565(b) (Jan. 16, 2015-June 4, 2019) ....... 22, 64, 68, 76

    31 C.F.R. § 515.565(b)(1) (2015, 2018) .................................. 71, 72, 77

    31 C.F.R. § 515.565(b)(1) (2016, 2017) .................................. 71, 72, 77

    31 C.F.R. § 515.565(b)(2) (2000) ............................................... 67

    31 C.F.R. § 515.565(b)(2) (2016, 2017) ..................................... 70

31 C.F.R. § 515.565(b)(2) (2015, 2018) ........................................ 71, 72

31 C.F.R. § 515.565(b)(3) (2015, 2018) ............................................. 70

31 C.F.R. § 515.565(c) (Jan. 16, 2015-Nov. 8, 2017) ............. 22, 69, 76

31 C.F.R. § 515.565(f) (Nov. 9, 2017-June 4, 2019)............... 22, 69, 76

31 C.F.R. § 515.572 .......................................................................... 64

31 C.F.R. § 515.572(a)(1) ................................................................. 64

31 C.F.R. § 515.572(b)(1) (2016) ..................................................... 63

31 C.F.R. § 515.801(b)(6) (1996) ..................................................... 62

31 C.F.R. § 515.802 .......................................................................... 16

64 Fed. Reg. 25808 (May 13, 1999) ............................................ 21, 67

68 Fed. Reg. 14141 (Mar. 24, 2003) .................................................. 21

76 Fed. Reg. 5072 (Jan. 28, 2011) ..................................................... 21

80 Fed. Reg. 2291 (Jan. 16, 2015) ................................................ 22, 68

81 Fed. Reg. 13989 (Mar. 16, 2016) .................................................. 68

82 Fed. Reg. 48875 (Oct. 20, 2017)............................................. 28, 82

82 Fed. Reg. 51998 (Nov. 9, 2017).............................................. 68, 82

**Federal Rules**

Fed. R. Civ. P. 12(e).......................................................................116

Fed. R. Civ. P. 44.1 .......................................................................... 48

Fed. R. Civ. P. 8........................................................... 96, 114, 116

Fed. R. Civ. P. 8(a)(2) ...................................................................114

## Other

43 Dep't State Bull. 715 (Oct. 19, 1960)...................................................15

44 Dep't State Bull. 103 (Jan. 3, 1961) ...................................................15

51 Dep't State Bull. 674 (Oct. 17, 1964)..................................................41

61A Am. Jur. 2d *Pleading* (May 2023 update) ......................................96

Ashby, Timothy,
    *U.S. Certified Claims Against Cuba*,
    40 U. Miami Inter-Am L. Rev. 413 (2009).........................................11

Black's Law Dictionary (6th ed. 1990).....................................................89

Black's Law Dictionary (11th ed. 2019)...................................................45

*H.R. Rep. No. 104-468 (1996) .........................61, 118, 119, 122, 130, 131

H.R. Rep. No. 104-202 (1995)..................................................................95

Proclamation No. 3447,
    76 Stat. 1446 (Feb. 3, 1962)..............................................................15

Statement on Action on Title III of the Cuban Liberty &
    Democratic Solidarity (LIBERTAD) Act of 1996,
    32 Weekly Comp. Pres. Doc. 1265, 1996 WL 396122
    (July 16, 1996)..................................................................................20

U.S. Bureau of Labor Statistics,
    *CPI Inflation Calculator*
    <https://tinyurl.com/3cz78hku>.......................................................131

U.S. Dep't of Justice,
    *Completed Programs—Cuba* (updated Apr. 21, 2022)
    <https://perma.cc/M3A9-V5PM> .......................................................42

U.S. Dep't of State,
    *Remarks to the Press* (Apr. 17, 2019)
    <https://tinyurl.com/mvpddjjp>.......................................................29

U.S. Dep't of State,
*Secretary Enacts 30-Day Suspension of Title III
(LIBERTAD Act) With an Exception* (Mar. 4, 2019)
<https://tinyurl.com/j2zw6tf2> ......................................................... 28

U.S. Dep't of State,
*Secretary's Determination of 45-Day-Suspension Under Title
III of LIBERTAD Act* (Jan. 16, 2019)
<https://tinyurl.com/w5actde3> ....................................................... 28

U.S. Dep't of State,
*Secretary Pompeo Extends For Two Weeks Title III
Suspension with an Exception (LIBERTAD Act)* (Apr. 3, 2019)
<https://tinyurl.com/3y2kf94b> ....................................................... 28

White House,
*Remarks by President Obama and President Raul Castro of
Cuba in a Joint Press Conference* (Mar. 21, 2016)
<https://tinyurl.com/bdh65prn> ...................................................... 80

Wright, Charles Alan & Miller, Arthur R.,
*Federal Practice & Procedure* (4th ed. Apr. 2023 update) ....... 114, 116

## INTRODUCTION

The four judgments in these consolidated appeals are the result of a calculated business risk. The defendant cruise lines knew, when setting sail for Havana from 2015 to 2019, that their massive ships were mooring and disembarking tourists on the very same piers in the very same terminal that the Cuban government confiscated from plaintiff Havana Docks in 1960. Those cruise lines, among the world's most sophisticated and best counseled companies, also knew that they faced potential liability for trafficking in such confiscated property under the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, Pub. L. No. 104-114, 110 Stat. 785 (1996) (Tab A). The cruise lines could have avoided liability altogether by obtaining Havana Docks' authorization to use the confiscated property. But none of them did so. Indeed, none of them even asked.

Instead, they all rolled the dice. Hoping to position themselves as first movers in the market for tourist travel to Cuba, they gambled that the Executive Branch would neither seek to enforce the Cuban embargo against them nor end the suspension of the LIBERTAD Act's private right of action by owners of claims to confiscated property in Cuba.

Accordingly, the cruise lines used Havana Docks' confiscated property to carry almost a *million* tourists to Cuba and sponsored shore tours for them there. Those tours, organized and operated by agents of the Cuban Ministry of Tourism, led the passengers to experience Cuba just as the Cuban regime wanted—a fun and happy place that offered unique tourist experiences, from "joyrides" in classic American cars to "sensual dancing" at one of the world's most "legendary" cabarets. The cruise lines reaped handsome rewards for opening this new tourist market, earning over a billion dollars in *net* revenue from their Cuban cruises from 2015 to 2019 and in return rewarding Cuba's cash-strapped Communist regime with at least $130 million in hard currency. Not one of the cruise lines paid a penny to any Cuban person or entity not affiliated with the regime.

The party ended when the Executive stopped suspending the LIBERTAD Act's private right of action effective May 2, 2019. Havana Docks filed the first of these lawsuits on that very day. The cruise lines continued sailing to Havana (and using Havana Docks' confiscated property) for roughly another month, but now faced legal responsibility for their business decisions.

And that is what these lawsuits are all about. The cruise lines try to make these cases seem complicated, but they are not. To the contrary, the cruise lines did *exactly* what the LIBERTAD Act seeks to deter. The Act establishes trafficking liability for anyone who knowingly, intentionally, and without authorization engages in commerce using property confiscated from a U.S. national by the Cuban government. And where, as here, that U.S. national holds a certified claim to the property, the Act sets baseline damages as the present value of that claim, trebled. The district court simply applied these statutory provisions to the undisputed facts. The cruise lines can claim no surprise or unfairness in any of this: they all knew the legal risk they were taking and could have avoided that risk altogether by obtaining Havana Docks' authorization. And because they had Havana Docks' certified claim in their hands, they could calculate their potential liability before setting sail for Havana and using the confiscated docks.

The cruise lines now lash out at everyone but themselves for their predicament—at Havana Docks, which they accuse of reaping a "windfall" at their expense; at the Foreign Claims Settlement Commission, which they accuse of being a rubber stamp; at Congress,

which they accuse of enacting a "controversial," "draconian," and "punitive" statute; at the Executive, which they accuse of pulling a "bait-and-switch"; and even at the district court, which they all but accuse of bias. But the cruise lines have only themselves to blame. They knowingly engaged in the very conduct that the LIBERTAD Act seeks to deter—exploiting property confiscated from U.S. nationals to prop up the repressive and anti-American Cuban regime by pumping hard cash into its coffers. The judgments here represent a straightforward application of the Act, and this Court should affirm them.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because these cases arise under the LIBERTAD Act, a federal statute. The cruise lines argued below that Havana Docks lacks Article III standing, but the district court rejected that argument both before and after this Court's decisions in *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1277-79 (11th Cir. 2022), and *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 922-28 (11th Cir. 2023) (*per curiam*), *see* Dkt. 477, at 155-

56;[1] NCL Dkt. 73, at 6-12; NCL Dkt. 452, at 7-8, and the cruise lines do not renew it here. As this Court explained, a LIBERTAD Act plaintiff suffers a tangible pocketbook injury from a trafficker's "failure to obtain permission and pay for the use of the property," distinct from its injury from the Cuban government's confiscation of the property. *Garcia-Bengochea*, 57 F.4th at 924; *see also id.* at 925 ("[T]he continued use of confiscated property—without permission and without payment—constitutes an ongoing and tangible financial harm.").

This Court has jurisdiction under 28 U.S.C. § 1291 over the cruise lines' timely appeals from the final judgments entered in each of their four respective cases.

---

[1] Each of the four cases has its own district-court docket. Entries in the Carnival docket (No. 19-21724) are cited as "Dkt."; entries in the MSC docket (No. 19-23588) are cited as "MSC Dkt."; entries in the Royal docket (No. 19-23590) are cited as "RCCL Dkt."; and entries in the Norwegian docket (No. 19-23591) are cited as "NCL Dkt." These various docket entries are cited by document number and, where relevant, ECF page number.

## STATEMENT OF THE ISSUES

1.     Whether the district court correctly applied the LIBERTAD Act to the undisputed facts to hold the cruise lines liable for trafficking in property confiscated from Havana Docks by the Cuban government.

2.     Whether the district court correctly calculated trafficking damages under the LIBERTAD Act, and whether those statutory damages are constitutional.

## STATEMENT OF THE FACTS AND THE CASE

### A.     The Creation, Use, And Confiscation Of Havana Docks' Property Rights In The Havana Docks

The city of Havana, Cuba, is blessed with a glorious natural harbor that allowed the city to develop into one of the commercial hubs of the Spanish colonial empire in the Americas.  After Cuba's independence from Spain in 1898, the fledgling Cuban government decided that a modern port facility would maximize the harbor's (and the country's) economic potential.  But the government lacked the money and expertise to undertake the project itself.  Accordingly, in 1905, Cuba's President issued a decree authorizing a private Cuban company, the Compañía del Puerto, to construct a pier and terminal building in Havana harbor at its own expense in exchange for "usufruct" rights to operate those new port

facilities and use the underlying real property for 50 years.  *See* Decree 467, Dkt. 73-3 at ¶¶ 2, 4, 5.  The Decree provided, among other things, that if the Cuban government ever expropriated the works, the government "shall indemnify the concession holder for the value of all works built by the latter."  *Id.* ¶ 7.

After construction started, the Cuban government drastically revised the original port design.  In 1910, Cuba's President issued another decree expanding the project's scope from one to four piers.  *See* Decree 1022, Dkt. 318-22, at 8.  Later that year, the Compañía del Puerto transferred its rights and obligations to an American company, the Port of Havana Docks Company, and Cuba's President issued yet another decree recognizing the transfer.  *See* Decree 184, Dkt. 318-9, at 2.  The Port of Havana Docks Company then built the first two proposed piers but ran into financial difficulties.

Plaintiff-appellee Havana Docks was incorporated in Delaware in 1917 to, among other things, (1) "purchase or otherwise acquire from the Port of Havana Docks Company … a certain concession granted by the Republic of Cuba … for the construction of docks and other works and buildings," and (2) "construct own maintain and operate and to carry on

the business of proprietors of wharves piers jetties docks basins warehouses harbors ports works and channels." Dkt. 318-27, at 4-5. The corporation has remained incorporated in good standing in Delaware to this day. *See* Dkt. 318-29; Dkt. 506-6, at 196-325.

In May 1918, Havana Docks bought the Port of Havana Docks Company, *see* Dkt. 318-21, at 7-11, and began to finance its activities, which included "pay[ing] and discharg[ing]" the "obligations debts and liabilities" incurred in connection with the project, Dkts. 337, 367 ¶¶ 12 (citing Dkt. 318-21, at 9; Dkt. 318-31, at 8). In 1920, Cuba's President issued yet another decree modifying the concession to provide for three piers, instead of four, and substantial improvements to the existing infrastructure. *See* Decree 1944, Dkt. 73-4, at 2. As "compensation" for the "cost increase" entailed by these modifications, the decree extended the concession's life from 50 to 99 years (starting from the original date of 1905) and granted "the usufruct for the term thereof of the spaces between the streets that were established as public thoroughfares between jetties 'A,' 'B,' and 'C.'" *Id.* at 3-4.

The project was completed in the 1920s. This photograph shows the three piers and terminal building:



Dkt. 309-41, at 2. In 1934, Cuba's President issued a decree "recogniz[ing] the transfer performed by the Port of Havana Docks Co. in favor of Havana Docks Corporation, of the concession of the docks, warehouses and other works." Decree 2424, Dkt. 73-5, at 4-5.

Pursuant to that decree, Havana Docks occupied and operated the Havana docks for the next 26 years. During that time, it collected fees (the "usufruct") from *all* operations of the port facilities, including passenger services. *See* Dkt. 318-35, at 2-39, 42, 45, 48-49, 54, 57, 60, 63, 72, 79, 87, 94, 101, 108-09, 117, 125-26 (all line 48, showing revenue from

"Passengers" from 1954-58); *id.* at 167 (audit addressing "[i]ncome from … passenger service charges"); Dkt. 73-2, at 2 (Havana Docks promotional brochure mentioning passenger lines such as Holland America and Cunard). In addition, in 1946, Havana Docks issued $1.6 million in bonds backed by a mortgage on the real property subject to the concession. *See* Dkt. 318-18; *see also* Dkt. 318-55, at 3 (mortgage recorded); Dkt. 318-35, at 178-80 (bonds paid off).

Havana Docks had a front-row seat when Fidel Castro and his revolutionaries seized control of Cuba in January 1959:




Dkt. 73-9, at 2, 4. On October 24, 1960, Prime Minister Fidel Castro (along with Cuba's token President) issued a Resolution decreeing the "nationalization by means of forced expropriation … [of] all the properties

and enterprises" in Cuba owned by "nationals of the United States of North [*sic*] America," specifically including "Havana Docks Corp." Resolution 3, Dkt. 73-6, at 2-3, 7. On November 21, 1960, the Cuban government forcibly seized the premises. *See* Dkt. 73-7. From that day to this, Havana Docks has never received a penny in compensation from the Cuban government. *See* Dkt. 318-1, at 17. The sweeping Cuban confiscations of 1960 represent "the largest uncompensated taking of American property by a foreign government in history." Timothy Ashby, *U.S. Certified Claims Against Cuba*, 40 U. Miami Inter-Am L. Rev. 413, 414 (2009).

## B.     Havana Docks' Certified Claim

Under international law, governments have the authority to pursue (and, if appropriate, settle) the claims of their nationals against foreign governments. *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 679 (1981). As the number of such claims increased after World War II, Congress enacted the International Claims Settlement Act of 1949, 22 U.S.C. § 1621 *et seq.*, which "created … the Foreign Claims Settlement Commission, and gave it jurisdiction to make final and binding decisions with respect to claims by United States nationals against settlement

funds," *Dames & Moore*, 453 U.S. at 680. In 1964, Congress authorized the Commission to adjudicate claims by U.S. nationals against the Cuban government. *See* Pub. L. 88-666, 78 Stat. 1110 (Oct. 16, 1964); *see generally* 22 U.S.C. § 1643.

Havana Docks filed such a claim in April 1967, represented by the New York law firm now known as Davis Polk & Wardwell. *See* Dkt. 331-14 (Tab B). The claim explains that the company had suffered "losses" from the Cuban government's confiscation of, among other things, "Land and concession" and "Buildings." *See id.* at 2. It describes the claim as including "seizure of the Headquarters Building, ocean steamship piers, and contents," and describes the real property at issue as "[p]iers and buildings … constructed by the claimant and predecessor company under a concession granted by the Cuban Government." *Id.* at 3. The claim notes that the company was incorporated in Delaware, and lists its address as a room in an office building in Miami, Florida. *Id.* at 2.

The Commission adjudicated the claim over the next few years and rendered a Proposed Decision in April 1971. *See* Dkt. 1-1 (Tab C), at 5-13. After finding, as required by law, that Havana Docks was a U.S. national, *see id.* at 6, the Commission found that the Cuban government

had confiscated the company's property consisting of "a concession for the construction and operation of wharves and warehouses in the harbor of Havana," including "the real property with all improvements and appurtenances located on [the block where the terminal is located and from which the piers extend]," *id.* at 7. The Commission recognized that these concession rights were not fee simple rights, as they "were to expire in the year 2004" but for the confiscation. *Id.* at 9. The Commission also recognized that the definition of "property" under the International Claims Settlement Act is not limited to fee simple rights, but "'means *any* property, right, or interest including *any* leasehold interest.'" *Id.* at 5-6 (quoting 22 U.S.C. § 1643a(3) (emphasis added)). The Commission proposed to certify a claim in the amount of $7,669,420.88 plus interest at a yearly rate of 6% from the time of confiscation to the time of settlement. *See id.* at 13.

Havana Docks objected on the ground that the Proposed Decision undervalued "the concessions and dock facilities." *Id.* at 2. In response, the Commission found that, "in view of the considerable increase of *land values* along the Havana waterfront between 1934 and 1960, the value of claimant's concession and tangible assets should be increased." *Id.* at 2-

3 (emphasis added).  The Commission, however, rejected the appraisal proffered by Havana Docks as "not appropriate in this type of evaluation of valuable improved *real property*."  *Id*. at 3 (emphasis added). Accordingly, on September 28, 1971, the Commission issued a Final Decision certifying a claim in the amount of $9,179,700.88, plus interest at a yearly rate of 6% from the time of confiscation to the time of settlement.  *Id*. at 4.

From that day to this, Havana Docks' business has consisted primarily of (1) "maintaining its corporate existence pending any potential recovery" for the confiscation, and (2) "maintaining and managing a number of income-producing marketable investments." Dkts. 337, 367 ¶¶ 48-49; *see also* Dkt. 318-1, at 53-54; Dkt. 318-2, at 16; Dkts. 388, 401 ¶¶ 111, 114-15.  For many years, these affairs were managed and directed by Richard McCready, a lawyer at Davis Polk & Wardwell in New York who eventually returned home to his native Kentucky.  *See*, *e.g.*,  Dkt. 365-7, at 7-8, 14-15, 17.  Since McCready's death in 2011, these affairs have been managed and directed by Jerry Johnson, the head of the trust and wealth management department at a Kentucky bank, from his office (and the corporation's headquarters) at

215 Southland Drive in Lexington, Kentucky. *See* Dkt. 318-1, at 53-54; Dkts. 388, 401 ¶ 113.

## C. The United States' Economic Embargo Of Cuba

As the Cuban government targeted the economic interests of U.S. nationals in the early 1960s, so too did the U.S. government target the economic interests of the Cuban regime. In October 1960, the Eisenhower Administration invoked authority under the Export Control Act to prohibit most American exports to Cuba, *see* 43 Dep't State Bull. 715 (Oct. 19, 1960), and the two countries broke diplomatic relations less than three months later, *see* 44 Dep't State Bull. 103-04 (Jan. 3, 1961). Shortly thereafter, in the Foreign Assistance Act of 1961, Congress expressly authorized the President to "establish and maintain a total embargo upon all trade between the United States and Cuba." 22 U.S.C. § 2370(a)(1). Based on that authority, President Kennedy later imposed an embargo on all trade with Cuba. *See* Proclamation No. 3447, 76 Stat. 1446 (Feb. 3, 1962).

The current sanctions regime was launched in 1963, when the Kennedy Administration invoked statutory authority under both the Foreign Assistance Act of 1961 and the Trading with the Enemy Act of

1917, now codified at 50 U.S.C. § 4301 *et seq.*, to promulgate the Cuban Assets Control Regulations (CACR). *See* 28 Fed. Reg. 6974 (July 9, 1963). Those regulations broadly prohibit all transactions involving money or property in which Cuba, or any national thereof, has any interest, unless "specifically authorized by the Secretary of the Treasury" or a delegee. 31 C.F.R. § 515.201; *see generally Regan v. Wald*, 468 U.S. 222, 224-25, 233-34 (1984) (detailing federal Cuba sanctions framework); *Odebrecht Constr. Inc. v. Secretary, Fla. Dep't of Transp.*, 715 F.3d 1268, 1275-78 (11th Cir. 2013) (same). The Secretary has since delegated this authority to the Office of Foreign Assets Control (OFAC). *See* 31 C.F.R. § 515.802.

