IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆◆

HAVANA DOCKS CORPORATION,

*Plaintiff-Appellee,*

—v.—

ROYAL CARIBBEAN CRUISES, LTD.,

*Defendant-Appellant.*

HAVANA DOCKS CORPORATION,

*Plaintiff-Appellee-Cross Appellant,*

—v.—

ROYAL CARIBBEAN CRUISES, LTD., NORWEGIAN CRUISE LINE HOLDINGS, LTD., CARNIVAL CORPORATION, a foreign corporation doing business as Carnival Cruise Lines, MSC CRUISES S.A. CO., MSC CRUISES (USA), INC., *et al.,*

*Defendants-Appellants-Cross Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CIVIL NOS. 19-21724, 19-23588, 19-23590, 19-23591
THE HONORABLE BETH BLOOM, J.

## BRIEF OF DANIEL W. FISK AS *AMICUS CURIAE* IN SUPPORT OF APPELLEE AND AFFIRMANCE

MARCOS DANIEL JIMÉNEZ
Florida Bar No.: 441503
LEÓN COSGROVE JIMÉNEZ, LLP
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone: (305) 570-3249
mjimenez@leoncosgrove.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Mr. Fisk discloses that he is an individual and not affiliated with any of the corporations that are interested persons in this case.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Mr. Fisk also certifies that, in addition to the persons and entities named in the parties' certificates of interested persons, the following individual or entities have or may have an interest in the outcome of this case:

- Akerman, LLP, *Counsel for Defendant-Appellant Carnival Corporation*

- American Society of Travel Advisors, Inc., *Amicus Curiae*

- Baldridge, James Douglas, *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Balmori, Daniel, *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Black, Hillary S., *Counsel for Defendant-Appellant Carnival Corporation*

- Bloom, Honorable Beth, *United States District Judge*

- Bohrer, Sanford L., *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Boies Schiller & Flexner, LLP, *Counsel for Defendant-Appellant Carnival Corporation*

- Bondi, Bradley J., *Counsel for Amici Curiae U.S. Travel Association, United States Tour Operators Association, Inc., and American Society of Travel Advisors, Inc.*

- Burck, William Anthony, *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Carnival Corporation (CCL), *a foreign corporation doing business as Carnival Cruise Lines, Defendant-Appellant*

- Casey, Stephanie A., *Counsel for Plaintiff-Appellee*

- Clement & Murphy, PLLC, *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Chamber of Commerce of the United States of America*, Amicus Curiae in the Eleventh Circuit*

- Clement, Paul D., *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Colson Hicks Eidson, *Counsel for Plaintiff-Appellee*

- Cooper, Jonathan Gordon, *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Cruise Lines International Association, *Amicus Curiae in the Eleventh Circuit and District Court proceedings*

- Dvoretzky, Shay, *Counsel for Amicus Curiae Cruise Lines International Association in the Eleventh Circuit*

- Elayan-Martinez, Aziza F., *Counsel for Plaintiff-Appellee*

- Ellis George Cipollone O'Brien Annaguey, LLP, *Counsel for Plaintiff-Appellee*

- Fisk, Daniel, *Amicus Curiae*

- Foreman Friedman, PA, *Counsel for Amicus Curiae Cruise Lines International Association in the District Court*

- Gayles, Honorable Darrin P., *United States District Judge*

- Goodman, Honorable Jonathan, *United States Magistrate Judge*

- Gray, Corey Patrick, *Counsel for Defendant-Appellant Carnival Corporation*

- Harper, Chadwick J., *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Harvard Law School, *Counsel for Amicus Curiae Cruise Lines International Association in the District Court*

- Havana Docks Corporation, *Plaintiff-Appellee*

- Hernacki, Andrew T., *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Hogan Lovells US, LLP, *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Holland & Knight LLP, *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd. and Defendant-Appellant Carnival Corporation*

- Jiménez, Marcos Daniel, *Counsel for Amicus Curiae Daniel Fisk*

- Jones Day, *Counsel for Amicus Curiae Peter Kucik*

- Jones Walker, LLP, *Counsel for Defendant-Appellant Carnival Corporation*

- Kats, Vitaliy, *Counsel for Amici Curiae U.S. Travel Association, United States Tour Operators Association, Inc., and American Society of Travel Advisors, Inc.*

- Klingler, Richard Douglas, *Counsel for Plaintiff-Appellee*

- Kroeger, Thomas A., *Counsel for Plaintiff-Appellee*

- Kucik, Peter, *Amicus Curiae*

- Landau, Christopher, *Counsel for Plaintiff-Appellee*

- Li, Vincent, *Counsel for Plaintiff-Appellee*

- Lindsay, Alvin Francis, III, *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Lioi, Samuel V., *Counsel for Amicus Curiae Peter Kucik*

- Lipshultz, Zachary A., *Counsel for Plaintiff-Appellee*

- Lipshutz, Brian M., *Counsel for Defendant-Appellant Carnival Corporation*

- León Cosgrove Jiménez, LLP, *Counsel for Amicus Curiae Daniel Fisk*

- Llamas, Luis Emilio, *Counsel for Defendant-Appellant Carnival Corporation*

- Loeb, Robert, *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Lorenzo, Richard C., *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Louis, Honorable Lauren Fleischer, *United States Magistrate Judge*

- Lutz, Zachary P., *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Marcus, Steven*, Counsel for Amicus Curiae Cruise Lines International Association in the Eleventh Circuit*