Under the CACR, OFAC may authorize economic transactions involving Cuba through either a "specific" or a "general" license. A specific license is a conventional license; it authorizes a specific transaction submitted for approval by a putative licensee. *See* 31 C.F.R. § 515.318. A general license, in contrast, is simply a regulation of general applicability; it does not purport to assess the lawfulness of any specific transaction. *See id.* § 515.317. While this regulatory regime has evolved over time, one thing has remained constant for the past forty years: *the CACR do not authorize tourist travel to or in Cuba.*

### D. The LIBERTAD Act

The CACR, however, are hardly the last word on the economic embargo of Cuba. Rather, "Congress has remained active in legislating with respect to Cuba." *Odebrecht*, 715 F.3d at 1276. Of particular relevance here, a bipartisan majority in Congress enacted, and President Clinton signed, the LIBERTAD Act in 1996. *See* Tab A. The Act has four sections. Title I strengthens the economic embargo against Cuba and codifies all restrictions under the CACR "as in effect on March 1, 1996," thereby precluding OFAC from relaxing them unless and until the President makes a determination that a transitional government has taken power in Cuba. *See* 22 U.S.C. § 6032(h); *see generally id.* §§ 6031-46. Title II creates a framework governing U.S. relations with a free and democratic Cuba after the end of the Communist regime. *See generally id.* §§ 6061-67. Title III establishes liability for trafficking in confiscated property and creates the private right of action at issue here. *See generally id.* §§ 6081-85. And Title IV provides for the exclusion from the United States of aliens who either confiscated property in Cuba or trafficked in such confiscated property. *See generally id.* § 6091.

Title III's private right of action focuses on the knowing, intentional, and unauthorized commercial use of property confiscated from U.S. nationals by the Cuban government. The Act thus defines such use, when done "knowingly and intentionally," and "without the authorization of any United States national who holds a claim to the property," as "trafficking." *Id.* § 6023(13)(A). Such trafficking, the Act explains, "provides badly needed financial benefit … to the current Cuban Government, and thus undermines the foreign policy of the United States" to pressure that government to institute democratic reforms and resolve "the claims of United States nationals who had property wrongfully confiscated by the Cuban Government." *Id.* § 6081(6). The Act thus seeks "[t]o deter trafficking in wrongfully confiscated property" by providing "United States nationals who were the victims of these confiscations … with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." *Id.* § 6081(11); *see also id.* § 6022(6) (Act seeks "to protect United States nationals against … the wrongful trafficking in property confiscated by the Castro regime"). Would-be traffickers are immune from Title III liability,

however, if they obtain authorization from the holder of a claim to the confiscated property. *See id.* § 6023(13)(A).

The Act also builds on, and seeks to enforce, claims certified by the Foreign Claims Settlement Commission. Indeed, a certified claim operates as the centerpiece of the Act's remedial scheme. In addition to having the purpose of pressuring the Cuban government to resolve such claims, *see id.* § 6081(6), the Act sets the present value of a certified claim as the baseline for damages, *see id.* § 6082(a)(1)(A)(i), creates a presumption favoring that valuation and the certified claimant against other claimants, *see id.* §§ 6082(a)(2), 6082(a)(5)(D), entitles the certified claimant to treble damages, *see id.* § 6082(a)(3), and provides that courts must accept a certified claim "as conclusive proof of ownership of an interest in property," *id.* § 6083(a)(1).

The LIBERTAD Act's private right of action for trafficking, which requires traffickers to pay certified claimants the present value of their claim, trebled, *see id.* §§ 6082(a)(1)(A)(i)(I); 6082(a)(3)(C)(ii), is strong medicine. Some foreign governments protested the Act's extraterritorial scope, and the European Union even enacted a "blocking" regulation seeking to prevent its nationals from participating in proceedings under

the Act.  *See*, *e.g.*, *Marti v. Iberostar Hoteles y Apartamentos S.L.*, 54 F.4th 641, 644 (11th Cir. 2022).  To ensure that such concerns could be addressed in the broader context of U.S. foreign policy, the Act authorizes the President to suspend either (1) Title III as a whole, *see* 22 U.S.C. § 6085(b), or (2) Title III's private right of action, *see id.* § 6085(c)(1)(B).

President Clinton chose the latter course:

> I will allow Title III to come into force.  As a result, *all companies doing business in Cuba are hereby on notice that by trafficking in expropriated American property, they face the prospect of lawsuit and significant liability in the United States.*  This will serve as a deterrent to such trafficking, one of the central goals of the LIBERTAD Act. … *[W]ith Title III in effect, liability will be established irreversibly during the suspension period* and suits could be brought immediately when the suspension is lifted.

Statement on Action on Title III of the Cuban Liberty & Democratic Solidarity (LIBERTAD) Act of 1996, 32 Weekly Comp. Pres. Doc. 1265, 1996 WL 396122 (July 16, 1996) (emphasis added).  Even with the private right of action suspended, the Act would provide "a strong incentive to immediately cease trafficking in expropriated property, the only sure way to avoid future lawsuits."  *Id.*  The suspension continued, at regular 6-month intervals, for the rest of President Clinton's tenure, as well as the tenures of Presidents G.W. Bush and Obama.

Notwithstanding the LIBERTAD Act's codification of the economic embargo of Cuba, including all restrictions under the CACR "as in effect on March 1, 1996," 22 U.S.C. § 6032(h), OFAC—under Presidents of both political parties—continued to amend the CACR, including the regulation specifically addressing educational travel to Cuba. On March 1, 1996, that regulation authorized such travel only for persons who applied for, and were granted, a *specific* license for either (1) "[a]ttendance at a meeting or conference" under certain circumstances, or (2) "study for an undergraduate or graduate degree sponsored by a college or university located in the United States." 31 C.F.R. § 515.419(a) (1996). In 1999, OFAC amended the regulation to authorize (again, if undertaken pursuant to a specific license) "[e]ducational exchanges not involving academic study pursuant to a degree program when those exchanges take place under the auspices of an organization that sponsors and organizes such programs to promote people-to-people contact." 64 Fed. Reg. 25808, 25817 (May 13, 1999). OFAC removed authorization for such people-to-people educational exchanges in 2003, *see* 68 Fed. Reg. 14141, 14142, 14147 (Mar. 24, 2003), but restored it in 2011, *see* 76 Fed. Reg. 5072, 5073, 5075 (Jan. 28, 2011).

When, in 2015, OFAC granted a *general* license for "people-to-people" educational travel to Cuba, *see* 80 Fed. Reg. 2291, 2297 (Jan. 16, 2015), it emphasized that it was *not* opening a back door for tourism. Rather, that general license authorized educational travel only "for the purpose of engaging, while in Cuba, in a *full-time schedule* of activities intended to [1] enhance contact with the Cuban people, [2] support civil society in Cuba, or [3] promote the Cuban people's independence from Cuban authorities," and thus required each traveler to have "a *full time schedule* of *educational exchange activities* that will result in *meaningful interaction* between the traveler and *individuals* in Cuba." 31 C.F.R. § 515.565(b) (Jan. 16, 2015-June 4, 2019) (emphasis added). And, lest the point be missed, the regulation specified that "[t]ransactions related to activities that are primarily tourist-oriented … are *not* authorized pursuant to this section." *Id.* § 515.565(c) (Jan. 16, 2015-Nov. 8, 2017); *id.* § 515.565(f) (Nov. 9, 2017-June 4, 2019) (emphasis added); *see also id.* § 515.560(f) (2015, 2016, 2017, 2018) ("Nothing in this section authorizes transactions in connection with tourist travel to Cuba.").

**E.    The Cruise Lines' Trafficking In The Property Confiscated From Havana Docks**

Given the statutory and regulatory prohibition on tourism, the travel industry—including the cruise lines—was understandably wary about expanding operations into Communist Cuba.  As Norwegian's CEO put it during an address at a "Cuban Opportunity Summit" in April 2015, "[N]o cruise line that is American-based—certainly not a publicly traded company like Norwegian—can routinely go to Cuba with tourists.  Tourism is still illegal under today's set of rules and policies and guidelines.  And it would be difficult for us to have a ship with 4,000 tourists—people let's call them—show up in Havana and call that people-to-people travel.  That would be a stretch of the … rules."  NCL Dkt. 221-15, at 4; *see also* Dkt. 318-59, at 2 (internal Royal "Update on Potential Cruise Opportunities with Cuba" noting that "[w]hile President Obama is committed to a more open relationship with Cuba, his authority lies primarily in restoring diplomatic relations," and "[t]he prohibition on cruise vacations to Cuba is controlled by Congress which must lift the trade embargo that has been in place since 1962").

But the lure of Cuba's potentially vast tourist market and the desire not to miss out on a "first-mover advantage," NCL Dkt. 221-15, at 4; *see also* Dkt. 308-50 at 2, 11, soon proved irresistible.  Carnival launched cruises from Miami to Havana in May 2016 and continued them through May 27, 2019, using the confiscated Havana docks 83 times and carrying nearly 130,000 passengers.  *See* Dkt. 445-7, at 3-4, 6.  Royal's ships used those docks 198 times between 2017 and 2019, carrying nearly 350,000 passengers, and Norwegian's ships used them 166 times during that period, carrying nearly 200,000 passengers.  *See id.*; RCCL Dkt. 131-3, at 15-16; RCCL Dkt. 194, at 11; RCCL Dkt. 202, at 1; Dkt. 457, at 175.  Between December 2015 and June 2, 2019, MSC's ships used the confiscated Havana docks on 190 voyages, carrying more than 250,000 passengers, both on cruises from Miami and on cruises beginning and ending in Havana.  *See* Dkt. 445-7, at 3-4, 6; Dkt. 477, at 45-46.  Altogether, thus, the cruise lines carried almost a *million* passengers to the confiscated Havana docks from 2015 to 2019.

And the cruise lines were hardly mere passive carriers of passengers to Cuba.  Rather, they sponsored shore tours for their passengers through collaboration with tourism authorities from the

Cuban regime. Together, the cruise lines and the Cuban authorities developed tour packages, and the cruise lines handed over their passengers to agents of the Cuban regime to conduct the tours. While some of the tours had a more cultural flavor than others, none involved "people-to-people" educational "exchange activities," as all were conducted by the Cuban government itself and did not involve "meaningful interaction" with Cuban "individuals." Some were nakedly hedonistic, such as a "joyride" touring Havana in a classic American car, Dkt. 311-38, at 5; *see also* MSC Dkt. 253-2, at 30; RCCL Dkt. 131-43, at 10; NCL Dkt. 217-6, at 6; or a night at Havana's "legendary" *Tropicana* cabaret, including "sensual dancing," NCL Dkt. 221-16, at 5; *see also* Dkt. 311-38, at 4; MSC Dkt. 253-2, at 30; RCCL Dkt. 131-43, at 17-18:




Case 1:19-cv-23591-BB   Document 43-10   Entered on FLSD Docket 02/04/2020   Page 3 of 3

Dkt. 445-10, at 74; NCL Dkt. 43-10, at 3; *see also* Dkt. 445-10, at 106-07 (Royal tour on "The Art of Cuban Cocktails").

These trips were big business for the Cuban government, which the cruise lines paid directly for use of the confiscated port facilities, the shore tours, and tourist visas. Carnival paid the government roughly $24.3 million ($5.4 million to port operators, $12.5 million to tour operators, and $6.4 million for tourist visas); MSC paid the government roughly $30 million ($9.3 million to port operators, $7.6 million to tour operators, and $12.5 million for tourist visas); Royal paid the government roughly $47 million ($10.6 million to port operators, $19.3 million to tour operators, and $17.4 million for tourist visas); and Norwegian paid the government roughly $29 million ($12.5 million to port operators, $6.3

million to tour operators, and $10 million for tourist visas). *See* Dkt. 445-7, at 2, 5-6; MSC Dkt. 218-3, at 8; RCCL Dkt. 277-1, at 17 (cruise lines bought visas from Cuban government for $50 and resold them to passengers for $75); NCL Dkts. 221-4, at 65-67; 228, 282 ¶ 26. (All these figures are unadjusted for inflation or the time value of money.)

These Cuba voyages were also big business for the cruise lines. Carnival's *net* revenue from its Cuba cruises exceeded $112 million; MSC's exceeded $272 million; Royal's reached almost $330 million; and Norwegian's reached almost $300 million. *See* Dkt. 445-7, at 2, 5;[2] Dkt. 477, at 90; NCL Dkt. 221-29; *see also* RCCL Dkt. 131-32, at 6 (Royal's CFO describes Cuba as a "high yielding destination"); RCCL Dkts. 141, 172 ¶ 55 (Royal admission that cruises to Cuba earned a "premium," outperforming non-Cuba cruises); NCL Dkt. 235-76, at 22 (Norwegian's CEO describes Cuba as "a profitable itinerary"). But none of the cruise lines paid a penny to any Cuban person or entity not affiliated with the

---

[2] The cruise lines steadfastly refused below to provide the details of their profits from the Cuba cruises. But they did produce evidence of their "net revenue," which deducts expenses from their "gross revenue" and thereby provides a proxy for profits. *See* Carnival SEC 8-K Statement (Dec. 20, 2018) <https://tinyurl.com/3vd5p2t5> (describing net revenue accounting).

Communist regime.  Dkts. 332, 374 ¶ 33; MSC Dkt. 218-4, at 47; RCCL

Dkts. 141, 172 ¶ 36; RCCL Dkt. 131-3, at 18; NCL Dkts. 228, 282 ¶ 20;

NCL Dkt. 214-1, at 34.

**F.    The LIBERTAD Act's Private Right Of Action Takes Effect**

From the outset of his Administration in 2017, President Trump

signaled that he would not engage in business as usual toward Cuba.

*See, e.g.*, 82 Fed. Reg. 48875, 48876 (Oct. 20, 2017) ("It shall be the policy

of the executive branch to … [e]nsure adherence to the statutory ban on

tourism to Cuba," and "[s]upport the economic embargo of Cuba described

in [the LIBERTAD Act]").

Starting in early 2019, Secretary of State Pompeo made a series of

announcements suggesting that the Administration was moving to end

the suspension of Title III's private right of action, and "encourag[ing]

any person doing business in Cuba to reconsider whether they are

trafficking in confiscated property and abetting this dictatorship."  U.S.

Dep't of State, *Secretary's Determination of 45-Day-Suspension Under*

*Title    III    of    LIBERTAD    Act*    (Jan.    16,    2019)

<https://tinyurl.com/w5actde3>; U.S. Dep't of State, *Secretary Enacts 30-*

*Day Suspension of Title III (LIBERTAD Act) With an Exception* (Mar. 4, 2019) <https://tinyurl.com/j2zw6tf2>; U.S. Dep't of State, *Secretary Pompeo Extends For Two Weeks Title III Suspension with an Exception (LIBERTAD Act)* (Apr. 3, 2019) <https://tinyurl.com/3y2kf94b>. Finally, on April 17, 2019, the Secretary announced that there would be no further extensions, and the suspension would lapse on May 2, 2019. U.S. Dep't of State, *Remarks to the Press* (Apr. 17, 2019) <https://tinyurl.com/mvpddjjp>; *see also id.* (warning "[a]ny person or company doing business in Cuba [to] heed this announcement," because "[i]n addition to being newly vulnerable to lawsuits, they could be abetting the Cuban regime's abuses of its own people.").

In early February 2019, Havana Docks sent each of the cruise lines a letter noting its certified claim and emphasizing that trafficking in confiscated property violates Title III of the LIBERTAD Act. *See* Dkt. 318-47 (Carnival), 318-48 (Carnival), 318-49 (MSC), 318-50 (Norwegian), 318-51 (Royal), 318-52 (Royal). Although authorization by the holder of a certified claim provides immunity from trafficking liability under the Act, *see* 22 U.S.C. § 6023(13)(A), *none of the cruise lines sought such authorization from Havana Docks or otherwise responded to the company*.

Instead, the cruise lines directed their trade association, the Cruise Lines International Association (CLIA), to assess their potential liability under the Act. *See* Dkt. 318-41. CLIA's lawyers warned in a memo that "the scope of Title III has potentially very broad implications," and "a court may interpret that the use of port docks, which are associated with confiscated property, constitutes violative 'trafficking' under the Act." *Id.* at 84-85. In addition, the memo warned that "it is unclear whether a court would find that carriers and travel service providers, including the cruise lines, are covered by th[e] ['lawful travel'] exception." *Id.* at 85. And the memo noted that "[t]he Havana Docks Corporation, incorporated in Delaware, holds a claim valued at $9.2 million by the [Commission] in 1971 (absent interest) in connection with a concession it then held at the Havana Harbor," and that "the accumulation of interest … has significantly increased the value of the[] claim[]." *Id.* at 91. The CLIA lawyers suggested seeking an administrative fix, but warned that "Title III claims will be adjudicated by federal courts, which would be free to interpret the Act differently than an interpretation by the Administration." *Id.* at 92.

The cruise lines thereupon launched a lobbying campaign to try to persuade the Executive not to end the suspension, or at least to create an exception for their industry. They wrote a letter to the Secretary of State, *see* Dkt. 318-41, at 103-04, and Carnival's Chairman lobbied the President directly, both in person and by e-mail, *see* Dkt. 308-9, at 34-41, emphasizing that "[i]f there are no exceptions or clarifications, we would be subject to significant legal liability for our use of the Ports," Dkt. 318-7; *see also id.* ("[W]e could be deemed as 'trafficking' in confiscated property and the potential penalty to my company alone would be over $600 million."). In the meantime, CLIA plotted a legal strategy, urging the cruise lines to "[s]eek to assert as many potentially viable defenses in order to 'see what sticks.'" Dkt. 318-41, at 135.

## G.    Proceedings Below

On May 2, 2019, the very day the suspension lapsed, Havana Docks filed a Title III action against Carnival in the U.S. District Court for the Southern District of Florida. Dkt. 1 (No. 19-21724). Several months later, in August 2019, Havana Docks filed Title III actions against MSC, Royal, and Norwegian. *See* MSC Dkt. 1 (No. 19-23588); RCCL Dkt. 1 (No.

19-23590); NCL Dkt. 1 (No. 19-23591). All four cases were eventually assigned to District Judge Beth Bloom.

For most of the proceedings, briefing in the four cases proceeded on separate tracks. As relevant here, the cruise lines filed motions to dismiss, each of which the district court denied—although, in the MSC and Norwegian cases, the court initially granted the motions on the ground that Havana Docks' concession had expired in 2004, before any of the cruise lines set sail for the Havana docks, *see* MSC Dkt. 40, NCL Dkt. 42, *pub'd at* 431 F. Supp. 3d 1375, before reconsidering that decision, *see* MSC Dkt. 55, *pub'd at* 455 F. Supp. 3d 1355, NCL Dkt. 53, *pub'd at* 454 F. Supp. 3d 1259. The parties then filed omnibus cross-motions for summary judgment, and—in a lengthy published order—the court, applying the statute's terms to the undisputed facts, granted Havana Docks' motion and denied the cruise lines' corresponding cross-motions. *See* Dkt. 477, *pub'd at* 592 F. Supp. 3d 1088. The court thereafter resolved various disputed legal issues relating to damages and interest, *see* Dkt. 541, Dkt. 542, and consolidated the cases for a trial on damages, *see* Dkt. 543. Such a trial became unnecessary, however, after Havana Docks elected to recover baseline statutory damages and moved for entry

of final judgment in each of the four cases. *See* NCL Dkt. 444. Applying the Act's damages provisions, the district court granted that motion, *see* NCL Dkt. 452, and entered final judgments against each of the four cruise lines, *see* Dkt. 544, MSC Dkt. 395, RCCL Dkt. 318, NCL Dkt. 453.

## SUMMARY OF ARGUMENT

If ever there were a paradigm for liability under the LIBERTAD Act, this case is it. The Act seeks to deter the commercial use of confiscated properties in Cuba by creating a trafficking cause of action for the owners of claims to such properties. Under the Act, anyone who knowingly and intentionally uses such a confiscated property in commerce without the claimholder's authorization is liable to the claimholder for the value of the claim, plus interest. And if the claim was certified by the Foreign Claims Settlement Commission before the Act's effective date, the Act trebles the damages.