- Margol & Margol, *Counsel for Plaintiff-Appellee*

- Margol, Rodney S., *Counsel for Plaintiff-Appellee*

- Martinez, Honorable Jose E., *United States District Judge*

- Martinez, Roberto, *Counsel for Plaintiff-Appellee Massey & Gail LLP, Counsel for Amicus Curiae Cruise Lines International Association in the District Court*

- Massey, Jonathan S., *Counsel for Amicus Curiae Cruise Lines International Association in the District Court*

- Mayer Brown LLP, *Counsel for Amicus Curiae Chamber of Commerce of the United States of America*

- McAliley, Honorable Chris M., *United States Magistrate Judge*

- Michel, Christopher, *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Moriceau, Alisha, *Counsel for Defendant-Appellant Carnival Corporation*

- MSC Cruises S.A. CO., *Defendant-Appellant*

- MSC Cruises (USA), Inc., *Defendant-Appellant*

- MSC Cruises, S.A., *Defendant-Appellant*

- Munyan, Katherine, *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Nelson, Timothy G., *Counsel for Amicus Curiae Cruise Lines International Association in the Eleventh Circuit*

- Nemeroff, Justin B., *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Norwegian Cruise Line Holdings, Ltd., *Defendant-Appellant*

- Oliu, Pascual A., *Counsel for Defendant-Appellant Carnival Corporation*

- Orrick Herrington & Sutcliffe, LLP, *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Otazo-Reyes, Honorable Alicia M., *United States Magistrate Judge*

- Paul Hastings, LLP, *Counsel for Amici Curiae U.S. Travel Association, United States Tour Operators Association, Inc., and American Society of Travel Advisors, Inc.*

- Paul, Weiss, Rifkind, Wharton & Garrison LLP, *Counsel for Defendant-Appellant Carnival Corporation*

- Pegg, Allen P., *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Ponce, Scott D., *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd. and Defendant-Appellant Carnival Corporation*

- Proctor, Ryan M., *Counsel for Amicus Curiae Peter Kucik*

- Quinn Emanuel Urquhart & Sullivan, LLP, *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Rider-Longmaid, Parker*, Counsel for Amicus Curiae Cruise Lines International Association in the Eleventh Circuit*

- Rosenkranz, E. Joshua, *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Rowen, Matthew D., *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Royal Caribbean Cruises, Ltd., *Defendant-Appellant*

- Saladrigas, Caitlin F., *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Schultz, Meredith L., *Counsel for Defendant-Appellant Carnival Corporation*

- Shaffer, Derek L., *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Shanmugam, Kannon K., *Counsel for Defendant-Appellant Carnival Corporation*

- Singer, Stuart H., *Counsel for Defendant-Appellant Carnival Corporation*

- Skadden, Arps, Slate, Meagher & Flom, LLP, *Counsel for Amicus Curiae Cruise Lines International Association in the Eleventh Circuit*

- Stander, Robert N., *Counsel for Amicus Curiae Peter Kucik*

- Sullivan, Kathleen M., *Counsel for Defendant-Appellant Norwegian Cruise Line Holdings, Ltd.*

- Tager, Evan M., *Counsel for Amicus Curiae Chamber of Commerce of the United States of America*

- Taormina, Benjamin A., *Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

- Tribe, Laurence H., *Counsel for Amicus Curiae Cruise Lines International Association in the District Court*

- U.S. Travel Association, *Amicus Curiae*

- United States Tour Operators Association Inc., *Amicus Curiae*

- Venable, LLP, *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

- Vice, Abigail Frisch, *Counsel for Defendant-Appellant Carnival Corporation*

- Von Bokern, Jordan L., *Counsel for Amicus Curiae Chamber of Commerce of the United States of America*

- Wang, Jonas, *Counsel for Defendants-Appellants MSC Cruises S.A. CO.; MSC Cruises (USA), Inc.; MSC Cruises, S.A.*

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ........................... C-1

TABLE OF AUTHORITIES ................................................ iii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ................... 1

STATEMENT OF THE ISSUE ............................................. 4

INTRODUCTION AND SUMMARY OF THE ARGUMENT ......... 5

ARGUMENT ................................................................. 8

   I.  Havana Docks' Claim Goes to the Heart of the
      LIBERTAD Act's History, Purpose, and Text ................... 8

      A. The Historical Context of the LIBERTAD Act
         Showcases How the Act is Part of Longstanding
         U.S. Policy to Deny Resources to Cuba's Communist
         Regime ................................................................ 10

      B. The Purpose of the LIBERTAD Act Was
         Intentionally Inserted into the Text of the Statute
         and Would Be Seriously Undermined if Havana
         Docks is Deprived of Relief ................................... 12

      C. The Text of the LIBERTAD Act Deliberately
         Provides a Broad Private Right of Action for
         Claimholders, Like Havana Docks, Against
         Companies, Like Appellants, who "Traffic" Property
         Confiscated by the Cuban Communist Regime ........... 17

         i.  Havana Docks' Concession is Protected Under
            the Act, Regardless of Its Original Expiration ..... 17

         ii.  Havana Docks Is a Certified Claimholder,
            Which Created a Presumption of Validity and
            Justifies a Heightened Damages Award ............. 19

PAGE

iii. Appellants Do Not Qualify for Immunity from
"Trafficking" Liability Provided for Under the
Act.................................................................. 21

CONCLUSION ........................................................ 27

CERTIFICATE OF COMPLIANCE ...................... 28

CERTIFICATE OF SERVICE ............................... 29

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Board of Trs. of Univ. of Ill. v. United States*,
   289 U.S. 48 (1933) .......................................................... 8