In these cases, the Act operated exactly as intended. Havana Docks holds a certified claim to the Havana docks, which the Cuban government confiscated in 1960. The defendants are four cruise lines that, with *actual* knowledge of both that claim and their own potential liability under the Act, used the confiscated docks to carry tourists to Cuba and

sponsored shore tours for them there. The cruise lines now suggest that, by deciding issue after issue in Havana Docks' favor, the district court must have been biased against them. But that point highlights not bias, but the weakness of the cruise lines' position on the merits. They did *precisely* what the Act prohibits them from doing, and are now being held accountable.

Put in statutory terms, Havana Docks' certified claim "conclusively" establishes that the Havana docks are "property which was confiscated by the Cuban Government on or after January 1, 1959." 22 U.S.C. § 6082(a)(1)(A). The cruise lines "trafficked" in that confiscated property because they "knowingly and intentionally … engage[d] in a commercial activity using or otherwise benefiting from [it] … without the authorization of any United States national who holds a claim to the property." *Id.* § 6023(13)(A)(ii). The cruise lines' use of the confiscated property was not "incident to lawful travel to Cuba, to the extent … necessary to the conduct of such travel," *id.* § 6023(13)(B)(iii), because the cruise lines (a) carried passengers to Cuba to engage in unlawful tourism, (b) sponsored unlawful shore tours organized and operated by the Cuban regime, and (c) did not need to use Havana Docks' confiscated property

to travel to Cuba.  Havana Docks is a "United States national" because it is both a "United States citizen" as a citizen of Delaware, *id.* § 6023(15)(A), and a "legal entity … organized under the laws" of Delaware with "its principal place of business" in Kentucky, *id.* § 6023(15)(B).  Accordingly, each of the cruise lines is "liable to" Havana Docks "for money damages in … the amount … certified" in the claim "plus interest."  *Id.* § 6082(a)(1)(A)(i)(I).  And because Havana Docks has a certified claim, each cruise line is liable for "3 times" that amount.  *Id.* § 6082(a)(3)(C)(ii).

The cruise lines' briefs boil down to a series of attempts to avoid or deflect attention from this dispositive statutory language.  Their "property" arguments challenge the statutory "[c]onclusiveness of certified claims," *id.* § 6083(a)(1), which defines the claimholders' property interests at the time of confiscation.  Their "lawful travel" arguments challenge the statutory and regulatory bans on tourism in Cuba.  Their "U.S. national" argument challenges the plain language of the statute, as well as the governing law for determining a company's "principal place of business."  Their *scienter* argument seeks to reshuffle and sidestep the relevant statutory language.  Their argument about

MSC's Cuba-to-Cuba cruises seeks to construe a complaint against the drafter. And their damages arguments challenge Congress' eminently reasonable legislative decision to deter trafficking in confiscated property by setting baseline statutory damages by reference to the present value of a certified claim (which includes interest) and trebling those damages.

None of this is particularly complicated, and none of this required resolution of any genuine dispute as to any material fact. The district court simply applied the relevant statutory provisions to the undisputed facts to grant Havana Docks summary judgment and award baseline statutory damages. This Court should affirm the judgments.

## STANDARDS OF REVIEW

As the parties recognized by cross-moving for summary judgment below, there are no material factual disputes in this case; rather, the parties dispute only "the legal significance attached to the undisputed facts." *AMFAC Distrib. Co. v. Harrelson*, 842 F.2d 304, 305 (11th Cir. 1988) (*per curiam*). Thus, with one exception, all of the issues raised by the cruise lines are issues of law subject to *de novo* review. *See, e.g.*, *Dixon v. Univ. of Miami*, 75 F.4th 1204, 1207 (11th Cir. 2023). The only exception is the cruise lines' challenge to the district court's

interpretation of the scope of Havana Docks' complaint against MSC (Joint Br. Issue V), which—as the cruise lines concede—"is reviewed for abuse of discretion." Joint Br. 34.

## ARGUMENT

I. **The District Court Correctly Applied The LIBERTAD Act To Hold The Cruise Lines Liable For Trafficking In Property Confiscated From Havana Docks By The Cuban Government.**

This is a straightforward statutory case. The LIBERTAD Act imposes "liability for trafficking" on "any person that … traffics in property which was confiscated by the Cuban Government" to "any United States national who owns the claim to such property." 22 U.S.C. § 6082(a)(1)(A). Insofar as that claim has been certified by the Foreign Settlement Claims Commission, it provides "*conclusive* proof of ownership of an interest in property." *Id.* § 6083(a)(1) (emphasis added). The Act further defines "trafficking" in relevant part as "knowingly and intentionally … engag[ing] in a commercial activity using or otherwise benefiting from confiscated property … without the authorization of any United States national who holds a claim to the property." *Id.* § 6023(13)(A)(ii). But "trafficking" does not include "transactions and uses of property incident to lawful travel to Cuba, to the extent that such

transactions and uses of property are necessary to the conduct of such travel." *Id.* § 6023(13)(B)(iii).

Applying this statutory framework to the undisputed facts, the district court correctly granted Havana Docks' motion for summary judgment and denied the cruise lines' corresponding cross-motions. *First*, Havana Docks filed a claim to the Havana docks—the very terminal and piers used by the cruise lines—in 1967, *see* Dkt. 331-14 (Tab B), the Commission certified that claim in 1971, *see* Dkt. 1-1 (Tab C), and that certified claim facially and conclusively establishes that the cruise lines used Havana Docks' "property" confiscated by the Cuban government. (Subsection A). *Second*, the cruise lines "trafficked" in that property by using it in commerce, because they were not engaged in "lawful travel" to or in Cuba and their use of the property was not "necessary" to the conduct of such travel. (Subsection B). *Third*, Havana Docks is a "United States national" because it is a Delaware corporation with its principal place of business in Kentucky, which makes it both a "United States citizen" and a legal entity both organized and having its principal place of business in the United States. (Subsection C). *Fourth*, the cruise lines used Havana Docks' confiscated property knowingly and intentionally, as

opposed to inadvertently or accidentally, which is all that is necessary to satisfy the Act's *scienter* requirement. (Subsection D). And *fifth*, even if the Court reaches the issue, the district court did not remotely abuse its discretion by concluding that MSC's Cuba-to-Cuba cruises were within the scope of Havana Docks' operative complaint. (Subsection E).

**A.** **The Cruise Lines Used "Property" Confiscated By The Cuban Government To Which Havana Docks Owns A Certified Claim.**

**1.** **The Certified Claim And The LIBERTAD Act's Conclusive Presumption Establish That The Cruise Lines Used Havana Docks' Confiscated Property.**

As a threshold matter, the cruise lines indisputably used Havana Docks' confiscated "property" when they moored their ships and disembarked their passengers on the very same piers in the very same terminal built by the company and confiscated by the Cuban government. As might be expected of a statute that seeks to vindicate the "fundamental right to own and enjoy property," 22 U.S.C. § 6081(1), the LIBERTAD Act defines "property" in the broadest of terms, *see id.* § 6023(12) ("The term 'property' means *any* property (including … intellectual property), whether real, personal, or mixed, and any present,

future, or contingent right, security, or other interest therein, including any leasehold interest.") (emphasis added). The Act thereby recognizes that owners of less than a fee simple interest in real property (*e.g.*, a usufruct interest, or "any leasehold interest," *id.*) may nonetheless have a claim to such property that allows them to sue for trafficking in the property—although obviously the nature and extent of their interest will determine the value of their claim.

The LIBERTAD Act, however, does not saddle the owner of a certified claim with the burden of proving again the nature and extent of its confiscated property some sixty years after confiscation. Rather, the Act builds on the claims process, and provides that "the court shall accept as *conclusive proof of ownership of an interest in property* a certification of a claim to ownership of that interest that has been made by the [Commission]." 22 U.S.C. § 6083(a)(1) ("Conclusiveness of Certified Claims.") (emphasis added). That conclusive presumption puts the owner of a certified claim in a privileged position, which explains why the Act limits its cause of action to persons who "acquire[d] ownership of the claim before" the Act's date of enactment, *id.* § 6082(a)(4)(B)—Congress did not want to create a market for certified claims (though, apparently

inadvertently, it thereby precluded the acquisition of claims by inheritance, *see Garcia-Bengochea*, 57 F.4th at 930-31; *see also id.* at 932-39 (Jordan, J., concurring)).

Title III's conclusive presumption makes sense. By and large, confiscation claims against the Cuban government involve property interests created under foreign law, and actions that took place in a foreign country long ago. The point of establishing a formal claims process was to enable a specialized and independent U.S. Government body to promptly review and adjudicate such claims before they became stale. *See* 22 U.S.C. §§ 1622a, 1622g; *see also* 51 Dep't State Bull. 674 (Oct. 17, 1964) (Statement by President Johnson) ("I have signed [the Cuba Claims Act] because of the importance of making such a permanent record while evidence and witnesses are still available."). The claims process (like a claim under Title III) was available only to U.S. nationals, *see* 22 U.S.C. §§ 1643a(1), 1643b, 1643d, and required claims to be filed within a fixed period after confiscation, *see id.* § 1643b(a). Congress in the LIBERTAD Act reasonably chose to spare those who had already gone through the claims process from having to relitigate the nature, scope, and value of their claims decades later.

Indeed, in setting up the claims process itself (decades before the LIBERTAD Act), Congress assured claimants that they could rely on the results of that process, and never would have to duplicate their efforts. *See id.* § 1622g ("The decisions of the Commission with respect to claims shall be *final and conclusive on all questions of law and fact*, and shall not be subject to review by … any … official of the United States or by any court by mandamus or otherwise.") (emphasis added); *id.* § 1623(h) ("The action of the Commission in allowing or denying any claim under this subchapter shall be *final and conclusive on all questions of law and fact* and not subject to review by … any … official, department, agency, or establishment of the United States or by any court by mandamus or otherwise.") (emphasis added).[3]

---

[3] The cruise lines seek to impeach the claims process, suggesting that the Commission had no reason to investigate claims because the Cuban government did not participate. *See* Joint Br. 29, 45-46; Carnival Br. 8, 22, 29, 31. But that suggestion overlooks the fact that any fund eventually established by that government to pay claims would necessarily be limited, and the Commission (like a bankruptcy court) therefore policed claims to ensure that a greater number of claimants could recover a greater portion of their claims. *See, e.g., Am. & Eur. Agencies, Inc. v. Gillilland*, 247 F.2d 95, 97-98 (D.C. Cir. 1957) ("The [Commission] … has the duty of distributing a governmentally created fund among a class."); *see generally* U.S. Dep't of Justice, *Completed Programs—Cuba* (updated Apr. 21, 2022) <https://perma.cc/M3A9-

Accordingly, Havana Docks' rights in the confiscated property are not up for debate in this litigation, but are determined by reference to its certified claim. That claim recognizes that the confiscated concession gave the company two forms of property rights: (1) the right to operate and derive income from the Havana docks during the term of the concession, and (2) corresponding rights in the real property comprising those docks. *See* Dkt. 1-1 (Tab C), at 7 ("Based upon the record, the Commission finds [1] that … claimant HAVANA DOCKS CORPORATION obtained from the Government of Cuba the renewal of a concession for the construction and operation of wharves and warehouses in the harbor of Havana …; [2] that claimant acquired at the same time the real property with all improvements and appurtenances located on [the block where terminal is located and from which the piers extend]"); *id.* at 8-9 (valuing Havana Docks' confiscated property by

---

V5PM> (Commission found only 5,911 of 8,816 claims against Cuba— about 2/3—to be compensable). Indeed, the Commission in this very case *rejected* Havana Docks' proffered appraisal of its confiscated property. *See* Dkt. 1-1, at 3-4, 9-10. In any event, the cruise lines' efforts to impugn the Commission are legally irrelevant, as its findings are conclusive as a matter of law under both the LIBERTAD Act, *see* 22 U.S.C. § 6083(a)(1), and the Commission's own organic statute, *see id.* at §§ 1622g, 1623(h).

reference to the value of the "Land and Concession" as well as the three piers and structures built by Havana Docks). By mooring their ships and disembarking their passengers on the Havana docks, the cruise lines plainly used the property identified in Havana Docks' certified claim.

In any event, wholly apart from the statutory conclusive presumption, the Commission got it right. As noted above, the concession is memorialized in a series of five decrees signed by Presidents of Cuba from 1905 to 1934. *See* Decree 467, Dkt. 73-3; Decree 1022, Dkt. 318-22; Decree 184, Dkt. 318-9; Decree 1944, Dkt. 73-4; Decree 2424, Dkt. 73-5. These decrees expressly granted Havana Docks the right "in usufruct" to the real property on which the docks are located during the term of the concession, which encompassed both the right to exploit that property by operating the port and rights in the real property itself. *See* Decree 467, Dkt. 73-3 at 4 ¶ 4 ("The State assigns in usufruct during the term of the concession that part of the San Francisco docks, as well as the public domain area, that will be occupied by the project's works."); Decree 1944, Dkt. 73-4 at 3 (granting "the usufruct for the term [of the concession] of the spaces between the streets that were established as public thoroughfares between jetties 'A,' 'B,' and 'C.'"); *id.* at 4 ("The Company

is granted the use, for the term of the concession, of the spaces comprised between the public streets and thoroughfares affording access to the jetties.").

"Usufruct," as the cruise lines acknowledge, is a civil-law "'right for a certain period to use and enjoy the fruits of another's property.'" Joint Br. 6 n.3 (quoting *Black's Law Dictionary* (11th ed. 2019)). In American law, it appears most often in Louisiana, which follows a Civil Code. *See* La. Civ. Code Ann. art. 535 (2023) ("Usufruct is a real right of limited duration on the property of another."); *id.* art. 539 ("If the things subject to the usufruct are nonconsumables, the usufructuary has the right to possess them and to derive the utility, profits, and advantages that they may produce, under the obligation of preserving their substance."); *see generally Boggs v. Boggs*, 520 U.S. 833, 836 (1997) ("A lifetime usufruct is the rough equivalent of a common-law life estate."); *City of Marietta v. CSX Transp., Inc.*, 196 F.3d 1300, 1305 (11th Cir. 1999) (a "usufruct … is coextensive with the landlord's estate").

The property rights granted by a usufruct are *greater* than the rights granted by a simple lease. *See*, *e.g.*, *Hoffman v. Laurans*, 18 La. 70, 73 (1841) (noting that "the right of an usufructuary … is a real right,

a kind of ownership, subjecting the possessor to the payment of taxes and repairs; susceptible by law of hypothecation, and conferring generally a life-estate, which the usufructuary can at any time renounce or abandon, or transfer at his will and pleasure," whereas a lease "is a right strictly personal giving to the lessee only the use of the property and conferring neither the legal possession nor any proprietary interest in it."). Given that the LIBERTAD Act specifically recognizes that "any leasehold interest" is a protected property interest within the scope of the Act, 22 U.S.C. § 6023(12), it follows *a fortiori* that so too are the usufruct rights that compensated Havana Docks for building the piers and terminal at its own expense.

> **2.** **The Cruise Lines' Efforts To Avoid The Certified Claim And The Conclusive Presumption Are Meritless.**

The cruise lines, however, argue that they "did not engage in trafficking because they did not use [Havana Docks'] confiscated 'property.'" Joint Br. 34 (quoting 22 U.S.C. § 6082(a)(1)(A)); *see generally id.* at 34-47; Carnival Br. 25-36. That argument encompasses two distinct sub-arguments. *First*, the cruise lines collaterally attack both the certified claim and the conclusive presumption, arguing that Havana

Docks never owned more than an intangible "non-exclusive right to use the terminal for *cargo* operations" untouched by the cruise lines' *passenger* operations. Carnival Br. 4 (emphasis added); *see also id.* at 1, 6-7, 17, 21-22, 25-32; Joint Br. 5, 31, 35, 45-47. *Second*, the cruise lines contend that all of Havana Docks' property rights in the docks "expired in 2004," and thus were unaffected by the cruise lines' subsequent use of the docks. Joint Br. 2; *see generally id.* at 31, 35-44; Carnival Br. 5, 32-35. The district court correctly rejected both arguments.

### a. The LIBERTAD Act Validly Forecloses The Cruise Lines' Collateral Attack On Havana Docks' Certified Claim.

At the broadest level, the cruise lines argue that they were free to ignore Havana Docks' certified claim because in their view—and contrary to the claim's plain language—Havana Docks' confiscated property was a "limited usufruct only for cargo operations." Carnival Br. 27.[4] That

---

[4] The cruise lines base this imaginary limitation on the report of their supposed Cuban-law expert. *See* Carnival Br. 6-7, 27-28 (citing Dkt. 331-1). Carnival trumpets that report as "unrebutted," Carnival Br. 28, but the report is rebutted by both the statutory conclusive presumption and the undisputed record evidence. Indeed, the whole point of the conclusive presumption is to fend off disputes over Cuban property law in cases involving certified claims. Needless to say, the cruise lines cannot create a genuine issue of material fact by hiring a supposed Cuban-law expert

argument conflicts not only with the documents establishing the concession and undisputed evidence showing that Havana Docks used the docks for passenger operations, but also with the LIBERTAD Act's conclusive presumption. Carnival (but not the other cruise lines) makes a run at sidestepping that presumption on statutory grounds, *see* Carnival Br. 29-31, and all the cruise lines attack the presumption on constitutional grounds, *see id.* at 31-32; Joint Br. 45-47.

With respect to the statute, Carnival argues that the LIBERTAD Act "does not require a court to defer to the Commission's references to the *nature or extent* of an interest," because "the function of the Commission is limited to certifying the *value* of an interest." Carnival Br. 29 (emphasis modified). It is no surprise that the other cruise lines refrain from making this argument, because it defies the statute's plain language. As noted above, the Act requires a court to "accept as conclusive proof of *ownership of an interest in property*" a certified "claim to ownership of that interest." 22 U.S.C. § 6083(a)(1) (emphasis added).

---

to invent unwritten limitations on Havana Docks' concession, as the interpretation of foreign law presents "a question of law," not fact. Fed. R. Civ. P. 44.1.

That provision means what it says: a court adjudicating a LIBERTAD Act case must accept as "conclusive" the Commission's findings with respect to the nature and extent of the plaintiff's confiscated property, and may not relitigate those issues. *Id.* In that respect, the LIBERTAD Act mirrors the Commission's organic statute providing that its decisions "shall be final and conclusive on *all questions of law and fact*." 22 U.S.C. §§ 1622g, 1623(h) (emphasis added). Contrary to Carnival's argument, the LIBERTAD Act's conclusive provision is not about the Commission's determination of the "value" of the interest; an entirely *different* provision of the Act establishes a "presumption" that the owner of a certified claim is entitled to the "amount that is certified" in the claim, although the owner may seek increased liability under certain circumstances by rebutting that presumption. *Id.* § 6082(a)(2).[5]

And with respect to the Constitution, the cruise lines breezily assert that the Act's conclusive presumption violates their procedural due

---

[5] Carnival's insistence that "the function of the Commission is limited to certifying the *value* of an interest," Carnival Br. 29 (emphasis in original), also makes no sense. The Commission cannot certify the "value" of a property interest without first identifying "the nature or extent of [that] interest." *Id.* As noted in the text, the Commission did just that.

process rights because they did not participate in the Commission proceedings. *See* Carnival Br. 31-32; Joint Br. 46-47. But the LIBERTAD Act simply relies on the Commission's findings to define the scope of what the LIBERTAD Act itself prohibits. The cruise lines are really complaining about Congress' substantive policy decision in the Act to define a *statutory* "no-go" zone by reference to the property identified in a certified claim. *Cf. B&G Constr. Co. v. Dir., OWCP*, 662 F.3d 233, 253-54 (3d Cir. 2011); *Catlin v. Sobol*, 93 F.3d 1112, 1117-18 (2d Cir. 1996); *U.S. v. Chase*, 18 F.3d 1166, 1172 n.7 (4th Cir. 1994); *P.O.P.S. v. Gardner*, 998 F.2d 764, 767 (9th Cir. 1993); *Michael H. v. Gerald D.*, 491 U.S. 110, 119-21 (1989) (plurality opinion). But the cruise lines have no constitutional right to have participated in the underlying proceedings that the *statute* made "conclusive," just as they have no constitutional right to have participated in the legislative process that established the conclusive presumption. *See, e.g.*, *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). As long as the cruise lines had adequate notice of the scope of the "no go" zone established by the statute (which they unquestionably did, having had both actual and constructive

notice of Havana Docks' certified claim), they received all the process they were due. *See*, *e.g.*, *U.S. v. Locke*, 471 U.S. 84, 108 (1985).