**Constitutuional Provisions**

U.S. CONST. art. I, § 8, cl. 3 ............................................... 8

**Statutes**

22 U.S.C. § 2370(a)(1), Foreign Assistance Act ....................... 10

22 U.S.C. §§ 6021–6091,
   Cuban Liberty and Democratic Solidarity Act of 1996
   ("LIBERTAD Act") ("Helms-Burton Act") ................... *passim*

   22 U.S.C. § 6021(1) ..................................................... 12

   22 U.S.C. § 6021(4) ..................................................... 13

   22 U.S.C. § 6021(9) ..................................................... 13

   22 U.S.C. § 6022(6) ................................................... 8, 14

   22 U.S.C. § 6023(12) .................................................... 17

   22 U.S.C. § 6023(13)(A) ............................................... 22

   22 U.S.C. § 6023(13)(B)(iii) ........................................... 22

   22 U.S.C. § 6032(h) ................................................. 11, 23

   22 U.S.C. § 6064 ......................................................... 23

   22 U.S.C. § 6067 ......................................................... 19

   22 U.S.C. § 6067(d) ..................................................... 19

   22 U.S.C. § 6081(1) ..................................................... 17

   22 U.S.C. § 6081(2) ..................................................... 13

   22 U.S.C. § 6081(3) ..................................................... 13

   22 U.S.C. § 6081(6) ..................................................... 13

PAGE(S)

22 U.S.C. § 6082(a)(2) ................................................. 20

22 U.S.C. § 6082(a)(3) ................................................. 20

22 U.S.C. § 6085................................................................ 9

Cuban Democracy Act (1992)............................................ 11

Trading with the Enemy Act ............................................ 10

## Regulations

31 C.F.R. § 515.201 ....................................................... 26

31 C.F.R. § 560(a)(2)....................................................... 26

31 C.F.R. § 560(b)(2)....................................................... 26

## Other Authorities

141 CONG. REC. H950 (daily ed. Sept. 20, 1995) (statement of
     Rep. Torricelli) ............................................... 15

141 CONG. REC. S14998 (daily ed. Oct. 11, 1995) (statement
     of Sen. Helms) ........................................... 9, 15

141 CONG. REC. S15320-01 (daily ed. Oct. 19, 1995)
     (statement of Sen. Helms) ............................... 24

142 CONG. REC. H1724-04 (daily ed. Mar. 6, 1996)
     (statement of Rep. Diaz-Balart)...................... 23

*Cuba: Title III FAQs (LIBERTAD)*,
     U.S. DEP'T STATE, https://www.state.gov/cuba-title-iii-
     faqs-libertad/.................................................... 9

Richard E. Feinberg, *Reconciling U.S. Property Claims in
     Cuba: Transforming Trauma into Opportunity* LATIN AM.
     INITIATIVE AT BROOKINGS (2015),
     chromeextension://efaidnbmnnnibpcajpcglclefindmkaj/htt
     ps://www.brookings.edu/wp-
     content/uploads/2016/07/Reconciling-US-Property-
     Claims-in-Cuba-Feinberg.pdf........................... 5

PAGE(S)

Daniel Fisk & Courtney R. Perez, *Managed Engagement: The Case of the Castro's Cuba*, 42 U. MIAMI INTERN-AM. L. REV. 47 (2010) ................................................................... 2

Daniel W. Fisk, *Cuba in U.S. Policy: An American Congressional Perspective*, CAN., THE US & CUBA HELMS-BURTON & ITS AFTERMATH (1999) ....................................... 2

Daniel W. Fisk, *Foreign Claims*, 33 INT'L L. 493 (1999) ............. 2

House Report on H.R. 927, H. REP. NO. 104-202(1), at 25 (1995) ................................................................................. 14

H. REP. NO. 104-468 (1996) ....................................... 20, 21, 25

Andreas F. Lowenfeld, *Congress and Cuba: The Helms-Burton Act*, 90 AM. J. INT'L L. 419-434 (1996).................... 11

*Presentation by Carlos Fernandez de Cossio, Deputy Minister for Foreign Affairs of Cuba*, REPRESENTACIONES DIPLOMÁTICAS DE CUBA EN EL EXTERIOR (Dec. 21, 2022), https://misiones.cubaminrex.c u/en/articulo/presentation-carlos- fernandez-de-cossio-deputy-minister-foreign-affairs-cuba ............................................................................ 15

*Researching Cuba: Business, Economy, and U.S. Relations*, LIBR. OF CONG., https://guides.loc.gov/cuba-business-economy/legislation-actions ............................................. 11

Symposium, *The Cuban Embargo: Policy Outlook After 50 Years*, Occasional Paper Series 10, UNIV. GA. SCH. L. (2014), https://digitalcommons.law.uga.edu/rusk_oc/10/ .... 2, 24

U.S.-Cuba Relations, COUNCIL ON FOREIGN RELS. (2023), https://www.cfr.org/timeline/us-cuba-relations.................. 10

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

*Amicus* Daniel W. Fisk was a Senior Professional Staff Member and Associate Counsel of the United States Senate Foreign Relations Committee from 1994 to 1997. Mr. Fisk served as the principal committee staff member involved in the drafting and legislative strategy of the Cuban Liberty and Democratic Solidarity Act of 1996 ("LIBERTAD Act"), also known as the Helms-Burton Act. In this capacity, Mr. Fisk regularly interacted with Members of Congress and staff in both chambers and among both political parties.