> **b.  Havana Docks' Concession Did Not "Expire" In 2004, As It Was Confiscated And Ceased To Exist In 1960.**

The cruise lines also argue that, regardless of the scope of Havana Docks' confiscated property rights in the Havana docks, any such rights "expired in 2004," years before the cruise lines used those docks between 2015 and 2019.[6]  By concluding otherwise, the cruise lines insist, the district court ignored this temporal limitation on Havana Docks' property rights; as they put it, "use of the Terminal *after* the expiration of a time-limited right in the Terminal cannot interfere with that time-limited property right … as a matter of law."  Joint Br. 35 (emphasis in original). That argument, as the district court explained, reveals a fundamental

---

[6] Havana Docks has also alleged that Carnival is liable for trafficking between 1996 and 2001.  *See* Dkt. 149, at 8-10.  The district court did not address that allegation in light of its conclusion that Carnival was liable for trafficking between 2016 and 2019, and this Court need not address that allegation either to affirm the judgments.  Carnival suggests that, in the event of a remand, this Court "should permit the district court to address those issues in the first instance," Carnival Br. 16-17 & n.2, and Havana Docks agrees.

misunderstanding of the LIBERTAD Act and the property rights it seeks to vindicate.

By its plain terms, the Act creates a cause of action for owners of a claim to "property *which was confiscated* by the Cuban Government on or after January 1, 1959." 22 U.S.C. § 6082(a)(1) (emphasis added). Once property is confiscated by the Cuban government, as this Court has recognized, the previous owners' rights in that property are extinguished. *See, e.g.*, *Glen v. Club Méditerranée, S.A.*, 450 F.3d 1251, 1255 (11th Cir. 2006). Insofar as those previous owners are U.S. nationals, their rights in the underlying property at the time of confiscation are replaced with a compensation claim against the Cuban government. *See id.* The LIBERTAD Act gives those claimholders a judicial remedy against traffickers in the confiscated properties.

It follows that Havana Docks' property rights in the Havana docks were extinguished when those rights (including the concession) were confiscated by the Cuban government in 1960. Once the concession was confiscated, it ceased to exist, and was replaced with a compensation claim against the Cuban government (and, eventually, a cause of action under the LIBERTAD Act against traffickers). Because the concession

ceased to exist in 1960 (at which point it still had 44 years to run), it never "expired." When 2004 rolled around, nothing happened—no concession expired, because no concession had existed for 44 years. Havana Docks' certified claim reflects the value of those 44 years of concession that were confiscated by the Cuban government in 1960.

That is why the certified claim explains that "the terms of the concession granted by the Cuban government *were to* expire in the year 2004." Dkt. 1-1, at 9 (emphasis added). The cruise lines read this language as expressing the simple future tense. *See* Joint Br. 41. But the simple future tense would have said that the concession "will expire" in 2004. The Commission did not use the simple future tense for the obvious reason that the Commission understood that the concession was not going to expire in 2004, because it had ceased to exist in 1960. That is why the Commission used the *subjunctive* mood—the terms of the concession "were to expire" in 2004, but for the fact that the Cuban government confiscated (and thus extinguished) the concession in 1960. If persons born in 1924 die in 2023, one might say that they "were to celebrate" their 100th birthday in 2024, but not that they "will celebrate" their 100th birthday in that year, because they are dead.

To recognize that the confiscation stopped the clock on the concession is not to "expand or enlarge the property interest that was owned pre-confiscation." Joint Br. 43. The property that was owned pre-confiscation included a concession that still had 44 years to run, not an expired concession. The cruise lines' suggestion that they cannot "traffic" in property that is not subject to a *current* property interest at the time of trafficking is nonsensical. The LIBERTAD Act seeks to deter trafficking in property "which *was confiscated* by the Cuban Government." 22 U.S.C. § 6082(a)(1) (emphasis added); *see generally Glen*, 450 F.3d at 1255 (same). Thus, by definition, *all* property subject to the Act "was confiscated" from its original owners, and none of those original owners has a *current* interest in that property. That is why the Act defines the property subject to trafficking by reference to the property identified in a certified claim, which in turn defines the claimant's property interests *at the time of confiscation*. Any temporal limitations on those property interests are reflected in the value of the claim, not the scope of the property subject to trafficking.

The cruise lines themselves underscore this point by arguing that the International Claims Settlement Act of 1949 "focuses on the temporal

dimensions of the property interest and would award nothing for a leasehold that expired just before expropriation." Joint Br. 42. As noted above (and conceded by all), Havana Docks' concession had *not* expired before expropriation. To the contrary, it was "property 'owned … *at the time*'" of confiscation. *Id.* (quoting 22 U.S.C. § 1643b(a)) (emphasis added by cruise lines). And by arguing that the Settlement Act "would award only a small amount for a leasehold set to expire shortly after expropriation," *id.*, the cruise lines again underscore Havana Docks' point that temporal limitations on confiscated property relate to the *value*, not the *existence*, of a claim. *See also id.* at 38-39 ("A leasehold set to expire a month after confiscation would obviously be worth less than a lease extending ten years into the future."). For that reason, the cruise lines miss the point by declaring that it "makes no sense" that "a confiscated lease expropriated a day before its expiration would give rise to perpetual trafficking claims, no less than confiscation of a fee interest." Joint Br. 36. A confiscated lease, no less than a confiscated fee interest, gives rise to a claim to the underlying property, which is why both a landlord and a tenant may have claims to a confiscated parcel of property—although obviously the value of those claims will depend on

55

the scope of those interests. *See, e.g.*, *U.S. v. Petty Motor Co.*, 327 U.S. 372, 374 (1946); *A.W. Duckett & Co. v. U.S.*, 266 U.S. 149, 151 (1924); *see also* Joint Br. 38 (acknowledging this point).

The situation would be no different if the Castro regime in 1960 had confiscated a commercial building in downtown Havana leased by an American company for its Cuban headquarters. Assume the lease was to run through 1965. That American company could have filed a claim with the Commission for the loss of its leased property, and the value of that claim would have been the value of the lease from the date of confiscation through the end of the lease. *See, e.g.*, *Alamo Land & Cattle Co. v. Ariz.*, 424 U.S. 295, 303 (1976); *U.S. v. General Motors Corp.*, 323 U.S. 373, 380-83 (1945). If a cruise line then came along in 2016 and leased that building from the Cuban government for some commercial purpose, it would have been trafficking in the property "which was confiscated by the Cuban Government," 22 U.S.C. § 6082(a)(1), and thus would be liable to the original leaseholder who holds a certified claim, even though the original lease would have expired in 1965 but for the confiscation. Indeed, the Act's definition of "property" to include "*any leasehold interest*" compels that result. 22 U.S.C. § 6023(12) (emphasis added); *see*

*also* Joint Br. 1, 37 (cruise lines characterize Havana Docks' concession as "a leasehold interest").

Unlike the underlying concession, the certified claim that replaced it is not time-limited. Unless and until the governments of the United States and Cuba resolve the property claims of U.S. nationals, that claim remains alive and well. *See generally Dames & Moore*, 453 U.S. at 679-83 (discussing Executive authority to resolve property claims of U.S. nationals against foreign governments). It is the property rights in these claims, created by the U.S. Government under federal law, that the LIBERTAD Act seeks to vindicate. *See Glen*, 450 F.3d at 1255 ("The [LIBERTAD] Act refers to the property interest that former owners of confiscated property now have as ownership of a 'claim to such property.'") (quoting 22 U.S.C. § 6082(a)(1)(A)). Accordingly, the cruise lines cannot avoid liability by arguing that Havana Docks' concession "expired" in 2004.

**B. The Cruise Lines' Use Of Havana Docks' Confiscated Property Was Neither Incident To "Lawful Travel" To Cuba Nor "Necessary" To The Conduct Of Such Travel.**

The cruise lines' use of Havana Docks' confiscated property was neither incident to "lawful travel" to Cuba, nor "necessary" to the conduct

of such travel, *see* 22 U.S.C. § 6023(13)(A)(ii), because the cruise lines'
activities in Cuba were not authorized by statute or regulation and the
cruise lines did not need to use the confiscated property to travel to Cuba.

For more than forty years, federal law has expressly prohibited economic
activities involving tourism in Cuba, and yet the cruise lines not only
carried almost a *million* tourists to Havana but also organized their shore
tours there in collaboration with the Cuban regime.  Those tours started
and ended in the very terminal confiscated from Havana Docks by that
regime.  *See, e.g.*, Dkt. 308-14, at 16, 27; MSC Dkts. 224, 253 ¶ 50; RCCL
Dkts. 141, 172 ¶ 93; NCL Dkts. 228, 282 ¶ 31.  As the district court
recognized, the cruise lines' efforts to characterize those tours as "people-
to-people" educational exchange activities make a mockery of the law, *see*
Dkt. 477, at 114-46, and in any event their use of Havana Docks'
confiscated property was not necessary for such travel, *see id.* at 146-52.
Each point is discussed in turn below.

### 1. The Cruise Lines Did Not Engage In "Lawful Travel" To Cuba.

To understand "the extensive and highly calibrated federal regime
of sanctions against Cuba," *Odebrecht*, 715 F.3d at 1272, it helps to go

back to first principles. "The Constitution expressly grants Congress, not the President, the power to 'regulate Commerce with foreign Nations.'" *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 329 (1994) (quoting U.S. Const. art. I, § 8, cl. 3); *see also Bd. of Trustees of Univ. of Ill. v. U.S.,* 289 U.S. 48, 56 (1933) ("It is an essential attribute of the [Foreign Commerce Clause] power that it is exclusive and plenary."). Congress has exercised that power over the years to create a statutory framework limiting economic interaction with foreign countries ruled by hostile governments, which unfortunately include Cuba since the Castro regime seized power.

Operating within that statutory framework, the Executive Branch established a comprehensive regulatory scheme (the CACR) limiting economic interaction with Cuba. Under those regulations, all economic transactions involving Cuba are prohibited unless specifically authorized. *See, e.g.*, *Regan*, 468 U.S. at 233-34 ("[A]bsent an explicit license, all transactions involving Cuban property are and, at all relevant times, have been prohibited."); *Odebrecht*, 715 F.3d at 1276 ("Broadly speaking, the regulations prohibit, unless specifically authorized, any dealing in any property in which Cuba or a Cuban national has an

interest of any nature."); 31 C.F.R. § 515.201 (prohibiting all economic transactions involving Cuba "except as specifically authorized by the Secretary of the Treasury" or a delegee).

Here, the cruise lines base their "lawful travel" argument entirely on the regulation governing educational travel, 31 C.F.R. § 515.565, which was amended several times from 2015 to 2019 while the cruise lines were using Havana Docks' confiscated property. *See* Joint Br. 13-14, 56; Carnival Br. 38-41. That argument fails for two separate and independent reasons: (1) the LIBERTAD Act itself codified the entire economic embargo of Cuba, including all restrictions under the CACR, as of March 1, 1996, and the cruise lines' activities in Cuba from 2015 to 2019 were not lawful under that statutory standard (*see* Subsection (a) below), and (2) in any event, the cruise lines' activities in Cuba from 2015 to 2019 did not comply with any (much less all) of the various iterations of the regulation governing educational travel during that period (*see* Subsection (b) below). The bottom line is that the cruise lines' use of Havana Docks' confiscated property from 2015 to 2019 cannot be characterized as incident to "lawful travel" to Cuba under *either* the statute *or* the regulations.

### a. The Cruise Lines' Activities In Cuba Were Not Incident to "Lawful Travel" Under The LIBERTAD Act.

The statutory issue here is straightforward. Under our constitutional system, regulations are creatures of statute, and Congress may "freeze existing restrictions" in regulations by converting them into statutory law. *Regan*, 468 U.S. at 236. And that is exactly what Congress did in the LIBERTAD Act: it specified that "[t]he economic embargo of Cuba, as in effect on March 1, 1996, *including all restrictions under part 515 of title 31, Code of Federal Regulations [the CACR] … shall remain in effect*." 22 U.S.C. § 6032(h) ("Codification of Economic Embargo") (emphasis added); *see also id.* § 6023(7)(A) (defining "economic embargo of Cuba" to include "*all* restrictions on … travel to or from, Cuba") (emphasis added); H.R. Rep. No. 104-468 (1996), at 45-46 ("It is the intent of the committee of conference that all economic sanctions in force on March 1, 1996, shall remain in effect until they are either suspended or terminated pursuant to … a Presidential determination that a democratic transition is underway in Cuba. It is not the intent of this section to prohibit executive branch agencies from amending existing regulations to *tighten* economic sanctions on Cuba or to *implement* the

provisions of this Act.") (emphasis added); *Odebrecht*, 715 F.3d at 1277

(LIBERTAD Act "codifies the regulatory sanctions that were in place on

March 1, 1996."); *U.S. v. Plummer*, 221 F.3d 1298, 1309 n.8 (11th Cir.

2000) (Congress "codified and strengthened the embargo by enacting the

[LIBERTAD Act]").   In other words, the Act established a one-way

ratchet: it set the 1996 embargo as a statutory floor, and left the

Executive discretion only to *tighten* the embargo.   As a result of this

codification, economic activity related to travel to or in Cuba is not

"lawful" under the LIBERTAD Act itself unless such travel is authorized

by the CACR "in effect on March 1, 1996."  22 U.S.C. § 6032(h).  This is

not a *delegation* of regulatory authority, but a *revocation* of such

authority.[7]

---

[7] The cruise lines attempted to avoid this conclusion below by arguing that the CACR as codified in 1996 themselves provided OFAC with discretion to issue licenses "'in accordance with such regulations, rulings, and instructions as [OFAC] may from time to time prescribe.'" Dkt. 368, at 18 (quoting 31 C.F.R. § 515.801(b)(6) (1996)).  But the regulations that OFAC "may from time to time prescribe" are necessarily limited by OFAC's statutory authority. *See, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2368-75 (2023).  By codifying the economic embargo of Cuba "as in effect on March 1, 1996, including all restrictions under [the CACR]," 22 U.S.C. § 6032(h), Congress stripped OFAC of statutory authority to relax the embargo.  Indeed, the cruise lines' trade association, CLIA, recognized as much: "[T]he Act codified the *existing* CACR into statute—which to that

The cruise lines' Cuba-related activities from 2015 to 2019 fall into two distinct categories that required two distinct licenses: (1) carriers of passengers to and from Cuba, and (2) sponsors of shore tours for those passengers within Cuba. Not surprisingly, the cruise lines highlight their role as carriers, suggesting that they had no legal responsibility for what their passengers did while in Cuba. *See, e.g.*, Joint Br. 17-18, 50-51; Carnival Br. 12, 39. In particular, they assert that they necessarily complied with their *carrier* licenses because they "required travelers to provide affidavits certifying that they were complying with one of the authorized categories of travel." Carnival Br. 39 (citing 31 C.F.R. § 515.572(b)(1) (2016)); *id.* ("If passengers did not ultimately do what they swore they would in the affidavits, that is a matter for OFAC to take up with the passengers, not with Carnival.").

---

point had only been implemented through Executive Orders and regulations—making the CACR and its general license provisions *permanent* until amended or repealed by Congress." Dkt. 318-41, at 85 (emphasis added); *see also id.* ("[W]e anticipate that a court could interpret the Travel Exception narrowly, such that only persons engaged in activity that was otherwise authorized under U.S. sanctions *at the time the Act was signed in 1996* are exempted from private rights of action.") (emphasis added).

That argument might have more force if the cruise lines had nothing to do with, or no way of knowing, what their passengers did in Cuba. But the argument is self-defeating where, as here, the cruise lines themselves organized shore tours for their passengers in Cuba, and the cruise lines' certification forms assured the passengers that their tours complied with federal regulations. *See*, *e.g.*, Dkt. 326-45, at 16; MSC Dkt. 210, at 1; RCCL Dkt. 133-35, at 10; NCL Dkts. 390-33, 390-34, 390-35; *see also* Dkt. 311-38, at 3, 5, 7, 9-23; NCL Dkts. 221-16, at 4-6; 234-27, at 2; 234-28, at 2; 234-29, at 7; 234-34, at 2; MSC Dkt. 202-45, at 18.

The passenger certifications thus cannot immunize the cruise lines from non-compliance with their *carrier* licenses, which only allowed the cruise lines to carry passengers to Cuba for "authorized" travel. 31 C.F.R. § 515.572 (2015, 2016, 2017, 2018)); Dkt. 326-35, at 3, 5 (Carnival specific carrier license noting this limitation). And under no circumstances can the passenger certifications validate the cruise lines' *shore tours* in Cuba, for which they required a separate license. *See* 31 C.F.R. §§ 515.572(a)(1), 515.565(b); *see generally* Carnival Br. 39-40 (limiting passenger-certification argument to carrier license, not shore tour

license). The shore tours alone establish that the cruise lines did not engage in "lawful travel" to Cuba.

The cruise lines gamely seek to justify those tours as "educational travel" under the CACR. *See, e.g.*, Joint Br. 13-14, 56; Carnival Br. 38-41. But the CACR "in effect on March 1, 1996," 22 U.S.C. § 6032(h), which the LIBERTAD Act codified into statutory law, did not provide any *general* license for educational travel to or within Cuba. To the contrary, with narrow exceptions not relevant here, *see* 31 C.F.R. § 515.560(a)(1) (1996), the codified CACR require a *specific* license for all travel to or within Cuba, including educational travel, *id.* § 515.560(b) ("Travel to Cuba that is characterized as falling within the criteria specified in paragraph (b) is prohibited unless specifically licensed."). And a specific license for "clearly defined educational activities" is authorized *only* for (1) "[a]ttendance at a meeting or conference held in Cuba" under certain circumstances, and (2) "study for an undergraduate or graduate degree sponsored by a college or university located in the United States." *Id.* § 515.419(a); *see also id.* § 515.419(b) ("Transactions related to travel that is primarily tourist travel, including self-directed educational activities that are intended for personal enrichment, will not be licensed pursuant

to § 515.560(b)."); *id.* § 515.560(b) ("Nothing in this section authorizes transactions in connection with tourist travel to Cuba.").

By codifying all restrictions under the CACR "as in effect on March 1, 1996," 22 U.S.C. § 6032(h), the LIBERTAD Act makes the "lawful travel" issue in this case an easy one. The cruise lines did not, and cannot, establish that their use of Havana Docks' confiscated property was incident to "lawful travel" because they did not satisfy the *statutory* criteria codified in the LIBERTAD Act: they did not obtain a specific license, and in any event were ineligible for one because their passengers were not attending an academic meeting or pursuing an accredited course of study. *See* 31 C.F.R. § 515.419(a) (1996). The cruise lines' insistence that "there is no such thing as 'statutorily prohibited tourism' separate and apart from what is allowed under the CACR," Joint Br. 54, can only be described as wishful thinking. Contrary to the cruise lines' assertion that the LIBERTAD Act does nothing more than "piggyback on the CACR and define impermissible tourism in terms of travel that violates the CACR," *id.*, the statute *on its face* codifies the economic embargo of Cuba "as in effect on March 1, 1996," including all restrictions under the CACR, and provides that these measures "shall remain in

effect" until certain political conditions in Cuba are satisfied, 22 U.S.C. § 6032(h).  This is codification, not piggybacking.  *See Regan*, 468 U.S. at 236.  That simple statutory point should be the beginning and the end of the "lawful travel" issue in this case.[8]

### b. The Cruise Lines' Activities In Cuba Were Not Incident to "Lawful Travel" Under The CACR.

Above and beyond the statutory argument, the cruise lines' regulatory argument fails on its own terms, as the cruise lines' shore tours in Cuba from 2015 to 2019 do not remotely qualify as "lawful travel"

---

[8] In the Trade Sanctions Reform & Export Enhancement Act of 2000 (TSRA), Pub. L. 106-387, 114 Stat. 1549, Congress made some minor adjustments to the economic embargo, directing OFAC to provide a "general license for travel to, from, or within Cuba for the marketing and sale of agricultural and medical goods," 22 U.S.C. § 7209(a), but specifying that "[n]otwithstanding any other provision of law or regulation, [OFAC] may *not* authorize the travel-related transactions listed in [31 C.F.R. § 515.560(c)] … for travel to, from, or within Cuba for *tourist activities*."  22 U.S.C. § 7209(b)(1) (emphasis added).  Insofar as any of the cruise lines' activities in Cuba were authorized by 31 C.F.R. § 515.560(c), and thus fall within the scope of TSRA, that would get the cruise lines nowhere, because TSRA defined statutorily prohibited "tourist activities" by reference to the CACR "in effect on June 1, 2000," 22 U.S.C. § 7209(b)(2), which (like the travel regulations in effect on March 1, 1996) require a *specific* license for educational travel, *see* 31 C.F.R. § 515.565(b)(2) (2000); *see generally* 64 Fed. Reg. 25808, 25810, 25816-17 (May 13, 1999).

under any (much less every) version of the educational travel regulation ostensibly in effect during that period, *i.e.*, (1) the January 2015 version, *see* 80 Fed. Reg. 2291, 2296-97 (Jan. 16, 2015), (2) the March 2016 version, *see* 81 Fed. Reg. 13989, 13989-90 (Mar. 16, 2016), and (3) the November 2017 version, *see* 82 Fed. Reg. 51998, 52002 (Nov. 9, 2017). All of these versions included a *general* license for "people-to-people" educational travel to Cuba. *See* 31 C.F.R. § 515.565(b) (2015, 2016, 2017, 2018). But all of these versions likewise specified that such "people-to-people" educational travel is not *all* travel to Cuba; rather, it is travel *only* "for the purpose of engaging, while in Cuba, in a full-time schedule of activities intended to [1] enhance contact with the Cuban people, [2] support civil society in Cuba, or [3] promote the Cuban people's independence from Cuban authorities," and thus required each traveler to have "a full time schedule of educational exchange activities that will result in meaningful interaction between the traveler and individuals in Cuba." *Id.* The regulations expressly distinguish such people-to-people educational travel from tourism. Indeed, all versions of the regulation emphasized that "[t]ransactions related to activities that are primarily tourist-oriented are *not* authorized pursuant to this section." *Id.*

§ 515.565(c) (Jan. 16, 2015-Nov. 8, 2017) (emphasis added); *id.* § 515.565(f) (Nov. 9, 2017-June 4, 2019) (same); *see also id.* § 515.560(f) (2015, 2016, 2017, 2018) ("Nothing in this section authorizes transactions in connection with tourist travel to Cuba.").