Under the direction of Senator Jesse Helms, Chairman of the Foreign Relations Committee, Mr. Fisk oversaw all aspects of the legislation's drafting from the initial text and its introduction, committee consideration, and Senator floor action to the House-Senate Conference Committee bill text and report. Chairman Helms was the initiator of the LIBERTAD legislation, its primary Senate sponsor, and with

---

[1] Undersigned counsel certifies, pursuant to Federal Rule of Appellate Procedure 29(a)(4)(e), that this brief was not authored in whole or in part by counsel for any of the parties, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person—other than the *amicus curiae* or its counsel—contributed money that was intended to fund preparing or submitting the brief.

Congressman Dan Burton, the leading force behind the legislation and its ultimate congressional approval.

From 2002 to 2005, Mr. Fisk was directly involved in the implementation of Cuban policy at the U.S. Department of State as the Deputy Assistant Secretary for Western Hemisphere Affairs, overseeing the Office of Cuban Affairs. Then, from 2005 to 2009, Mr. Fisk was the Special Assistant to the President and Senior Director of Western Hemisphere Affairs of the National Security Council in the Executive Office of the President. Mr. Fisk is an expert on U.S. policy toward Cuba and the LIBERTAD Act—he has written extensively on the subject and has been published numerous times for his work in the space.[2]

Appellants and their supporting *amici's* characterization of the purpose and interpretation of the Act are incompatible with Congress'

---

[2] *See, e.g.*, Symposium, *The Cuban Embargo: Policy Outlook After 50 Years*, Occasional Paper Series 10, UNIV. GA. SCH. L. (2014), https://digitalcommons.law.uga.edu/rusk_oc/10/; Daniel Fisk & Courtney R. Perez, *Managed Engagement: The Case of the Castro's Cuba*, 42 U. MIAMI INTERN-AM. L. REV. 47 (2010); Daniel W. Fisk, *Foreign Claims*, 33 INT'L L. 493 (1999); Daniel W. Fisk, *Cuba in U.S. Policy: An American Congressional* Perspective, *in* CAN., THE US & CUBA HELMS-BURTON & ITS AFTERMATH (1999).

intent. Their interpretation disparages the hard-won bipartisan consensus that resulted in the passage of the LIBERTAD Act.

Mr. Fisk, as *amicus*, respectfully submits this brief to offer the Court his unique perspective on the purpose, substance, and deterrent nature of the Act, and to explain the Act's role as part of longstanding U.S. policy to deny resources to Cuba's Communist regime and to protect the fundamental rights of U.S. claimants harmed by the regime's unlawful takings of their property. Mr. Fisk is in favor of affirmance and is interested in the fair and proper application of the Act, consistent with the intent of Congress.

## STATEMENT OF THE ISSUE

Whether the District Court properly held that Appellants are liable under the LIBERTAD Act for "trafficking" Appellee's property knowing that Appellee held a certified claim since 1971 for the Cuban Communist regime's confiscation of Appellee's property?

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Havana Docks is one of many U.S. nationals deprived of its fundamental right to own and enjoy their property in Cuba by Cuba's Communist regime. To collect and adjudicate the property claims of U.S. nationals against foreign governments, the United States established the Foreign Claims Settlement Commission (FCSC). Richard E. Feinberg, *Reconciling U.S. Property Claims in Cuba: Transforming Trauma into Opportunity,* LATIN AM. INITIATIVE AT BROOKINGS (2015), chromeextension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.broo kings.edu/wp-content/uploads/2016/07/Reconciling-US-Property-Claims-in-Cuba-Feinberg.pdf. The FCSC is a quasi-judicial body that offers an avenue for U.S. nationals to receive compensation for their claims. *See id.*

In 1967, Havana Docks filed a claim with the FCSC, and in 1971 it was awarded a certified claim in the amount of $9.179 million. *See* DE 331-14; DE 1-1, at 4.[3] The certified claim recognized the property confiscated as "the construction and operation of wharves and warehouses in the harbor of Havana . . . [including] the real property with

---

[3] All docket cites correspond to Case No. 19-23591.

all improvements and appurtenances" where the terminal was located. *See* DE 1-1, at 8–9. At the time of confiscation, Havana Docks held a 99-year concession to the property. *See* DE 73-4, at 3–4.

In 1996, the LIBERTAD Act, which sought to increase sanctions against the Castro government, support the transition of Communist Cuba to a democratically elected government, and protect U.S. nationals against the Cuban government's unlawful taking of property, was passed into law. Title III of the Act created a broad private right of action allowing U.S. nationals to sue for the "trafficking" of their confiscated property in Cuba. Title III was an extension of the FCSC's claims process and provided additional protections to claimholders.

From 2015 to 2019, Appellants—despite being on notice of Havana Docks' certified claim—continuously used the piers where the terminal was located without Havana Docks' permission. Subsequently, after the suspension was lifted, Havana Docks brought suit against the Appellants in the U.S. District Court for the Southern District of Florida, which held Appellants liable for trafficking Havana Docks' property and assessed damages.

The District Court correctly applied the LIBERTAD Act consistent with the intent of Congress. Havana Docks' claim reaches the core purpose of the LIBERTAD Act's private remedy: to deter the injection of private equity into the Cuban Communist regime by providing a remedy to claimants, like Havana Docks, whose confiscated property was used without their consent.