The cruise lines have not challenged the district court's conclusion that "lawful travel" is an affirmative defense, *see* Dkt. 47, at 3-8, and indeed all the cruise lines pleaded it as such, *see* Dkt. 160, at 18; MSC Dkt. 133, at 15; RCCL Dkt. 59, at 5; NCL Dkt. 107, at 14; *see generally Echeverría v. Expedia, Inc.*, No. 19-22621, 2023 WL 5227002, at *4-5 (S.D. Fla. Aug. 15, 2023) (citing cases). Because the regulations specify that *all* tourism in Cuba is unlawful, and in light of the background rule that *all* economic activity in Cuba is unlawful unless authorized, *see, e.g.*, 31 C.F.R. § 515.201, the cruise lines cannot establish that they were engaged in "lawful travel" to Cuba if their shore tours involved tourism.

As the district court recognized, they failed to carry this burden as a matter of law. The court's summary judgment order explains in great detail why the cruise lines' shore tours in Cuba from 2015 to 2019 do not qualify as authorized "people-to-people" educational exchange activities. *See* Dkt. 477, at 51-68, 119-45. In a nutshell, the whole point of "people-

to-people" educational exchange activities (as its name suggests) is to promote mutual understanding through "meaningful" one-on-one contact with Cuban "individuals" that would promote democratic norms. 31 C.F.R. § 515.565(b)(2) (2016, 2017); *id.* § 515.565(b)(3) (2015, 2018) (emphasis added); *see generally id.* Example 4 (2016, 2017) ("brief exchanges with shopkeepers while making purchases" and "casual conversations with waiters at restaurants and hotel staff" do not qualify as "meaningful interaction" with Cuban "individuals"); Dkt. 326-35, at 3 (OFAC letter to Carnival emphasizing that "th[e] general license [for educational travel to Cuba] authorizes *educational exchanges* to promote *people-to-people contact*, namely *contact between the traveler and nationals of Cuba*.") (emphasis modified). Far from "fly-speck[ing]" the cruise lines' shore tours, Joint Br. 55, the district court recognized that herding hundreds of thousands of cruise passengers onto tour buses is the very antithesis of bespoke "people-to-people" educational exchanges with individual Cubans—as indeed Norwegian's CEO recognized in 2015, *see* NCL Dkt. 221-15, at 4.

In particular, the shore tours sponsored by the cruise lines in Cuba between 2015 and 2019 cannot be described with a straight face as

"intended to [1] enhance contact with the Cuban people, [2] support civil society in Cuba, or [3] promote the Cuban people's independence from Cuban authorities." 31 C.F.R § 515.565(b)(1) (2016, 2017); *id.* § 515.565(b)(2) (2015, 2018) (emphasis added). All four cruise lines contracted with either Havanatur or Cubanacan, Cuban government entities within the Ministry of Tourism, to provide "tourist excursions" for their passengers. MSC Dkt. 218-9, at 3-7; *see also* RCCL Dkt. 277-18, at 2 ("inbound tourism services"), 6 ("tourism services"), 10 ("specialised tourism services"); NCL Dkt. 390-78, at 2 ("tourist reception services"), 6 ("tourist services on land"); Dkt. 445-10, at 61 ("specialized tourism options"); Dkt. 505-12, at 2 (Spanish) (*"servicios turísticos de receptivo"*).

As a 2019 internal Royal e-mail explained, many of the Havanatur guides "are hired from the Cuban Ministry of Foreign Relations Academy (because of their language skills) [and] these individuals (after being brainwashed for four years) come to work for Havanatur believing our guests are not tourists, but the American invaders they were told were coming." RCCL Dkt. 123-29, at 4. That e-mail's author further testified that the Havanatur guides would "enter all kinds of nonsensical discussions with our guests on political issues," and "[w]hat they were

doing basically to our guests was reading the communist party bible." RCCL Dkt. 122-6, at 27; *see also id.* ("I believe that many of these guys got those positions and were trained on how to respond to questions from the guests in the way they did, basically brainwash[ed]."). Norwegian's corporate representative likewise testified that the shore tours were organized and operated by the Cuban government, and could not think of a tour where a passenger "met with somebody in Cuba that was not somehow affiliated with the Cuban Government." NCL Dkt. 214-1, at 34-35; *see also* NCL Dkt. 221-24, at 2 (e-mail from Norwegian's CEO recognizing that "Havanatur (owned by Cuba's military) … is our [tour] operator in Cuba"); NCL Dkt. 217-6, at 6 (Norwegian shore tour guide advising passengers that "Cruise tourism in Cuba is operated by a Government owned Tour company.").

Thus, far from "promot[ing] the Cuban people's independence from the Cuban authorities," 31 C.F.R. § 515.565(b)(1) (2016, 2017); *id.* § 515.565(b)(2) (2015, 2018), *the cruise lines put their passengers into the hands of those very authorities*, so that the passengers saw nothing that the Cuban government did not want them to see and heard nothing that the Cuban government did not want them to hear. To accept the cruise

lines' argument that such tours qualify as "people-to-people" educational exchange activities would be to render "the exception to the trade embargo … so broad that the embargo itself would lack substance," *U.S. v. Fuentes-Coba*, 738 F.2d 1191, 1195 (11th Cir. 1984), and plainly conflict with the statutory and regulatory ban on tourism, *see, e.g.*, *U.S. v. Marte*, 356 F.3d 1336, 1341 (11th Cir. 2004) (noting that "regulation[s] must be construed in light of … statute[s]"); *see generally Emergency Coalition to Defend Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 7 (D.C. Cir. 2008) (noting that such tours are "cynically manipulated by the Cuban regime to coat the repressive Communist state with a patina of reasonability, openness, and legitimacy").

The cruise lines knew full well that they were not carrying hundreds of thousands of passengers to Cuba to engage in "educational exchange activities" or "meaningful interaction" with Cuban "individuals," but instead were handing them over to the Cuban government for tourism. Thus, Giora Israel, Senior VP of Carnival's Global Port and Destination Development Group and a leader of Carnival's "Cuba Committee," marked up a draft Cuba tour itinerary to express concern that references to "interaction" and "exchanges" with the

Cuban people "may not be completely reflective of the facts" and that "idea-sharing" and "support[ing] the Cuban people" may rub the Cuban government the wrong way. Dkt. 310-3, at 5-7; *see also id.* at 11 n.24 (noting that a reference to supporting "entrepreneurship" is "[a]gainst the approach of Cuban government" and "should be removed"); Dkt. 326-38, at 172 (license granted by the Cuban government to Carnival for "the performance of commercial activities related to tourism, travel leisure activities and cruise ship destinations").

Similarly, Royal purported to identify the "people-to-people" components of its tours, but those comprised only a small fraction (if any) of those tours and often consisted of nothing more than exchanges with vendors or waiters. RCCL Dkt. 131-43, at 6-33. Indeed, the cruise lines' "lawful travel" arguments degenerate into farce when they try to defend "joyride[s]" in classic American cars, Dkt. 311-38, at 5; *see also* MSC Dkt. 253-2, at 30; RCCL Dkt. 131-43, at 10; NCL Dkt. 217-6, at 6, nights at the "[l]egendary" Tropicana cabaret (which Norwegian advised—either as warning or enticement—"may contain sensual dancing"), NCL Dkt. 221-16, at 5; *see also* Dkt. 311-38, at 4; MSC Dkt. 253-2, at 30; RCCL Dkt. 131-43, at 17-19, and cocktail-making classes ("The Art of Cuban

Cocktails"), *see* Dkt. 445-10, at 106-07, as "people-to-people" educational exchange activities. *See*, *e.g.*, Joint Br. 57; Carnival Br. 41.[9]

Carnival in fact acknowledged at the time that its evening tours to nightclubs and cabarets did not qualify as authorized people-to-people educational exchange activities. *See, e.g.*, Dkt. 311-38, at 4, 8 ("This evening shore excursion does *not* comply with the People-to-People guidelines and cannot be considered to be part of the required full schedule of activities."); *see also id.* at 6. But Carnival nonetheless now seeks to justify those concededly non-compliant tours on the ground that

_____

[9] Defendant MSC did not even make a pretense of complying with U.S. federal law when using Havana Docks' confiscated property for its Cuba-to-Cuba cruises, and thus has no "lawful travel" defense. *See, e.g.*, MSC Dkt. 218-17, at 4-5; MSC Dkt. 257-4. MSC tacitly acknowledges this point by arguing instead that its Cuba-to-Cuba cruises "were purely extraterritorial" and hence beyond the LIBERTAD Act's scope. Joint Br. 59. But Title III obviously applies extraterritorially; it seeks "to deter trafficking in wrongfully confiscated property" *in Cuba*. 22 U.S.C. § 6081(11); *see generally Doe v. Drummond Co.*, 782 F.3d 576, 601-02 (11th Cir. 2015); Dkt. 318-41 (CLIA memo acknowledging that "Congress clearly intended for the Act to have an extraterritorial effect"). As long as MSC is subject to jurisdiction in the United States (which it does not contest), it can be held liable for violating the LIBERTAD Act. Indeed, this is exactly why some foreign countries protested the Act so vigorously, to the point of enacting "blocking" regulations against it. *See generally Marti,* 54 F.4th at 644. Nothing in the LIBERTAD Act supports the suggestion that it imposes trafficking liability upon persons subject to U.S. jurisdiction for U.S.-to-Cuba cruises but not Cuba-to-Cuba cruises.

passengers had "earned" some tourism time by engaging in an otherwise full schedule of "people-to-people" educational exchange activities. *See* Carnival Br. 40-41.

There are two problems with this argument. *First*, the premise that Carnival's passengers engaged in an otherwise full schedule of "people-to-people" educational exchange activities is incorrect; Carnival's passengers did not engage in *any* "people-to-people" educational exchange activities because, as noted above, all of their group tours were organized and operated by the Cuban government and did not involve "meaningful interaction" with Cuban "individuals." And *second*, even if Carnival's passengers *had* engaged in an otherwise full schedule of "people-to-people" educational exchange activities, OFAC's guidelines underscore that people-to-people educational travelers cannot thereby "earn" any tourism time. *See* 31 C.F.R. § 515.565(b), Example 5 (2016, 2017). Indeed, the very regulations the cruise lines invoke emphasize that *all* tourist activities in Cuba are strictly forbidden—whether instead of, or in addition to, otherwise authorized educational travel. *See id.* § 515.565(c) (Mar. 16, 2016-Nov. 8, 2017); *id.* § 515.565(f) (Nov. 9, 2017-

June 4, 2019); *id.* § 515.560(f) (2015, 2016, 2017, 2018). There is, in short, no such thing as "lawful tourism" in Cuba.

In addition, both the January 2015 and the November 2017 versions of the CACR—covering a period when all four cruise lines used the confiscated Havana docks—authorized "people-to-people" educational exchange activities only "under the auspices of an organization that sponsors and organizes such programs *to promote people-to-people contact.*" *Id.* § 515.565(b)(1) (2015, 2018) (emphasis added). The cruise lines (which bear the burden of proof on this affirmative defense) introduced *no* evidence below that they took passengers to Cuba "to promote people-to-people contact," which is not surprising because they obviously took passengers to Cuba to promote their own business interests.

Unable to defend their shore tours in Cuba from 2015 to 2019 on their own terms, the cruise lines retreat to the argument that the district court failed to grant the requisite "deference" to the Executive with respect to the lawfulness of those tours. *See* Joint Br. 49, 57. But there was nothing to which the district court could have "deferred," because *neither OFAC nor any other government agency ever reviewed those shore*

*tours and determined that they complied with federal law.* Contrary to the cruise lines' assertion that "the record here is *replete* with evidence that the Executive saw the cruise lines' travel as lawful," Joint Br. 49 (emphasis added), the record is *devoid* of evidence that the Executive determined that the cruise lines' shore tours in Cuba from 2015 to 2019 were authorized by federal law. The "licenses" to which the cruise lines refer are *general* licenses, which are no more than regulations of general applicability that the cruise lines *themselves* interpreted to authorize (and marketed to their passengers as authorizing) their activities in Cuba. *See* 31 C.F.R. § 515.317. Such self-licensing, of course, carries no legal weight.[10]

Never mind that OFAC never reviewed nor approved their shore tours, say the cruise lines—the fact remains that "the State Department" specifically determined that their "use of the Terminal was necessary for

---

[10] This case involves only a single specific license, a carrier license that allowed Carnival to carry passengers to and from Cuba that was granted in July 2015 and expired on July 31, 2017. *See* Dkt. 326-35. OFAC pointedly noted that this license did *not* encompass shore tours, and did *not* "authorize Carnival to transport any person who will disembark in Cuba and who is not authorized by a general license or a separate specific license." *Id.* at 2-3. *None of the cruise lines had a specific license for its shore tours.*

lawful travel and permitted by the Act."  Joint Br. 21; *see also id.* at 50;

Carnival Br. 14 (citing Dkt. 331-104); *id.* at 36 (arguing that district

court's conclusion on lawfulness of cruise lines' activities in Cuba runs

"contrary" to a "determination by the State Department") (citing Dkt.

331-104).  Their marquee evidence on this score consists of an August

2018 e-mail from the Acting Coordinator for Cuban Affairs to Havana

Docks, which states that the Department is "not *currently* pursuing Title

IV actions in relation to commercial cruise lines."  Dkt. 331-104, at 2

(emphasis added).  (Title IV of the LIBERTAD Act requires the State

Department to exclude aliens involved in trafficking in Cuba.  *See* 22

U.S.C. § 6091.) While the e-mail references the "lawful travel" exception,

it does not express a determination that the cruise lines' use of Havana

Docks' confiscated property was lawful, much less a determination that

all of the cruise lines' shore tours from 2015 to 2019 were lawful.

To the contrary, the e-mail explains that the Department is

"operating under limited resources" and thus "prioritize[s] cases

according to a number of factors, including the availability of information

and our assessment of the strength of the Title IV case."  *Id.*  The e-mail

concludes that "we have … *opened a file* for your request regarding port

properties in Havana and will reach out should additional information become necessary for our investigation." *Id.* (emphasis added). When deposed in this case, the e-mail's author testified that she did not recall "reviewing *any* records prior to sending [the e-mail], other than the e-mail chain that [the] e-mail is responding to." Dkt. 326-49, at 26 (emphasis added); *see generally id.* at 23-26. It says something about the strength of the cruise lines' "lawful travel" defense when their best evidence that the U.S. government determined that their shore tours in Cuba from 2015 to 2019 were lawful is a 2018 e-mail to Havana Docks saying that the State Department was "open[ing] a file" on the matter.

Nor did the Executive ever "encourage" the cruise lines to engage in tourist activities in Cuba in violation of federal law. President Obama's remarks in Havana in March 2016 highlighting removal of "'the last major hurdle to resuming cruises and ferry service'" between the two countries are not to the contrary. Joint Br. 17, 49; Carnival Br. 11 (quoting The White House, *Remarks by President Obama and President Raul Castro of Cuba in a Joint Press Conference* (Mar. 21, 2016) <https://tinyurl.com/bdh65prn>). The President emphatically did not say that he was flinging open the doors to tourism in Cuba; to the contrary,

he said that his Administration was making it easier for "*individual*

Americans to come here for *educational travel*." *Id.* (emphasis added); *see*

*also id.* (Administration increasing "opportunities for Americans to travel

to Cuba *and interact with the Cuban people*") (emphasis added). And this,

of course, is consistent with what the Obama Administration *actually*

*did*; as noted above, the CACR at all times retained the blanket

prohibition on tourism in Cuba.

In any event, even if President Obama *had* encouraged the cruise

lines to engage in tourism in Cuba, that would not change the analysis.

"The President encouraged me to do it" is no defense to a violation of

federal law. *See, e.g., U.S. v. North,* 910 F.2d 843, 890 (D.C. Cir. 1990)

(*per curiam*); *U.S. v. Ehrlichman*, 546 F.2d 910, 925-26 (D.C. Cir. 1976).

The Executive, like everyone else, must abide by the law, so it makes no

sense for the cruise lines to argue that "if the Executive liberalizes our

relations with Cuba by authorizing relatively more travel to Cuba, the

courts should not … impose massive damages on private companies that

followed the Executive's lead." Joint Br. 49. In our constitutional system

of separated powers, Presidents do not have the authority to make (or

unmake) the law at their whim.

The cruise lines' efforts to justify their conduct by reference to the Obama Administration's liberalization of relations with Cuba also fails as a simple chronological matter. Of the four cruise lines here, only Carnival even *started* to cruise from the U.S. to Cuba during the Obama Administration, and then only in May of that Administration's final year. *See, e.g.*, Dkt. 308-4, at 32. The other three cruise lines did not even *start* cruising from the U.S. to Cuba until the Trump Administration. *See* NCL Dkt. 214-1 at 15 (March 2017); RCL Dkts. 141, 172 ¶ 28 (March 2017); MSC Dkt. 218-1, at 3-4 (December 2018). All four of the cruise lines thus used Havana Docks' confiscated property predominantly—if not exclusively—during the Trump Administration, even after that Administration signaled a harder line toward Cuba. *See, e.g.*, 82 Fed. Reg. 48875 (Oct. 20, 2017); 82 Fed. Reg. 51998 (Nov. 9, 2017). Accordingly, each of the four cruise lines is liable for trafficking in Havana Docks' property based exclusively on its conduct during the Trump Administration, when any real or imagined encouragement by President Obama was just a distant memory.

Undeterred, the cruise lines turn to the more ambitious argument that the district court "erred by finding the cruise lines' travel unlawful

in the *absence* of any OFAC finding that the cruise lines engaged in any trafficking activity." Joint Br. 52 (emphasis added); *see also* Dkt. 457, at 253 ("OFAC is the only arbiter of lawful travel"); *id.* at 223 ("[I]t's OFAC that determines the compliance with the general license, not a jury and not Your Honor. And Plaintiff is not a prosecutor that gets to try to prosecute violations of an OFAC license."). Putting aside the fact that OFAC has no authority to make any "findings" about "trafficking" under the LIBERTAD Act, that argument flips the entire regulatory regime on its head. As noted above, transactions with Cuba are not generally authorized unless and until OFAC prohibits them; rather, *all transactions with Cuba are strictly prohibited unless and until OFAC (acting within its statutory bounds) authorizes them*. *See Regan*, 468 U.S. at 233-34; *Odebrecht*, 715 F.3d at 1276; 31 C.F.R. § 515.201.