# ARGUMENT

## I.    Havana Docks' Claim Goes to the Heart of the LIBERTAD Act's History, Purpose, and Text.

Article I, Section 8 of the U.S. Constitution provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations." U.S. CONST. art. I, § 8, cl. 3. The Foreign Commerce Clause is one of Congress' most fundamental powers: the Supreme Court has described the power as broad, "exclusive[,] and plenary." *See Board of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 56 (1933).

Under that power, on March 12, 1996, Congress passed the LIBERTAD Act. 22 U.S.C. §§ 6021–6091. The Act strengthened international sanctions against the Castro regime, encouraged free and fair democratic elections in Cuba, and sought to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." *Id.* § 6022(6).

The Act has four primary sections (Title I–Title IV). *See id.* §§ 6021–6091. Titles I and II codified several policies related to Cuba, including the enforcement and conditions for termination of the U.S. embargo of Cuba. However, "[t]he most important element of [the] legislation is contained in title III," which "created a new right of action that allows

8

U.S. nationals to sue those who are exploiting their confiscated property in Cuba." 141 CONG. REC. S14998 (Oct. 11, 1995) (statement of Senator Jesse Helms). Title IV permits the United States to exclude noncitizens who confiscate or traffic the property of U.S. nationals.

Title III also gave the executive branch the power to suspend the private right of action. *See* 22 U.S.C. § 6085. Every President since passage exercised that suspension power until April 17, 2019, when Secretary of State Mike Pompeo, under President Donald J. Trump's direction, ended the suspension of the right to sue. *See Cuba: Title III FAQs (LIBERTAD)*, U.S. DEP'T STATE, https://www.state.gov/cuba-title-iii-faqs-libertad/.

 Once the suspension was lifted, Havana Docks was afforded the opportunity to seek the relief and protection that Congress intended to offer under Title III. Havana Docks' action in this case is a quintessential exercise of the remedy provided by the LIBERTAD Act. As the District Court correctly recognized, the Act's history, purpose, and text leave no question that Appellants, who knew Havana Docks held a certified claim for the confiscation of its property since 1971, are liable to Havana Docks for "trafficking" its confiscated property.

### A. The Historical Context of the LIBERTAD Act Showcases How the Act is Part of Longstanding U.S. Policy to Deny Resources to Cuba's Communist Regime.

In 1961, then-Prime Minister Fidel Castro declared that Cuba was a socialist state and aligned Cuba with the former Soviet Union. In response, Congress enacted the Foreign Assistance Act, which in part provides that no assistance shall be furnished to the government of any country unless the President determines that such country is not subject to control by the international Communist movement, and that no assistance would be provided to the government of Cuba. *See* 22 U.S.C. § 2370(a)(1). The Act authorized the President "to establish and maintain a total embargo upon all trade between the United States and Cuba." *Id.*

In 1962, President Kennedy proclaimed the embargo, which has remained in place now for more than sixty years—during which time Cuba has remained a Communist country. *See* U.S.-Cuba Relations, COUNCIL ON FOREIGN RELS. (2023), https://www.cfr.org/timeline/us-cuba-relations. Subsequently, following the Cuban Missile Crisis, the Cuban Asset Control Regulations were developed under the congressional authority provided to the President by the Trading with the Enemy Act.

10

In 1992, Congress passed the Cuban Democracy Act, reaffirming bipartisan congressional oversight of and policy direction to the President and executive branch on U.S. policy toward Communist Cuba. *See Researching Cuba: Business, Economy, and U.S. Relations*, LIBR. OF CONG., https://guides.loc.gov/cuba-business-economy/legislation-actions.

In 1995, Senator Helms introduced the LIBERTAD Act to address the continuing threat Cuba posed to the United States, the hemisphere, and the Cuban people, as well as to deter the Havana regime's use of confiscated American properties to replace lost Soviet subsidies. *See* 22 U.S.C. §§ 6021–6091.

In 1996, Cuba shot down two Brothers to the Rescue planes, killing three Americans and a U.S. resident. *See* Andreas F. Lowenfeld, *Congress and Cuba: The Helms-Burton Act*, 90 AM. J. INT'L L. 419–434 (1996). That tragic moment expedited Congress' enactment of the LIBERTAD Act, which codified the Cuban embargo and required it to remain in place until the President certifies that Cuba has transitioned from a Communist regime to a democratically elected government. *See id.*; 22 U.S.C. § 6032(h).

11

The "consistent policy of the United States towards Cuba since the beginnings of the Castro regime . . . has sought to keep faith with the people of Cuba, and has been effective in sanctioning the totalitarian Castro regime." 22 U.S.C. § 6021(1). The Act did not put the actions of Congress in uncharted territory. Simply put, it built on and strengthened existing congressional policy of sanctioning the Castro regime and supported the transition of Communist Cuba to a democracy.

### B.  The Purpose of the LIBERTAD Act Was Intentionally Inserted into the Text of the Statute and Would Be Seriously Undermined if Havana Docks is Deprived of Relief.

The LIBERTAD Act sets forth important findings of Congress and makes abundantly clear the purpose of each provision. The stated purposes of the Act are further corroborated and explained by several of the drafters' committee and floor statements and official Congressional Reports.

According to Congress' findings, since Castro took over Cuba, which at the time of the LIBERTAD Act's passage had been around 37 years, the "economy in Cuba ha[d] experienced a decline of at least 60 percent." 22 U.S.C. § 6021(1). Further, the "repression of the Cuban people, including a ban on free and fair democratic elections, and continuing violations of

fundamental human rights, ha[d] isolated the Cuban regime as the only completely nondemocratic government in the Western Hemisphere." *Id.* § 6021(4). The United States considered it a "deep commitment" and "moral obligation" to "promote and protect human rights and fundamental freedoms as expressed in the Charter of the United Nations and in the Universal Declaration of Human Rights." *Id.* § 6021(9).