The cruise lines' argument also reveals a profound misunderstanding of the LIBERTAD Act and the separation of powers. Title III creates a private right of action directly enforceable by private parties in court, and gives the Executive no role whatsoever in such an action (other than the suspension authority, *see* 22 U.S.C. § 6085, and a potential adjunct role in determining ownership and amount of

uncertified claims upon appointment by the court, *see id.* § 6083(a)(2)). Accordingly, OFAC need not make a "finding" that the cruise lines broke the law in order for a court adjudicating a Title III action to reject a "lawful travel" defense. The Judiciary, not the Executive, adjudicates such actions. *Cf. Marbury v. Madison*, 5 U.S. 137, 177 (1803). Indeed, the whole point of a private right of action is to give private parties (and the courts) a role in enforcing the law, and not to leave such enforcement entirely in the Executive's hands. The LIBERTAD Act endows plaintiffs "with a *judicial remedy in the courts of the United States*," 22 U.S.C. § 6081(11) (emphasis added), and encourages such private enforcement of the law by authorizing successful plaintiffs to recover treble damages and attorney's fees, *see id.* §§ 6082(a)(1)(A)(ii); 6082(a)(3)(C)(ii).

Further, the cruise lines' suggestion that the Judiciary is powerless to interpret, or give legal effect to, the CACR without the Executive's guidance is fanciful. There is nothing magical about the CACR; they are just federal regulations of the sort interpreted and applied by the courts every day (except insofar as they have been codified, in which case they are just federal statutes of the sort interpreted and applied by the courts every day). Indeed, federal courts have routinely interpreted and applied

the CACR in a wide array of cases, from statutory challenges to the Treasury Department's interpretation of the regulations, *see Real v. Simon*, 510 F.2d 557, 561-65 (5th Cir. 1975), to criminal prosecutions, *see, e.g., U.S. v. Macko,* 994 F.2d 1526, 1534-35 (11th Cir. 1993); *Fuentes-Coba*, 738 F.2d at 1195-96, to assessing Cuban companies' trademark rights, *see, e.g., Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 472-76 (2d Cir. 2005); *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 122-26 (2d Cir. 2000). As this Court has explained (in the specific context of construing travel restrictions), the CACR must be interpreted "with a common sense regard for regulatory purposes and plain meanings." *Fuentes-Coba*, 738 F.2d at 1195 (internal quotation omitted).

The overarching theme of the cruise lines' briefs is that they did nothing wrong by using Havana Docks' confiscated property because "they used the docks to facilitate lawful travel to Cuba pursuant to the Executive's license and encouragement, and the Executive repeatedly refused [Havana Docks'] requests to take action against them." Joint Br. 47; *see generally id.* at 1-2, 47-60; *see also* Carnival Br. 37-42; CLIA *Amicus* Br. 9-12; Kucik *Amicus* Br. 15-26; Travel Industry *Amicus* Br. 7-

14. Underpinning this theme are the assumptions that the Executive has unfettered discretion to legalize any economic interactions with Cuba, and in fact exercised such discretion to cast a binding blanket of legality over all of the cruise lines' operations in Cuba from 2015 to 2019—in other words, the Executive makes the law, enforces the law, and applies the law in this area. Above and beyond the cruise lines' failure to identify any Executive Branch authorization for their shore tours, this argument evinces a fundamental misunderstanding of our Nation's constitutional structure.

Even in the realm of foreign affairs, the Executive has no free-floating authority to flout laws passed by Congress (and claimed no such authority with respect to the laws at issue here). To the contrary, the Supreme Court has squarely rejected the proposition that "the President is free from Congress' lawmaking power in the field of international relations," and emphasized that "[w]hether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law." *Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015); *see also id.* ("The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue."); *see also Medellín*

*v. Tex.*, 552 U.S. 491, 526 (2008) (underscoring the "fundamental constitutional principle that the power to make the necessary laws is in Congress; the power to execute in the President") (internal quotation omitted). That point is especially powerful where, as here, economic relations with a foreign country are at issue, given Congress' express constitutional power "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3.

The cruise lines' "lawful travel" argument thus ultimately collapses into nothing more than a negative inference—because the Executive never charged them with violating the law, their conduct must have been lawful. *See* Joint Br. 48, 50, 54 n.8. But any such inference is groundless as a matter of both fact and law. The factual premise is that OFAC must have been fully aware of, and authorized, all of the cruise lines' shore tours in Cuba from 2015 to 2019. But the cruise lines presented no evidence that OFAC reviewed and authorized those tours.

In any event, prosecutorial discretion is one of the hallmarks of executive power. "[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case," *U.S. v. Nixon*, 418 U.S. 683, 693 (1974), and the fact that the Executive does not charge

a person with wrongdoing does not establish that the person has done no wrong, much less shield that person from civil liability. Thus, speeding does not become lawful just because a driver is not ticketed, even if a police officer happens to see the car whiz by. Accordingly, the fact that OFAC did not charge the cruise lines with violating the embargo does not establish that their shore tours from 2015 to 2019 received "OFAC's tacit approval," Carnival Br. 36, and by no means establishes that the cruise lines engaged in "lawful travel" to Cuba under Title III of the LIBERTAD Act.

### 2. The Cruise Lines' Use Of Havana Docks' Confiscated Property Was Not "Necessary" To Their Travel To Cuba.

Above and beyond the fact that the cruise lines' use of Havana Docks' confiscated property was not incident to "lawful travel" to Cuba, such use was not "*necessary* to the conduct of such travel." 22 U.S.C. § 6023(13)(B)(iii) (emphasis added). This argument has both a legal and a factual component.

With respect to the law, it is a truism that the word "necessary" is susceptible of two different meanings, one lenient (*e.g.*, helpful, useful, convenient) and the other strict (*e.g.*, required, critical, essential).

*Compare, e.g., Comm'r v. Tellier,* 383 U.S. 687, 689 (1966); *McCulloch v. Md.*, 17 U.S. 316, 414-15 (1819) *with Vorchheimer v. Philadelphian Owners Assoc.*, 903 F.3d 100, 105-07 (3d Cir. 2018); *Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*, 685 F.3d 917, 923 (10th Cir. 2012) (Gorsuch, J.).  It all depends on the context in which the word is used, including any other words that may accompany it—either words of discretion (*e.g.*, "reasonably necessary," "necessary and proper," "ordinary and necessary") or words of limitation (*e.g.*, "to the extent necessary").  *See, e.g., Ayestas v. Davis*, 138 S. Ct. 1080, 1092-93 (2018); *Campbell v. Universal City Dev. Partners, Ltd.*, 72 F.4th 1245, 1254-61 (11th Cir. 2023).[11]

In the context of the LIBERTAD Act, "necessary" must be construed to carry the stricter meaning, both because Congress paired it with words

---

[11] The cruise lines selectively quote Black's Law Dictionary for the proposition that necessary means "'convenient, useful, appropriate, suitable, proper, or conducive to the end sought.'"  Joint Br. 63 (quoting Black's Law Dictionary (6th ed. 1990)).  That dictionary actually defines "necessary" as follows: "This word must be considered in the connection in which it is used, as it is a word susceptible of various meanings.  It may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought."  Black's Law Dictionary (6th ed. 1990).

of limitation ("to the extent"), *see, e.g., U.S. v. Church of Scientology of Boston, Inc.*, 933 F.2d 1074, 1075-79 (1st Cir. 1991) (Breyer, J.), and because otherwise the clause would be meaningless—Congress would have stopped by saying that trafficking does not encompass the use of confiscated property "incident to lawful travel to Cuba," period.  Given the gravity with which Congress viewed trafficking in confiscated property in Cuba, *see, e.g.,* 22 U.S.C. §§ 6081(2), (6), (11), Congress would not have added a necessity requirement to allow putative traffickers to argue (as the cruise lines do) that their use of confiscated property was "helpful," "useful," or "convenient," Joint Br. 63 (internal quotations omitted); *see generally* Dkt. 477, at 149.

And with respect to the facts, the cruise lines' use of Havana Docks' confiscated property was not "necessary to the conduct of *such travel*," *i.e.*, "lawful travel *to Cuba*."  22 U.S.C. § 6023(13)(B)(iii) (emphasis added).  The cruise lines did not need to dock in Havana at all to travel to Cuba—there are other places in Cuba that they could have docked.  *See* Dkt. 477, at 149-52.  Indeed, that is exactly what Viking Cruises and several other cruise lines did, and explains why those other companies are not part of these cases.  *See id.* at 151; *see also* Dkt. 445-9, at 15

(Viking docked in Cienfuegos and offered land tours to Havana); *id.* at 7 (showing other cruise lines' Cuba itineraries that did not include Havana). All four of the cruise lines involved here were authorized by the Cuban government to, and did, dock at (or anchor nearby) other ports in Cuba. *See id.* at 4-6, 8-10; Dkt. 332, at 7-9; MSC Dkt. 224, at 9-10; RCCL Dkt. 142, at 8-10; NCL Dkt. 228, at 7-9; *see also* Dkt. 308-50, at 6-7, 16 (March 2015 Carnival "whitepaper" on "Cuba Strategy" discussing berthing options in Havana and elsewhere). And even with respect to Havana, MSC sought and received approval to dock at a *different* terminal across Havana harbor from the docks at issue here. *See* Dkt. 445-9, at 18-26; MSC Dkt. 224, at 9; *see also* Dkt. 308-29, at 9-12 (internal Carnival document called "Destination Havana" discussing "Possibilities of Cargo Terminals to be converted into Cruise Terminals with minimum investments"). By no means did the cruise lines have "no other choice," Joint Br. 18, but to use Havana Docks' confiscated property in their travel to Cuba.

## C.  Havana Docks Is A United States National Entitled To Pursue A Claim Under The Statute.

Havana Docks is a "United States national" entitled to pursue an action under the LIBERTAD Act for two separate and independent reasons: (1) it is a "United States citizen" because it is incorporated under the laws of one of those States (Delaware), 22 U.S.C. § 6023(15)(A); Dkt. 477, at 26; and (2) it is a "legal entity which is organized under the laws" of Delaware and "which has its principal place of business" in Kentucky, 22 U.S.C. § 6023(15)(B); Dkt. 477, at 26-30, 101-06.  Indeed, the notion that Havana Docks is anything other than a U.S. national is preposterous.  The Castro regime confiscated the company's property in 1960 *precisely because of* its U.S. nationality.  *See* Resol. 3, Dkt. 73-6, at 2-3, 7.  The Commission certified the company's claim to such property in 1971 *precisely because of* its U.S. nationality.  *See* Dkt. 1-1, at 6.  And the company's business for the past sixty years has consisted primarily of maintaining its corporate status active and in good standing *precisely because* its U.S. nationality creates a prospect of recovering on that claim, from either the Cuban government or traffickers under the LIBERTAD Act.  *See* Dkts. 337, 367 ¶ 48; Dkt. 318-2, at 16.

By defining a "United States national" in the first instance as "*any* United States citizen," 22 U.S.C. § 6023(15)(A) (emphasis added), Congress conspicuously did not limit that definition to natural persons—and Congress knows how to distinguish between natural and corporate persons when it wants. *See, e.g., id.* § 1643a(1) ("The term 'national of the United States' means (A) a *natural person* who is a citizen of the United States, *or* (B) a corporation or other legal entity …") (emphasis added); *id.* §§ 1641, 1642, 1644a, 1645a; 19 U.S.C. § 4452(f)(7); 50 U.S.C. § 4131(c). Congress reaffirmed that point in the very next subsection by defining "United States national" to include "any *other* legal entity" meeting certain criteria. 22 U.S.C. § 6023(15)(B). The word "other" makes no sense if "United States citizen" does not include *some* legal entities, including corporations (which, in sharp contrast to unincorporated legal entities—*e.g.*, partnerships, trusts, LLCs, etc.—are capable of having citizenship as legal persons in their own right, *see, e.g., Carden v. Arkoma Assocs.,* 494 U.S. 185, 188-97 (1990)). And Congress knows how to lump in corporations with other legal entities when it wants, as it did in the definition of "foreign national" in the same section,

where it expressly included "corporation[s]" along with other legal entities.  *See* 22 U.S.C. § 6023(8)(B).

Ignoring this statutory text, the cruise lines insist that subsection (A) sets forth the nationality test for natural persons, while subsection (B) sets forth the test for *all* (not just "other") legal entities, including corporations.  *See* Carnival Br. 47.  But the line the statute actually draws is between persons and entities capable of having citizenship in their own right (covered by subsection (A)) and "other" legal entities not capable of having citizenship in their own right (covered by subsection (B)).  *See generally Carden*, 494 U.S. at 190 ("[T]he tradition of the common law … is to treat as legal persons *only* incorporated groups and to assimilate all others to partnerships.") (emphasis added; internal quotation omitted).  Because subsection (B) provides a path for legal entities not capable of having citizenship in their own right to establish that they are nonetheless "United States nationals" under the Act, there is nothing "superfluous," Dkt. 477, at 101, about that subsection.

This interpretation of these two subsections also has the virtue of making sense: once it is shown that a plaintiff is a United States citizen, Congress can (and did) provide that plaintiff a right of action under the

LIBERTAD Act without requiring any additional showing.  *See* 22 U.S.C. § 6081(10) ("The United States Government has an obligation to its *citizens* to provide protections against wrongful confiscations by foreign nations …, including the provision of private remedies.") (emphasis added).  The cruise lines offer no clue as to why Congress, which built on the framework established by the claims process, might have wanted to *narrow*, as opposed to *broaden*, the Claims Act's definition of "United States national," and thereby preclude some certified claim holders from recovering under the LIBERTAD Act.  Nor do they explain why Congress might have wanted to deny any United States *citizen* the right to recover under the LIBERTAD Act or distinguish between natural and corporate citizens.  Indeed, dissenting Members of Congress criticized the Act for "invit[ing] anyone who has had property confiscated in Cuba … — whether a U.S. citizen or not—to rush to incorporate in the U.S. and file a lawsuit in U.S. federal courts."  H.R. Rep. No. 104-202, at 55 (1995).[12]

---

[12] Carnival also complains that "Havana Docks failed to allege th[e] fact [that it is a United States citizen] in its operative complaint."  Carnival Br. 47 (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (*per curiam*)).  But all operative complaints here alleged that Havana Docks is a "United States national" and pleaded facts to support that allegation.  *See, e.g.*, Dkt. 149 ¶¶ 1, 6; MSC Dkt. 104 ¶¶ 1,

In any event, even if Havana Docks were relegated to subsection (B), the result would be the same. As applied to corporations, the only relevant difference between subsections (A) and (B) is that federal law generally determines citizenship by reference to *either* place of incorporation *or* principal place of business, *see* 28 U.S.C. § 1332(c), whereas legal entities covered by subsection (B) must establish that they are *both* "organized under the laws" of a State *and* have their "principal place of business in the United States." So the subsection (B) route allows the cruise lines to challenge Havana Docks' principal place of business. And that is exactly what they do: they argue that the company's principal

9; RCCL Dkt. 46 ¶¶ 1, 6; NCL Dkt. 56 ¶¶ 1, 6. That is more than enough to satisfy Rule's 8 notice pleading requirements, *see, e.g.*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-14 (2002): a complaint need not specify particular legal theories under which a plaintiff intends to prove a claim, *see, e.g., Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (*per curiam*); *Skinner v. Switzer*, 562 U.S. 521, 530 (2011), and a plaintiff is not bound by any particular legal theory mentioned in the complaint, *see, e.g.*, 61A Am. Jur. 2d *Pleading* § 148 (May 2023 update) (citing, *inter alia*, *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 540 (7th Cir. 2018)). *Gilmour* is not the contrary: it holds only that plaintiffs cannot "raise new *claims* at the summary judgment stage," 382 F.3d at 1314 (emphasis added), which is why the district court deemed the case "inapposite," Dkt. 477, at 85; *see also id.* at 101 (addressing Havana Docks' § 6023(15)(A) theory on the merits).

place of business must be in London, England, because its President, Mickael Behn, lives there. *See* Joint Br. 65-67, 69; Carnival Br. 48-50.

But a company's "principal place of business" is not like a suitcase that invariably follows around its chief executive wherever he or she may move. To the contrary, the Supreme Court has defined a corporation's principal place of business under federal law as its "nerve center," which in turn is "normally … the place where the corporation maintains its *headquarters*." *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010) (emphasis added); *see also id.* at 81, 93, 95.

For many years, Havana Docks has been headquartered in Kentucky. That is because, for some forty years, the person who managed and directed the company's affairs (and those of the Behn family, the company's majority shareholders) was an attorney named Richard McCready, who began working for the company as a young lawyer at Davis Polk & Wardwell in New York. *See* Dkt. 318-1, at 5; Dkt. 318-2, at 15; Dkt. 365-7, at 7-8, 14-15, 17; NCL Dkt. 237-32, at 13. McCready eventually returned to his home state of Kentucky, from where he continued to manage and direct the company's affairs until he became terminally ill in 2010 (and died in 2011). *See* Dkt. 318-1, at 5; Dkt. 365-

7, at 7-9. Shortly thereafter, Jerry Johnson (the head of the trust and wealth management department at Bank of the Bluegrass & Trust Company in Lexington, Kentucky) assumed management and direction of the company's affairs. *See* Dkt. 318-1, at 5-6.

Thus, since 2015, Havana Docks has maintained its corporate headquarters at Johnson's offices at 215 Southland Drive in Lexington, Kentucky, and has listed that address as its headquarters in every document. *See, e.g.*, Dkt. 318-1, at 53-54; Dkt. 318-33, at 2; Dkt. 318-34, at 2; Dkt. 506-6, at 196, 218, 227, 229, 243, 251-52, 268, 277-78, 297, 307-08, 325; Dkt. 508-26, at 4, 6; *see generally* Dkts. 388, 401 ¶ 113. The cruise lines have never identified *a single piece of evidence* identifying London as the corporation's headquarters.

To be sure, *Hertz'* bright-line rule is not absolute, and a company's headquarters may not always be its principal place of business. But that is true only in the exceptional circumstance where the headquarters is not actually a company's "nerve center," *e.g.*, where the headquarters is "simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)," or "nothing more than a mail drop box, a bare office with

a computer, or the location of an annual executive retreat." *Hertz*, 559 U.S. at 93, 97. The cruise lines seize on this exception, arguing that— regardless of its headquarters—Havana Docks' "nerve center" must be in London because (1) Behn lives there, and (2) under the bylaws, Behn (the company's President) outranks Johnson (the company's Vice President, Comptroller, Secretary, and Treasurer). Joint Br. 29, 65-66; Carnival Br. 48-49.

To identify a company's "nerve center," of course, it is necessary to understand what the company actually does. *See, e.g.*, *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 356 n.21 (3d Cir. 2013) ("[I]t is difficult to locate a corporation's brain without first identifying its body."). Since the Cuban government confiscated the Havana docks in 1960, Havana Docks' business has consisted primarily of (1) maintaining its corporate status active and in good standing for a potential recovery from either Cuba or a LIBERTAD Act trafficker, and (2) managing its (relatively modest) investments. *See, e.g.*, Dkt. 318-1, at 53-54; Dkt. 318-2, at 16; Dkts. 337, 367 ¶¶ 48-49; Dkts. 388, 401 ¶¶ 111, 114-15. This is, to put it mildly, not a full-time job. Thus, Havana Docks has no employees. *See* Dkt. 318-1, at 55; Dkts. 388, 401 ¶ 111. For more than

twenty years (long before he had any role in the company), Behn has lived in London, where he works full time as the head of IT, video editor, and office manager for a video broadcast distributor. *See* Dkt. 365-7, at 4-5, 7-8; Dkt. 508-17, at 5-6; NCL Dkt. 279-1, at 4-7. And Johnson works full time as the head of the trust and wealth management department at Bank of the Bluegrass & Trust Co. in Lexington, Kentucky. *See* Dkt. 318-1, at 5; NCL Dkt. 237-32, at 6.

The cruise lines err by arguing that Behn's formal title and authority under the bylaws necessarily means that the company's "nerve center" moves with him. To the contrary, *Hertz* focuses on "the place of *actual* direction, control, and coordination." 559 U.S. at 97 (emphasis added); *see also id.* at 93 ("*actual* center of direction, control, and coordination") (emphasis added). Thus, the cruise lines' focus on Behn's *formal* authority under the bylaws is misplaced. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Scopia Windmill Fund, LP*, 87 F. Supp. 3d 603, 608 (S.D.N.Y. 2015) ("[T]o find that [a party's] principal place of business is tied to [an officer's] location simply because he has *ultimate but generally unexercised decisionmaking authority* would disregard the Supreme Court's instruction to determine the '*actual* center' of direction, control,

and coordination.") (quoting *Hertz*, 559 U.S. at 93) (emphasis added); *accord Johnson,* 724 F.3d at 355-56 & n.21 (rejecting argument that company's "nerve center" was wherever its officers were located, because "this particular corporation did not vest the relevant decisionmaking in its officers"); *Moore v. Johnson & Johnson*, 907 F. Supp. 2d 646, 657-61 (E.D. Pa. 2012) (noting that *Hertz*' "nerve center" inquiry does not turn on corporate formalities "listed on paper," and holding that, although "the bylaws may confer on [the company's president] authority to supervise all of [the company's] business activities, ... the evidence before the court shows that she does not make full use of her corporate powers").