Communist Cuba was not only detrimental to the people of Cuba, but also to U.S. nationals who held property interests in the country. The Castro regime "confiscated the property of . . . thousands of United States nationals." *Id.* § 6081(3). Congress found that such confiscations "and the subsequent exploitation of that property at the expense of the rightful owner, undermines the comity of nations, the free flow of commerce, and economic development." *Id.* § 6081(2). Significantly, Congress found that such trafficking and exploitation of property belonging to U.S. nationals, "provides badly needed financial benefit, including hard currency[,] . . . to the current Cuban Government and thus undermines the foreign policy of the United States." *Id.* § 6081(6).

Because Congress' findings are set forth directly in the text of the Act itself—it is difficult to distort the intent of Congress. One of the major

13

purposes of the law was to protect U.S. nationals against confiscatory takings and the wrongful trafficking in their property, *see id.* § 6022(6), thereby deterring the use of confiscated property to fund Communist enterprise after the loss of the Soviet Union's patronage in the 1990s.

The drafters' committee and floor statements and official Congressional Reports reinforce this purpose. The House Report on H.R. 927 stated:

> Title III and IV seek to protect the interests of U.S. nationals whose property has been confiscated illegally by making persons or companies that knowingly and intentionally traffic in confiscated property of U.S. nationals in Cuba (beginning six months after the date of enactment) liable for damages in U.S. District Court (title III), and by excluding from entry into the United States any person who traffics in confiscated property of U.S. nationals (title IV). These provisions are intended primarily to create a 'chilling effect' that will deny the current Cuban regime venture capital, discourage third-country nationals from seeking to profit from illegally confiscated property, and help preserve such property until such time as the right owners can successfully assert their claim.

H. REP. NO. 104-202(1), at 25 (1995).

Senator Helms, the primary Senate sponsor of the Act, added a similar statement regarding Title III of the Act:

> This new civil remedy will also discourage persons and companies from engaging in commercial transactions involving confiscated property, and in so doing deprive Cuba's

14

> Communist Elite of the Capital—the cash money—which they
> need to perpetuate their exploitation of the people of Cuba.

141 CONG. REC. S14998 (daily ed. Oct. 11, 1995) (statement of Sen.

Helms). Congressman Robert Torricelli added the following perspective

as to why the United States and Congress had to intercede and create an

avenue for U.S. nationals to seek relief:

> We will give the right to sue in an American court to a
> citizen who has lost their property, not because they should
> not have the right legitimately, appropriately, to take that
> suit to a Cuban court. That is the real answer, that is the right
> answer, but Castro will not let them in the court. If he would,
> we would not be here tonight.

141 CONG. REC. H950 (daily ed. Sept. 20, 1995) (statement of Rep.

Torricelli).

The deterrent and remedial purpose of the Act has come to fruition

since President Trump lifted the suspension. The Cuban government has

felt the monetary "chilling effect" and has repeatedly pleaded for

President Biden to suspend the private right of action. *See Presentation*

*by Carlos Fernandez de Cossio, Deputy Minister for Foreign Affairs of*

*Cuba*, REPRESENTACIONES DIPLOMÁTICAS DE CUBA EN EL EXTERIOR (Dec.

21, 2022), https://misiones.cubaminrex.c   u/en/articulo/presentation-

carlos-   fernandez-de-cossio-deputy-minister-foreign-affairs-cuba ("The

President of the United States could also have suspended the possibility of taking actions in U.S. courts on lawsuits brought under Title III of the Helms-Burton Act. This has a deterrent impact on our developmental purpose of attracting foreign capital.").

There is only one explanation for this: the deterrent effect of the LIBERTAD Act works. Cuba's repeated pleas validate this. That said, the deterrent effect is most impactful when the remedy provided by Congress is enforced.

In this case, Appellants' actions exemplify what Congress sought to deter through the LIBERTAD Act. Appellants, which are cruise lines in the tourism industry, exploited Havana Docks' confiscated property for four years in order to promote what can only be properly understood as tourism to Cuba. In doing so, they significantly aided in the funding of the Communist regime contrary to U.S. policy as clearly expressed by Congress, and in contravention of the fundamental rights of Havana Docks, a U.S. national with a certified claim stemming from the confiscation of its property.

The LIBERTAD Act was meant to hold companies like Appellants responsible when they traffic in confiscated property. Holding them

responsible sends the message that Congress meant what it wrote and that the Act provides an effective remedy for trafficking. If Havana Docks does not have a claim here, it is hard to imagine a plaintiff who would.

**C.    The Text of the LIBERTAD Act Deliberately Provides a Broad Private Right of Action for Claimholders, Like Havana Docks, Against Companies, Like Appellants, who "Traffic" Property Confiscated by the Cuban Communist Regime.**

Congress knew the interpretation of provisions of the LIBERTAD Act would be left to the discretion of the courts. With that in mind, Congress—in the text of the Act—provided courts with a clear direction on the property interests protected, the handling of certified claims, and the calculation of damages.

> ### *i.    Havana Docks' Concession is Protected Under the Act, Regardless of Its Original Expiration.*

"Individuals enjoy a fundamental right to own and enjoy property which is enshrined in the Unites States Constitution." 22 U.S.C. § 6081(1). The LIBERTAD Act broadly defines the term "Property" as "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest." *Id.* § 6023(12). Congress drafted such

17

a broad definition in order to protect any U.S. national with *any* property interest. Whether it be a fee simple interest or a concession, the Act provides the same protection.