Here, as the district court recognized, the undisputed evidence shows that Johnson operates as the company's "brain," making and implementing the key decisions. *See* Dkt. 477, at 28, 104-06. To be sure, Johnson keeps Behn "apprised" of the company's business, Dkt. 318-1, at 54, but Johnson is the one who *actually* manages and directs the company. Behn, who has no background in business, finance, or law, *see* Dkt. 365-7, at 4-8; Dkt. 508-17, at 5; NCL Dkt. 279-1, at 7, testified that Johnson made decisions about "paying taxes, investments, administration ... Pretty much everything, I would say" without Behn's

input.  Dkt. 508-17, at 40; *see also id.* at 8 (Behn testimony that Johnson "runs everything in the company.  He consults me.  He keeps me up to date.  But … it's not as if—we don't do it in such a manner as the president runs everything.  That's not how we operate."); *id.* (Behn testimony that his "responsibilities as president aren't too much"); *id.* at 40 (Behn testimony that Johnson had "authority … to do what he needs to do for Havana Docks … to keep the company running"); NCL Dkt. 279-1, at 9 (Behn testimony that Johnson "has full autonomy for keeping the company going, paying the taxes, hiring, whatever we need, to protect the certified claim"); Dkt. 318-2, at 22 (Johnson testimony that he "can bind the company on any decision" without Behn's authorization).  And Johnson exercises complete autonomy over the company's investments. *See* Dkt. 365-7, at 13-14; Dkt. 508-17, at 21; Dkts. 337, 367 ¶ 53.

The cruise lines' assertion that "Behn calls the shots" for Havana Docks, Joint Br. 66, thus defies the record.  It is based on Behn's *formal* authority as President under the bylaws, *see id.* at 65, and Johnson's recognition that Behn outranks him and thus "*would* win out" if they clashed, *id.* at 66 (quoting Dkt. 349-5, at 9 (emphasis added); *see also* Carnival Br. 49 (Johnson "subordinate to" Behn); *id.* at 50 ("Behn had

*ultimate* authority over the corporation's affairs") (emphasis added). Other than that, the cruise lines rely on the fact that Behn picked Johnson to manage and direct the company's affairs in the first place, *see* Joint Br. 65-66, and has "overseen," "approved," "sign[ed] off" on, was "consult[ed]" on, or had "input" into, decisions made by Johnson, *see id.* at 66 (quotations omitted); Carnival Br. 48—all of which comports with the unrebutted testimony that Johnson actually manages and directs the company. Because Johnson "exercised virtually complete control over the company," and was afforded "'sound discretion'" by Behn, *CostCommand, LLC v. WH Adm'rs, Inc.*, 820 F.3d 19, 23-24 (D.C. Cir. 2016), no reasonable factfinder could conclude that the company's "nerve center" was anywhere other than its headquarters at Johnson's office in Kentucky. *See* Dkt. 477, at 101-06.

Indeed, both sides recognized below that there was no genuine dispute as to any material fact on this issue, which is why both sides cross-moved for summary judgment. *See* Dkt. 330, at 23-27; Dkt. 336, at 8-10. Such summary disposition is by no means unusual, because the *Hertz* analysis—formulated in the jurisdictional context—is designed for the very purpose of *avoiding* factual complexity and promoting

"administrative simplicity." *Hertz*, 559 U.S. at 92, 94; *see also id.* at 80 (application of "nerve center" test must "remain as simple as possible"); *id.* 94-96 (emphasizing that the test seeks to avoid factual complexity); *see also Holston Invs., Inc. B.V.I. v. LanLogistics Corp.*, 677 F.3d 1068, 1071 (11th Cir. 2012) (describing *Hertz* as "a simple rule").[13]

In the final analysis, it is hard to miss the irony in the cruise lines' argument that "Havana Docks is not among the class of plaintiffs that Congress intended to protect." Carnival Br. 49. Other than the fortuity that Behn works in video distribution in London, England (as opposed to, say, the London in Ohio, Kentucky, or Arkansas), this would not even be an issue. The only question here—assuming that Havana Docks' citizenship is not enough to resolve the "United States national" issue

---

[13] Carnival proves nothing by noting that Havana Docks is not registered to do business in Kentucky. *See* Carnival Br. 15, 49. As explained in the text, a corporation's "nerve center" is where corporate decisionmaking *actually* takes place, and Kentucky law allows a corporation to make business decisions of the sort made by Johnson without registering to do business there. *See* Ky. Rev. Stat. Ann. § 14A.9-010 (2023). Nor is Havana Docks registered to do business in England or elsewhere. *See* Dkt. 477, at 104 ("Notably, Defendants do not identify any other corporate address for Havana Docks nor any other location where it is registered to do business."); Dkt. 318-1, at 53 (Havana Docks conducts no business in England).

under § 6023(15)(A)—is whether that fortuity *strips* the company of protection under the LIBERTAD Act. The district court correctly recognized that it does not. If any "windfall" lurks in this case, it is in the cruise lines' "gotcha" argument that they can avoid their statutory responsibility for trafficking in Havana Docks' confiscated property because Mickael Behn lives in England.

## D. The Cruise Lines Knowingly And Intentionally Used Havana Docks' Confiscated Property.

The cruise lines "knowingly and intentionally" used Havana Docks' confiscated property because it is undisputed that, "with knowledge or reason to know" of Havana Docks' certified claim to that property and their potential liability under the LIBERTAD Act, 22 U.S.C. § 6023(9)), they moored their ships and disembarked their passengers on the very same piers in the very same terminal confiscated by the Cuban government. 22 U.S.C. § 6023(13)(ii); *see generally* Dkt. 477, at 91-99. The cruise lines cannot, and do not, deny that they all had *actual* knowledge of Havana Docks' certified claim no later than February 2019. *See id.* at 92. Because that claim expressly identifies the confiscated property, and the cruise lines continued to use that property in commerce

after then, their conduct satisfies the statute's *scienter* requirement as a matter of law—they used the property "with knowledge or reason to know" that it was confiscated from Havana Docks. *See id.* at 94-95.

Three of the cruise lines (all but Carnival, which expressly waived this argument below, *see* Dkt. 279, at 4) nonetheless argue that they "did not knowingly and intentionally *traffic* in confiscated property." Joint Br. 69 (capitalization modified); *see generally id.* at 69-75. In their view, the district court erred in granting Havana Docks summary judgment on this score because a reasonable factfinder could conclude that they sincerely (if mistakenly) believed that Havana Docks' concession had expired in 2004 or that the company was not a United States national. *See id.* at 72-73, 75.

That argument is based on a manifest distortion of the statute's plain language. The Act does not require that "trafficking" be "knowing and intentional," *see* 22 U.S.C. § 6082(a)(1), but instead defines "trafficking" itself (as relevant here) as "knowingly and intentionally … engag[ing] in a commercial activity using or otherwise benefiting from confiscated property," *id.* § 6023(13)(A)(ii). What must be "knowing and intentional" in other words, is not "trafficking" (with the additional

requirements and legal defenses that entails), but engaging in a commercial activity using confiscated property. Here, as noted above, there can be no dispute that the cruise lines knowingly and intentionally engaged in commercial activity using Havana Docks' confiscated property—they used the Havana docks with full knowledge of Havana Docks' claim to that property and their own corresponding legal peril. *See, e.g.*, Dkt. 477, at 94 ("[T]he undisputed facts show that Defendants continued using the Terminal after gaining actual knowledge of the Certified Claim."). Whether they believed that they had legal defenses to "trafficking" liability is beside the point. *See*, *e.g.*, *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 582-83 (2010) ("[A]n act may be 'intentional' for purposes of civil liability, even if the actor lacked actual knowledge that her conduct violated the law."); *see also id.* ("If one intentionally interferes with the interests of others, he is often subject to liability notwithstanding the invasion was made under an erroneous belief as to some … legal matter that would have justified the conduct.") (internal quotation omitted). At the very least, the certified claim gave the cruise lines "reason to know" that they were using Havana Docks' confiscated property.

The cruise lines base their contrary argument on *Ruan v. U.S.*, 142 S. Ct. 2370 (2022), which in their view "underscores that scienter provisions like the Act's require knowledge and intent as to *all* the elements of the statute," Joint Br. 71 (emphasis added).  But *Ruan* simply applied the venerable "*mens rea* canon," a background rule of statutory interpretation that Congress presumably means to apply a *scienter* requirement to every element of a *criminal* statute.  *See* 142 S. Ct. at 2376-77; *see also id.* at 2383 (Alito, J., concurring in the judgment); *Rehaif v. U.S.*, 139 S. Ct. 2191, 2195 (2019); *Morissette v. U.S.*, 342 U.S. 246, 250-52 (1952).  That canon does not apply here for the simple reason that the LIBERTAD Act is a not a criminal statute.  The cruise lines fail to cite a single appellate decision in which a court has implied a *scienter* requirement (or expanded such a requirement beyond its text) in a purely *civil* statute.

Rather, the cruise lines base their argument that the *mens rea* canon applies to a purely civil statute on two district court decisions under the LIBERTAD Act: (1) *Gonzalez v. Amazon.com, Inc.*, No. 19-23988, 2020 WL 1169125, at *2 (S.D. Fla. Mar. 11, 2020), *aff'd on other grounds*, 835 F. App'x 1011 (11th Cir. 2021), and (2) *Glen v. TripAdvisor*

*LLC*, 529 F. Supp. 3d 316, 331-32 (D. Del. 2021), *aff'd on other grounds*, 2022 WL 3538221 (3d Cir. Aug. 18, 2022). The district court in *Gonzalez* simply dismissed a complaint without prejudice on pleading grounds and asserted, without discussion, that a LIBERTAD Act complaint requires "allegations that the Defendants knowingly and intentionally trafficked in confiscated property." 2020 WL 1169125, at *2; *see also* Dkt. 477, at 98 (distinguishing *Gonzalez*). And the district court in *Glen* purported to follow "numerous other courts that have interpreted statutes having specific knowledge requirements as requiring knowledge of all the elements listed in the statute," citing (a) several criminal cases, (b) the district court in *Gonzalez,* and (c) the district court in another *Glen* case, subsequently vacated in part by the Fifth Circuit. *See* 529 F. Supp. 3d at 331-32 & n.16. None of these district court decisions provides any basis for ignoring the LIBERTAD Act's plain language and extending the statutory *scienter* requirement to every element of a "trafficking" claim.

And even if the cruise lines were correct that the *scienter* requirement applied to every element of a "trafficking" claim, their argument would still fail. A statutory *scienter* requirement, as the Supreme Court recently reaffirmed, generally refers to a particular

defendant's "knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023). Here, the cruise lines successfully blocked Havana Docks from discovering evidence regarding whether they actually believed, at the time of trafficking, either that (1) Havana Docks' concession had expired in 2004, or (2) Havana Docks was not a United States national, by warranting to the magistrate judge that they would not present evidence to a factfinder regarding any such beliefs in the legality of their conduct. *See* MSC Dkt. 173, at 8-12; RCCL Dkt. 102, at 9-11; NCL Dkt. 177, at 6-11. (Carnival expressly waived this *scienter* argument precisely because such evidence is likely to be privileged and Carnival did not want to imperil the privilege—or, presumably, reveal the legal advice. *See* Dkt. 279, at 4.)

Needless to say, the cruise lines cannot have it both ways: having persuaded the magistrate judge to deny Havana Docks' motion to compel evidence regarding their subjective legal beliefs by warranting that they would not affirmatively rely on any such evidence, they are estopped from arguing that there is no evidence in the record regarding those beliefs. *See, e.g., N.H. v. Me.*, 532 U.S. 742, 749 (2001) (judicial estoppel

"generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase").  Even now, the cruise lines identify no *record evidence* showing that they actually believed, at the time of trafficking, that their use of the Havana docks was lawful; instead, they rely entirely on non-record lawyer argument.  *Compare* Joint Br. 75 *with* Dkt. 457, at 133 (MSC counsel conceding that "there's no evidence before the Court on exactly how we analyzed the issue"); *see also* Dkt. 318-41 (CLIA memo analyzing potential claim by Havana Docks without suggesting that Havana Docks' rights in the Havana docks expired in 2004 or that the company was not a United States national).  Without identifying any such material facts in the record, the cruise lines certainly cannot establish that the district court improperly resolved a genuine dispute as to any material fact.[14]

---

[14]  The Joint Brief cites a letter from Norwegian to OFAC "contemporaneously stating that it believed that there was no basis to conclude that its use of the Terminal would fall within the Certified Claim."  Joint Br. 72-73 (citing Norwegian Dkt. 214-48, at 2 n.1).  In that letter, which requests a license to upgrade one of the piers of the Havana docks, Norwegian asserts that it has "no basis to conclude that the pier that [it] proposes to repair is property within the scope" of Havana Docks' claim.  NCL Dkt. 214-48, at 2 n.1.  But the letter does not provide any

**E.  MSC's Cuba-To-Cuba Cruises Were Within The Scope of Havana Docks' Operative Complaint.**

Unlike the other three cruise lines, MSC used Havana Docks' confiscated property not only for U.S.-to-Cuba cruises, but also for Cuba-to-Cuba cruises that began and ended in Havana.  Although (as the judgments against the other cruise lines underscore) the U.S.-to-Cuba cruises provide a sufficient basis for establishing liability against MSC, and carving out the Cuba-to-Cuba cruises would not alter statutory damages by a penny, MSC argues that Havana Docks "failed to properly plead" the Cuba-to-Cuba cruises in its Second Amended Complaint, and asks this Court to direct the district court to dismiss claims involving such cruises as time-barred.  Joint Br. 76; *see generally id.* at 76-78.

As a threshold matter, this argument does not ask the Court to alter the judgment in any way: the final judgment against MSC awards only damages, not injunctive relief, and does not address the Cuba-to-Cuba cruises.  *See*, *e.g.*, MSC Dkt. 395.  It follows that MSC is seeking an impermissible advisory opinion.  *See, e.g.*, *In re UAL Corp. (Pilots'*

---

basis for that non-conclusion, and certainly does not express a belief that Havana Docks' property rights in the Havana docks expired in 2004.

*Pension Plan Termination)*, 468 F.3d 444, 449 (7th Cir. 2006) ("Appellate courts … review *judgments*. … [A] remand directing the district judge to write a different opinion but enter the same judgment—is not within the judicial power under Article III. Fiddling with explanatory language, when the judgment is fixed, would be advisory.") (emphasis in original).

In any event, even if this Court were to reach the issue, the district court did not remotely "abuse [its] discretion" by construing Havana Docks' Second Amended Complaint against MSC to include a challenge to the Cuba-to-Cuba cruises. Joint Br. 34 (acknowledging this standard of review). Havana Docks' original and amended complaints against MSC, filed in August 2019 and April 2020 respectively, *were* in fact limited to MSC's U.S.-to-Cuba cruises launched in December 2018. *See* MSC Dkt. 1, at 2, 4-5; MSC Dkt. 56, at 2, 8.

During discovery, however, Havana Docks learned that MSC had been using its confiscated property for Cuba-to-Cuba cruises since 2015. Thus, in an interrogatory answer served in September 2020, Havana Docks asserted that MSC had trafficked in the property "from *at least as early as 2015* to 2019," by (among other things) using it "as a homeport" for Cuba-to-Cuba cruises. MSC Dkt. 278-1, at 5 (emphasis added).

Several weeks later, Havana Docks filed a Second Amended Complaint to include another MSC defendant and expand the relevant timeframe to "*after November 1, 1996.*" MSC Dkt. 104, at 9 (emphasis added); *see also id.* at 2 ("MSC Cruises SA owns and operates cruise ships which, after November 1, 1996, traveled to Cuba, *including* the cruises to Cuba from Miami.") (emphasis added). Given that MSC concededly operated no U.S.-to-Cuba cruises before December 2018, these wording changes (not mirrored in any of the other cases) can be explained only as an effort to bring MSC's Cuba-to-Cuba cruises into the case.

That is especially true under the Federal Rules' notice-pleading standard, which require a complaint to provide only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Nothing in Rule 8 requires a complaint to specify a claim's temporal scope, and such issues are often hashed out in discovery. *See, e.g., Swierkiewicz*, 534 U.S. at 512-13. The district court thus did not remotely abuse its discretion by concluding that "the Second Amended Complaint, although not a model of clarity, sufficiently alleges that the alleged trafficking encompasses Cuba-to-Cuba cruises." Dkt. 477, at 87; *see generally* 5 Charles Alan Wright & Arthur R. Miller,

*Federal Practice & Procedure* § 1286 (4th ed. Apr. 2023 update) (courts must not "draw refined inferences against the pleader," but instead "make a determined effort to understand what the pleader is attempting to set forth"). A complaint is not a statute, and cannot be construed like one.[15]

That point is particularly compelling in light of MSC's admission that it seeks reversal of the district court's interpretation of the Second Amended Complaint to obtain dismissal of the "Cuba-to-Cuba claims …

---

[15] MSC's various efforts to construe the complaint narrowly are unavailing. *First*, MSC argues that "just one month *before* seeking to amend to file a second [amended] complaint," Havana Docks' counsel said that Cuba-to-Cuba cruises "'are not the subject matter'" of the case. Joint Br. 77 (citing MSC Dkt. 96, at 34; emphasis added). But a present-tense statement about the case made *before* the filing of the Second Amended Complaint obviously says nothing about the scope of the Second Amended Complaint. *Second*, MSC argues that Havana Docks "expressly stated in its subsequent request for leave to amend that it was amending *only* for the purpose of pleading Swiss parent MSC Cruises S.A. as a defendant." *Id.* (citing MSC Dkt. 99, at 1-2; emphasis added). But the cited motion nowhere "state[s]"—much less "expressly"—that the "only" purpose of the amendment was to add a defendant, *id.*, and in any event a motion for leave to file an amended complaint does not govern the scope of the amended complaint. And *third*, MSC argues that "the parties agreed to limit discovery to exclude Havana-to-Havana cruises." *Id.* at 77-78 (citing MSC Dkt. 171, at 4-6). But there was no such "agreement" (and the cited pages identify none); to the contrary, the parties vigorously disputed whether discovery should encompass MSC's Cuba-to-Cuba cruises. *See*, *e.g.*, MSC Dkt. 187.

as time-barred." Joint Br. 76; *see also id.* at 78. The whole point of Rule 8's notice-pleading regime is to *avoid* dismissal of actions in whole or in part because of alleged pleading deficiencies. *See* Wright & Miller, *Federal Practice & Procedure* § 1286. If MSC were truly confused about the scope of Havana Docks' complaint, it could and should have moved for a more definite statement, *see* Fed. R. Civ. P. 12(e), not waited until it was too late and then sought dismissal of the Cuba-to-Cuba claims as time-barred.

## II. The District Court Correctly Calculated Trafficking Damages Under The LIBERTAD Act, And Those Statutory Damages Are Constitutional.

Like liability, the damages in this case are dictated by the statute's plain language. By its terms, the LIBERTAD Act sets the baseline measure of damages in cases—like this one—involving a certified claim to trafficked property as the *present* value of that claim (*i.e.*, "the amount … certified to the claimant …, plus interest," 22 U.S.C. § 6082(a)(1)(A)(i)(I)), and then trebles that amount, *see id.* § 6082(a)(3)(C)(ii). Here, the base award from the certified claim is roughly $9.2 million, and statutory interest on that award (which the cruise lines do not challenge) is roughly $27.4 million, for a total present

value of some $36.6 million. *See* NCL Dkt. 452, at 2-3. The district court then trebled that amount to arrive at the judgments of roughly $110 million against each cruise line. *See id.*

The cruise lines now attack the damages awards on both statutory and constitutional grounds. *See* Joint Br. 78-85; Carnival Br. 50-55. In their view, the district court erroneously (1) assessed statutory damages against each of them, as opposed to (apparently) only one of them, *see* Joint Br. 79-82; Carnival Br. 50-54, and (2) trebled the entire base amount of statutory damages, including the interest component, *see* Joint Br. 82-84. And even if the damages awards comport with the statute, the cruise lines suggest, those awards violate their substantive due process rights. *See* Joint Br. 84-85; Carnival Br. 54-55. These final arguments fare no better than any of the preceding ones.