Appellants' attempt to slice and dice Havana Docks' property interest misses the mark entirely. They focus on the irrelevant fact that their exploitation of the property occurred after Havana Docks' concession was slated to expire. Appellants point to nothing suggesting that Congress meant to limit the trafficking remedy simply because the property interest, but for the confiscation, might or would expire at some point in the future. Such a conclusion certainly runs afoul of the deterrence that Congress intended.

As a matter of common sense, the duration of Havana Dock's concession became meaningless when the Castro regime confiscated its property. What matters is that Havana Docks held an interest in the property *at the time of the confiscation*. And who is to say that the concession would have actually expired and not been renewed in favor of Havana Docks but for the confiscation?

Havana Docks holds a certified claim stemming from the confiscation of its property. That claim contains no expiration. Any

18

interest Havana Docks has in the property is evidenced by the claim, which operates as the focal point of determining recovery under the Act, as explained below.

### ii. *Havana Docks Is a Certified Claimholder, Which Created a Presumption of Validity and Justifies a Heightened Damages Award.*

Title II of the LIBERTAD Act requires the Secretary of State to report to Congress on the status of claims to property confiscated by the Cuban government. *See* 22 U.S.C. § 6067. Congress placed a high priority on the potential resolution of these property claims: "It is the sense of Congress that the satisfactory resolution of property claims by a Cuban Government recognized by the United States remains an essential condition for the full resumption of economic and diplomatic relations between the United States and Cuba." *Id.* § 6067(d).

The design of the LIBERTAD Act was meant to build on the claims process that already existed with the FCSC, and to ensure that *all* certified claimholders had a right of action under Act. Appellants suggest that some certified claimholders would not have a right of action under Title III. However, that could not be further from the drafters' intention: the definition of U.S. national was written to encompass *all* certified

claimholders, both natural persons and corporations. *See* H.R. REP. NO. 104-468, at 63 ("The committee of conference recognizes the importance of a decision by the Foreign Claims Settlement Commission in certifying a claim and, accordingly, believes that no court should dismiss a certification in an action brought under [Title III].").

Congress aimed at protecting certified claimholders in two primary ways: (1) declare a presumption in favor of certified claims, and (2) increase the liability for trafficking in property that is subject to a certified claim. *See id.* §§ 6082(a)(2)–(3). The presumption ensures that certified claimholders do not have to go through the process of proving their property claim all over again, and that courts do not have to decipher Cuban property law.

Further, Congress increased the liability for trafficking property subject to a certified claim because the claim put the entire world on notice: "The committee of conference notes that investors in Cuba have been effectively on notice regarding the 5,911 certified U.S. claims since the Cuban claims program was completed on July 6, 1972. Information regarding whether the claim to a particular property in Cuba is held by a certified U.S. claimant is readily available. The intent of the conference

20

committee in revising the House language is to provide priority to certified claimants by allowing them to seek treble damages without an additional notice or an additional waiting period (beyond the initial 3-month grace period)." H.R. REP. NO. 104-468, at 59 (1996).

The inclusion of treble damages was not an accidental decision of Congress. Treble damages reflect Congress' conviction that trafficking in confiscated property in Cuba is a serious transgression that bolsters a repressive and hostile foreign government. Congress' intention was to create a strong deterrent for actions like Appellants' in this case.

Havana Docks has been a certified claimholder since 1971. When Appellants engaged in the exploitation of its property, they were on notice of its claim. Havana Docks is the exact plaintiff the LIBERTAD Act aimed at protecting, and the fact it was a certified claimholder only strengthened Havana Docks' remedy. As the District Court properly held, Appellants' gamble for profit has consequences under the LIBERTAD Act—and the failure to enforce such liability would render the Act futile.

### iii.     *Appellants Do Not Qualify for Immunity from "Trafficking" Liability Provided for Under the Act.*

Two potential avenues to obtain immunity from "trafficking" liability under the LIBERTAD Act are: (1) authorization and (2) the

"lawful travel" exemption. However, Appellants are not eligible for either.

Authorization—from a U.S. national who holds a claim to the property—to use and enjoy the confiscated property, provides complete immunity from "trafficking" under the Act. 22 U.S.C. § 6023(13)(A). In this case, none of the Appellants sought authorization from Havana Docks. Instead, they sought legal advice to assess their potential liability for their unauthorized use of the property. *See generally* DE 318-41. Despite being advised that the "scope of Title III has potentially very broad implications," and that their use of the property could constitute a "violat[ion] [of] 'trafficking' under the Act," Appellants followed through with their business plan. *Id.* at 84–85.

The Act exempts "lawful travel" from the definition "traffics." *See* 22 U.S.C. § 6023(13)(B)(iii) (exempting "transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel"). The "lawful travel" exemption must be viewed in light of the LIBERTAD Act's codification of the Cuban embargo "as in effect on March 1, 1996." Congress codified "all restrictions under part 515 of title 31, Code of

Federal Regulations," which "shall be in effect on March 12, 1996, and shall remain in effect," subject to the termination of the embargo as provided in Section 6064 of the Act. *See* 22 U.S.C. § 6032(h).