A. **The Cruise Lines' Statutory Challenges To The Damages Awards Are Meritless.**

The cruise lines first contend that awarding statutory trafficking damages against each of them violates the LIBERTAD Act. *See* Joint Br. 79-82; Carnival Br. 50-54. But the cruise lines identify no textual basis for any such limitation. To the contrary, the Act's plain language

provides that "any person that … traffics in property which was confiscated by the Cuban Government … shall be liable … for money damages in … the amount … certified to the claimant by the [Commission], plus interest." 22 U.S.C. § 6082(a)(1)(A)(i)(I). The Act nowhere says that a trafficker is *not* liable for damages if another trafficker has already paid damages for trafficking in the same confiscated property.

And that omission is no oversight, as the Act specifically addresses the potential for multiple recoveries. In particular, the Act specifies that a plaintiff "may not bring any other civil action … that seeks monetary or nonmonetary compensation by reason of the *same subject matter*." *Id.* § 6082(f)(1)(A) (emphasis added). As the text and the legislative history make clear (and the cruise lines do not contest), that provision bars a plaintiff from suing a *single* defendant in multiple actions and fora; it does not bar a plaintiff from suing *different* defendants under the LIBERTAD Act for trafficking in the same property. *See* H.R. Rep. No. 104-468, at 61-62 ("[T]he term 'same subject matter' refers not to the original confiscation of property, but rather to trafficking in the property," and thus "is intended to prevent persons from bringing

118

separate actions for trafficking against the *same* defendant or defendants.") (emphasis added).

In addition, the Act specifies that a successful plaintiff "may not receive payment on [a certified] claim under any agreement entered into between the Unites States and Cuba settling claims" insofar as the LIBERTAD Act recovery exceeds the amount of the claim. 22 U.S.C. § 6082(f)(2)(A). This provision, as the legislative history explains, is "designed to prevent double compensation of certified claimants" at the expense of other claimants to any settlement fund established by the Cuban government. H.R. Rep. No. 104-468, at 62; *see also id.* (noting that "[p]ersons who receive a recovery in an action under this section cannot subsequently collect compensation for the same claim in subsequent settlements" between the United States and Cuba). Limiting a successful plaintiff's potential recovery from *the Cuban government* at the expense of other claimants, of course, is a far cry from limiting a plaintiff's potential recovery from *multiple traffickers*. In short, the LIBERTAD Act expressly limits a plaintiff's potential recovery—but just not in the way the cruise lines wish.

Not to worry, say the cruise lines: the limitation they posit is provided by "a common-law background rule and equitable doctrine" known as the "one satisfaction" rule. Joint Br. 79; *see also* Carnival Br. 50. Even assuming *arguendo* that a background rule on multiple recoveries could apply to a statute, like the LIBERTAD Act, that specifically addresses multiple recoveries, the "one satisfaction" rule (as the district court recognized) does not apply here by its own terms. *See* Dkt. 542, at 3-9.

As the cruise lines note, the one-satisfaction rule "'generally provides that a plaintiff is entitled to only one satisfaction for a *single injury*.'" Joint Br. 79 (quoting *BUC Int'l Corp. v. Int'l Yacht Council, Ltd.*, 517 F.3d 1271, 1276 (11th Cir. 2008) (emphasis added)); *see also* Carnival Br. 50. The entire premise of their argument, thus, is that trafficking in Havana Docks' confiscated property by different defendants inflicts a "single injury" on Havana Docks. That premise is manifestly incorrect.

The trafficking injury that a LIBERTAD Act plaintiff suffers is the commercial use of its confiscated property without authorization. Recall that, under the Act, trafficking is defined in relevant part as "engag[ing] in a commercial activity using … confiscated property … *without the*

*authorization* of any United States national who holds a claim to the property." 22 U.S.C. § 6023(13)(A) (emphasis added). Thus, LIBERTAD Act plaintiffs suffer a tangible injury sufficient to confer Article III standing because "[a defendant's] failure to obtain permission and pay for use of the property constitutes a pocketbook injury." *Garcia-Bengochea*, 57 F.4th at 924; *see generally Lamb v. ITT Corp.*, No. 08:09CV95, 2010 WL 376858, at *2-3 (D. Neb. Jan. 26, 2010) (noting that an Italian company, STET, complied with the LIBERTAD Act in 1997 by paying U.S. national ITT, which holds a claim to confiscated property in Cuba, $22 million for authorization to use that property for ten years).

Once it is understood that a trafficking injury is a "pocketbook injury," *Garcia-Bengochea*, 57 F.4th at 924, the cruise lines' one-satisfaction argument collapses. That argument depends on (mis)characterizing Havana Docks' injury as "the alleged confiscation of the terminal." Carnival Br. 53; *see also id.* at 53-54 ("Congress sought to compensate plaintiffs for the injury of having their property confiscated by the Cuban Government."); Joint Br. 80 ("[T]he relevant injury is the loss of property through confiscation."). But Havana Docks did not sue the cruise lines for confiscating the terminal, because the cruise lines did

not confiscate the terminal.  Rather, Havana Docks sued the cruise lines for trafficking, *i.e.*, using confiscated property in commerce without authorization.  *See* 22 U.S.C. § 6023(13)(A); *see also* H.R. Rep. No. 104-468, at 61 ("subject matter" of Title III claim is "not … the original confiscation of property, but rather … trafficking in the property").  The cruise lines' trafficking in Havana Docks' confiscated property thus did not inflict a "single injury," *BUC Int'l*, 517 F.3d at 1276; rather, *each* cruise line was required to obtain Havana Docks' authorization to use the property, and *each* cruise line's failure to do so inflicted a separate injury.  In other words, the trafficking injury is defendant-specific; had Carnival paid Havana Docks to obtain the requisite authorization, Norwegian could hardly claim that it was thereby also authorized to use the docks.

The cruise lines thus err by equating a trafficking injury with a confiscation injury on the ground that "the Act measures damages solely by the value of the confiscated property or outstanding claim."  Joint Br. 80; *see also* Carnival Br. 53.  Congress' quintessentially legislative decision to set trafficking damages by reference to the value of a certified claim does not magically transform a trafficking injury into a confiscation injury.  *See* Dkt. 542, at 5 ("[T]he fact that Title III quantifies both [the

confiscation injury and the trafficking injury] by the amount of the certified claim does not mean that the injuries are the same."); *see generally Garcia-Bengochea*, 57 F.4th at 924-25 (distinguishing trafficking injury from confiscation injury); *Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 336 (5th Cir. 2021) (same). Congress could have set trafficking damages by reference to any number of benchmarks (*e.g.*, a fixed sum, the amount paid to the Cuban government, or a defendant's trafficking gains), and the benchmark chosen does not alter the nature of the injury.

Moreover, the cruise lines' argument that a plaintiff can recover only once for trafficking would effectively provide a license for anyone to traffic at will once a particular plaintiff recovered against any defendant. *See* Dkt. 542, at 9. But nothing in the LIBERTAD Act suggests that Congress meant to provide such *carte blanche* for trafficking. To the contrary, the Act seeks not only to provide compensation to owners of confiscated property (who may well never receive a penny from the Cuban government) but also to deter trafficking (which bolsters Cuba's Communist regime). *See id.* at 5; *see generally* 22 U.S.C. § 6081(11) (Title III actions intended "[t]o deter trafficking in wrongfully confiscated property."); *id.* § 6081(6) ("'[T]rafficking' in confiscated property provides

badly needed financial benefit, including hard currency, oil, and productive investment and expertise, to the current Cuban Government and thus undermines the foreign policy of the United States."). The cruise lines' assertion that "[t]he fundamental purpose of the [LIBERTAD] Act is to compensate claimants for the value of their confiscated property interest," Carnival Br. 52, and their concerns with "overcompensation" and "limitless-liability," Joint Br. 79, 82, wholly ignore this deterrent purpose.

It follows that there is no merit to the cruise lines' argument that the statute is "absurd" and "irrational" insofar as it allows a plaintiff to recover trafficking damages from an unlimited number of defendants. Carnival Br. 52; *see also* Joint Br. 82. The need for deterrence does not vanish once the first (or any subsequent) trafficker pays up; to the contrary, the more traffickers, the greater the boon to Cuba's hostile Communist regime. There is nothing unusual, much less "absurd" or "irrational," about Congress' desire to deter "100 or 1,000 defendants" from bolstering that regime by trafficking in property confiscated from United States nationals. Carnival Br. 52.

Three of the cruise lines (but not Carnival) next contend that the district court erred by "trebl[ing] the interest on the claim." Joint Br. 82; *see generally id.* at 82-84. But that is not what the district court did. As directed by the Act's plain language, the district court trebled the *entire damages award* specified by § 6082(a)(1)(A)(i). *See* Dkt. 541, at 11-13; *see generally* 22 U.S.C. § 6082(a)(3)(C)(ii) (directing court to award "3 times the amount determined applicable under paragraph (1)(A)(i)"). The Act sets baseline damages by reference to a claim's *present value*, which includes interest (as might be expected when dealing with a claim to property confiscated long ago). *See id.* § 6082(a)(1)(A)(i)(I) (setting statutory damages as "the amount … certified to the claimant by the [Commission], *plus interest*") (emphasis added); *id.* § 6082(a)(2) (establishing a rebuttable presumption that statutory damages calculated under § 6082(a)(1)(A)(i)(I) set "the appropriate amount of liability").[16]

---

[16] The certified claim itself fixed Havana Docks' loss at $9,179,700.88 "with interest thereon at 6% per annum from the respective dates of loss to the date of settlement." Dkt. 1-1, at 4. But, to avoid recovering interest on interest, Havana Docks did not argue below that this interest component was part of "the amount … certified to the claimant by the [Commission]." 22 U.S.C. § 6082(a)(1)(A)(i)(I).

The three cruise lines insist, however, that the statutory directive to treble "the amount determined applicable under paragraph (1)(A)(i)" refers to the "amount … certified by the [Commission]" under subparagraph (1)(A)(i)(I) *before* interest is added.  Joint Br. 83.  As the district court explained, that is incorrect as a matter of basic statutory interpretation.  The Act uses the word "amount" *both* in paragraph (1)(A)(i) *and* in subparagraph (1)(A)(i)(I), and the trebling provision by its terms refers to "the amount determined applicable under paragraph (1)(A)(i)," not subparagraph (1)(A)(i)(I).  *See* Dkt. 541, at 12-13.  Because "the amount determined applicable under paragraph (1)(A)(i)" is "the amount … certified … by the [Commission], plus interest" under subparagraph (1)(A)(i)(I), the district court correctly trebled the entire statutory damages award, *i.e.*, the claim's present value.  *See id.*; *see also* Dkt. 318-41 at 86-87 (CLIA memo recognizing that trebling applies to "[t]he amount certified to the claimant … plus interest").  Nothing in the statute either requires or permits a court, before trebling, to excise the portion of the damages award representing interest, and because the LIBERTAD Act specifically addresses the issue, it is neither necessary

nor appropriate to resort to "general rule[s]" that may apply to statutes that do not address the issue.  Joint Br. 82.

## B. The Cruise Lines' Constitutional Challenge To The Damages Awards Is Meritless.

Finally, the cruise lines suggest—almost as an afterthought—that the statutory damages awards in these cases are unconstitutionally excessive in violation of their substantive due process rights.  *See* Joint Br. 84-85; Carnival Br. 54-55.[17]  Three of the cruise lines devote but a single paragraph to this issue, while Carnival devotes less than two pages.  *See id.*  This perfunctory presentation is understandable; never in the post-*Lochner* era has the Supreme Court invalidated an award of

---

[17] *Amicus* Chamber of Commerce raises a distinct "common-law" challenge to the statutory damages in these cases.  *See* Chamber *Amicus* Br. 27-31.  That argument is unavailing for two reasons.  *First*, the cruise lines did not raise it below (or in this Court), and appellate courts do not consider arguments raised for the first time on appeal (much less only by an *amicus*).  *See, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 531 n.13 (1979).  *Second*, the argument is wrong, as the "common law" provides no license to override a statutory damages formula; the cases cited by the Chamber involve *punitive* damages determined by factfinders, not *statutory* damages determined by Congress.

statutory damages as unconstitutionally excessive, and substantive due process is hardly in vogue.[18]

The cruise lines base their constitutional argument on *Lochner*-era precedent stating that a statutory penalty may violate substantive due process if it is "'so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.'" Joint Br. 84 (quoting *St. Louis, Iron Mountain & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919)); *see also* Carnival Br. 54 (same). Putting aside the fact that courts have not been in the business of striking down economic legislation on substantive due process grounds for over eighty years, *see, e.g.*, *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 386-87, 400 (1937), and are exceptionally deferential to legislative judgments about the appropriate

---

[18] Insofar as the cruise lines grouse about "[t]he nearly $440 million in damages awarded in this case," Carnival Br. 54, their protest—as the district court recognized—is misguided, *see* NCL Dkt. 452, at 9. This consolidated appeal involves four *separate* judgments of roughly $110 million in statutory trafficking damages in four *separate* cases against four *separate* cruise lines. *See id.* Contrary to the cruise lines' suggestion, *see* Joint Br. 84; Carnival Br. 54, the one-satisfaction rule has no bearing on the due process analysis, as a defendant cannot establish that *it* is being subjected to excessive damages by arguing that *others* are being subjected to the same damages. *See BUC*, 517 F.3d at 1278 ("[T]he one satisfaction rule … is not a right created to protect defendants.").

measure of damages in civil actions, *see, e.g., BMW of N. Am. v. Gore*, 517 U.S. 559, 583 (1996); *Williams*, 251 U.S. at 66; *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1314 (11th Cir. 2021), that challenge fails on its own terms.

The cruise lines' constitutional excessiveness argument boils down to disagreement with three of Congress' legislative decisions in setting statutory damages under the LIBERTAD Act: (1) the decision to set the baseline measure of damages by reference to the amount of a certified claim to trafficked property, *see* 22 U.S.C. § 6082(a)(1)(A)(i)(I); (2) the decision to award interest to reflect that claim's present value, *see id.*; and (3) the decision to award treble damages in cases involving trafficking in property covered by a certified claim, *see id.* § 6082(a)(3)(C)(ii). *See* Joint Br. 84; Carnival Br. 55. But the cruise lines do not even argue that any of these legislative decisions is unconstitutionally irrational, and indeed each of them is eminently reasonable.

Title III of the LIBERTAD Act recognizes that trafficking in confiscated property harms more than individual plaintiffs; it "undermines the foreign policy of the United States." 22 U.S.C.

§§ 6081(5), (6).  Thus, the Act seeks "[t]o deter trafficking in wrongfully confiscated property [by] deny[ing] traffickers any profits from economically exploiting Castro's wrongful seizures," *id.* § 6081(11)— Congress wanted to make trafficking prohibitively expensive, not just another cost of doing business in Communist Cuba.  *See also* H.R. Rep. No. 104-468, at 58 (1996) ("The purpose of this civil remedy is, in part, to discourage persons and companies from engaging in commercial transactions involving confiscated property, and in so doing to deny the Cuban regime … the capital generated by such ventures and to deter the exploitation of property confiscated from U.S. nationals.").

It provides a measure of justice to set baseline trafficking damages by reference to the present value of a certified claim: it forces traffickers who do business in Cuba (and thereby prop up Cuba's hostile regime) to pay that regime's longstanding debts to U.S. nationals.  *See, e.g.*, 22 U.S.C. §§ 6081(6)(B), 6081(11).  And awards of treble damages are hardly unusual in American law; they express Congress' views as to the gravity of a particular offense and desire to encourage private enforcement.  *See, e.g., Reiter v. Sonotone Corp.*, 442 U.S. 330, 343-44 (1979); *cf. Yates*, 21 F.4th at 1314-15 (statutory trebling not relevant to Eighth Amendment

excessiveness). Here, Congress decided that treble damages are warranted for those who knowingly traffic in property covered by a certified claim because "investors in Cuba have been effectively on notice regarding the 5,911 certified U.S. claims since the Cuban claims program was completed" in 1972, and "[i]nformation regarding whether a claim to a particular property in Cuba is held by a certified U.S. claimant is readily available." H.R. Rep. No. 104-468, at 59.[19]

The cruise lines thus prove nothing by noting that the damages awards here are larger than they would have been had Congress made different legislative decisions about how to calculate statutory damages. *See, e.g.*, Carnival Br. 54 (noting that the award is "roughly 20 times" the amount that each cruise line paid the Cuban port operator, and "three times the entire purported value of the terminal with interest"). Noting that Congress could have made different decisions hardly establishes that the decisions that Congress *did* make are unconstitutional. Indeed,

---

[19] As a practical matter, adding simple interest to the certified claim in this case and then trebling that amount barely keeps up with inflation. Adjusted for inflation, Havana Docks' claim to $9,179,700.88 as of October 1960 is tantamount to $94.6 million in August 2023. *See* U.S. Bureau of Labor Statistics, *CPI Inflation Calculator* <https://tinyurl.com/3cz78hku>.

the statutory damages imposed here represent the statutory *minimum*; the LIBERTAD Act authorized Havana Docks to pursue "greater" damages, 22 U.S.C. § 6082(a)(1)(A)(i), representing "the fair market value" of the confiscated property "calculated as being either [1] the current value of the property, or [2] the value of the property when confiscated plus interest, whichever is greater," *id.* § 6082(a)(1)(A)(i)(III). Dkt. 526, at 11-13; *cf. Yates*, 21 F.4th at 1314 ("[P]enalties falling below the maximum statutory fines for a given offense receive a strong presumption of constitutionality.") (internal quotation, brackets, and ellipsis omitted); *Vanderbilt Mortg. & Fin., Inc. v. Flores,* 692 F.3d 358, 374 (5th Cir. 2012) (rejecting due process and Eighth Amendment challenges to "award … mandated by statute as a minimum penalty").

If anything, the cruise lines' decision to use Havana Docks' confiscated property with *actual* knowledge of Havana Docks' certified claim and their own potential liability under the LIBERTAD Act only underscores the need for strong deterrence to counteract the lure of doing business in Cuba (and thereby propping up the country's repressive and hostile regime). *See* NCL Dkt. 449, at 20-29 (summarizing evidentiary record of cruise lines' knowledge of Havana Docks, the LIBERTAD Act,

and their potential liability).  As noted above in the Statement of Facts, the cruise lines docked their massive ships hundreds of times on the very same piers in the very same terminal confiscated from Havana Docks and identified in the certified claim, disembarked almost a *million* tourists there for shore tours run by the Cuban regime, and put at least $130 million in hard currency into that regime's pockets.

The cruise lines also reaped more than a *billion* dollars in *net* revenues for opening up this new tourist market: from 2015 to 2019, Cuba cruises generated *net* revenues of roughly $112 million for Carnival, $272 million for MSC, $330 million for Royal, and $300 million for Norwegian.  Dkt. 445-7, at 2, 5; Dkt. 477, at 90.  And regardless of whether the cruise lines "lost money, made money, or merely broke even," Carnival Br. 55, they were unmistakably positioning themselves to make vast sums of money as first movers in a potentially lucrative Cuban tourism market.  *Cf. TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 459-62 (1993) (assessing substantive due process challenge to punitive damages in part by reference to *potential,* not *actual,* injury or gain from defendant's conduct).  Insofar as the cruise lines repackage their "lawful travel" argument as part of their substantive due process

argument, *see* Carnival Br. 54-55, it is no more persuasive. As the district court explained, "[t]here is simply no evidence in the record in any of these cases that the United States government encouraged or licensed Defendants to engage in trafficking of Plaintiff's property." NCL Dkt. 452, at 11.

In the final analysis, the cruise lines have no one but themselves to blame. They could have avoided trafficking liability under the LIBERTAD Act altogether by securing Havana Docks' authorization. *See* 22 U.S.C. § 6023(13)(A). But they made no effort to do so, and now must bear responsibility for the consequences of that choice.

## CONCLUSION

For the foregoing reasons, this Court should affirm each of the four judgments.

Respectfully submitted,

Roberto Martínez
Stephanie A. Casey
Zachary A. Lipshultz
Thomas A. Kroeger
Aziza F. Elayan
Sabrina S. Saieh
COLSON HICKS EIDSON, P.A.
255 Alhambra Circle, Penthouse
Coral Gables, FL   33134

September 29, 2023

Christopher Landau
Richard Klingler
ELLIS GEORGE CIPOLLONE
   O'BRIEN LLP
1155 F Street N.W., Suite 750
Washington, DC   20004
(202) 249-6900
*clandau@egcfirm.com*

Vincent H. Li
ELLIS GEORGE CIPOLLONE
   O'BRIEN LLP
152 West 57th Street, 28th floor
New York, NY   10019

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and 32(a)(7), I hereby certify that the foregoing brief is proportionately spaced using 14-point Century Schoolbook font and contains 27,968 words, as authorized by this Court's order of September 18, 2023.

_____

Christopher Landau

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 29, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

_____
Christopher Landau