This codification provision was critical; it reflected concern that the executive branch, namely the Office of Foreign Assets Control (OFAC), might relax the existing Cuban embargo. Congressman Lincoln Diaz-Balart highlighted this point:

> The conference report codifies, it puts into law, the existing embargo against Cuba, much of which exists only in regulations and miscellaneous executive orders. It will now take an act of Congress to modify the embargo, and no President will be able to weaken the embargo unless a democratic transition is underway in Cuba . . . . The importance of codifying—putting into law—the embargo, cannot be over-emphasized.

142 CONG. REC. H1724-04 (daily ed. Mar. 6, 1996) (statement of Rep. Diaz-Balart).

Congress was particularly concerned the executive branch might relax the embargo to allow tourism which would provide a lifeline to Cuba's government. A Senator Helms stated:

> What Castro has to offer is Cuban beaches. That is it. And allowing Americans to sit on a Cuban beach does not do anything for the Cuban people who are oppressed and from whom we hear daily pleas to enact the Libertad bill. The Cuban people inside of Cuba and also the Cuban people in

exile in the United States and elsewhere unanimously, as far as I know, favor the pending bill. Tourism, of course, is one of Fidel Castro's most important sources of hard currency, and for years and years Castro has lured foreigners to Cuba. This has not resulted in any liberalizing of his regime. It has instead resulted in less freedom and worse living circumstances for the Cuban people. Old Fidel, he is ugly, and he is blunt, and he is rough, and he is cruel, but he is not dumb. He knows the value of tourism for his regime. As a matter of fact, if he does not get hard cash from tourism and other aspects of operations, down he goes. And that is the point. We want him to go down. We want to be rid of him. We want the Cuban people to be rid of him so that they can establish a democratic government there that they have not had in a long, long time.

Proceedings & Debates on Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1995, 141 CONG. REC. S15320-01 (daily ed. Oct. 19, 1995) (statement of Sen. Helms).

At the time, the Executive was not in favor of the limitation on its foreign affairs discretion, and the ultimate compromise was to include the codification of the embargo but give the executive Title III suspension power in exchange. *See The Cuban Embargo: Policy Outlook After 50 Years*, at 36–37 ("The president wanted authority to waive the Title III right of action provision, and he received that authority from Congress. In exchange, Congress wanted the restrictions in place as of March 1st, 1996, codified. The executive branch representatives, again, fully

24

empowered to speak for and make commitments on behalf of the executive agreed to that deal.") (statement of Daniel W. Fisk).

The LIBERTAD Act's codification of the embargo is clear. All restrictions in place as of March 1, 1996, are in place under the Act and cannot be relaxed without congressional authority. Any interpretation that the LIBERTAD Act permits the executive branch to relax the embargo's travel restrictions ignores (1) that the Act codified the embargo's "restrictions" rather than any presidential authority to change them, and (2) the agreement reached between the executive and Congress that codified the embargo as of March 1, 1996, in exchange for the President's suspension power under Title III. The conference report shows that the intent was that economic sanctions on Cuba could be tightened or strengthened, but not relaxed without compliance with the LIBERTAD Act's requirement of a presidential certification that a transition to a democracy in Cuba is under way. *See id.* at 39; H.R. REP. NO. 104-468, at 44–46.

Appellants and their supporting *amici* all similarly argue that Appellants' decision to bring their cruise customers on a vacation to Cuba and exploit Havana Docks property was lawful because they did so under

25

the lead of President Obama. However, this argument fails for two primary reasons.

First, Cuban policy is not within the sole discretion of the executive branch. OFAC operates only under statutory authority from Congress, which has exclusive authority to regulate commerce with foreign nations under the Constitution. Any decision by the executive branch to flout the LIBERTAD Act and proceed as if the Act did not codify the embargo, does not make it legal.

Second, the law has remained clear: all tourism in Cuba is unlawful and all economic activity in Cuba is unlawful unless authorized. *See* 31 C.F.R. § 515.201, 560(a)(2), 560(b)(2); DE 365-11 (1996 CACR). The District Court correctly explained why Appellants' travel to Cuba was considered tourism and did not qualify as lawful travel under the federal regulations and the LIBERTAD Act. *See* DE 477. In short, Appellants, which exist only because they are in the tourism industry, brought many tourists on their cruise ships and those customers took cruise-sponsored shore tours, including tours of night clubs and cabarets. This was unlawful tourism in violation of the Cuban embargo. *See id.*

26

The District Court correctly applied the LIBERTAD Act and assessed the proper amount of damages, and Appellants do not qualify for any privilege that would afford them immunity from such damages.

## CONCLUSION

As a member of the congressional staff team who played a substantial role in the drafting and passing of the LIBERTAD Act, Mr. Fisk strongly urges this Court to affirm the District Court's decision and hold Appellants responsible for "trafficking" the property that is the subject of Havana Docks' certified claim since 1971.

Dated: October 6, 2023                    Respectfully submitted,

                                          *s/Marcos Daniel Jiménez*
                                          Marcos Daniel Jiménez
                                          León Cosgrove Jiménez, LLP
                                          255 Alhambra Circle, 8th Floor
                                          Miami, Florida 33134
                                          Telephone: (305) 740-1991
                                          mjimenez@leoncosgrove.com

                                          *Counsel for Amicus Curiae*

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,967 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f). Further, this brief complies with the typeface requirements of Rule 32(a)(5)-(6), because it has been prepared in a proportionately spaces typeface using Microsoft Word in Century School Book font size 14.

*s/Marcos Daniel Jiménez*
Marcos Daniel Jiménez

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2023, I filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit, using the CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Marcos Daniel Jiménez*
Marcos Daniel Jiménez